**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| FAIRPLAY ELECTRIC CARS, LLC | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v | ) |
| | ) C.A. No. 06-60 (JJF) |
| TEXTRON INNOVATIONS, INC. and | ) |
| TEXTRON, INC. (including its E-Z-GO | ) |
| Division) | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS, TRANSFER OR STAY SECOND-FILED**
**DECLARATORY JUDGMENT ACTION**

OF COUNSEL:

Craig N. Hentschel
Jeffrey W. Deane
DYKEMA GOSSETT PLLC
333 South Grand Avenue
Suite 2100
Los Angeles, CA  90071
(213) 457-1800

Allan J. Sternstein
Timothy M. Morella
DYKEMA GOSSETT PLLC
10 South Wacker Drive
Suite 2300
Chicago, IL  60606
(312) 876-1700

Dated:  April 18, 2006
728528 / 29987

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE  19899-0951
Telephone:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Plaintiff*
*Fairplay Electric Cars, LLC*

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

I.     NATURE AND STAGE OF PROCEEDINGS ........................................................1

II.    SUMMARY OF ARGUMENT ...............................................................................1

III.   FACTUAL BACKGROUND ...................................................................................1

IV.    ARGUMENT ............................................................................................................6

      A.    THE COURT SHOULD NOT, IN ITS DISCRETION,
           DECLINE JURISDICTION TO RESOLVE THE
           PRESENT, SEPARATE DISPUTE.........................................................6

      B.    THIS COURT HAS JURISDICTION. ....................................................6

      C.    THE PRESENT CASE IS NOT A MIRROR-IMAGE
           "SECOND-FILED" ACTION. ...............................................................9

      D.    TRANSFER IS NOT APPROPRIATE. ...................................................9

V.     CONCLUSION........................................................................................................11

# TABLE OF AUTHORITIES

**CASES**                                                             **Page(s)**

*Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.*,
  846 F.2d 731 (Fed. Cir. 1988)....................................................................6, 7, 9

*BP Chemicals Ltd. v. Union Carbide Corp.*,
  4 F.3d 975 (Fed. Cir. 1993)..............................................................................6

*Cardinal Chemical Co. v. Morton Int'l, Inc.*,
  508 U.S. 83 (1993)............................................................................................8

*Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.*,
  342 U.S. 180 (1952)..........................................................................................1

*Smith v. Colonial Penn Insurance Company*,
  943 F. Supp. 782 (S.D. Texas 1996)..............................................................10

*Super Sack Mfg. Corp. v. Chase Packaging Corp.*,
  57 F.3d 1054 (Fed. Cir. 1995)...........................................................................8

*Vanguard Research, Inc. v. Peat, Inc.*,
  304 F.3d 1249 (Fed. Cir. 2002)......................................................................7, 8

## I.    NATURE AND STAGE OF PROCEEDINGS

On January 30, 2006, Plaintiff ("Fairplay") filed its Complaint (D.I. 1) against

Defendants (collectively, "Textron"). On February 21, 2006, Textron filed a Motion to

Dismiss, Transfer or Stay Second -Filed Declaratory Judgment Action (D.I. 8). This is

Fairplay's Answering Brief in Opposition to Textron's Motion.

## II.    SUMMARY OF ARGUMENT

The Supreme Court has cautioned against "rigid mechanical solution[s]" to

questions of forum. *Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.*, 342 U.S. 180,

183 (1952). In the present action, too, no such rigid mechanical solutions should be

applied. This action is against Delaware defendants and is an action that is separate and

distinct from the action pending in Georgia. This action is also brought under

circumstances for which the Declaratory Judgment Act was established – to clear

Plaintiff's products from any allegations or innuendo of infringement – and should be

allowed to go forward and resolve the existing dispute.

## III.    FACTUAL BACKGROUND

Textron filed suit against Fairplay in Augusta, Georgia, where Textron's E-Z-Go

Division is a major employer, alleging that Fairplay's Fleet, Legacy, and Legacy LX

model electric golf cars infringed various design patents. Textron also filed for a

preliminary injunction, seeking to enjoin the Fleet model golf car, expressly stating in

their supporting memorandum:

> Fairplay offers several golf car models … including the Fleet, Legacy, and
> Legacy LX.   …  E-Z-GO's motion for a preliminary injunction seeks to
> enjoin sale of Fairplay's *Fleet* golf car (hereinafter "Fairplay golf car").

(Textron's Georgia Brief, p.8, Ex. A hereto, emphasis added).

The present action, on the other hand, involves different and distinct products being sold by Fairplay – its 2007 ZX model cars. With different products, the issues are also different in the two cases.

The *preliminary* ruling in Georgia, furthermore, is not final, and is not a finding of clear and intentional copying, of design patent infringement, and of trade dress infringement as Textron alleges and infers throughout its motion. Textron filed the Georgia action on January 17, 2006. On Wednesday, January 18, the Court entered an *ex parte* Order setting an evidentiary hearing on the preliminary injunction motion for the following Monday, January 23. As referenced above (and contrary to Textron's Memorandum here that it "immediately moved for a preliminary injunction against Fairplay's *Legacy* and Fleet model golf cars" (pp. 3-4, emphasis added)), that preliminary injunction motion was solely directed to the Fleet model car. The alleged basis for the expedited hearing, furthermore, was "[d]ue to Fairplay's scheduled attendance on January 26-29, 2006, at the PGA Merchandise Show in Orlando, Florida and again on February 9-11, 2006 at the Golf Industry Show in Atlanta, Georgia." (Textron's Georgia Motion, p. 1, Ex. B hereto). Fairplay was not served with the Georgia Complaint until Thursday, January 19, 2006, less than two business days before the scheduled Monday evidentiary hearing.

Fairplay, as it informed the Court in Georgia, had been selling its Fleet model car for about a year, and Textron had known about that car and had taken photographs of it for use in its preliminary injunction motion as early as October, 2005. Of greater significance, Fairplay was not showing or marketing its Fleet model electric golf car at the upcoming trade shows. Accordingly, Fairplay sought a continuance for what was

2

clearly not an emergency matter. (Fairplay's Georgia Motion, Ex. C hereto; Transcript of Proceedings, Ex. D hereto).

Notwithstanding the lack of any emergency, the Georgia Court proceeded with the evidentiary hearing on Monday, January 23, on Textron's Motion for a Preliminary Injunction. Textron had witnesses there, including an expert witness with his completed 29-page expert report. Fairplay, not having had time to prepare for an evidentiary hearing or even obtain an expert, had none. (*Id.*)

In accordance with its Motion, Textron offered into evidence at the evidentiary hearing photographs taken of Fairplay's Fleet model golf car, and presented testimony on the Fleet model car. Textron also brought a Fleet model car and its own car to the courthouse which were shown to the judge (in private and without allowing counsel to be present). There were no photographs taken or shown to the court of a Legacy model car, there was no testimony presented on a Legacy model car, and there was no Legacy model car brought to the courthouse. In his closing argument, Textron's counsel asked the Court, nevertheless, to issue an injunction to include the "Fleet and Legacy" cars. The Court's Order did so. (*Id.*; Order, Ex. E hereto). Without Fairplay having any opportunity to present its case, however, the findings of the Court were preliminary and the injunction of limited duration (*Id.*). Further rulings of the Court in Georgia have not been forthcoming.

In presenting its case in Georgia, Textron based its allegations of design patent infringement on numerous features *admittedly functional* and *not* shown in the design patent in suit. Its lead-off witness, Mr. Bruntz, for example, testified on comparing the location of mounting holes on the underside of the seat, the location of hinges under the

3

seat, mounting holes under the dashboard, a key switch, mounting holes for the brushguard underneath the front of the car, and such other functional items. Textron's motion for preliminary injunction relied upon these same features (Textron's Georgia Brief, pp. 12-26, Ex. A hereto). Mr. Bruntz also admitted, however, that none of these details are shown in Textron's asserted design patent (Transcript of Proceedings, pp. 38-43, Ex. D hereto), and Textron's expert witness admitted that "[a]ll of his [Mr. Bruntz's] testimony was dealing with functional aspects." (*Id.*, p. 60). This is the alleged "copying" and part of the alleged support and bases for design patent infringement in the Georgia action.

Errors seen in the Georgia Court's proceedings and rulings, including those referenced above and others, are set forth in more detail in the attached memorandum of Fairplay presented to the Court in Georgia. (Fairplay's Georgia Memorandum, pp. 2-12, Ex. F hereto). In short, and as referenced above, it is respectfully submitted that there has been no appropriate findings of copying or infringement of the patented design by Fairplay's Legacy and Fleet model cars as alleged by Textron in its motion. Issues of trade dress and willfulness, that Textron infers were decided (Textron's Memorandum, at, *e.g.*, pp. 3, 5), were not even addressed in the Georgia proceedings.

In late January, Fairplay introduced its new 2007 ZX electric golf car at the trade show in Florida, where the car was seen and studied by Textron personnel. Textron has acknowledged that the ZX car is not part of the Georgia action (and, thus, not part of the injunction issued in that action) (*see, e.g.*, Textron's Memorandum, pp. 2, 12-15), it has acknowledged that it has not alleged the ZX car infringes its patents (*Id.*), and Textron

did not seek to add the ZX car to the Georgia action. It is the ZX car, on the other hand, that is involved in the present suit.

Upon Fairplay's introduction of its ZX car, Textron's counsel wrote threatening letters to its own dealers who were also selling Fairplay cars.[1] Those letters flaunted the Georgia Court's order and, through vague and indefinite language and innuendo,[2] implied that the ZX cars were an infringement and/or could not be sold. The letters vaguely referred to "related vehicles from the Fairplay product lines;" that E-Z-GO brought suit against the distributor of "these products;" to the Georgia Court's vague reference to "equivalent cars" and that "these Fairplay vehicles" were found to infringe E-Z-GO's intellectual property; and cautioned that the E-Z-GO distributors could somehow "inadvertently participate in the Court restricted sale or offer for sale of Fairplay vehicles." In short, through limited information and vague references, sent out just when Fairplay was introducing its new ZX model cars, Textron's letters appear designed to confuse the customers and to stifle competition.

---

[1] *See* Brock Declaration, ¶ 3 (and exemplary letter referenced therein), Ex. G hereto.

[2] As already evident from Textron's Memorandum, its counsel are prone to unsupported statements and exaggeration. In their supporting Memorandum, for example, they loosely state that the Court in Georgia found the Legacy model car was a knock-off (Textron's Memorandum, p. 1), when no testimony was provided on the Legacy car, no photographs were taken of that car, and that car was not shown to the Court; they similarly state that the present case is a "mirror-image action" (Textron's Memorandum, p. 2), when it is clearly addressing different products, different proofs and is not a mirror-image action; they conjure negative connotations in stating that Fairplay's counsel "declined to produce" or were "unwilling" to show product literature on the ZX car when, as evident from the transcript, it was simply a matter of literature on the ZX car, which was not involved in the Georgia proceedings, was not brought to those proceedings and available to show; and, simply to cast aspersions and speculation, flaunt Fairplay's name change and characterize it as "sudden" when the name change is not relevant to any issue before the court and Textron admittedly has no knowledge about how or why the change occurred (Textron's Memorandum, p.7).

## IV.    ARGUMENT

### A.    The Court Should Not, in its Discretion, Decline Jurisdiction to Resolve the Present, Separate Dispute

A purpose of the Declaratory Judgment Act, as referenced in Defendants'
Memorandum, is to resolve disputes without having to await the commencement of
litigation. It accommodates the practical situation wherein the interests of one side to the
dispute may be served by delay in taking legal action. (Textron's Memorandum, p.9,
citing *BP Chems. Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 977 (Fed. Cir. 1993)). As
stated by Chief Judge Markey of the Federal Circuit, before the Declaratory Judgment
Act was enacted, patentees could engage in "scare-the-customer-and-run tactics that
infect the competitive environment . . . with uncertainty and insecurity." But, after the
Act, the DJ plaintiff could "clear the air by suing for a judgment that would settle the
conflict of interests." *Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.*, 846 F.2d
731, 735 (Fed. Cir. 1988).

The above scenario is exactly what is happening here. Textron can delay taking
any legal action on the ZX cars, yet publish vague and threatening "scare-the-customer-
and-run" letters to purchasers of Fairplay products, inferring that the resale of those
products can lead to the loss of an E-Z-GO dealership and monetary damages.

The purpose of the Declaratory Judgment Act is being served by Fairplay being
able to bring this action, having the present dispute heard before this Court, and clear the
air and settle the conflict of interests between the parties.

### B.    This Court Has Jurisdiction

Contrary to Defendants' arguments and bold text (*see, e.g.*, Textron's
Memorandum, p. 2), it is *not* necessary for Textron to have charged the 2007 ZX car with

6

infringement for there to be a reasonable apprehension of suit, an actual controversy, and subject matter jurisdiction. *See, e.g., Vanguard Research, Inc. v. Peat, Inc.*, 304 F.3d 1249, 1254 (Fed. Cir. 2002) ("Although the best evidence of a reasonable apprehension of suit comes in the form of an express threat of litigation, an express threat is not required"), *see, also, Arrowhead Industrial Water, supra,* at 738 ("a court may find a clear basis for a reasonable apprehension in all the circumstances, even when a patentee first learns of plaintiff's conduct upon receipt of the [declaratory judgment] complaint"). As stated *Arrowhead*, "[b]asically, the test [for declaratory judgment jurisdiction] requires two core elements: (1) acts of defendant indicating an intent to enforce its patent; and (2) acts of plaintiff that might subject it or its customers to suit for patent infringement." (*Id.*, at 737). Both of these elements are met here.

Clearly, Textron has shown an intent to enforce its patents. As referenced above, Textron has already sued Fairplay once on their patents over different products; and has informed Fairplay's customers that Fairplay is using Textron's designs without permission, even telling Fairplay's customers that they may be subject to compensation for damages if they sell "Fairplay vehicles." Textron's repeated statements that it has not yet charged Fairplay with infringement, on the other hand, is to no avail. In *Vanguard, supra*, there was prior litigation filed on the same technology, and contacts with customers that supported a reasonable apprehension of suit. The Court stated, in particular, that "[b]y filing the earlier lawsuit and informing Vanguard's clients that Vanguard is using the PEAT technology without a license, PEAT has shown 'a willingness to protect that technology.' [citation omitted]. Filing a lawsuit for patent infringement would be just another logical step in its quest to protect its technology."

(*Id.*, at 1255). In that case, the declaratory judgment defendant contested jurisdiction, even stronger than Textron does here, with the "repeated statement that it does not intend to sue Vanguard for patent infringement and its ongoing failure to bring such a suit." As the Federal Circuit explained, however, in reversing the district court's finding of no actual controversy, "a patentee's present intentions do not control whether a case or controversy exists. [citation omitted]. The appropriate inquiry asks whether Vanguard had a reasonable apprehension that PEAT would sue it for patent infringement in the future." (*Id.*) Here, Textron has not stated any intent not to sue, and has not acknowledged that infringement will not be claimed, the latter which would warrant dismissal. *See, e.g., Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054 (Fed. Cir. 1995).

In the Georgia litigation, Textron sued Fairplay over Textron's patents even though the patented design (shown in Ex. H hereto) and Fairplay's design (shown in Ex. I hereto) are significantly different (*see, also,* Fairplay's Georgia Memorandum, Ex. F hereto, and Declaration of Jordan Rotheiser (Ex. H to Fairplay's Georgia Memorandum), Ex. J hereto). The offers for sale of Fairplay's new ZX cars are not in dispute (*see, e.g.,* Textron's Memorandum, pp. 2, 12-15). Further, although the design of the newly introduced ZX cars (Ex. K hereto) are even more distinct than Fairplay's old cars, they are still electric golf cars subject to Textron's far-reaching allegations of infringement and, under the totality of circumstances, support the second prong of the declaratory judgment test, and a reasonable apprehension of suit. (*see, e.g., Cardinal Chemical Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 99-100 (1993) ("A company once charged with infringement must remain concerned about the risk of similar charges if it develops and

8

markets similar products in the future."); *see, also*, *Arrowhead Industrial Water, supra*, at 738, n.10 ("All that the second prong of the test requires, however, is a showing that plaintiff's conduct evidences a real interest in any activity that *may*, potentially, be enjoined." (emphasis in original))).

### C.    The Present Case is Not a Mirror-Image "Second-Filed" Action

As specified in Textron's Memorandum and all of the cases cited therein, the "first-filed" rule has been applied where there are the same parties and "the same issues" in two cases (Textron's Memorandum, p. 17). There are *no* substantive issues, however, that are identical in the two cases. For example, the products are different (the Georgia action, as recited above, involves Fairplay's old products, whereas the present action involves Fairplay's current, ZX model cars). Consequently, the issues of infringement are different here than in Georgia. Additionally, Textron's counsel has threatened Fairplay's customers, implying the infringement of Fairplay's ZX cars (cars that have never been subject to a Court Order). In short, the cases are not "mirror images," the Georgia action is not a "first-filed" action of the issues here, and the present action is not a "second-filed" action of the issues in Georgia. The first-filed rule as set forth in Textron's Memorandum is not applicable. Under these circumstances, with separate issues and separate products, maintaining the present action is appropriate.

### D.    Transfer Is Not Appropriate

Textron's alternative suggestion to transfer this action to Georgia "for the convenience of the parties and witnesses" is based upon a fiction – there are no parties or witnesses in Georgia. Textron's arguments are based upon its E-Z-GO Division, which is located in Georgia. That division, however, is not involved in this action. The issue before this Court is whether Fairplay, located in Colorado, infringes patents owned by

9

defendant, Textron Innovations Inc., admittedly *a Delaware corporation.* (The present action was filed against both Textron Inc., who is listed on the patents in suit as the assignee/owner, and Textron Innovations Inc., who defendants had made allegations in Georgia was the owner of the patents in suit. Since that ambiguity has now been clarified and confirmed before this Court in Textron's motion, wherein Textron confirmed Textron Innovations Inc. is the owner of all patents, an Amended Complaint is being filed concurrently with this Opposition and in which Textron Inc. has been eliminated as a defendant). E-Z-GO is not a division of or part of the now sole defendant, Textron Innovations Inc.

Textron's Memorandum also feigns convenience based upon unidentified and unnamed "relevant documents" and "witnesses." The lack of identification of any such documents and witnesses, however, cannot support the need to transfer. *See, e.g., Smith v. Colonial Penn Insurance Company*, 943 F.Supp. 782, 784 (S.D. Texas 1996)("vague statements about the convenience of unknown and unnamed witnesses is insufficient to convince this Court that the convenience of the witnesses and the parties would be best served by transferring venue").

In short, the issues addressed in the Georgia action are different than those presented before this Court, and there are no witnesses, documents or parties identified in Textron's Motion that are in Georgia or warrant transfer to that venue.

10

## V.    CONCLUSION

For the reasons stated above, Textron's Motion to Dismiss, Transfer or Stay the

present Action should be denied.

OF COUNSEL:                                      POTTER ANDERSON & CORROON LLP

Craig N. Hentschel
Jeffrey W. Deane                       By:    /s/ David E. Moore
DYKEMA GOSSETT PLLC                           Richard L. Horwitz (#2246)
333 South Grand Avenue, Suite 2100            David E. Moore (#3983)
Los Angeles, CA  90071                        Hercules Plaza, 6th Floor
(213) 457-1800                                1313 North Market Street
                                              P.O. Box 951
Allan J. Sternstein                           Wilmington, DE  19899-0951
Timothy M. Morella                            Telephone:  (302) 984-6000
DYKEMA GOSSETT PLLC                           rhorwitz@potteranderson.com
10 South Wacker Drive, Suite 2300             dmoore@potteranderson.com
Chicago, IL  60606
(312) 876-1700                         *Attorneys for Plaintiff*
                                       *Fairplay Electric Cars, LLC*

Dated:  April 18, 2006
728528 / 29987

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on April 18, 2006, the attached document was hand

delivered on the following person and was electronically filed with the Clerk of the Court using

CM/ECF which will send notification of such filing(s) to the following and the document is

available for viewing and downloading from CM/ECF.

Edmund D. Johnson
Peter B. Ladig
THE BAYARD FIRM
222 Delaware Avenue
Suite 900
Wilmington, Delaware  19801


I hereby certify that on April 18, 2006, I have Electronically Mailed the attached

document to the following non-registered participants:

Scott Robertson
Christopher C. Campbell
HUNTON & WILLIAMS LLP
1900 K Street, NW
Suite 1200
Washington, DC  20006
srobertson@hunton.com
ccampbell@hunton.com

                                    /s/ David E. Moore
                                    Richard L. Horwitz
                                    David E. Moore
                                    Potter Anderson & Corroon LLP
                                    Hercules Plaza – Sixth Floor
                                    1313 North Market Street
                                    P.O. Box 951
                                    Wilmington, DE  19899-0951
                                    (302) 984-6000
                                    rhorwitz@potteranderson.com
                                    dmoore@potteranderson.com

717640

# Exhibit A

ORIGINAL

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA

2006 JAN 17  AM 11: 05

CLERK C. Reynolds
SO. DIST. OF GA.

| | | |
|---|---|---|
| TEXTRON INNOVATIONS INC., AND | ) | |
| | ) | |
| E-Z-GO | ) | |
| (A DIVISION OF TEXTRON INC.), | ) | |
| | ) | CIVIL ACTION NO. **CV106 - 009** |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FAIRPLAY ELECTRIC CARS, LLC, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | **JURY TRIAL DEMANDED** |

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ...................................................................................1

II.   BACKGROUND .......................................................................................................2

    A.    E-Z-GO (A Division Of Textron Inc.)...........................................................2

    B.    United States Design Patent No. 369,762 ......................................................5

    C.    Golf Car Designs Prior To The '762 Patent...................................................6

    D.    Fairplay Electric Cars, LLC...........................................................................7

    E.    Fairplay's Infringing Golf Cars .....................................................................8

    F.    Fairplay Intentionally Copied E-Z-GO's Ornamental Golf Car Design Rather
       Than Copying Another Competitor's Design...................................................9

III.  ARGUMENT............................................................................................................11

    A.    Preliminary Injunction Standard ..................................................................11

    B.    Design Patent Infringement .........................................................................12

        1.    Construction of the '762 Design Patent Claim ...................................13

        2.    Ordinary Observer Analysis ..............................................................15

        3.    Point of Novelty.................................................................................21

    C.    Validity Of The '762 Patent.........................................................................26

        1.    The '762 Patent is Not Anticipated by the Prior Art ..........................29

        2.    The '762 Patent is Not Obvious.........................................................29

        3.    The Commercial Success of the Patented Design...............................31

    D.    Irreparable Harm .........................................................................................32

    E.    Even Without A Presumption Of Irreparable Harm Due To Fairplay's Willful
       Infringement, E-Z-GO Will Indeed Be Irreparably Harmed ........................33

    F.    Balance Of Hardships And The Public Interest.............................................34

IV.   CONCLUSION.........................................................................................................35

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Amazon.com, Inc., v. Barnesandnoble.com, Inc.,*
239 F.3d 1343 (Fed. Cir. 2001) ............................................................... 11, 12, 26, 32

*Contessa Food Prods., Inc. v. Conagra, Inc.,*
282 F.3d 1370 (Fed. Cir. 2002) ................................................................... 13, 15

*Durling v. Spectrum Furniture Co.,*
101 F.3d 100 (Fed. Cir. 1999) ............................................................................ 30

*Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co.,*
162 F.3d 1113 (Fed. Cir. 1998) .......................................................................... 16

*Gorham Co. v. White,*
81 U.S. (14 Wall.) 511 (1871) ...................................................... 15, 19, 21

*Graham v. John Deere Co.,*
383 U.S. 1 (1966)............................................................................................. 31

*Hupp v. Siroflex Am., Inc.,*
122 F.3d 1456 (Fed. Cir. 1997) .......................................................................... 29

*Hybritech, Inc. v. Abbott Labs.,*
849 F.2d 1446 (Fed. Cir. 1988) ................................................................. 11, 34

*In re Harvey,*
12 F.3d 1061 (Fed. Cir. 1993) ........................................................................... 30

*In re Mann,*
861 F.2d 1581 (Fed. Cir. 1988) ......................................................................... 12

*J. T. Eaton & Co. v. Atlantic Paste & Glue Co.,*
106 F.3d 1563 (Fed. Cir. 1997) ......................................................................... 32

*Keystone Retaining Wall Sys. v. Westrock, Inc.,*
997 F.2d 1444 (Fed. Cir. 1993) ......................................................................... 15

*LA Gear, Inc. v. Thom McAn Shoe Co.,*
988 F.2d 1117 (Fed. Cir. 1993) ............................................................. 12, 13, 19

*Lee v. Dayton-Hudson Corp.,*
838 F.2d 1189 (Fed. Cir. 1988) ......................................................................... 19

*Litton Sys., Inc. v. Whirlpool Corp.,*
728 F.2d 1423 (Fed. Cir. 1984) ......................................................................... 21

*National Steel Car Ltd., v. Canadian Pac. Ry., Ltd.,*
357 F.3d 1319 (Fed. Cir. 2004) ......................................................................... 12

*Oakley, Inc. v. Sunglass Hut Int'l,*
316 F.3d 1331 (Fed. Cir. 2003) ......................................................................... 27

*OddzOn Prods. v. Just Toys,*
  122 F.3d 1396 (Fed. Cir. 1997) ................................................................................... 12, 13, 15

*Peterson Mfg. Co. v. Central Purchasing, Inc.,*
  740 F.2d 1541 (Fed. Cir. 1984) ................................................................................. 30

*Polymer Techs., Inc. v. Bridwell,*
  103 F.3d 970 (Fed. Cir. 1996) ................................................................................. 32, 33

*Reebok Int'l Ltd. v. J. Baker, Inc.,*
  32 F.3d 1552 (Fed. Cir. 1994) ................................................................................. 11

*Stratoflex, Inc. v. Aeroquip Corp.,*
  713 F.2d 1530 (Fed. Cir. 1983) ................................................................................. 31

**Statutes**

35 U.S.C. § 102 ................................................................................................................. 29

35 U.S.C. § 103 ................................................................................................................. 29

35 U.S.C. § 173 ................................................................................................................. 12

35 U.S.C. § 283 ................................................................................................................. 11

35 U.S.C. § 289 ................................................................................................................. 12

## I.    PRELIMINARY STATEMENT

Textron Innovations Inc. and E-Z-GO (A Division of Textron Inc.) (hereinafter "E-Z-GO") respectfully move this Court for a preliminary injunction to enjoin Fairplay Electric Cars, LLC ("Fairplay") to cease infringing a patented golf car design that, for all intents and purposes, is a blatant "knock off" of E-Z-GO's commercially successful TXT series of golf cars.[1] Fairplay's ongoing infringement is irreparably harming E-Z-GO inasmuch as the Fairplay golf car at issue — which is manufactured in China — is a rank copy of E-Z-GO's patented TXT design, yet is sold at a fraction of the cost and is inferior in quality. This frontal assault on a product that fetches narrow margins to begin with will force E-Z-GO to all but concede any meaningful profit margins for its TXT golf car line unless and until this court enjoins Fairplay. As importantly, E-Z-GO's reputation for providing high quality, well engineered products is directly at stake by the importation and sale of this substandard golf car.

Every day E-Z-GO faces legitimate competition from golf car manufacturers who do not copy E-Z-GO's proprietary golf car design. Rather than invest the substantial resources necessary to design, build, market, distribute and brand a golf car like other competitors, Fairplay has elected instead to "freeride" off the commercial success and goodwill of E-Z-GO by stealing E-Z-GO's proprietary golf car design. No other plausible business reason exists for Fairplay to so slavishly copy E-Z-GO's patented design. The inescapable conclusion is that Fairplay has chosen the path of least resistance to enter the golf car market — by copying an established and successful brand and run for luck that it will not have to answer for this theft. E-Z-GO

---

[1] Although consumers commonly refer to golf cars as "golf carts," they are most often called the former by manufacturers, distributors, bulk purchasers and leasees.

respectfully requests that this Court put an end to Fairplay's unlawful business practices now,

before they do any further harm to E-Z-GO.

## II.    BACKGROUND

### A.    E-Z-GO (A Division Of Textron Inc.)

E-Z-GO was founded in 1954 in Augusta, Georgia. Ex. 20, Declaration of Ronald

Skenes, ¶4 ("Skenes Decl."). Currently, E-Z-GO maintains its principal place of business at

1451 Marvin Griffin Road, Augusta, Georgia, 30906. *Id.*, ¶2. In 1961, Textron Inc. acquired E-

Z-GO. Textron is a global, multi-industry company with market leading operations in diverse

areas such as aircraft, automotive, industrial, and finance. Today, E-Z-GO has the largest sales

and service network in the golf car industry, with more factory branch locations and independent

distributors than any other manufacturer. Skenes Decl., ¶4. Since its inception, E-Z-GO has

grown into one of the world's largest manufacturers of golf cars and utility vehicles. Ex. 2,

Declaration of Kent Bruntz, ¶3 ("Bruntz Decl.").

E-Z-GO prides itself in maintaining the highest quality assurance standards in the golf car

industry. E-Z-GO's commercial success is due not only to its reputation for manufacturing

products of the highest quality, but also in developing products that have a distinctive appearance

and are also visually appealing to consumers. Skenes Decl., ¶5; Bruntz Decl., ¶¶10-11. E-Z-GO

invests millions of dollars annually to develop its product lines and to maintain a rigorous quality

assurance program. Bruntz Decl., ¶5. In recognition of its innovative efforts, the United States

Patent Office has awarded E-Z-GO no less than 34 patents, with several patent applications

pending. Ex. 3, Declaration of Robert Kinder, ¶16 ("Kinder Decl.").

Throughout its existence, E-Z-GO has developed several successful golf car designs.

Skenes Decl., ¶¶4-5. None, however, compare to the success of the TXT model and its

immediate predecessor, the "Medalist." *Id.* Together, they represent a substantial evolutionary

-2-

leap beyond E-Z-GO's former models and all other models on the market at the time of their

launch. Bruntz Decl., ¶10.

From about 1988 until about 1994, E-Z-GO's primary golf car line was sold as the

"Marathon." *Id.*, ¶7. The Marathon (depicted below) adopted the boxy, rigid look characterizing

many of the golf cars manufactured and sold at that time. *Id.*



The Marathon had bucket seats with cylindrical side handles. Its cowl (the front skirt portion of

a golf car) was small and flat with angled corners. Realizing that many golf car designs lacked

aesthetic appeal, including its own, E-Z-GO undertook revolutionary design efforts — and

committed substantial resources — to develop a new line of golf cars unlike any seen before.

*Id.*, ¶¶7-10; Skenes Decl., ¶¶4-5.

E-Z-GO's "Medalist" line of golf cars was thus born. E-Z-GO sold the Medalist from about 1994-1995. *Id.* The Medalist immediately garnered several United States design patents. Bruntz Decl., ¶10. The Medalist is depicted below:



Around 1995, E-Z-GO refreshed the Medalist and launched the product line known today as the TXT. *Id.*, ¶9; Skenes Decl., ¶ 4. The TXT has been so successful that E-Z-GO has continuously produced and sold it for over ten years. Bruntz Decl., ¶¶9-11; Skenes Decl., ¶5. The TXT golf car is protected by the patent at issue in this motion for preliminary injunction — U.S. Design Patent No. 369,762 (the "'762 Patent") (Ex. 1). Bruntz Decl., ¶11. There is no question but that the TXT's success is due in large part to its unique ornamental design. Skenes Decl., ¶4. Indeed, the '762 design patent asserted in this action is identical to TXT's fleet model, *i.e.*, the TXT fleet car is ornamentally illustrated in the '762 patent. Bruntz Decl., ¶11.

A side-by-side comparison of the TXT and '762 patent establishes this fact beyond peradventure:





**TXT Fleet Model**                    **U.S. Patent D369,762**

B.      United States Design Patent No. 369,762

The application maturing into the '762 patent was filed on October 18, 1994, as design

application serial number 29/029,859 (the "'859 application"). The Patent Office allowed the

'859 application on first examination. *See* Ex. 25 (file history of the '859 application). The '762

patent was granted on May 14, 1996. Ex. 1. It expires May 14, 2010. By assignment, Textron

Innovations Inc. is the owner of all right, title and interest in the '762 patent.

The '762 patent claims the ornamental golf car, as shown and described in each of the

five figures of the patent. Ex. 1. Each figure represents a different view or perspective of the

ornamental golf car design. For example, FIG. 1 of the '762 patent depicts the TXT as follows:



(descriptions added).

-5-

The front of the claimed golf car has an ornamental cowl wrapping from the base on one side of the car, around the front, to the base on the other side of the car. The cowl is curvy, *i.e.*, it lacks sharp corners, and is positioned above and behind the tires. A brush guard with a slight protruding ornamental rectangular portion at its bottom is positioned in front of the axle beneath the cowl.

The seat back is one of the most well-recognized and distinguishable ornamental features. Prior seat designs had either uniform rectangular seat backs, or more commonly, dual bucket seats, *see, e.g.,* U.S. Design Patent Nos. 255,558 and 320,580 depicted in Section II. C. below. The ornamental rear fender partially wraps around the rear tires. The dashboard — in the top view (FIG. 2) of the '762 patent reproduced below — features four distinctive cup holders centered in the dashboard and extending toward the seat:



FIG. 2

### C.    Golf Car Designs Prior To The '762 Patent

When E-Z-GO introduced the TXT golf car, no golf car had a remotely similar ornamental design. *See, e.g.,* Ex. 22 (combined prior art cited in prosecution history of '762 patent and the patent applications on which the '762 patent is based). The ornamental design of the golf car depicted in the '762 patent differs significantly from that of prior golf cars in several material respects. Ex. 21, Declaration of Robert Anders, Industrial Design Expert ("Anders Decl."), ¶¶36-46. First, from an overall perspective, the contours and angles of the '762 patented

design create a unique visual appearance unlike any prior golf car. *Id.*, ¶25. The golf car

claimed in the '762 patent is sleek, curvy and ornamental as compared with the prior art. *Id.*,

¶25-30; 47-53. Three prior art patents, depicted below, illustrate the novel ornamental

differences between the '762 patented design and the prior art. *Id.*, ¶36-46. They feature boxy,

sharply curved angles that were, prior to the introduction of the Medalist and TXT designs,

regarded as state of the art:

          

**Des. 255,558**          **Des. 320,580**          **Des. 271,008**

### D.    Fairplay Electric Cars, LLC.

Fairplay Electric Cars, LLC, was apparently established on or around October 12, 2004,

as "Player Electric Car," or "Player Golf Car, LLC" ("Player"). Exs. 5 and 6; Kinder Decl. ¶7.

It appears, however, that on April 27, 2005, Player — for reasons presently unknown —

suddenly changed its name to Fairplay Electric Cars, LLC (hereinafter collectively "Fairplay").

Ex. 6; Kinder Decl. ¶7.[2] Fairplay's principal place of business is reported as 743 Horizon Ct.,

Suite 333, Grand Junction, Colorado. *Id.*

Fairplay asserts that "within five years, [it] will be a major brand in the Golf Car and

Electric Utility Car Industry," and that Fairplay "will be the preferred golf car sold by hundreds

---

[2] On information and belief, E-Z-GO understands that complaints of trademark
infringement of the "Player" name may have prompted the change.

of dealers throughout North America." Ex. 5 (advertising brochure); Bruntz Decl. ¶13. Fairplay

markets its golf cars "in national publications to support [its] dealer sales," and it claims that it

"will offer exclusive markets in over 125 key areas to the nearly 1,700 golf car dealers across

North America." *Id.* Fairplay further advertises its cars on the Internet at the URL:

www.fairplayelectriccars.com. Ex. 4, Kinder Decl., ¶6. Fairplay golf cars are sold online and

through several distributors throughout the country. Exs. 7-10, Kinder Decl., ¶6-11. Fairplay

golf cars are even offered for sale on eBay®. Ex. 7, Kinder Decl., ¶8.

### E.    Fairplay's Infringing Golf Cars

Fairplay offers several golf car models, *see* Ex. 4, including the Fleet, Legacy, and

Legacy LX. Fairplay also advertises six passenger versions for its cars. E-Z-GO's motion for a

preliminary injunction seeks to enjoin the sale of Fairplay's Fleet golf car (hereinafter "Fairplay

golf car").

The Fairplay golf car is pictured below, alongside its blueprint, the TXT. When the

Fairplay golf car is compared with the TXT golf car (Ex. 11), the similarities are undeniable,

obvious, and blatant.

    

**Fairplay Fleet Golf Car**                **TXT Fleet Model**

The Fairplay golf cars are identical ornamental copies of the E-Z-GO TXT golf car. In fact,

Fairplay copied each and every ornamental design feature found in the TXT, including, but not

limited to:

> (1) the overall body design (*compare* Ex. 11 with Ex. 12);
> (2) the seat backs (Ex. 13);
> (3) the bottom seat cushions (Ex. 14);
> (4) the dashboard panel (Ex. 15 — note the four cup holders and seven tee slots);
> (5) the front cowl (Ex. 16);
> (6) the rear fenders (Ex. 17);
> (7) the rear bag well (Ex. 17); and
> (8) the brush guard positioned in front of the front steering column (Ex. 18).

This "Chinese" copy is so complete and shameless that parts from the Fairplay golf car

are interchangeable with those on the TXT golf car. *See* Exs. 14 and 19 (photographs of E-Z-GO

TXT seat bottom and cowl fitted onto the Fairplay golf car); Bruntz Decl., ¶14. Fairplay's

intentional and willful copy not only replicates the ornamental design of the TXT, *it also*

*replicates the exact placement of the rivet holes.* Exs. 13-19; *see also* Bruntz Decl. ¶14. In fact,

the only discernible difference — and hardly a material one — between the two golf cars is that

the vertical trim lines on the front portion of the cowl are angled slightly more on the Fairplay

car than on the TXT and the Fairplay logo is oval shaped. Except for this slight difference,

indiscernible to an ordinary observer, the Fairplay golf car is a virtual "doppelganger" of E-Z-

GO's TXT golf car — indeed, every ornamental feature of moment was clearly copied.

### F.    Fairplay Intentionally Copied E-Z-GO's Ornamental Golf Car Design Rather Than Copying Another Competitor's Design

The golf car market in the United States is served by several manufacturers, the most

prominent of which are Club Car, Yamaha, and E-Z-GO. Skenes Decl., ¶7. Collectively, Club

Car, Yamaha and E-Z-GO account for nearly 90% of the cars leased and sold to golf courses or

other consumers. *Id.* The remaining 10% of the market is served, for the most part, by

legitimate specialty golf car manufacturers. *Id.* Club Car and Yamaha, like E-Z-GO, have

distinctive and proprietary ornamental designs for their cars. *Id.* 7; Anders Decl., ¶54-56. Club Car's Precedent golf car and Yamaha's G-Max golf cars are illustrated below:






**Club Car Precedent**                    **Yamaha G-Max**

The Club Car Precedent has a smaller protruding cowl, a prominent bumper extending around the periphery of the car, including beneath the cowl, and large trapezoidal seat backs. Some nine years after the Patent Office awarded E-Z-GO the '762 patent on the TXT, the Patent Office awarded Club Car U.S. Design Patent D498,704 (Fig. 1 below) for the Precedent.


FIG. 1

The Yamaha G-Max, by contrast, is a more traditional design than the Club Car Precedent. It has separate seat back panels reminiscent of late model golf cars, yet a stylish and curvy cowl with quarter moon cut-outs at the front nose portion of the cowl. Each of the Club

-10-

Car Precedent, Yamaha G-Max and E-Z-GO TXT are distinctive in their own right and significantly ornamentally different from one another. *Id.* Yet, despite having a multitude of ornamental design options for its golf car, Fairplay copied the TXT golf car down to the rivet holes. *See* Ex. 19; Bruntz Decl., ¶14.

## III.    ARGUMENT

### A.    Preliminary Injunction Standard

This Court may grant a preliminary "injunction[] in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283 (2000). The grant or denial of a preliminary injunction against patent infringement involves substantive matters unique to patent law and, as such, the substantive law of the United States Court of Appeals for the Federal Circuit governs. *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1450 (Fed. Cir. 1988).

E-Z-GO is entitled to a preliminary injunction if it can show: (1) a reasonable likelihood of success on the merits; (2) irreparable harm if an injunction is not granted; (3) a balance of hardships tipping in its favor; and (4) the injunction's favorable impact on the public interest. *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1555 (Fed. Cir. 1994). "These factors, taken individually, are not dispositive; rather, the district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested." *Hybritech*, 849 F.2d at 1451.

In patent infringement cases, "[i]rreparable harm is presumed when a clear showing of patent validity and infringement has been made." *Amazon.com, Inc., v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) (citation omitted). "This presumption derives in part from the finite term of the patent grant, for patent expiration is not suspended during litigation, and the passage of time can work irremediable harm." *Id.* (quoting *Bell & Howell Document*

-11-

*Mgmt. Prods. Co. v. Altek Sys., Inc.*, 132 F.3d 701, 708 (Fed. Cir. 1997)). The harm suffered is
more pronounced for infringement of a design patent whose term is only 14 years from the date
of patent grant. 35 U.S.C. § 173 (2000).

In order to demonstrate a likelihood of success on the merits, E-Z-GO will show, in light
of the presumptions and burdens that will inhere at trial on the merits, that (1) it will likely prove
that Fairplay infringes the '762 patent, and (2) its infringement claim will likely withstand
Fairplay's challenges to the validity and enforceability of the '762 patent. *Amazon.com*, 239
F.3d at 1350 (citing *Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1364 (Fed. Cir.
1997)). Only "[i]f [Fairplay] raises a substantial question concerning either infringement or
validity, *i.e.*, asserts an infringement or invalidity defense that the patentee cannot prove 'lacks
substantial merit,' [then] the preliminary injunction should not issue." *Id.* at 1350-51 (quoting
*Genentech*, 108 F.3d at 1364); *see also National Steel Car Ltd., v. Canadian Pac. Ry., Ltd.*, 357
F.3d 1319, 1325 (Fed. Cir. 2004). Otherwise, injunctive relief is appropriate; and particularly
here, where the intentional copying is so self-evident.

## B.    Design Patent Infringement

Pursuant to 35 U.S.C. § 289, design patent "infringement is defined as the unauthorized
manufacture or sale of 'the patented design, or any colorable imitation thereof.'" *LA Gear, Inc.
v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1124 (Fed. Cir. 1993) (quoting 35 U.S.C. § 289).
"Design patent infringement is a question of fact, to be proven by a preponderance of the
evidence." *Id.* (citing *Braun Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 819 (Fed. Cir. 1992)).
Design patent protection extends to the novel ornamental features of the patented design.
*OddzOn Prods. v. Just Toys*, 122 F.3d 1396, 1405 (Fed. Cir. 1997). The protection of a design
patent generally covers what is shown in the drawings. *In re Mann*, 861 F.2d 1581, 1582 (Fed.
Cir. 1988). The accused product need not be an exact match, however, because "[d]esign patent

-12-

infringement requires a showing that the accused design is *substantially the same* as the claimed

design." *LA Gear*, 988 F.2d at 1124 (emphasis added).

Infringement is a two-step process that first involves construing the scope of a claim, and,

following claim construction, comparing the patented and accused designs overall. *Contessa*

*Food Prods., Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1376 (Fed. Cir. 2002). "Comparison to the

accused product includes two distinct tests, both of which must be satisfied in order to find

infringement: (a) the 'ordinary observer' test, and (b) the 'point of novelty' test." *Id.* at 1377.

The two tests are separate, with the "point of novelty" test requiring proof that the accused

device infringes the novel aspects of the patented design as distinct from the prior art. *Id.*

### 1.    Construction of the '762 Design Patent Claim

Whether a design patent is infringed is determined by first construing the claim to the

design, when appropriate, and then comparing it to the design of the accused device. *OddzOn*

*Prods.*, 122 F.3d at 1404. The purpose of construing the claim of a design patent is mainly to

identify the ornamental features of the product design because "[a] design patent only protects

the novel, ornamental features of the patented design." *Id.* at 1405. "Where a design contains

both functional and non-functional elements, the scope of the claim must be construed in order to

identify the non-functional aspects of the design as shown in the patent." *Id.* (citation omitted).

The claim of the '762 patent must be analyzed to determine which aspects are non-

functional because "[t]he patentee 'must establish that an ordinary person would be deceived by

reason of the common features in the claimed and accused designs which are ornamental.'" *Id.*

(quoting *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 825 (Fed. Cir. 1992)). The golf car of the

'762 patent embodies several ornamental features, all of which are literally found in the Fairplay

golf car. Ex. 21, Anders Decl., ¶23-30.

-13-

**The Ornamental Cowl and Brush Guard**. The front of the patented golf car has an ornamental rounded and contoured cowl wrapping from the base on one side, around the front, to the base of the car on the other side. *Id.*, ¶26. The cowl is curvy, lacks sharp corners and is positioned above and behind the tires. *Id.* A brush guard with a slightly protruding, raised ornamental rectangular portion at its bottom is positioned in front of the axle beneath the cowl. *Id.*

**The Ornamental Dashboard**. The patented design further has an ornamental dashboard nested within the cowl. *Id.*, ¶27. The dashboard has four centrally positioned cup holders as part of a unitary shelf that extends toward the seat. *Id.*

**The Ornamental Seat Back**. The patented design also has an ornamental seat back. *Id.*, ¶28. The seat back has a unitary cushion contoured with a valley separating the driver side from the passenger side. *Id.* The seat back is generally long, slender, curvy and rectangular with rounded corners. *Id.* The center of the seat back has somewhat of an hourglass shape on the top side while remaining linear on the bottom. *Id.* While the seat back is a single cushion, the valley in the center gives the impression of two separate padded cushioning portions, one for the driver and another for the passenger. *Id.*

**The Ornamental Rear Fender**. Finally, the patented design has an ornamental rear fender. *Id.*, ¶29. The rear fender wraps around the rear tires and drops into a centrally located well for holding a golf bag. *Id.* When viewed from the side, *e.g.*, Fig. 3 of the '762 patent, the rear fender partially wraps around the rear tires. *Id.* The rear fenders provide the rear of the car with a curvy, rounded look.

Each of the foregoing features, *i.e.*, the cowl, the dashboard, the seat back, the handles and the rear fenders are ornamented, not functional. *Id.*, ¶30. Indeed, the designs for the cowl,

-14-

dashboard, seat back, handles and rear fenders could take on many different forms than those chosen by the inventors of the '762 patent. *Id. See also* Section II.F. Together, and taken as a whole in the combination presented, the ornamental design of the cowl, dashboard, seat back, and rear fenders provide a unique, ornamental appearance to an ordinary observer. *Id.*

### 2.   Ordinary Observer Analysis

The first step of the design patent infringement analysis requires a determination of "whether the patented design as a whole is substantially similar in appearance to the accused design." *OddzOn Prods.*, 122 F.3d at 1405. The trier of fact focuses on the overall visual impression of a patented design as a whole, and not on an element by element comparison of design details. *Id.* It is important to understand that the accused design and the patented design need not be identical in every respect. *See, e.g., Braun* 975 F.2d at 820 ("patent infringement can be found for a design that is not identical to the patented design"); *Contessa Food Prods.*, 282 F.3d at 1376 ("In assessing infringement, the patented and accused designs do not have to be identical in order for design patent infringement to be found.").

Rather, "if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other." *Gorham Co. v. White*, 81 U.S. (14 Wall.) 511, 528 (1871). An "ordinary observer" may be defined as the ordinary purchaser or one who may purchase the patented design. *See Keystone Retaining Wall Sys. v. Westrock, Inc.*, 997 F.2d 1444 (Fed. Cir. 1993). Significantly, "[a]nalysis under the 'ordinary observer' test is to be conducted with the 'ordinary observer' and not the expert designer in mind." *Contessa Food Prods. Inc.*, 282 F.3d at 1382.

-15-

E-Z-GO's TXT golf cars are sold, through it distribution network, to the general public without limitation. Skenes Decl., ¶5. The "ordinary observer," therefore, is not limited to individual golfers or people who live in golf communities, but would include almost any member of the general public who wishes to purchase and use a golf car. To punctuate the point, Fairplay sells its golf cars to the general public through eBay® and other channels. Exs. 7-10. In other words, the "ordinary observer" would include anyone who may desire to purchase a golf car for whatever reason, and this Court may conduct the ordinary observer analysis without trepidation. While expert analysis is unnecessary in this instance to find infringement, and the Federal Circuit has "counsel[ed] against measuring the similarity of designs from the viewpoint of experts in design," *Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co.*, 162 F.3d 1113, 1117 (Fed. Cir. 1998), E-Z-GO proffers an analysis by an expert industrial designer to illustrate the slavishness of the copying. Ex. 21, Anders Decl.

### i.     Comparison of Patented and Accused Designs

In the case at hand, the Fairplay golf car is not just "substantially similar" to the '762 patent, it is virtually identical. Fairplay studiously copied every ornamental feature visible to the ordinary observer. *See* Exs. 11-19. An ordinary observer comparing the two designs would come to but one inexorable conclusion — the two are one and the same. The following side-by-side comparisons illustrate the thoroughness and perfection of the copying.

# Table 1

## Comparison of Ornamental Features of U.S. Patent D369,762 with Fairplay Golf Car

| U.S. Patent D369,762 | Fairplay Golf Car | Ordinary Observer |
|---|---|---|
|  FIG. 1 |  | The ornamental cowl on the front of the Fairplay golf car, like the cowl in the '762 patent, wraps from the base on one side, around the front, to the base of the car on the other side. Anders Decl., ¶ 31-35. The cowl in the Fairplay golf car, like that in the '762 patent, is curvy, lacks sharp corners and is positioned above and behind the tires. *Id.* Based on at least the foregoing substantial similarities between the patented design and Fairplay's golf car, an ordinary observer giving such attention as a purchaser usually gives, would be induced to purchase the Fairplay golf car supposing it to be the patented TXT golf car. *Id.* |
|  FIG. 3 |  | The rear fender in both cars partially wraps around the rear tire. *Id.* Dimensionally, both cars are substantially identical with identical side profiles. *Id.* Even the handrails are identical. |
|  FIG. 4 |  | The curvature of the front cowl as well as positioning on the body frame is identical to an ordinary observer. *Id.* And the brush guard in the Fairplay golf car, like that in the patented design, has a slightly protruding, raised ornamental rectangular portion at its bottom. *Id.* Also visible is the hourglass shape of the top of the seat back. |

-17-



| | | An examination of FIG. 5 against a photograph of the rear portion of the Fairplay golf car illustrates the preciseness of the copying of the ornamental rear fender. *Id.* In both the patented design and the accused Fairplay golf car, the rear fender wraps around the rear tires and drops into a centrally located well for holding a golf bag. *Id.* Then, when viewed from the side, *e.g.*, FIG. 3 of the '762 patent above, the rear fenders in both the patented design and the accused Fairplay golf car partially wraps around the rear tires. *Id.* The rear fenders provide the rear of the car with a curvy, rounded look. *Id.* |
| | | From a top view, the identical curvatures of the bodies are readily discernable. The front end of the golf car in FIG. 2 is slightly distorted geometrically in an attempt to disclose more features of the golf car, but otherwise the ornamental designs of the cowls are also identical. *Id.* The Fairplay car has even copied the four cup holder design that is centrally located on a unitary shelf within the dashboard and extending toward the seat. *Id.* |

Based on at least the foregoing substantial similarities between the patented design and

Fairplay's golf car, an ordinary observer giving such attention as a purchaser usually gives,

would be induced to purchase the Fairplay golf car supposing it to be the patented TXT golf car.

Ex. 21, Anders Decl., ¶¶31-32. To assist the Court in comparing the figures of the '762 patent

with the thumbnails photographs of the Fairplay golf car, full page photographs of the Fairplay

golf car as taken by Robert Anders, corresponding to the thumbnail photographs in Table 1

above, are provided in Exhibit 23. Anders Decl., ¶14.

-18-

ii.     **Comparison of Patented Commercial Embodiment and Accused Design**

"When the patented design and the design of the article sold by the patentee are substantially the same, it is not error to compare the patentee's and the accused articles directly, *Lee v. Dayton-Hudson Corp.*, 838 F.2d [1186] at 1189 [(Fed. Cir. 1988)]; indeed, such comparison may facilitate application of the *Gorham* criterion of whether an ordinary purchaser would be deceived into thinking that one were the other." *LA Gear*, 988 F.2d at 1125-26. The TXT commercial embodiment is identical to the '762 patent. Bruntz Decl., ¶11. In fact, the purpose for applying for the '762 patent was to protect the ornamental design of the TXT. *Id.*, ¶10. With the patented TXT commercial embodiment juxtaposed with the Fairplay car, the extent and exactness of the copying is staggering.

| Table 2 — Comparison of Ornamental Features of TXT Commercial Embodiment with Fairplay Golf Car | | |
| --- | --- | --- |
| **TXT Commercial Embodiment** | **Fairplay Golf Car** | **Ordinary Observer** |
|  |  | The substantial similarities are even more pronounced when the patented commercial embodiment is juxtaposed with the Fairplay golf car. The ornamental cowl on the front of the Fairplay golf car, like the cowl in the '762 patent, wraps from the base on one side, around the front, to the base of the car on the other side. Ex. 21, Anders Decl., ¶ 34-35. The cowl in the Fairplay golf car, like that in the '762 patent, is curvy, lacks sharp corners and is positioned above and behind the tires. *Id.* |



| | | |
|---|---|---|
| | | The rear fender in both cars partially wraps around the rear tire. *Id.* Dimensionally, both cars are substantially identical. *Id.* The cars have identical side profiles and the side hand rails are also identical. *Id.* |
| | | The curvature of the front cowl as well as positioning on the body frame is substantially identical to an ordinary observer. *Id.* And the brush guard in the Fairplay golf car, like that in the patented design, has a slightly protruding, raised ornamental rectangular portion at its bottom. *Id.* The unique hourglass shape of the top of the seat back is readily apparent. |
| | | In both the patented commercial embodiment and the accused Fairplay golf car, the rear fender wraps around the rear tires and drops into a centrally located well for holding a golf bag. *Id.* The rear fenders provide the rear of the car with a curvy, rounded look. *Id.* |
| | | From a top view, the identical curvatures of the bodies are readily discernable. The ornamental design of the cowls are also identical. *Id.* The Fairplay car has even copied the four cup holder design that is centrally located on a unitary shelf within the dashboard and extending toward the seat. *Id.* |

Based on at least the foregoing substantial similarities between the patented commercial embodiment and Fairplay's golf car, an ordinary observer giving such attention as a purchaser usually gives, would be induced to purchase the Fairplay golf car supposing it to be the patented TXT golf car. *Id.* To assist the Court in its comparison of the patented commercial embodiment

-20-

and the accused design, full page photographs of the TXT golf car, corresponding to the thumbnail photographs in Table 2 above, are provided in Exhibit 24. *Id.*, ¶14. A comparison of the photographs in Exhibits 23 and 24 reveals the thoroughness of the copying.

An ordinary observer would discern no colorable differences in the TXT golf car and the Fairplay golf car. Anders Decl., ¶35. The patented and accused designs as a whole are substantially similar to an ordinary observer, *id.*, thus, the "ordinary observer" test is satisfied.

### 3.    Point of Novelty

In addition to the *Gorham* test of overall similarity, the accused design must appropriate the point of novelty of the patented design, *i.e.*, the accused design must incorporate the novel ornamental features that distinguish the patented design from the prior art. *Litton Sys., Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1444 (Fed. Cir. 1984). The design claimed in the '762 distinguishes from the prior art in several respects, each of which have been misappropriated in the Fairplay golf car.

### i.    The Ornamental Cowl and Brush Guard

Golf cars prior to the '762 patent typically had boxy cowls with sharp angles, with the brush guards in the prior art being more functional than aesthetic. Anders Decl., ¶37. Some of the prior art cowl and brush guard designs are depicted in Table 3 below, along with the patented design:

| Table 3 |
|---|
| **Point of Novelty of Ornamental Cowl and Brush Guard** |

| Patented Design | Prior Art | | |
|---|---|---|---|
|  FIG.1 |  D320,580 |  D326,831 |  U.S. Patent 4,037,614 |
|  FIG.4 |  U.S. Patent 4,773,695 |  U.S. Patent 4,334,692 |  D255,558 |

The cowl and brush guard in the '762 patent, by contrast to the prior art designs, create a unique ornamental impression by portraying a more rounded and curvy image without sharp, angled corners. *Id.*, ¶38. Similarly, the front brush guard located below the cowl of the '762 patent has a unique ornamental rectangular design that adds to this overall point of novelty.[3] *Id.*

---

[3] Notably, as seen in the prior art figures in Table 3 above, U.S. Design Patent D326,831 includes a central rectangular inset on its cowl, corresponding to the location of the manufacturer's name or logo. Likewise, the patented '762 golf car at issue in this motion for preliminary injunction also includes a rectangular inset for the manufacturer's logo. Because a rectangular inset centered on the cowl is part of the prior art, this design feature cannot be considered a "point of novelty" in the '762 patented design. Consequently, the fact that Fairplay's car has an oval inset rather than a rectangular inset has no bearing upon the "point of novelty" analysis.

The Fairplay car identically incorporates the point of novelty from the patented design. *Id.*, ¶39. The cowls to the cars are substantially similar to one another, as are the brush guards, *id.,*:

Top: An angle view of the front cowls of the E-Z-GO (green) and Fairplay (white) golf cars.





Above: The ornamental brush guard design of the E-Z-GO (left) and the Fairplay's (right) identical copy. Note the protruding rectangular portion toward the top of the picture.

In fact, the cowl of the Fairplay car was removed and replaced with the cowl of the patented TXT car. Bruntz Decl., ¶14. The match was exact.

The Fairplay car, depicted alongside the patented golf car (*see* side-by-side comparison below), appropriated the curvy and rounded ornamental cowl, among other features. Anders Decl., ¶40. In both cars, and unlike the prior art, the cowls extend from one side of the car,

-23-

around the front, to the other side of the car. *Id.* Furthermore, in both cars, the brush guard is a raised, rectangular ornament positioned ahead of the axle. *Id.*



| Patented Design | Fairplay |
|---|---|

### ii.     The Ornamental Seat Back

The seat back in the patented design is unique, ornamental and unlike anything found in the prior art. *Id.* ¶41. Prior to the '762 patented design, most prior art golf cars had either dual bucket seat backs or, less frequently, a unitary seat back for both passengers with no distinguishing or separating features. *Id.* The ornamental, curvy, partial hourglass shaped design of the '762 patent is seen nowhere in the prior art. *Id.* It has been slavishly copied by the Fairplay golf car. *See* Exs. 13, 14, 23 & 24. Even the bracket holes are in the same location. *Id.*; Bruntz Decl., ¶14. Fairplay's golf car appropriates the point of novelty residing in the ornamental seat back. Anders Decl., ¶42.

### iii.     The Ornamental Rear Fender Design

The rear fender design adopted by the '762 patent is also novel and appropriated in the Fairplay golf car. *Id.*, ¶43. The differences between the patented design and the prior art are apparent in Table 4 below. *Id.*

-24-



The visual impression created by the rear fenders in the '762 patented design is a sleek, rounded, curvy look as compared to a more boxy, angular look found generally in the prior art. *Id.,* ¶44. As shown in the photograph below, Fairplay copied this point of novelty down to the rivet hole connectors. *See* Bruntz Decl., ¶13-14.

Top: The rear fender designs of the E-Z-GO (left) and Fairplay (right) golf car.



*See* Ex. 17.

### iv.    Ornamental Dashboard

Finally, the dashboard design pictured in FIG. 2 of the '762 patent is novel and was copied by Fairplay. Anders Decl., ¶45. None of the prior art golf car designs have four cup holders centered in the dashboard and extending toward the driver and passenger seats. *Id.* Fairplay slavishly copied the dashboard, including four generally centered cup holders. *Id.*; *see* Ex. 15.

Top: Dashboard of a Fairplay (top) golf car and an E-Z-GO (bottom). Just above the four cup holders on the right hand side. Fairplay even copied the seven tee holder slots in the dashboard design.



Based upon the foregoing, only one inescapable conclusion can be drawn — the Fairplay golf car literally and wilfully infringes the '762 patent. Anders Decl., ¶46. The strength of E-Z-GO's infringement case against Fairplay is formidable, compelling and worthy of immediate injunctive relief. *See Amazon.com*, 239 F.3d at 1350.

### C.    Validity Of The '762 Patent

In light of the presumptions and burdens that will inhere at trial on the merits, E-Z-GO's infringement claim will easily withstand any challenge to the validity and enforceability of the '762 patent. *Amazon.com*, 239 F.3d at 1350 (citing *Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997)). In the context of a preliminary injunction, while the burden

of proving invalidity is with the party attacking validity, the party seeking the injunction retains

the burden of showing a reasonable likelihood that the attack on its patent's validity would fail."

*Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003) (internal quotations

omitted).

Should Fairplay decide to mount an invalidity defense, it will fail. The unique

combination of ornamental design features claimed in the '762 patent is unlike anything found in

the prior art. The "Medalist" and "TXT" golf car designs are revolutionary designs in the golf

car industry, and, as such, the validity of the '762 patent protecting the TXT golf cars is beyond

attack. As discussed below, the '762 patent is neither anticipated by a prior art reference, nor is

it obvious over a combination of references.

Exemplary prior art from the prosecution history of the '762 patent is provided in Table 5

below:

# Table 5

## Comparison of the Ornamental Design of the '762 Patent with the Prior Art

| Patented Design | Prior Art | | |
|---|---|---|---|
| D369,762 | D320,580 | D255,558 | D326,831 |

### 1.    The '762 Patent is Not Anticipated by the Prior Art

Invalidity by anticipation under 35 U.S.C. § 102 requires identity of invention. *Hupp v. Siroflex Am., Inc.*, 122 F.3d 1456, 1461 (Fed. Cir. 1997) (prior art must be identical in all material respects in order to invalidate invention under 35 U.S.C. § 102). None of the patents in Table 5 disclose designs identical in all material respects as that in the '762 patent. Anders Decl., ¶47-51. While each of the designs in Table 5 above depicts ornamental golf cars, each contrastingly provides a different ornamental presentation of the various components in the golf cars, and, more importantly, each provides a different overall ornamental appearance. *Id.* For example, comparing the top views of the patented design with those in D255,558, D320,580, D326,831 (refer to the last row of Table 5 above), distinct ornamental differences are immediately apparent to an ordinary observer, including but not limited the seat bottoms, seat backs, bag wells, dashboards (four cup holders in the patented design compared with two in the prior art), and the rear fenders (curved rear fenders in the patented design compared with boxy, angled rear fenders in the prior art). *Id.* These are but a few of the distinctions in just one of the corresponding drawing figures (the top view), yet numerous other material ornamental design differences pervade the other drawing figures (front view, back view and side view). *Id.*

To defeat a finding of invalidity based on anticipation under 35 U.S.C. § 102, only one ornamental distinction between a prior art reference and the claimed invention is necessary. In the case at hand, the distinctions are legion. *Id.* E-Z-GO's infringement claim will therefore withstand any challenge to the validity of the '762 patent based on 35 U.S.C. § 102. *Id.*

### 2.    The '762 Patent is Not Obvious

Nor is the '762 patent obvious to one of ordinary skill in the art under 35 U.S.C. § 103. *Id.*, ¶52. Referring to the prior art in Table 5 above, the differences between the claimed design

and prior art are too numerous to list in their entirety.[4] *Id.* One theme is common in the prior art — the scope and content of the prior art includes golf car designs that are generally boxy with sharp angles. *Id.* The seat backs in the prior art are generally separated with a clear visual division between the driver's seat back and the passenger's seat back. *Id.* Furthermore, the cowls and brush guards in the prior art designs have sharp edges and appear more rigid and sharp than curvatious and flowing. *Id.* The dashboards in the prior art do not have four cup holders as claimed in the '762 patent. *Id.* And the rear fenders as seen in the side view do not closely follow the contour of the rear wheel and then gently transition into the bag well like that in the patented design. *Id.* These are but a few of the non-obvious ornamental differences between the prior art and the patented design.

In fact, the scope and content of the prior art is so far afield of the claimed design that none could serve as a "primary reference." *See Durling v. Spectrum Furniture Co.*, 101 F.3d 100, 103 (Fed. Cir. 1999) (a single primary reference having basically the same design characteristics must be found before prior art references may be combined); *In re Harvey*, 12 F.3d 1061, 1063 (Fed. Cir. 1993) ("A primary reference (basic design) must be cited having design characteristics which are basically the same as the claimed design.... The designs of other references may then properly be relied upon for modification of such basic design when the references are so related that the appearance of certain ornamental features in one ... would have

---

[4] E-Z-GO relies on the technical design expertise of Robert Anders in assessing obviousness, because "[i]n civil litigation involving a design, an expert's testimony is most helpful, as in the determination of obviousness with respect to any other type of invention, to explain the technology, the scope and content of the prior art, the differences between the prior art and the invention, and the level of skill in the art." *Peterson Mfg. Co. v. Central Purchasing, Inc.*, 740 F.2d 1541, 1547 (Fed. Cir. 1984).

suggested application of those features to another."). In the case at hand, no prior art has the "basic design characteristics" as the claimed design. Anders Decl., ¶53. In the absence of a primary reference having a design that is basically the same as the claimed design, one of ordinary skill in the design of golf cars could not combine the prior art to arrive at the claimed invention. *Id.*

### 3.    The Commercial Success of the Patented Design

In *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966), the Court explained that commercial success is a secondary consideration that can demonstrate the non-obviousness of a claimed invention. In *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538-39 (Fed. Cir. 1983), the Court of Appeals for the Federal Circuit elaborated,

> [E]vidence arising out of the so-called "secondary considerations" must always when present be considered en route to a determination of obviousness.... Indeed, evidence of secondary considerations may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art was not. It is to be considered as part of all the evidence, not just when the decision maker remains in doubt after reviewing the art.

(internal citations omitted).

In the present case, the claimed invention, embodied in E-Z-GO's TXT golf car, has enjoyed tremendous commercial success. The success dates all the way back to its introduction in 1995 and continues today. Skenes Decl., ¶4-7. Over that period of time, the TXT fleet golf car has captured 40-44% of the fleet golf car market. *Id.* As a testimony to the influence of the '762 patented invention, the TXT commercial embodiment has been continuously offered for sale since 1995. *Id.* Where, as here, the patent owner can demonstrate commercial success, as demonstrated by significant sales in a relevant market, and that the successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due

to the patented invention. *J. T. Eaton & Co. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997). Accordingly, the TXT's incredible commercial success demonstrates that the patented design was non-obvious to those of ordinary skill in the art at the time of invention, and furthermore, that the '762 patent will survive any challenge to validity that Fairplay wishes to present.

### D.    Irreparable Harm

"Irreparable harm is presumed when a clear showing of patent validity and infringement has been made." *Amazon.com*, 239 F.3d at 1350 (citations omitted). E-Z-GO has demonstrated that the Fairplay golf car infringes the '762 patent, and, based upon the scope of the prior art, E-Z-GO will withstand Fairplay's challenge to the validity of its patent. Accordingly, irreparable harm is presumed, and Fairplay has the burden of negating the presumption. *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 974 (Fed. Cir. 1996) ("The presumption of irreparable harm acts as a procedural device which places the ultimate burden of production on the question of irreparable harm onto the alleged infringer." (internal quotation omitted)). The various types of evidence found to rebut the presumption include: "(1) the non-movant has or will soon cease the allegedly infringing activities, thus making an injunction unnecessary; (2) movants have engaged in a pattern of granting licenses under the patent...; or (3) movants unduly delayed in bringing suit, thereby negating the idea of irreparability." *Id.* (citations omitted).

First, E-Z-GO has no knowledge of Fairplay's future intent, except that it is currently offering for sale and selling infringing golf cars. Further, E-Z-GO has not licensed the '762 patent, Bruntz Decl., ¶15, and E-Z-GO has no intention of licensing Fairplay.

Finally, it was not until late October 2005 that E-Z-GO became suspicious of Fairplay's possible infringing activity. E-Z-GO obtained a Fairplay golf car and thereafter initiated an infringement analysis. *Id.* Immediately after E-Z-GO learned of the extent of Fairplay's

-32-

intentional copying of its TXT golf car, it prepared this suit seeking to enjoin Fairplay's conduct. Because the Motion for Preliminary Injunction was filed concurrently with the Complaint in this action, Fairplay has no legitimate claim of undue delay.

### E. Even Without A Presumption Of Irreparable Harm Due To Fairplay's Willful Infringement, E-Z-GO Will Indeed Be Irreparably Harmed

Fairplay's market entry of the "Chinese knock-off" version of the TXT will cause E-Z-GO irreparable loss of market share and goodwill. By Fairplay's own admissions, it will be a "major brand" in the golf car industry within five years. Ex. 5. The price of the Chinese knock-offs imported by Fairplay predictably undercut E-Z-GO's TXT golf cars. Fairplay's Fleet model golf cars are advertised for $3495.00. Ex. 5. By contrast, to account for the substantial investment in maintaining its successful brand and distribution channels, not to mention local jobs in Augusta, GA, the manufacturer's suggested retail price (MSRP) for the E-Z-GO TXT golf cars are $6,800.00 to $7,000.00. Ex. 20, Skenes Decl., ¶8. Fairplay's cars are being pawned off as E-Z-GO's, but for over $3,000.00 less per vehicle. This price differential will inevitably result in lost sales to E-Z-GO, particularly because the Fairplay golf car is an identical copy, ornamentally, of the E-Z-GO TXT golf car. *See Polymer Techs.*, 103 F.3d at 975-76. ("Years after infringement has begun, it may be impossible to restore a patentee's . . . exclusive position by an award of damages and a permanent injunction. Customers may have established relationships with infringers."). Accordingly, because money damages awarded at a later date are not adequate compensation for E-Z-GO's potential damage, a preliminary injunction immediately stopping all sales and offers for sale of Fairplay's Fleet model golf cars is warranted.

Furthermore, E-Z-GO faces an imminent threat to its market share by virtue of Fairplay's attendance at the upcoming PGA Merchandise Show in Orlando, Florida (the "Orlando Show")

and the Golf Industry Show in Atlanta, Georgia (the "Atlanta Show"). *See* Ex. 4 (the front page of Fairplay's Website advertises that it will be attending both trade shows). The Orlando Show is January 26-29, 2006. The Atlanta Show is February 9-11, 2006. On their website, Fairplay actively seeks authorized dealers, *see* Ex. 4, so it is likely that they will be offering dealerships for its infringing golf cars at both trade shows. The Orlando Show and the Atlanta Show, collectively, are regarded by the golf car industry as the premier events to showcase existing and new product lines. Skenes Decl.,¶10.

Until now, Fairplay has quietly attempted to penetrate the golf car market. Evidently emboldened, Fairplay will almost certainly display its knock-offs at the two most prominent industry trade shows. *See id.* ("these two industry shows are the most important for sales and marketing"). And to add insult to injury, Fairplay's knock-offs are slated to be displayed a *mere three booths away* from E-Z-GO's cars at the Orlando show. *See* Kinder Decl., ¶17. Without intervention from the Court, E-Z-GO will face immediate loss of market share, not to mention a loss of consumer credibility and confidence if Fairplay is not enjoined. Skenes Decl., ¶10. Also, if Fairplay is permitted to advertise and display its infringing car at the trade shows, other would-be infringers will be emboldened to knock-off the patent TXT golf car, and further diminish E-Z-GO's market position. E-Z-GO respectfully solicits this Court to take immediate action to preliminarily enjoin Fairplay from advertising, marketing, offering for sale, selling, and importing into the U.S. the Fairplay golf car or offering dealerships or distributorships for its clearly infringing fleet model golf car at the Orlando Show, the Atlanta Show and thereafter.

## F. Balance Of Hardships And The Public Interest

A preliminary injunction against Fairplay will serve the public interest by protecting the property rights in a valid patent. *Hybritech*, 849 F.2d at 1451. Further, a preliminary injunction will protect the consuming public from the confusion and deception that is occurring because of

-34-

Fairplay's ongoing infringement, and will preserve the intellectual property rights that E-Z-GO

has developed, promoted, and maintained in its TXT golf car design.

Fairplay elected, at its risk, to sell a replica of the E-Z-GO TXT golf car and in so doing,

is trading off of the goodwill established by E-Z-GO. Fairplay is just beginning to enter the

market. Unlike E-Z-GO, it has no apparent manufacturing facilities in the U.S., and it has most

likely enjoyed limited sales of its Fleet model golf car that E-Z-GO seeks to enjoin.

E-Z-GO, by contrast, employs 700-750 workers at its Augusta, GA manufacturing

facility. Skenes Decl., ¶9. These workers take pride in building quality golf cars and

maintaining the highest standards of quality assurance. Fully 85% of these employees are

dedicated to manufacturing, marketing, selling and supporting the TXT fleet golf cars. *Id.*, ¶9.

Without an injunction, E-Z-GO's market share is unfairly put to the test, as are the jobs of the

employees dedicated to the TXT fleet car. In fact, E-Z-GO may be forced to lay off employees if

Fairplay's infringing conduct is not enjoined. Balancing the hardships, and considering

Fairplay's gains are all ill-gotten through pawning off a Chinese knock-off that is identical to the

E-Z-GO TXT, the weight is clearly in favor of entering an injunction to stop Fairplay's illicit

conduct and to protect E-Z-GO and the jobs at stake in the community.

## IV.    CONCLUSION

For the reasons stated herein, E-Z-GO respectfully requests that this Court enter the

proposed Order submitted herewith, preliminarily enjoining Fairplay from any further

importation, use, sale, or offer to sell of its infringing Fleet Golf Car design as pictured and

described herein, pending trial of this action.

-35-

Respectfully submitted,

TEXTRON INNOVATIONS INC. and
E-Z-GO (A DIVISION OF TEXTRON INC.)

By _____

James Ellington
(Georgia Bar No. #243,858)
HULL, TOWILL, NORMAN, BARRETT & SALLEY
Post Office Box 1564
Augusta, GA 30903-1564
Telephone (706) 722-4481
Fax (706) 722-9779

Dated: January _17_, 2006

OF COUNSEL:
Scott L. Robertson
Christopher C. Campbell
Hunton & Williams LLP
1900 K Street, N.W.
Washington, DC 20006
(T) (202) 955-1500
(F) (202) 778-2201

-36-

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2006 JAN 17 AM 11: 19

CLERK C. Reynolds
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

ORIGINAL

TEXTRON INNOVATIONS INC., AND          )
                                        )
E-Z-GO (A DIVISION OF TEXTRON INC.),   )      CIVIL ACTION
                                        )      NO. **CV106-009**
        Plaintiffs,                     )
                                        )
v.                                      )      **EXHIBITS TO MEMORANDUM**
                                        )      **OF LAW IN SUPPORT OF**
FAIRPLAY ELECTRIC CARS, LLC,           )      **MOTION FOR PRELIMINARY**
                                        )      **INJUNCTION**
        Defendant.                      )

NOW COME the plaintiffs, Textron Innovations Inc. and Textron Inc. (and more specifically,

the E-Z-GO division of Textron, Inc.) (collectively "E-Z-GO"), and submit the following exhibits

attached as Exhibit A in support of their Motion for Preliminary Injunction.

This _17_ day of _January_, 2006.


                        TEXTRON INNOVATIONS INC. and E-Z-GO (A
                        DIVISION OF TEXTRON INC.)

                        By: _____

                        James B. Ellington
                        Georgia Bar No. 243858
                        HULL, TOWILL, NORMAN, BARRETT & SALLEY
                        Post Office Box 1564
                        Augusta, GA 30903-1564
                        Telephone (706) 722-4481
                        Fax (706) 722-9779

1

OF COUNSEL:
Scott L. Roberston
Christopher C. Campbell
Hunton & Williams LLP
1900 K Street, N.W.
Washington, DC 20006
(T) (202) 955-1500
(F) (202) 778-2201

# Exhibit B

ORIGINAL

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA 2006 JAN 17  AM 11: 05

| | |
|---|---|
| TEXTRON INNOVATIONS INC., AND | ) |
| | ) |
| E-Z-GO | ) |
| (A DIVISION OF TEXTRON INC.), | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| FAIRPLAY ELECTRIC CARS, LLC, | ) |
| | ) |
| | ) |
| Defendant. | ) |

CLERK C Reynolds
SO. DIST. OF GA.

CV106-009

CIVIL ACTION NO. _____

MOTION FOR PRELIMINARY
INJUNCTION

JURY TRIAL DEMANDED

### PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Textron Innovations Inc., and Textron Inc. (and more specifically, the E-Z-GO division of

Textron Inc.) (collectively "E-Z-GO"), by and through its counsel, moves pursuant to Rule 65 of

the Federal Rules of Civil Procedure for a preliminary injunction and asks this Court to enter an

Order enjoining Fairplay Electric Cars, LLC ("Fairplay") from infringing E-Z-GO's United

States Design Patent No. 369,762. A proposed Order is enclosed herewith.

The grounds for this Motion are set forth in the accompanying Memorandum of Law in

Support of Plaintiffs' Motion for Preliminary Injunction and accompanying Exhibits and

Declarations. Due to Fairplay's scheduled attendance on January 26-29, 2006, at the PGA

Merchandise Show in Orlando, Florida and again on February 9-11, 2006 at the Golf Industry

Show in Atlanta, Georgia, E-Z-GO respectfully requests an expedited evidentiary hearing on this

Motion.

This __17__ day of _January_, 2006.

James Ellington
Georgia Bar No. 243858
HULL, TOWILL, NORMAN, BARRETT, & SALLEY
Post Office Box 1564
Augusta, GA 30903-1564
Telephone (706) 722-4481
Fax (706) 722-9779

Attorneys for Plaintiffs:
    Textron Innovations Inc., and
    E-Z-GO (A Division of Textron Inc.)

OF COUNSEL:

Scott Robertson
Christopher C. Campbell
Hunton & Williams LLP
1900 K Street, N.W.; Suite 1200
Washington, DC 20006
(T) (202) 955-1500
(F) (202) 778-2201

# Exhibit C

# ORIGINAL

2006 JAN 23  AM 9: 59

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

SO. DIST. OF GA.

TEXTRON INNOVATIONS, INC. and      )
                                   )
E-Z GO (a division of TEXTRON, INC.),   )
                                   )
    Plaintiffs,              )         CIVIL ACTION NO. CV 106-009
                                   )
v.                                 )
                                   )
FAIRPLAY ELECTRIC CARS, LLC,       )
                                   )
    Defendant                )

## MOTION FOR CONTINUANCE

NOW COMES FAIRPLAY ELECTRIC CARS, LLC, Defendant named herein,

and moves for a continuance of the show cause hearing now scheduled for January 23,

2006, at 1:00 p.m., for a period to be determined by the Court. Defendant submits

herewith its supporting brief.

                                   Charles C. Stebbins, III
                                   Ga. Bar No. 677350
                                   Attorney for Defendant

OF COUNSEL:

WARLICK, TRITT, STEBBINS & HALL, LLP
Post Office Box 1495
Augusta, Georgia 30903-1495
(706) 722-7543

## CERTIFICATE OF SERVICE

This is to certify that I have caused a copy of the within and foregoing motion for

continuance to be served upon counsel for Plaintiffs by U.S. Mail addressed to:

> James B. Ellington, Esq.
> Hull, Towill, Norman, Barrett & Salley
> P.O. Box 1564
> Augusta, Georgia 30903-1564

and by facsimile transmission to Mr. Ellington.

This the 23d day of January, 2006.

Charles C. Stebbins, III

# ORIGINAL

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

2006 JAN 23 AM 9: 59

CLERK _____
SO. DIST. OF GA.

| | | |
|---|---|---|
| TEXTRON INNOVATIONS, INC. and | ) | |
| | ) | |
| E-Z GO (a division of TEXTRON, INC.), | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. CV 106-009 |
| | ) | |
| v. | ) | |
| | ) | |
| FAIRPLAY ELECTRIC CARS, LLC, | ) | |
| | ) | |
| Defendant | ) | |

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR CONTINUANCE

Defendant was served with the complaint herein, along with the Court's order to show cause of January 18, on Thursday, January 19, this being the first notice Defendant had of this lawsuit claiming alleged patent infringement. The complaint, the motion for preliminary injunction (with 25 exhibits) and the order to show cause were transmitted to Defendant's counsel in California on the evening of January 19. Defendant's undersigned counsel was retained on Friday, January 20.

It is simply impossible for Defendant to present an adequate showing, as required by the Court's Order, by 1:00 p.m. today. Plaintiffs' 35 page brief is accompanied by over 250 pages of supporting material, including the affidavit of a purported expert witness and affidavits of three other witnesses. Plaintiff's conclusory statements go to the underlying merits of its action. Its moving papers show that it has been preparing this application, with evidentiary support, for at least three months.

1

Most importantly, there is no urgency that this matter be resolved prior to the trade shows of January 26-29 and February 9-11, 2006. Any appearance of urgency has been manufactured by Plaintiffs in an attempt to force a decision on their application for preliminary injunction, without an adequate record. The consequences of issuance of such an injunction, without an adequate opportunity being given to Defendant to present an adequate and full showing, could be catastrophic for this new entrant into a heavily concentrated market.

## I.   Introduction

This Court should allow the present dispute to be considered on the merits, on an even playing field, with both sides able to present their case, able to investigate and marshal in their facts, able to obtain and present evidence of experts, and able to fully prepare their positions. Under the current situation, Plaintiffs were preparing their case and taking the photographs used as exhibits as early as October 2005. Yet they waited until one week before a major trade show, manufacturing an alleged "emergency" by their timing, and seek to push this case to an evidentiary hearing after allowing Defendant only two days to prepare its response. Such gamesmanship should not be condoned.

There is no urgency as claimed by Plaintiffs. Plaintiffs requested an expedited evidentiary hearing on their motion for preliminary injunction ("Motion") "[d]ue to [Defendant's] scheduled attendance on January 26-29, 2006, at the PGA Merchandise Show in Orlando, Florida and again on February 9-11, 2006 at the Golf Industry Show in Atlanta, Georgia . . ." (Motion, p. 1). The accused infringing product identified in Plaintiffs' Motion is the defendant's Fleet golf car (Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Injunction ("Brief"), p. 8). Defendant, however, is not

2

showing the accused infringing Fleet golf car at either of these shows. Without any such showing, the urgency of which Plaintiffs complain does not exist, and an evidentiary hearing can and should be presented after affording all parties (instead of only Plaintiffs) adequate time to prepare and present their case.

Finally, although there has been insufficient time to investigate, prepare or present evidence in this matter, the issues are not as represented by Plaintiffs and the evidence, when Defendant is able to obtain and present same, will show that Plaintiffs are not likely to succeed on the merits of their claim of infringement and that a preliminary injunction is not warranted.

## II.    Plaintiffs' Manufactured "Emergency"

In their Motion, Plaintiffs    allege that Defendant'sFleet golf car infringes Plaintiffs' U.S. Design Patent No. 369,762 ("the '762 Patent") (Brief,  p. 8).  Plaintiffs further allege that Defendant's  apparent intent to display its Fleet golf car at two upcoming trade shows creates the urgency for an expedited evidentiary hearing on this matter (Motion, p. 1). This urgency, however, has been manufactured by Plaintiffs, who waited until the last possible moment before springing both their Complaint for patent infringement and their Motion on Defendant.

As stated in their Brief, Plaintiffs began "an infringement analysis" upon becoming suspicious of Defendant's  activity in "late October 2005." (Brief,  p. 32). Photographic exhibits used in the exhibits to their Brief taken in October (Bruntz Declaration, Brief, Exhibit 2).   Plaintiffs' expert, John Anders, signed his lengthy declaration on January 12, and obviously took some of the exhibit photographs and started his analysis much earlier.   (The Anders Declaration noticeably does not state

3

when Mr. Anders was retained.) (Anders Declaration, Brief, Exhibit 21).    Internet displays used as exhibits attached to Plaintiffs' Brief were run, as shown by the dates thereon, on December 8, 2005 (Plaintiffs' Brief, Exhibit 7) and in early January (Plaintiffs' Brief, Exhibits 4, 6, 8, 9, 10), and all of the supporting declarations were completed and signed by January 12, 2006 (Plaintiffs' Brief, Exhibits 2, 3, 20, 21).

Notwithstanding the months of preparation for its infringement investigation and Motion, Plaintiffs did not file their Complaint and Motion until Tuesday, January 17, 2006, the week before the start of the PGA Merchandise Show in Orlando is to open. On January 18, 2006, without notice to Defendant, this Court granted Defendant's Motion For Order To Show Cause, setting January 23, 2006 at 1:00 p.m. as the date and time on which an evidentiary hearing would be held -- two and one half business days later. Defendant was served on January 19, 2006, and Fairplay's counsel subsequently received a copy of a portion of the pleadings and papers (including the Motion and related papers) late on Thursday afternoon, January 19, 2006, thus effectively leaving one business day to respond.[1]

Clearly, the one business day provided for Defendant to investigate and prepare to respond to the allegations raised in Plaintiffs' Motion and Brief, and to obtain factual and expert evidence, is insufficient. There is no need, however, for the emergency Plaintiffs thought they were creating. Defendant is not showing its Fleet car, the car asserted as an infringement in Plaintiffs' Motion and Brief, at the upcoming golf shows. Without this urgency, a more reasoned schedule can be set. Defendant's motion for a continuance of the evidentiary hearing should be granted.

---

[1] In fact, as of the filing of this Response Defendant;s counsel has not been furnished with a copy of Exhibit 12 to Plaintiffs' Motion.

4

### III.    Plaintiffs' Misstated Allegations of Patent Infringement

Numerous issues and evidentiary matters need to be addressed in opposition to Plaintiffs' Motion -- many of which issues are misstated by Plaintiffs in their moving papers. The following addresses some of these issues in an effort to advise the Court of their complexity, the evidence that is expected, and the need for additional time to conduct further investigation and obtain factual and expert evidentiary support.

As an initial and fundamental matter, Plaintiffs imply throughout their Brief that the scope of design patent protection is broad. They even cite to the case of *In re Mann* for the proposition that the protection of a design patent "generally" covers what is shown in the drawings (Brief, p. 12). To the contrary, as the Federal Circuit actually said in *In re Mann*, "[d]esign patents have almost *no scope*. The claim at bar, as in all design cases, *is limited to what is shown in the application drawings.*" *In re Mann*, 861 F.2d 1581, 1582 (Fed. Cir. 1988) (emphasis added). See, also, *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed. Cir. 1995).

Plaintiffs also continually compare the accused product to their own. It is generally improper, however, to compare an accused device solely with the patentee's commercial embodiment of the design -- the proper comparison being between the accused device and the design shown in the patent. *Sun Hill Industries, Inc. v. Easter Unlimited, Inc.*, 48 F.3d 1193, 1196-1197 (Fed. Cir. 1995) ("The test for infringement is not whether the accused product is substantially similar to the patentee's commercial embodiment of the claimed design. . . . The trial court must measure infringement against the claim, not against a commercial embodiment that contains more than the claim."); *Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985 (Fed. Cir. 1993) (vacating

5

ruling on preliminary injunction motion in part for improperly comparing accused device with patentee's commercial embodiment of the design). Although comparison with a commercial embodiment is sometimes useful, it can result in an improper focus on features not present in the patented design (*Sun Hill Industries, supra.*), such as exactly what is being done here where Plaintiffs continuously point to the location of rivet holes. Such rivet holes are not remotely shown or claimed in the asserted patent, and have nothing to do with infringement of the design shown in the patent.

Plaintiffs Brief also only shows the Defendant's Fleet car without a canopy. As shown in the specifications attached to Plaintiffs' own Brief, Defendant's Fleet car, however, comes with a canopy (Brief, Exhibit 4, pages 1 of 4 and 2 of 4 in the specifications).

In addressing the point of novelty test for infringement, which "requires proof that the accused design appropriates the novelty which distinguishes the patented design from the prior art" (*Bernhardt, LLC v. Collezione Europa USA, Inc.*, 386 F.3d 1371 (Fed. Cir. 2004)), Plaintiffs identify *some* points of novelty they claim are appropriated. Of those identified, one is clearly not appropriated and one is functional such that it is inappropriate to consider. Other points of novelty not appropriated, and substantiating no infringement, are omitted from Plaintiffs' Brief.

One of the alleged points of novelty addressed in Plaintiffs' Brief is the "the ornamental seat back" (Brief, p. 14). This feature, as shown in the '762 patent, however, is different from the seat back on Defendnat's Fleet product. The seat back claimed in the patent is a single back support with prominently separated and individualized supporting sections (see, e.g., Complaint, Exhibit A, patent Figures 1 and 2). Such

6

separated and individualized supporting sections are not found on Defendant's Fleet car,
which has a single, flush back support.

Another alleged point of novelty addressed in Plaintiffs' Brief are the four cup
holders. These are simple cut-out circles — standard for holding cups and functional. As
a functional feature — as opposed to ornamental feature — this should not even be
considered in an infringement analysis.

Other points of novelty, as appear from the prior art attached to Plaintiffs' Brief,
include a prominent central raised portion with parallel edges on the hood or cowl of the
golf car, and a rectangular recessed portion for placement of a nameplate or logo. Both
are shown in the '762 patent (see, e.g., Complaint, Exhibit A, Figure 1), and neither are
present on Defendant's Fleet car.    The lack of these features also supports
noninfringement under the point of novelty test.

The above issues and differences under the point of novelty test need be fully
investigated, addressed, and supported with factual and expert evidence in opposition to
Plaintiff's Motion — none of which Defendant has had an opportunity to prepare for or
do.

In the ordinary observer test for infringement, also addressed in Plaintiffs' Brief
and by their expert, it is asserted that the ordinary observer, giving such attention as a
purchaser usually gives, considers the two designs substantially the same. But Plaintiffs'
expert merely states that the ordinary observer he considered is "the ordinary purchaser
or one who may purchase the patented golf car." Such loose and circular "evidence"
provides no information at all, and does not identify the standard that is applied.
Plaintiffs' own Brief, for example, makes the distinction between "consumers" and "bulk

7

purchasers and leasees" (Memorandum, p. 1, footnote 1), but which "ordinary purchaser"
is being used by their expert?

Finally, the United States Patent and Trademark Office ("PTO") has
acknowledged the patentability, and issued a Notice of Allowance, of Defendant's
design. Defendant's own patent on its car will be issued shortly. The allowance of
Defendant's design patent claim on its own design, furthermore, was made with the PTO
considering and having Plaintiffs' '762 design patent cited to it. Accordingly,
Defendant's design, "against which the ['762] patent was cited and considered as prior
art, is thus presumed nonobvious in view of the ['762] patent until proven otherwise. The
nonobviousness of the accused device, evidenced by the grant of a United States patent,
is relevant to the issue of whether the change therein is substantial. *Roton Barrier, Inc. v.
Stanley Works*, 79 F.3d 1112, 37 USPQ2d 1816 (Fed. Cir. 1996) (Nies, J., Additional
Views); *National Presto Indus, Inc. v. West Bend Co.*, 76 F.3d 1185, 1192, 37 USPQ2d
1685, 1689 (Fed. Cir. 1996) ("The fact of separate patentability is relevant, and is entitled
to due weight.')." *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1570 (Fed. Cir. 1996).

## IV.    Discovery Needed

To appropriately address Plaintiffs' Motion and conduct an evidentiary
preliminary injunction hearing, discovery is required in numerous areas. Plaintiffs cite to
and rely on, for example, the commercial success of their TXT series golf cars and the
assertion that that success is due in large part to its unique ornamental design (Brief, pp. .
1, 4, 31). But what is the basis of these general conclusory statements? Is there any
nexus to the design patents asserted? If so, to which one? Discovery is warranted.

8

Discovery is also necessary on the functionality of design features where, as referenced above, features dictated by function are not considered in a design patent infringement analysis. Proper inventorship, prior art known to the inventors, and what the inventors consider to be their invention, are all areas in which discovery is necessary. Accordingly, discovery about the design and development of Plaintiffs' TXT product, including testimony from the patentees, Messrs. Molzon and Criscuolo, is warranted.

As also referenced above, discovery of Plaintiffs' sales activities and the identity of their customers is necessary to determine who is the "ordinary observer" under the ordinary observer test, and what is the standard of care given by that ordinary observer.

Investigation and discovery is necessary on the alleged validity of the design patent at issue, including areas of prior art known to Plaintiffs.

Finally, discovery is necessary on the alleged "irreparable harm" due to Defendant's alleged infringement, relied upon by Plaintiffs in their Brief, pp. 33-34).

**V.   Conclusion**

For the foregoing reasons, the hearing on Plaintiffs' Motion should be continued to a later date, in accord with a discovery and briefing schedule set by the Court to allow each party a reasonable opportunity to present its evidence and arguments.

Charles C. Stebbins, III
Ga. Bar No. 677350
Attorney for Defendant

OF COUNSEL:
WARLICK, TRITT, STEBBINS & HALL, LLP
Post Office Box 1495
Augusta, Georgia 30903-1495
(706) 722-7543

9

## CERTIFICATE OF SERVICE

This is to certify that I have caused a copy of the within and foregoing brief in support of motion for continuance to be served upon counsel for Plaintiffs by U.S. Mail addressed to:

> James B. Ellington, Esq.
> Hull, Towill, Norman, Barrett & Salley
> Post Office Box 1564
> Augusta, Georgia 30903-1564

and by facsimile transmission to Mr. Ellington.

This the 23d day of January, 2006.

Charles C. Stebbins, III

10

# Exhibit D

1

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF GEORGIA

3               AUGUSTA DIVISION

4   TEXTRON INNOVATIONS, ET AL., )

5              Plaintiffs,        )

6      vs.                        )   FILE NO. CV106-009

7                                 )

8   FAIRPLAY ELECTRIC CARS LLC., )

9              Defendant.         )

10

11               (Show Cause Hearing)

12

13  Before:

14           Honorable DUDLEY H. BOWEN, JR.,

15                          District Court Judge

16        at The Federal Courthouse Building,

17  Augusta, Georgia, on the 23rd day of January 2006,

18  commencing at the hour of 1:30 p.m.

19

20

21             RICHARD A. DUERINGER,

22          CERTIFIED COURT REPORTER

23             P. O. BOX 2106

24         AUGUSTA, GEORGIA   30903

25             (706) 790-6212

2

### INDEX TO EXAMINATIONS

WITNESS FOR THE PLAINTIFF

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| K. BRUNTZ | 22 | 38 | 46 | 48 |
| J. ANDERS | 50 | 71 | 74 | |
| R. SKENES | 76 | | | |

3

1   APPEARANCES OF COUNSEL:

2   On behalf of the

3   Plaintiff:     JAMES B. ELLINGTON, Esq.

4                  SCOTT ROBERTSON, Esq.

5                  CHRISTOPHER CAMPBELL, Esq.

6

7   On behalf of the

8   Defendant:     CHARLES C. STEBBINS, III., Esq.

9                  ALLAN STERNSTEIN, Esq.

10

11                      -  -  -

12          THE COURT:  Mr. Ellington, who should I

13  address as lead counsel?

14          MR. ELLINGTON:  Mr. Robertson will be

15  handling the lead argument.

16          THE COURT:  Mr. Robertson, the defendant

17  Fairplay has told me by way of motion since they

18  don't intend to have this alleged infringing gulf

19  cart at the Florida trade show there is no need to

20  have the hearing today.  What are your comments on

21  that.

22          MR. ROBERTSON: Yes, sir I see the

23  representation and I think that's fairly interesting

24  and I take counsel at their word in and I respect

25  their good faith in that regard. However, I would

4

1   suggest that language is very precisely worded.
2   Under the patent statute if you are an infringer you
3   shall not make, sell, use, or offer for sale or
4   import into the United States an infringing design.
5   Obviously, that is the relief we are seeking.
6             What I believe the defendant is
7   suggesting is that the defendant simply does not
8   intend to have a vehicle present at the trade show.
9   It is not averring that it will not be offering that
10  vehicle for sale or will not be attempting to sell
11  it or will not be marketing the device.
12            I think it is important to understand
13  what the purpose of these trade shows are. There are
14  a number of people who attend these trade shows.
15  Among them are dealers who are interested in
16  purchasing or leasing fleets of vehicles.  These
17  leases are typically three to five years in duration
18  and they often involve hundreds of golf cars that
19  are leased at one time. What could happened at the
20  trade show is the defendant can lease hundreds of
21  cars and establish relationships with dozens of
22  various dealers and they can consummate these lease
23  transaction so that my client will be irreparably
24  harmed in the sense that they will be locked out
25  forever or at least for five years, which in this

5

1   industry is forever, from leasing the cars to those

2   respective dealers.

3            If the representation is that they won't

4   market, sell or enter into any lease contract on

5   these cars then I would suggest we could enter into

6   an interim order to that effect and then we could

7   proceed at a later date with a full hearing on the

8   merits.  That would be our response to the proffer

9   in their document.

10           THE COURT:  Remind me when did I sign the

11  order setting up this hearing?

12           MR. ELLINGTON:  On Wednesday January 18th

13  you signed the show cause order and it was served on

14  Thursday the 19th on Fairplay in Colorado.

15           THE COURT:  Well, Mr. Stebbins, let me

16  hear your side of it.

17           MR. STEBBINS:  Your Honor, I don't know

18  anything about patent law and that is why Mr.

19  Sternstein is here, but for the moment I still am

20  lead counsel.

21           As I said in my brief this has caught us

22  completely by surprise and we were not able get our

23  principal litigator over here from Los Angeles

24  because of the short notice.  It is my understanding

25  from the company that we do not plan to have the

6

1   model in question at the trade show nor do we plan

2   to be offering it and we have no brochures for the

3   model. We don't plan to be offering the model for

4   sale.   It is in our catalog, but the company is not

5   planning to do anything that would be unique to the

6   trade show.  We feel, that being the case, that

7   there is no reason for injunction to be issued

8   simply because of the existence of the trade show.

9          THE COURT:   I will tell you what's let's

10  do.  We'll forget about the trade show for a

11  moment.  When I reviewed these documents it occurred

12  to me that somehow E-Z-Go must have gotten a hold of

13  one of these carts somehow because they were able to

14  dissect it, photograph it and put parts together and

15  they have a fairly impressive display of what fits

16  with this, that and other as far as being

17  interchangeable.

18          So, I am curious as to how they got one

19  if it is not being marketed or sold.

20          MR. STEBBINS: I didn't mean to say that,

21  Your Honor. We have been selling this model for some

22  time.   Part of our argument is that this action

23  could have been brought up much earlier than just

24  before the trade show.  What's going to happen at

25  the trade show is a different model is going to be

7

1  unveiled and shown.  Of course, we contend the

2  present model is materially different from the

3  E-Z-GO product they say we are infringing.

4        I note, Your Honor, although we have not

5  yet had the opportunity to engage an expert we are

6  talking here about a design patent which is

7  different from an engineering patent. I am told that

8  the relatively small differences in the structure

9  and appearance are sufficient to make a separate

10 product that is not infringing on the patent.  Of

11 course, the nature of the golf cart is that they are

12 all going to look alike.  But we are planing to

13 introduce a new model which is even more different

14 than the one they are complaining about here at the

15 trade show.  No one has seen that new model yet, but

16 it is no secret and many people are aware that the

17 new model is going to be brought out at the trade

18 show.

19        So, there will be no promotion of the

20 existing model at trade show.  So, in our view this

21 action could have been brought sooner.  There is no

22 secret about the model they got anybody can buy one

23 and a good many have been sold.

24        THE COURT:  Mr. Stebbins, you and I share

25 a significant level of ignorance about patents.  I

8

1  have always been delighted to get through my patent

2  cases and I have had a few.  To put it bluntly the

3  patent disputes I have had over the use and design

4  of various devices is different from what I'm seeing

5  here in this design patent case. Happily what I see

6  in the design situation is a standard by which the

7  reasonable observe can determine whether there is an

8  infringement or not.  I can be an observer and I

9  hope I can be a reasonable observer.  In other words

10  if it looks like a Textron golf cart, the parts fits

11  and that sort of thing it may, in fact, be a copy.

12        I am always, of course, going to be very

13  attentive to experts, but I sort of came in here

14  today thinking this is an area where I don't need to

15  be lead by experts or as some people call them hired

16  guns.

17        I don't know what kind of presentation

18  these folks intend to make.  I am inclined to hear a

19  little bit about it.  The urgency may be as you say,

20  but I am going to take a presentation that would

21  pertain to trade show.  If as you say there is not

22  going to be a concentration at the trade show on

23  this particular type of unit and they are not going

24  to present this as their latest and newest and all

25  of that what would be a harm of going ahead and

9

1    hearing about it and see if there is at least a

2    preliminary phase of an infringement.

3    MR. STEBBINS: Your Honor, we have never

4    seen the proposed order that the Court is being ask

5    to enter.  We don't know how broad that order might

6    be.  We have an inventory of the existing product

7    and we don't feel it is proper for us to be enjoined

8    from selling that existing product.

9    Frankly, we would not object to an

10   injunction that we won't promote the existing

11   product they say is infringing at the trade show

12   because we won't be doing that any way.  I'm having

13   trouble and my client is having trouble

14   understanding how much relief is desired here.  We

15   don't think it would be right to plead that the

16   trade show presents an emergency and that be

17   enjoined from selling this product.

18   We certainly don't have a problem with a

19   narrowly tailored injunction that we don't intend to

20   promote this product at the trade show which we are

21   attending strictly for the purpose of unveiling our

22   new model.  One which we contend is even a more

23   different model.

24   THE COURT:  All right.  Mr. Robertson, I

25   would like to hear from you all. I'm going to keep

10

 1    the motion for continuance under advisement.  I

 2    would like to hear from you on those features of all

 3    of this that might have some greater urgency.  If

 4    this thing has been on the market for almost a year

 5    we are not in such a rush that we have to do it

 6    within three or four days time.

 7          MR. ROBERTSON: What it this important in

 8    that you understand the chronology here from my

 9    client's prospective.  First just so the Court knows

10    E-Z-Go has been Augusta for 50 years and has eight

11    hundred employees eighty-five percent of whom are

12    dedicated to the development and manufacture of this

13    car that is cover by this design patent. It is the

14    only golf cart that they sell now so, therefore, it

15    is of critical commercial importance to this

16    company.

17          It is no short argument to make that,

18    indeed, the fact that this Fairplay car has come

19    into the market place and it hasn't copied our main

20    competitor Club Car and it hasn't copied our other

21    main competitor Yamaha.  Together E-Z-Go, Club Car

22    an Yamaha factor into more than ninety percent of

23    the current golf cart market.  What this company has

24    done is come in and try to free ride off the

25    reputation and good will that we have created for

11

1  over the ten years that this car has been on the

2  market.

3       Like I said it is our only car we

4  manufacture and to come in and under sell us with

5  what only can be described as a rank knock off.  I

6  have three witnesses one of whom is our manager of

7  industrial engineering Kent Bruntz who can describe

8  his efforts to obtain a car and reverse engineer it

9  and identify not only the substantial similarity

10 which Your Honor has already noted is called the

11 ordinary observer test, but the outright slavish

12 copy of the pieces down to even defects that were in

13 our car and down to even things that are

14 insubstantial and would only be replicated if you

15 were making a rank copy.

16      I also have here today Mr. Ronald Skekes

17 our director of marketing.  Mr. Skekes can address

18 some of the issues that would establish the

19 irreparable harm that would occur to E-Z-Go if the

20 infringer would be able to market this car and make

21 significant inroads into our market share.

22      Finally, I have the declaration of Mr.

23 Robert Anders who is our expert.  Mr. Anders has

24 forty-eight years experience as a designer.  I can

25 call those witnesses now, Your Honor, if you would

12

1    like.

2              THE COURT:  What I want you to talk about

3    is the urgency for doing it today which is four or

4    five days after filing of the complaint. We heard

5    about the trade show and now they are telling me

6    that the trade show will not include all of this.

7              MR. ROBERTSON: Let me address the issue

8    that the car has been on market for a year.  We had

9    not been able to obtain a car until late October.

10   So, we had a car in late October from a company we

11   then identified as Player Golf Cart.  Apparently the

12   company has now changed its name to Fairplay

13   because, according to my information, it ran afoul

14   of other trademarks involving the Player name.  It

15   was only last Thursday that we were able to obtain,

16   here in Georgia, a Fairplay car by purchasing it

17   though a dealer.  We had been contacting our dealers

18   in an effort to find out where they are marketing

19   the car.

20             The trade shows as Mr. Skekes can testify

21   to are a significant outlet for marketing the cars.

22             THE COURT:  When did you get a hold of a

23   golf cart?

24             MR. ROBERTSON:  The Fairplay car we got

25   last Thursday.

13

1          THE COURT:  When did you get a hold of
2    the Player?
3          MR. ROBERTSON: Sometime last October.  In
4    accordance with our Rule 11 obligations I was
5    retained in October and I came down here and
6    inspected the car.  I instructed them to make a
7    detailed comparison of that car and ours to
8    determine if we had a meritorious good faith basis
9    to bring the case. We learned of Orlando trade show
10    in late December and we appraised our client of that
11    and that is what added the urgency to this matter
12    because we appreciated the significance of
13    attendance at a trade show at a booth that we
14    understand is anticipated to be three booths down
15    from the E-Z-Go booth.
16          At that point I instructed my client that
17    we should obtain an expert in order to be able to
18    present testimony at any injunction hearing a court
19    may order.  We retained Mr. Anders on or about
20    December 28th.  Mr. Anders was able to arrange a
21    visit to E-Z-Go on January 3rd at which time he
22    inspected the vehicle.  By January 12th we prepared
23    Mr. Anders declaration for his affidavit and filed
24    the lawsuit, after the long holiday weekend, on
25    January 17th.  Then the Court issued its show cause

14

1    order on the 18th.

2             So, Your Honor, we have moved with all

3    deliberate speed to address the issue.  I was only

4    retained in October at which point I ask that we

5    make detail inspection and disassemble the cart.

6             As far as the trade shows I want to

7    emphasize they are very significant in the marketing

8    these carts and we may never be able to unring the

9    bell should Fairplay be able to go forward and

10   market the car.

11            This is a brochure that we obtained with

12   the cart we purchase last Thursday.  What is

13   interesting is they are marketing the accused device

14   as not only as the Fleet cart that we put in our

15   papers, but now as the Legacy slash Fleet car.

16   These marketing brochures, price lists and the like

17   will be at the trade shows and available to dealers

18   and prospective purchasers.

19            Quite frankly, this has been evolving

20   over the last three months. At first when we became

21   aware of the car it was being called a Player. Later

22   it was called the Fairplay Fleet car and now it is

23   being marketed as the Legacy slash Fleet car based

24   on the most up to date literature we have obtained

25   as of last Thursday.

15

1        So, the concern we have is that we are

2    not certain that the car they are representing is

3    the car that is not going to be shown, but they are

4    certainly prepared to market and offer for sale and

5    sell the car that we say directly threatens the

6    existence of E-Z-Go.

7        If I might make a suggestion we were

8    going to propose an order at the end of the hearing

9    we expected to have. Since then Mr. Ellington has

10   crafted an order that, in essence, is asking for

11   half a loaf based on the representations in the

12   defendant's papers. In other words, we are not

13   asking for an injunction, that we think we would be

14   entitled to after a full hearing, causing them to

15   stop using, distributing or importing the car from

16   China. We would only ask in the interim, before the

17   Court can have a full hearing, that they be enjoined

18   from selling, offering for sale or marketing the car

19   until the Court has full hearing on the merits at

20   which time we would ask for an injunction. We have

21   proposed an order to that effect that we will hand

22   to opposing counsel at this time.

23        THE COURT: That way we will be getting

24   it all at the same time. Let me see what your

25   desired result is. Give that to Mr. Stebbins and

16

1    me.

2           Mr. Stebbins, I wonder if you brought

3    with you, by any chance, any promotional materials

4    on the new and more distinct golf cart?

5           MR. STEBBINS: It is not a secret that we

6    will be unveiling this thing, but it is a secret as

7    to what it looks like.  So, we haven't got any

8    material on it here today.  My co-counsel might be

9    able to described it because I believe he has

10   handled all of the patent applications for this

11   predecessor to the Legacy which is an earlier

12   vehicle than the Fleet and it has been out longer.

13   Let me ask him to address the Court if I may.

14           THE COURT:  Mr. Sternstein.

15           MR. STERNSTEIN: First of all the Legacy,

16   although counsel indicated they first received

17   material on it Thursday.  Actually the Legacy they

18   have known about that for some time as well because

19   there is even an advertisement in their motion

20   papers on the Legacy.  So, in their motion papers

21   they point out both yet argue on the Fleet only.

22   That's why in our response we addressed only the

23   Fleet because that is what they addressed.

24           As far as the new unit the new car that

25   is coming out as Mr. Stebbins said we don't have any

17

1    promotional literature because that is being

2    unveiled at the show.  It does have a more unique

3    hood ornamentation and disclosure in appearance than

4    the other one that would be visible up in front.

5              As indicated we have been marketing the

6    Fleet car for the some time now.  As counsel has

7    indicated they have had one since October.  So, it

8    is not something that is that urgent with regard to

9    days.

10              MR. STEBBINS: I don't want to double

11   team, but I would like to comment on the proposed

12   order Mr. Ellington just gave me.

13              THE COURT:  Sure.

14              MR. STEBBINS: I don't think the purpose

15   of this hearing should be to obtain an advantage

16   that I perceive the plaintiffs would obtain under

17   this proposed order.

18              Secondly, the thing that I find I

19   difficult to accept is where it says my client will

20   not offer to sell or market its existing cars.  We

21   won't do it at the trade show and it is not in our

22   interest to do it at the trade show because they are

23   trying to promote this new one.

24              But look at the situation E-Z-Go and

25   these two other companies have over ninety percent

18

1   of the market. My client is a new entrant and I

2   think it would be wrong to enjoin my client from

3   selling the vehicles it has when there has been no

4   proof of even a likelihood of success on the

5   infringement right now.  That is why we are asking

6   for more time to respond.

7           I realize that possibly the layman is a

8   reasonable observer, but I have looked at enough law

9   in this area to see what appears to be is not always

10  what comes to pass. I would again say the urgency

11  presented as to why, after knowing about this at

12  least since October, they wait to bring this action

13  until a week before the trade show. The urgency

14  appears to be the trade show and if we don't market

15  this vehicle at the trade show the urgency isn't

16  there.  So, this order would fine with us except for

17  the words offering to sell, selling or marketing and

18  if it were restricted to the trade show that would

19  be all right with us also.

20          MR. ROBERTSON: Might I briefly respond,

21  Your Honor?

22          THE COURT:  Sure.

23          MR. ROBERTSON:  Under those circumstances

24  the order would be pointless and meaningless because

25  it wouldn't proscribe any activity.  We are here for

19

1   an injunction to demonstrate the likelihood of

2   success that this car should not even be on the

3   market. That this car is a rank Chinese knock off of

4   our car that is aimed like a dagger to the heart of

5   my client and they have attempted to capitalize on

6   the good will and reputation of E-Z-Go.

7          THE COURT:  Dagger in the heart and all

8   of that is most impressive imagery Mr. Robertson,

9   but when have you ever gotten a preliminary

10  injunction in a patent case when you filed the

11  complaint on Wednesday, served it on Thursday and

12  have gotten a hearing on Monday afternoon?

13         MR. ROBERTSON:  It is not an often

14  occurrance, but Your Honor set the hearing date.

15         THE COURT:  I did that because they told

16  me the trade show started this Wednesday.

17         MR. ROBERTSON: Absolutely, and as I said

18  we learned of the trade show in late December.  When

19  we appraised them of that my client said this is a

20  significant event for us.

21         THE COURT:  There is a golf cart trade

22  show that your people didn't know about?

23         MR. ROBERTSON: They knew about it and

24  they were attending, but they didn't know Fairplay

25  was attending.  We learned about it not when we

20

1    purchased the car.  We looked at page four on the

2    home page of their web site.  These are pages from

3    Fairplay's web site there it appears that they are

4    attending the Orlando trade show.  So, yes, it took

5    on added significance for us.

6            It is our position that this car should

7    not be in the market place.  Your Honor, is right it

8    does not take an expert to recognize the significant

9    substantial similarity which is the test between the

10   E-Z-Go car and the Fairplay car.  The Court is right

11   you do not need expert testimony to determine under

12   the ordinary observer test that the cars are

13   substantially similar.

14           We do have witnesses present to provide

15   the court with a little better background, but we

16   think our papers on their face demonstrate that we

17   have met our burden of showing a likelihood of

18   success on the merits.  If this is not a car of

19   great significance why is it that they cannot agree

20   not to market it or offer it for sale at the trade

21   show pending a full hearing on the merits.

22           THE COURT:  All right, let's go ahead

23   with your engineer.  I'm going to take some

24   testimony on this.

25           MR. ROBERTSON:  I will be happy to go

21

1    right to the engineer if the Court doesn't think it

2    is necessary to go through the background material

3    about obtaining the car and disassembling it and

4    making the comparison.  I can put aside the

5    testimony of Mr. Bruntz and Mr. Skekes from E-Z-Go

6    and go directly to Mr. Anders.

7         THE COURT:  That's up to you.  I would

8    like to hear about the reverse engineering.

9         MR. ROBERTSON:  With that in mind I would

10    call Kent Bruntz and ask Your Honor to allow my

11    partner Chris Campbell to briefly conduct the direct

12    examination of Mr. Bruntz.

13         MR. CAMPBELL:  Your Honor, we have for

14    your convenience the exhibits we might be referring

15    to.  They are all contained in the papers we have

16    previously filed with the Court.

17              KENT HOWARD BRUNTZ,

18    called as a witness on behalf of the Plaintiff,

19    having been first duly sworn, was examined and

20    testified as follows:

21         THE CLERK: State your full name for the

22    record.

23         THE WITNESS:  Kent Howard Bruntz.

24

25              ////

22

DIRECT EXAMINATION

BY MR. CAMPBELL:

Q.    Please state your name?

A.    Kent Howard Bruntz.

Q.    What is you educational background?

A.    I graduated from Thomson High in 1980 and
I graduated from Southern Technical Institute with a
bachelor's degree in industrial engineering in 1984.

Q.    Who is your current employer?

A.    E-Z-Go.

Q.    How long have you been employed there?

A.    It will be thirteen years in May.

Q.    What is your current title?

A.    Golf car manager.

Q.    What other positions have you held at
E-Z-Go?

A.    Manufacturing engineer, product manager,
marketing manager and golf car manager.

Q.    Will you describe your current job
responsibilities?

A.    I currently handle intellectual
properties.  All the patents that are filed I make
sure they get filed through our patent attorneys for
all accessory designs related to the golf cart.

Q.    How long have you held your current

23

1    position?

2         A.      Three years.

3         Q.      What is the nature of E-Z-Go's business?

4         A.      To build and sell golf cars and utility

5    vehicles.

6         Q.      Who are your primary competitors?

7         A.      Club Car and Yamaha.

8         Q.      Have you heard of Fairplay Electric Cars

9    LLC?

10        A.      Yes.

11        Q.      What is the business of Fairplay?

12        A.      The manufacturing and selling of golf

13   cars.

14        Q.      In the course of your job do you stay

15   abreast of the product produced by E-Z-Go's

16   competitor?

17        A.      Yes.

18        Q.      As a part of staying informed did you at

19   some point learn about Fairplay Electric Cars?

20        A.      Yes.

21        Q.      Did E-Z-Go at some point acquire a

22   Fairplay golf car?

23        A.      Yes.

24        Q.      For what purpose?

25        A.      We wanted to look at it and evaluate the

24

1    construction of the vehicle and compare it to the

2    construction of the E-Z-Go golf car.

3        Q.    From whom do you acquire the first

4    Fairplay golf car?

5        A.    The first one came from West Texas Golf

6    Cars.

7        Q.    When was that?

8        A.    The end of September or the first of

9    October.

10       Q.    Did you them analyze that gulf car?

11       A.    Yes.

12       Q.    What did you do?

13       A.    We took it apart side by side with the

14   E-Z-Go car disassembling both of them and we

15   compared them.

16       Q.    Who was present when you disassembled the

17   Fairplay gulf car?

18       A.    A gentleman named Rob Kinder.

19       Q.    Is he with the law firm of Hunter and

20   Williams?

21       A.    Yes.

22       Q.    Did you photograph the Fairplay golf cart

23   as you disassembled it?

24       A.    Yes.

25       Q.    I would like to direct your attention to

25

1    the exhibit note book in front of you and

2    specifically exhibits 13 through 19.

3            THE COURT:  I am not going to admit

4    particular numbers of the note book.  I will let the

5    note book be a part of the record and I am going to

6    provisionally allow all of the exhibits in the note

7    book as evidence for the limited purpose of this

8    hearing.  Go ahead.

9        Q.    Referring, Mr. Bruntz, to exhibits 13

10   through 19 in the note book in front of you.  Are

11   these some of the photographs taken during your

12   inspection of the Fairplay golf cart?

13       A.    Yes.

14       Q.    When did that inspection occur?

15       A.    At the end of October.

16       Q.    October 27th?

17       A.    Yes.

18       Q.    Were some components of the parts on the

19   Fairplay gulf cart identical to the parts on the

20   E-Z-Go XTX model?

21       A.    Yes.

22       Q.    Were these photographs taken during your

23   the inspection of Fairplay golf cart?

24       A.    Yes.

25       Q.    What does exhibit 13 illustrate?

26

1       A.    It illustrates the back seat assemblies

2   that would have come off the E-Z-Go and Fairplay

3   model.

4       Q.    What is the black piece?

5       A.    It is a portion of the seat back assembly

6   that covers the seat back itself to give it a little

7   bit of an ornamental appearance or a cosmetic

8   appearance.

9       Q.    There appear to be holes in the black

10  plastic piece.  What are the holes for?

11      A.    There are holes on the outside of plastic

12  covers that allow you to attach it to the seat back

13  and there are holes in the rectangular molded

14  section for mounting to the gulf car.

15      Q.    Do the holes in the Fairplay assembly

16  align with the holes in the E-Z-Go model?

17      A.    Yes.

18      Q.    Is the alignment precise?

19      A.    Yes, it is.

20      Q.    How precise is it?

21      A.    It is so precise you can attach it either

22  way.  The E-Z-Go to the Fairplay and vice versa.

23      Q.    Are the outer form of the seat backs

24  identical?

25      A.    Yes.

27

1          Q.    Turning to exhibit 14.  Are these

2     photographs taken during the inspection of the

3     Fairplay golf cart?

4          A.    Yes.

5          Q.    What does exhibit 14 show?

6          A.    It shows the seat bottom assembly from

7     the E-Z-Go car and the seat bottom assembly from the

8     Fairplay car.

9          Q.    Were the seat bottoms of the same size

10    and shape?

11         A.    Yes.

12         Q.    Did they have hinges?

13         A.    They had the same hinges that you can

14    see.

15         Q.    Were the hinges in the same location?

16         A.    Yes.

17         Q.    What is the purpose of the hinges?

18         A.    To allow access to the under side of the

19    car to expose the batteries or the power train.

20    They are designed to let you raise the seat forward

21    and lift it off if necessary.

22         Q.    Were the seat bottoms and side handles on

23    the Fairplay and E-Z-Go cars interchangeable?

24         A.    Yes.

25         Q.    Are the outer forms of the seat bottom

28

1   and handle configuration identical?

2        A.    Yes.

3             THE COURT:   What about the hinges are

4   they interchangeable?

5        A.    Yes.

6             THE COURT:   So, you can put the seat on

7   either car and it will hinge correctly?

8        A.    Yes.

9        Q.    If the hinges on the Fairplay car were

10  shifted by say a fourth of an inch would they fit

11  and meet with the hinges on the E-Z-Go cart?

12       A.    No.

13            THE COURT:   I think I know that the Club

14  Car seat hinges forward also.  Are your hinges

15  different from theirs?

16       A.    Yes.

17            THE COURT:   So, you all don't contend you

18  are infringing on each other there?

19       A.    No, sir.  I would like to point out that

20  the way the rear body houses the seat even if you

21  put the hinges of the Club Car on the E-Z-Go car it

22  would not fit.  The body and the seat the way they

23  work together it would not pocket.  So, in answer to

24  Chris' question if seat hinges were slightly moved

25  the seat wouldn't fit.  If the seat itself was a

29

1    little fatter or wider it wouldn't fit the car.

2        Q.    Was it necessary for Fairplay to put the

3    hinges exactly where they have positioned them on

4    this vehicle?

5        A.    No.

6        Q.    Going to exhibit 15.  Are these

7    photographs taken during your inspection of Fairplay

8    cart?

9        A.    Yes.

10        Q.    What does exhibits 15 show?

11        A.    It is showing what we refer to as an IP

12    an instrument panel or dashboard.  The top picture

13    would be as if you were sitting in the seat of the

14    car.  The left-hand pocket would be the driver's

15    side and the right-hand would be the passenger

16    side.  You are observing a couple of cut outs in

17    there for the key switch and golf ball holder.

18        Q.    How does the dashboard mount to its

19    component parts on a golf car?

20        A.    There are holes in the upper portion of

21    the frame and the floorboard that allow you mount it

22    via rivets.

23        Q.    Is there a cowl that attaches to that?

24        A.    Yes, the front body portion attaches to

25    that instrument panel or dashboard with the same

1    type of rivets through mounting holes.

2        Q.    And does the dashboard mount to the frame

3    of the golf car?

4        A.    Yes, the lower part of the dashboard has

5    holes that meet with holes in the floorboard and

6    frame of the vehicle.

7        Q.    Do the rivet holes on the Fairplay

8    dashboard align with the E-Z-Go dashboard?

9        A.    Yes.

10        Q.    Does the cowl on the E-Z-Go dashboard fit

11    on to the Fairplay dashboard?

12        A.    Yes, it does.

13        Q.    Are the outer forms and shapes of the

14    dashboards exactly the same between the two carts?

15        A.    Yes.

16        Q.    Turn to exhibit 16.  Were these

17    photographs taken during your inspection of the

18    Fairplay gulf cart?

19        A.    Yes.

20        Q.    What does exhibit 16 show?

21        A.    It is showing the front cowl on each of

22    the vehicles that we had disassembled and laid side

23    by side.

24        Q.    Are there mounting holes on the side of

25    cowl of the E-Z-Go car?

31

1    A.    Yes, you can see the holes in the white
2 easier than you can in the green, but nevertheless
3 they are there.
4    Q.    What are the those mounting holes?
5    A.    They are for mounting the front strut
6 which holds the top canopy or roof of the gulf cart.
7    Q.    Are there corresponding mounting holes on
8 the side of the cowl on the Fairplay car?
9    A.    Yes.
10    Q.    Are the mounting holes in the same
11 location?
12    A.    They were.  The nuts that hold the top
13 canopy is a weld on the frame and when I aligned the
14 cowl with the dash holes the holes on the frame that
15 hold the top came through the body of the front cowl
16 as they would on the E-Z-Go car.
17    Q.    Let me go to exhibit 19.  Are these
18 photographs taken during inspection of the Fairplay
19 golf cart?
20    A.    Yes, the top picture is a picture of the
21 Fairplay when we were disassembling it with the
22 E-Z-Go cowl attached to the Fairplay.  It is showing
23 those holes for the top were lining up and the
24 bottom rivet holes on the frame were lined up on the
25 cowl as well.

32

1       Q.      So, you are saying the mounting holes for

2   the top roof structure align in the E-Z-Go cowl with

3   the nut in the Fairplay car?

4       A.      Yes.

5       Q.      Are the outer shapes of the cowls

6   identical between the two cars?

7       A.      Yes.

8       Q.      Turning to exhibit 17.  Were these

9   photographs taken during your inspection of the

10  Fairplay car?

11      A.      Yes.

12      Q.      What does exhibit 17 show?

13      A.      Exhibit 17 shows the rear body of the

14  Fairplay and the E-Z-Go after they were disassembled

15  and sat side by side.

16      Q.      Does the E-Z-Go rear fender have rivet

17  holes?

18      A.      Yes.

19      Q.      Give me an example of the main use of

20  those holes?

21      A.      The holes are set up in such a way so

22  that you can mount this rear body to the frame

23  similarly the way the cowl and the dashboard did,

24  they run along the top edge where the seat goes and

25  along the front portion and mount to the frame.

33

1       Q.    Does the Fairplay fender have a rivet

2   hole in the identical location as the E-Z-Go rear

3   fender?

4       A.    Yes.

5       Q.    Are the two interchangeable?

6       A.    Yes.

7       Q.    Is the outer shape of the rear fender on

8   the two cars identical?

9       A.    Yes.

10      Q.    Go to exhibit 18.  Were these photographs

11  taken during your inspection of the Fairplay car?

12      A.    Yes.

13      Q.    What does exhibit 18 show?

14      A.    Exhibit 18 shows our front shield or

15  brush guard that sits up underneath the front cowl

16  to cover the shocks and the front suspension

17  component.

18      Q.    What is the purpose of the brush guard?

19      A.    To protect the from end a little bit from

20  brush that would interfere with the shocks or

21  suspension and also to hide the appearance of the

22  mechanical component.

23      Q.    How is the E-Z-Go brush guard attached to

24  the car?

25      A.    There are four holes in the E-Z-Go brush

34

1    guard two of them mount on the top part of the frame

2    and the other two mount to a bracket that hangs down

3    off the frame.

4        Q.    Are there corresponding holes on the

5    Fairplay brush guard?

6        A.    Yes.

7        Q.    Are the brush guards interchangeable?

8        A.    Yes.

9        Q.    Are the frames identical between the two?

10       A.    Yes.

11       Q.    Did you discern any difference in quality

12   between the Fairplay and the E-Z-Go car during your

13   inspection?

14       A.    We found that a shock was loose.  The

15   shocks nuts were loose and they were identified with

16   a piece mark that in the industry is known as a

17   quality check that it has been torqued to the right

18   torque setting.  One of the shock mounts was just

19   finger tight even though they were marked they came

20   loose.

21            We noticed when you look at the rear body

22   we pride ourselves on an automotive class finish and

23   make sure it has the proper gloss similar to an

24   automobile.  The rear body on Fairplay had jagged

25   cut lines.  It is not a smooth cut so it shows

35

1   gaps.  The body is very wavy it would appear like a

2   car that has been wrecked and reworked and had a

3   poor Bondo job.  So, the lines were not clear and

4   true similar to an E-Z-Go.

5       Q.    If you had time to study it could you

6   identify other differences in the quality between

7   the two cars?

8       A.    Yes, if they were side by side you can

9   identify other difference in the quality between the

10  two cars.

11      Q.    Has Fairplay copied any design

12  imperfections that you identified in the E-Z-Go

13  design?

14      A.    One of the earlier steering components we

15  had a flaw in was actually designed into their

16  steering component.  That dent would occur from the

17  driving of an E-Z-Go theirs already had a

18  manufactured dent in the bracket cover.

19      Q.    So, it served no purpose whatsoever?

20      A.    No.

21      Q.    And it was identically found on the

22  Fairplay car?

23      A.    Yes.

24      Q.    Did E-Z-Go recently acquired another

25  Fairplay car?

36

```
 1        A.    Yes.

 2        Q.    How did you acquire that car?

 3        A.    Through our Augusta branch.

 4        Q.    When did you acquire it?

 5        A.    Last Thursday, January 19th.

 6        Q.    And that was purchased from West Georgia

 7   Gulf Cars?

 8        A.    Yes.

 9        Q.    Where are they located?

10        A.    In Douglasville, Georgia.

11              MR. CAMPBELL:  I have no further

12   questions.

13              THE COURT:  Mr. Bruntz, what we have

14   talked about so far is largely ornamental things.  I

15   guess the seat is somewhat elemental because you

16   want to be able to sit comfortably on it, but still

17   it is a right easy thing to make.

18              Talk to me a little bit about the

19   mechanical parts of the car.  For example, do you

20   use metrics or SAE threads on your fasteners?

21        A.    On our TXT we use standard, yes, sir.

22              THE COURT:  What did you find on the

23   Chinese golf cart?

24        A.    We found both.  I was able to use

25   standard tools and metric tools.
```

37

1          THE COURT:  What about the threads did

2     the use American type threads?

3          A.     The threads were the same.

4          THE COURT:  They used American type

5     thread?

6          A.     Yes.

7          THE COURT:  Are there threaded caps

8     holding the wheel on with a cotter key in there?

9          A.     Yes, they use -- we stepped away from

10    cotter keys, but we use lock nuts.  They had the

11    same lock nuts.  The shock nuts appeared to be the

12    same.  They were mounted in the same fashion on the

13    front axle as ours.

14          Speaking of the mechanical portions the

15    batteries that power the car were configured in the

16    same fashion.  The same type of axle and the same

17    type of motor.  The same type of rear end springs

18    that attach the axle to the frame.

19          THE COURT:  To what extent did you find

20    any of those parts interchangeable?

21          A.     I did not go that far to swap out those

22    parts.

23          MR. CAMPBELL:  If I may, Your Honor.  The

24    parts that you did attempt to swap out were the

25    ornamental parts that were subject to the design

38

1    patent?

2        A.    Yes.

3            THE COURT:  Okay.  Thank you.  Mr.

4    Sternstein, do you have any questions?

5            MR. STERNSTEIN:  Yes, Your Honor.

6            THE COURT:  Excuse me just a minute.

7    What about the golf bag rack and the belt

8    attachments were there any similarities there?

9        A.    Yes, sir, they were using the same

10   plastic bag support and the same strap.  The bag

11   well was identical in the rear of the body the black

12   liner that drops into the rear body.

13           THE COURT:  Back to you, Mr. Sternstein.

14           CROSS-EXAMINATION

15   BY MR. STERNSTEIN.

16       Q.    Mr. Bruntz, in your position you're

17   familiar with the patents that have been asserted in

18   this lawsuit?

19       A.    Yes.

20       Q.    Directing your attention to the exhibits

21   that you have just testified about.  Let me first

22   direct your attention to exhibit 13.  In exhibit 13

23   you testified about the alignment of the holes on

24   the underside of the seat?

25       A.    Yes.

39

1      Q.    Are those holes any part of the patent
2    that's asserted in the preliminary injunction?
3      A.    I don't know how to answer that question
4    I have not dug into the detail of that patent.
5      Q.    Are those holes shown anywhere in patent
6    that's been asserted?
7      A.    I don't know.
8      Q.    Let me direct your attention to the
9    patent that has been asserted which is exhibit 1.
10   Can you show me anywhere where those holes are shown
11   in this patent?
12     A.    No, sir.
13     Q.    I would like to direct your attention to
14   exhibit 14 that you testified about.  You talked
15   about the hinges on the seat bottom?
16     A.    Yes.
17     Q.    Are those hinges anywhere in the patent
18   that's asserted to be infringed in this lawsuit?
19     A.    The specific hinge, no, sir.
20     Q.    I would like to the direct you're
21   attention the exhibit 15 that you testified about.
22   You testified about the mounting holes there.  Are
23   those mounting holes any part of the design patent
24   that's asserted for this preliminary injunction?
25     A.    The dashboard?

40

1      Q.    The mounting holes?

2      A.    No, sir.

3      Q.    You testified about the key switch on

4  exhibit 15, is that shown in the patent?

5      A.    After a quick observance no, sir.

6      Q.    I would like to direct your attention to

7  exhibit 16, that's directed to the cowl?

8      A.    Yes.

9      Q.    First you testified about the mounting

10 holes on exhibits 16.  Are the mounting holes shown

11 anywhere in the patent asserted to be infringed at

12 this hearing?

13     A.    No, sir.

14     Q.    Is it correct what is shown in the patent

15 that is being asserted that is also shown in exhibit

16 16 is the front raised section in the design on the

17 cowl?

18     A.    Yes.

19     Q.    Isn't it correct that the front raised

20 section which is shown in the patent the two edges

21 are parallel in the patents on the E-Z-Go product?

22     A.    Close to parallel.

23     Q.    Is it correct that on the Fairplay it is

24 not parallel?

25     A.    They are not parallel.

41

1    Q.    They are not even close to parallel?

2    A.    No.

3    Q.    Also, what is in patent there is the

4    rectangular portion in the front of the unit for the

5    logo?

6    A.    Yes.

7    Q.    And in the Fairplay one it is not

8    rectangular?

9    A.    Correct.

10   Q.    It is not as recessed to the extent that

11   the one shown in the patent is, correct?

12   A.    I'm not sure about to depth of recess.

13   Q.    While we are looking at things that are

14   in the patent take a look at figure one of the

15   patent and figure two of the patent on the seat back

16   that you testified about.  The figures you pointed

17   to only show the figures of the back.  Looking at

18   the front which is shown in the patent isn't it

19   correct that the seat back of the E-Z-Go unit shows

20   two distinct back sections?

21   A.    I shows them joined together.

22   Q.    In middle it is joined together in the

23   recessed portions and both individual back sections

24   come out?

25   A.    No, sir.

42

1      Q.    How is that not correct?

2      A.    It is one solid piece.

3      Q.    As it is shown in the figure where the

4   two individuals sit it comes out?

5      A.    Yes, I'm sorry, I didn't understand the

6   question.  Yes, there is a raised section compared

7   to the center.

8      Q.    Isn't it correct on the Fairplay unit the

9   back is flush?

10      A.    No, that's not correct.

11      Q.    Where is it not flush straight across?

12   I'm talking about the front we were just looking at?

13      A.    It is the same.

14      Q.    It is flush across?

15      A.    No, sir.

16      Q.    Take a look at where you are saying it is

17   not flush across.  Does it have the same

18   pronouncement?

19           THE COURT:  It is kind of hard to see

20   with that photography, Mr. Sternstein, but take a

21   look at exhibit 5 the first color photo.

22           MR. STERNSTEIN: Yes, Your Honor, I'm

23   looking at exhibit 5.  I was looking for the example

24   on the fifth page of exhibit 5.  Looking at the

25   fifth page it does show it straight across.

43

1            Let's go to exhibit 17.  In exhibit 17
2    you testified about the holes that were placed in
3    the unit, correct?
4        A.    Yes.
5        Q.    Are those holes shown anywhere in the
6    patent asserted here?
7        A.    I don't believe so.
8        Q.    Let's take a look at exhibit 18.  You
9    were talking about the brush guard and you testified
10   about the holes that are used to attach that,
11   correct?
12       A.    Yes.
13       Q.    Are those holes shown anywhere in the
14   patent asserted for the preliminary injunction?
15       A.    They are not shown.
16       Q.    Another element that is shown in the
17   patent let's talk about exhibit 19.  The white
18   portion of that by the seat.  That's of the Fairplay
19   unit?
20       A.    The white body is the Fairplay unit.
21       Q.    Looking at figure two of the patent do
22   you have that in front of you toward the front of
23   the seat.  In front of it in the middle there is a
24   section that's protrudes do you see that?
25       A.    Yes.

44

1      Q.    What is that?

2      A.    That would be forward and neutral and

3    reverse on the gas vehicle.

4      Q.    That is shown in figure three as

5    protruding out?

6      A.    Yes.

7      Q.    Is that shown at all in figure nineteen?

8      A.    No.

9      Q.    So, that's not there?

10     A.    That's not there.

11     Q.    You talk about to straps, for example, at

12   the end of your testimony?

13     A.    Yes.

14     Q.    Is there anything unique about the strap

15   and the strap that is used on almost all golf carts?

16     A.    They are unique in the fact of the way it

17   is mounted.

18     Q.    I'm talking about the strap itself it is

19   a webbing?

20     A.    Yes, a nylon.

21     Q.    Not unique at all?

22     A.    No, sir.

23     Q.    Are you aware that Fairplay filed for a

24   patent on their design as well?

25     A.    No, I am not.

45

1    Q.    You are not aware that Fairplay on their

2    design the patent office has allowed claims on

3    theirs?

4    A.    No.

5    Q.    Are you aware that the Fairplay unit as

6    sold has a canopy?

7    A.    Yes, sir.

8    Q.    But none of you're pictures show the unit

9    with the canopy?

10   A.    That's correct. It was shipped to us with

11   the canopy wrapped in plastic with the hardware

12   inside with instructions on how to assemble it.

13   Q.    On the three patents asserted here each

14   patent deals with a separate invention?

15   A.    Yes.

16   Q.    Do you know what the difference is in the

17   patent asserted in this preliminary injunction?

18   A.    I'm not sure I follow you.

19   Q.    Isn't it true in the patent asserted as

20   opposed to the other two that raised center portion,

21   for example, that show the parallel lines and

22   significantly raised section that is different from

23   the other two patents?

24   A.    I don't understand the question.  The

25   raised line on what?

46

1    Q.    On the front cowl.

2    A.    Ask the question again.  I don't

3  understand what you're talking about.

4    Q.    Isn't it correct that in the patent

5  asserted as oppose to the other patents the one of

6  expressly asserted for the preliminary injunction is

7  the raise center of section of the cowl?

8    A.    I haven't studied the other patents to

9  answer your question.

10           MR. STERNSTEIN:  I have no further

11  questions.

12           THE COURT:  That raised portion in the

13  center section is ornamental, but it is also a

14  stiffener?

15    A.    Yes.

16           THE COURT:  Do you have some other

17  questions, Mr. Campbell?

18           MR. CAMPBELL:  I have just one other

19  question, Your Honor.

20           THE COURT:  All right.

21                REDIRECT EXAMINATION

22  BY MR. CAMPBELL:

23    Q.    If I may direct your attention to exhibit

24  23.

25    A.    Okay.

47

1      Q.    Figure one of the 762 patent which is

2   exhibit 1 do you recognize the photograph, the first

3   photograph in exhibit 23 is the Fairplay golf cart?

4      A.    Yes.

5      Q.    Does the seat back on the Fairplay golf

6   car have an indentation?

7      A.    Yes.

8      Q.    Does the seat back in the 762 patent have

9   an indentation?

10     A.    Yes.

11     Q.    Are the indentations the same?

12     A.    Yes.

13             MR. CAMPBELL:  I have no further

14   questions.

15             THE COURT:  Mr. Bruntz, what did you do

16   with the Player or Fairplay golf cart?

17     A.    We stuck it back together and put it out

18   behind the building.

19             THE COURT:  Were both of the models you

20   compared electric?

21     A.    Yes.

22             THE COURT:  As far as you know they only

23   make an electric unit?

24     A.    As far as I know, yes.

25             MR. STERSTEIN: Can I have a brief follow

48

1    up.

2              THE COURT:  Sure.

3                   RECROSS-EXAMINATION

4    BY MR. STERNSTEIN:

5         Q.    Right when I was sitting down the judge

6    asked you about the raised section was in part for

7    stiffening purposes?

8         A.    Yes.

9         Q.    The difference between the parallel as

10   shown in the patent and the angled one shown on

11   Fairplay that is different for functional reasons

12   isn't it?

13        A.    I don't know why they have it at an

14   angle.  Any form of embossment creates a stiffening.

15        Q.    So, it can be any shape?

16        A.    Yes.

17              MR. ROBERTSON:  Your Honor, I would call

18   Robert Anders or our expert.

19              THE COURT:  All right let's take a brief

20   recess.

21              (Recess taken.)

22              THE COURT:  Mr. Robertson, I know you all

23   have done a lot of work putting all of these books

24   together and the pictures are most impressive. Is it

25   Mr. Anders he's an expert at looking at things?

49

1           MR. ROBERTSON:  I think we all are, Your

2    Honor.

3           THE COURT:  Well, it may depend on the

4    situation, but if I've got two of these sitting less

5    than three or four miles from here how come I'm not

6    looking at the real thing?

7           MR. ROBERTSON:  If your Honor would like

8    to look at them we can certainly arrange that, but I

9    will make a legal argument that I was going to raise

10   with the expert.  Under the case law the proper

11   focus is not between the two commercial products the

12   proper focus is to compare the design patent which

13   controls what is claimed against the Fairplay

14   product.  In fact, we don't even need to have the

15   commercial embodiment, but we do.

16          I can direct you to the cases, but that

17   is the proper inquiry.  We do have some blow ups of

18   the design of the Fairplay car to facilitate that

19   comparison.

20          THE COURT:  You make your presentation

21   then.

22          MR. ROBERTSON:  We will call John

23   Anders.

24                ROBERT JOHN ANDERS,

25   called as a witness on behalf of the Plaintiff,

50

1   having been first duly sworn, was examined and

2   testified as follows:

3            THE CLERK: State your full name for the

4   record.

5            THE WITNESS:  Robert John Anders.

6                 DIRECT EXAMINATION

7   BY MR. ROBERTSON:

8       Q.    Mr. Anders what is your present

9   occupation?

10      A.    I'm an industrial design consultant.

11      Q.    As part of those consulting efforts have

12  you had occasion to testify in design patent cases

13  previously?

14      A.    Yes, I have.

15      Q.    Approximately how many cases have you

16  testified in with respect to design patents?

17      A.    Well, I have been retained in nineteen

18  and I have been deposed in six and I have testified

19  in court in three.

20      Q.    What is your educational background?

21      A.    I have an under graduate degree a

22  bachelor's degree in industrial design from the

23  Pratt Institute.  I was also a graduate student in

24  the 1990s, but I did not finish my master's.

25      Q.    How many years experience do you have in

51

1    industrial design?

2        A.    Forty-eight.

3        Q.    Have you been qualified in federal court

4    before as an expert witness in industrial design?

5        A.    Yes.

6        Q.    Are you a member of any professional

7    organizations or societies?

8        A.    Yes, the Society of Designers and the

9    Ergonomics and Human Factors Society.

10       Q.    Have you taught industrial design?

11       A.    Yes, I have.

12       Q.    At what institution?

13       A.    The Pratt Institute.

14       Q.    Is the Pratt Institute recognized for its

15   industrial design program?

16       A.    Yes. More than fifty percent of the

17   Industrial Design Society are alumni of the Pratt

18   Institute.  Pratt is one of the largest schools

19   teaching art and design in the United States.

20       Q.    Have you published in the area?

21       A.    Yes, I have authored numerous articles

22   and some books.

23       Q.    Have you ever designed a golf cart?

24       A.    No.

25       Q.    Have you designed vehicles?

52

1    A.    Yes, I have. As a matter of fact I
2    designed a series of vehicles for a company that
3    used to manufacture golf cars.
4    Q.    What company was that?
5    A.    That was Outboard Marine.  The vehicles I
6    designed were under water vehicles.
7    Q.    Have you ever thought vehicle design?
8    A.    Yes, I have. Again it was under water
9    vehicle design.  As well as I was a faculty critic
10   of the automobile design classes at Pratt.  We
11   criticized the design of both automobiles and trucks
12   and specialty vehicles that the students had
13   designed.
14   Q.    Do you feel it is important to be an
15   expert in golf car design to render the opinions you
16   intend to offer here this afternoon?
17   A.    No, I don't believe so.
18   Q.    Can you tell us what types of design
19   patent cases you have previously offered testimony
20   in?
21   A.    The design of a tray for shrimp.  Faucet
22   design like you use in bathrooms, for example. The
23   design of roofing shingles.
24   Q.    Were you ever a designer of those
25   products?

53

1       A.      No.

2       Q.      Was your opinion accepted in those cases?

3       A.      Yes?

4       Q.      In fact, the Federal Circuit Court which

5    hears the appeals in patent cases which would

6    include this case if it is appealed accept your

7    opinions in the shrimp tray case?

8       A.      Yes.

9               MR. ROBERTSON: Your Honor, I would offer

10   Mr. Anders as an expert in industrial design for

11   purposes of this hearing today.

12              THE COURT:  Are there any questions as to

13   Mr. Anders' qualifications?

14              MR. STERNSTEIN:  Yes, Your Honor.

15              VOIR DIRE EXAMINATION

16   BY MR. STERNSTEIN:

17      Q.      Mr. Anders, are you familiar with the

18   customers that the golf carts at issue here are sold

19   to?

20      A.      I understand that the customers that the

21   golf carts are sold are probably the owners or

22   operators of golf courses.

23      Q.      So, it is more of a professional person

24   than your consumer off the street?

25      A.      That's my understanding.

54

1      Q.    Are you aware or have you done any

2  investigation as to the usual investigation that

3  such customers do in their perception of products?

4      A.    I haven't as of this time had a chance to

5  do that, yet.

6          MR. STERNSTEIN: Your Honor, in this area

7  for design patents the specific criteria is the

8  ordinary observer giving due regard to the person

9  who is the typical purchaser of the product. Mr.

10  Anders has testified that he has done no

11  investigation as to determine how such a purchaser

12  looks at the product.  I don't see how his testimony

13  can qualify as expert to look at the design under

14  the test of an ordinary observer.

15          THE COURT:  Thank you.  You may elicit

16  his opinion.

17              CONTINUED DIRECT EXAMINATION

18  BY MR. ROBERTSON:

19      Q.    My brother references the ordinary

20  observe test are you familiar with that test?

21      A.    Yes.

22      Q.    Have you offered opinions as to the

23  ordinary observer test in the past?

24      A.    Yes.

25      Q.    Was your understanding consistent with my

55

1    brother's representation that you need to consult

2    with the actual purchasers of the product at issue

3    in order to render an opinion under the ordinary

4    observer test?

5        A.    No, sir, that's not my understanding.  My

6    understanding is based upon the 1871 Supreme Court

7    decision in Gorham v White.

8        Q.    Have you had occasion to study that

9    decision?

10       A.    Since 1991 I have had occasion to study

11   it every time I have received a design patent case.

12       Q.    For the purpose of rendering your

13   opinions did you study that case?

14       A.    Yes.

15       Q.    Can your articulate what your

16   understanding of that test encompasses?

17               MR. STERNSTEIN:  I object, Your Honor.

18               THE COURT:  Mr. Robertson, I think I

19   would rather take a look at that on my own.  With

20   all of the help I've got I might be able to

21   understand it on my own.

22       Q.    As part of the inquiry we constructed a

23   frame construction as to the 762 patent.  Did you

24   conduct such an analysis?

25       A.    Yes.

56

1    Q.    What formed the basis of your analysis?

2    A.    The first thing I did was examine each

3    and everyone of the figures in the asserted patent.

4    In looking at the drawings I first had to

5    distinguish between what I considered to be

6    ornamental elements and the functional elements.

7    Because in a design patent drawing I know both

8    functional and ornamental elements are included, but

9    the design patent covers only the ornamental

10   elements.

11   Q.    Going to the 762 patent with reference to

12   the five figures in the patent can you provide the

13   court with what the ornamental aspects are and what

14   the functional aspects are?

15   A.    Figure one is a three quarter view

16   prospective of the golf car and has a number of

17   elements.  The first thing I do is I look at the

18   overall silhouette or outline because in a design

19   patent the outline is very important.  We also know

20   that silhouette technique is used to quickly

21   identify a large variety of objects.

22          The second thing is what is the overall

23   ornamental appearance.  A design patent is only for

24   the ornamental appearance.  Then in analyzing what

25   the ornamental appearance of the design you break it

57

1    down as to whether it is a dominant element or is it

2    a subdominant element.  I this case, because it is

3    the most interesting and intriguing part of the

4    design, I would say that the cowl and the brush

5    guard in the front of the vehicle would be the

6    dominant ornamental elements.

7         From looking at all of the other figures

8    I determined that the subdominant element was the

9    rear fender portion.

10        Then in looking at the figures again I

11   determined that the third ornamental element was the

12   seat back which has a very distinguishing recessed

13   period in the center.

14        Looking at the top view figure two I have

15   identified a fourth ornamental element which is the

16   arrangement of the four cup holders.

17        Q.    Does the figures in patent disclose any

18   functional elements?

19        A.    Yes.

20        Q.    Why would you include in a design patent,

21   which is stressing ornamental features as an overall

22   ornamental appearance functional elements?

23        A.    Because the functional elements are part

24   of the over all design.  However, one has to the

25   mentally separate those out in evaluating the

58

1    ornamental aspects.  For example, the four wheels

2    are functional so I did not include them in my

3    analysis.  Likewise I did not include the steering

4    column and steering wheel because those are

5    functional items. I also did not include the bracket

6    with the straps holding that.  I also did not

7    comment in my declaration on the slightly raised

8    section of the cowl because from my industrial

9    design training and experience I know that in order

10   to strengthen a large expanse of rather thin metal

11   the traditional way of doing that is by building in

12   structural ribs in order to maintain the shape.  So,

13   that raised section I did not comment on as an

14   ornamental element because I considered that to be a

15   functional element.

16              Also, the two brackets on the side of the

17   seat I considered that to be a functional element.

18        Q.    Is it you are understanding that all golf

19   cars have tires and steering wheels?

20        A.    As far as I know.

21        Q.    As far as you know is E-Z-Go claiming

22   here and infringement of the tires and the steering

23   column as part of the overall design appearance of

24   the 762 patent?

25        A.    As far as I know we are not asserting any

59

1    functional elements of the accused product are

2    infringed by our design patent.  I'm only asserting

3    four ornamental elements.

4         Q.    You mentioned the four cups holders.

5    Aren't the cup holders functional?

6         A.    Yes, their function is to holds cups and

7    each individual one has the function to hold a cup,

8    but the ornamental part of it is the arrangement

9    having four in a row together.  That's ornamental.

10        Q.    Could the cups be arranged differently?

11        A.    Yes.  From looking at some of the prior

12   art they are grouped in two on either side.  There

13   are other ways of doing it.  In my declaration I

14   included some close up photographs.  I looked at the

15   foot pedals. The foot pedals are functional and we

16   are not claiming that they are ornamental.  However,

17   I did feel obliged to alert the court to the fact

18   that there was such slavish copying. That even the

19   arrangement of the rivets on the accused product are

20   virtually identical to the rivets on the foot pedals

21   that are found not in the design patent, but on the

22   E-Z-Go car itself.

23        Q.    Look at exhibit 21, specifically at page

24   17, that is your declaration.  Can you identify on

25   that page what you are referencing with respect to

60

1    copying?

2         A.    On page 17 I included photographs of the

3    foot pedals and it is a direct steal.  It is a knock

4    off.

5         Q.    On the direct examination Mr. Bruntz

6    testified at length with respect to exhibits 13,

7    through 19 with respect, for example, to the

8    placement of the rivet holes to attach various

9    aspects of the car to the chassis?

10        A.    Yes.

11        Q.    Do you have understanding that E-Z-Go is

12   claiming that the placing of the rivets is part of

13   the ornamental appearance?

14        A.    No, and all of that is not part of the

15   ornamental appearance. All of his testimony was

16   dealing with functional aspects.  The value of that

17   testimony was only additional proof, from an

18   engineering standpoint, that not only from a design

19   prospective have they copied the ornamental

20   appearance, but they have copied the engineering

21   aspects.

22        Q.    Go to exhibit 13 which was a rear of the

23   seat backs for the Fairplay and the E-Z-Go car.  Is

24   that seat back covered in your opinion by the

25   ornamental design depicted in the 762 patent?

61

1      A.    Yes, the front of seat back is.

2      Q.    Is it significant that the same

3  ornamental seat back that appears in the design

4  patent and on the Fairplay unit is fastened in the

5  exact same manner?

6      A.    It is just another indication that it had

7  been engineered.  That Fairplay has re-engineer the

8  E-Z-Go car and has copied it.

9      Q.    Let me reference you to exhibit 15 the

10  dashboard.  That dashboard, specifically the cup

11  holder, you felt was part of ornamental design?

12      A.    That area were the cups are because that

13  is shown in design patents drawings.

14      Q.    Do you have an opinion as to whether or

15  not under the ordinary observer test the dashboard

16  in the accused Fairplay car is substantially similar

17  to the figure depicted in figure two of the 762

18  patent under the ordinary observer test?

19      A.    Yes, it is.

20      Q.    Is this dashboard attached to the chassis

21  in exactly the same manner under the Fairplay design

22  and E-Z-Go design?

23      A.    Yes, and it is further proof of direct

24  copying.

25      Q.    Could that be a mere accident or

62

1    happenstance that resulted in these various parts

2    having the exact same rivet holes and be

3    interchangeable parts?

4        A.    I can't believe that it is at all

5    probable.

6        Q.    Have you ever seen a situation in your

7    forty-eight years experience where there was a

8    design that copied the same features that were

9    attached in the same way?

10        A.    No, never.

11        Q.    When you looked at the four or five areas

12    you described did you make a side by side comparison

13    of the patent to the accused Fairplay car?

14        A.    Yes, I did that on my trip down here on

15    January 3rd.  I examined the accused product from

16    the positions shown in the patent drawings and made

17    my determination that they were the same.

18        Q.    Referring to exhibit 21 what is depicted

19    there?

20        A.    What I tried to do is take photographs of

21    the accused product from the same point of view as

22    the patents drawings were created.  Knowing full

23    well that photographing of a three dimensional

24    objects will never be the same as the drawing that

25    is produced by the orthodontic system used to

63

1    produce the drawings.

2         Q.    Do you have an opinion whether or not

3    under the ordinary observer test the accused

4    Fairplay golf car is substantially similar to the

5    figures you have seen in the 762 patent?

6         A.    Yes, absolutely,

7         Q.    On what do you base that opinion?

8         A.    By looking at the accused product and in

9    looking at my photographs taken of the accused car I

10   can't conceive of the ordinary observer, giving the

11   kind of attention they do, would ever consider that

12   the accused product is not substantially similar to

13   the drawings disclosed in the patent.

14        Q.    Under the test you need to apply to

15   render opinions before this court does the design of

16   the 762 patent have to be identical to the design of

17   the Fairplay golf cart?

18        A.    No and my understanding is based on

19   Gorham v White.

20             MR. STERNSTEIN:  I object to the witness

21   going into what the law is.

22        Q.    Have you ever had an opportunity to look

23   at the actual products involved in the Gorham v

24   White case?

25        A.    No, sir.

64

1      Q.    What are they?

2      A.    Handles and spoons.

3      Q.    Do you know what the holding was in that

4  case were they found to be substantially similar?

5      A.    Yes.

6      Q.    In your opinion would it be instructive

7  for the court to look at the actual depicted handles

8  for silverware in order to have an understanding of

9  the substantially similar test?

10     A.    Yes.

11           MR. ROBERTSON:  Your Honor, I have a copy

12  of that case.

13           THE COURT:  I will be happy to look at

14  it.

15     Q.    Did you have occasion to examine the

16  prior art?

17     A.    Yes.

18     Q.    Will you tell the court what the prior

19  art consisted of?

20     A.    The prior art are the documents that are

21  always included on the face of the patent which are

22  indicative of inventions that proceeded submission

23  of the application for the particular invention.

24     Q.    Have you had an opportunity to examined

25  that prior art as well as some additional prior art

65

1   that may not have been cited?

2       A.    Yes.

3       Q.    Do you have an opinion as to whether or

4   not these ornamental features you have been talking

5   about, the overall silhouette and the overall

6   appearance of the cowl, the brush guard, the seat

7   back and the rear fender have you had an opportunity

8   to examine those ornamental aspects you testified

9   about with respect to the prior ornamental art?

10      A.    Yes.

11      Q.    Look at page eighteen of your report and

12  tell us what you are trying to depict there?

13      A.    One of the tests is whether or not the

14  accused product is appropriate from the point of the

15  novelty of the patent in suit.  In order to

16  determine what are the points of novelty one has to

17  look at all of the prior art to find out what it is

18  about the 762 patent that distinguishes it from

19  everything else.  In looking at the prior art that's

20  how I came up with what I believe to be the four

21  basic elemental design elements that I did not find

22  in the prior art which I believe distinguished the

23  application of the 762 patent from all of the prior

24  art.

25      Q.    On page eighteen of your report you

66

1    identify six patents there.  Can you tell us briefly

2    why you believe certain aspects you have identified

3    as ornamental is distinguishable from the prior art?

4         A.    All you have to do is look at the prior

5    art and ask yourself is that overall appearance

6    found anywhere in the prior art?  And I have to say

7    no. When I take it element by element and I ask

8    myself looking up all of the prior art does any of

9    prior art have a cowl and brush guard of the same

10   general overall shape, proportion and angles as is

11   found in the 762 patent?  I have to say no.  I

12   didn't finds it there so that must be a point of

13   novelty.

14           So, then I go, for example, to the seat

15   back and in looking at the seat back of all of the

16   prior art no where have I found a seat back that has

17   on the top portion some sort of an hour glass shape

18   and on the bottom it is straight with a recessed

19   area between the protruding section.  No where did I

20   find this in the prior art.

21        Q.    Did you do that with respect to the rear

22   fender design that is referenced on page twenty-one?

23        A.    Yes.

24        Q.    Did you find that design present in prior

25   art?

67

1      A.    No, I did not find it.

2      Q.    Did you do it with respect to the overall

3   ornamental design including the top, rear and side

4   view with respect to the prior art?

5      A.    Yes, I did.

6      Q.    Are you familiar with the vehicle of the

7   main competitors in the market place, Club Car and

8   Yamaha?

9      A.    I have seen photographs.

10     Q.    Let me direct you to page twenty-seven of

11  your report.  Do you depict those competitors there?

12     A.    Yes, I have seen these photographs.

13     Q.    Do you have an opinion as to whether or

14  not the 762 patent has the features as the Yamaha

15  and the Club Car car?

16     A.    No, they are different.

17     Q.    Why is that?

18     A.    Well, the cowl is of a different shape

19  and proportion.  The same is true with the seat back

20  it is again different.

21     Q.    Let me direct you back to table one which

22  is a side by side comparison and let me ask you with

23  respect to each figure what your opinion is?

24     A.    My opinion is on the top one, the figure

25  one, as to the overall ornamental appearance of the

68

1   entire product it looks substantially similar to

2   drawing in figure one.  When you go to the next

3   image down I was concentrating on looking at the

4   ornamental cowl and the front of the brush guard and

5   ornamental cowl is substantially similar to that

6   disclosed in the 762 patent.

7        Q.    There has been some suggestion here that

8   the stiffening lines show in the patent might be

9   different from that on the Fairplay golf car.  Does

10  that change you mind as to the design being

11  substantially similar?

12       A.    As I stated before I did not regard that

13  design ornamental.  I viewed those as functional.  I

14  know when you have a large expense like this that

15  you have to, without increasing the thickness of the

16  material, it has to be self-support somehow and I

17  know it has to be supported somehow.  The standard

18  way that designers do this is by inserting a design

19  element like this as a functional rib supporter.

20       Q.    Assuming that the court would find there

21  is some more ornamental than functional feature with

22  respect to that would that change your opinion in

23  any way?

24       A.    No, because I think the substantially

25  similarity in the overall design is what is

69

1    important.

2              In Gorham v White it was indicated that

3    these very little differences don't really matter it

4    is the overall substantial similarity.  These

5    variations are subtle and insubstantial in my

6    opinion.

7        Q.    What is your understanding of how the

8    comparison should be done under the ordinary

9    observer test. Should the Court be considering the

10   E-Z-Go vehicle in a side by side with the accused

11   unit?

12       A.    It is my understanding that a side by

13   side comparison is not the proper way to do it.

14   Under the ordinary observer test if you hold up one

15   and put it down and hold up the other do they look

16   substantially similar.

17       Q.    Do you have an understanding as to

18   whether or not any other u golf cart looks

19   substantially similar to the 762 other than the

20   Fairplay car?

21       A.    I haven't examine every golf cart made by

22   the other manufacturers so I can't say.

23       Q.    As far as the prior art have you

24   satisfied yourself, based on the prior art, they are

25   different?

70

1      A.      As far as the prior art that was included

2    on the face of the patents and the three pieces of

3    additional prior art that was given to me

4    yesterday.  I haven't done a search on my own to see

5    if there are other pieces of prior art out there.

6      Q.      Have you had occasion to look at the

7    dashboard with respect to the placement of the tee

8    holders?

9      A.      Yes.

10     Q.      What does that show?

11     A.      It showed a pattern that was identical of

12   seven tee holders in the same location on the

13   dashboard.

14            I should point out to the court that I

15   made a typo in which I misidentified the figures on

16   the left and the right.

17     Q.      Let me direct the court to that.  On page

18   twenty-two of your report you represented that the

19   E-Z-Go was on the right and Fairplay is on the left

20   and it is reversed; is that correct?

21     A.      Yes.

22     Q.      In fact.  The E-Z-Go is on the left and

23   the Fairplay is on the right?

24     A.      Yes, in those photographs you can see the

25   pattern of the seven tee holders are virtually

71

1   identical.

2              THE COURT:  What page are you on?

3              MR. ROBERTSON:  Page twenty-two.

4        A.    The tee holders are in the vertical part

5   of the dashboard right in the area where the key

6   is.  You will see a row of four on the left and on

7   the right is a row of three and the same pattern is

8   seen on the accused product.

9              MR. ROBERTSON:  That's all I have.

10             CROSS-EXAMINATION

11  BY MR. STERNSTEIN:

12        Q.    Mr. Anders, you indicated that you only

13  looked at the ornamental and not the functional

14  elements?

15        A.    I looked at the entire design both the

16  functional and the ornamental elements and I

17  distinguished in my mind what were ornamental and

18  what were functional features.

19        Q.    Something is functional if it serves a

20  function?

21        A.    But that doesn't necessarily make it

22  functional.  For example, lots of things serve a

23  function.

24        Q.    But you can do it multiple ways so it

25  looks different that would be more ornamental than

72

1    function?

2        A.    You will have to give me something more

3    specific.

4        Q.    The wheels, for instance, you said you

5    considered them functional?

6        A.    Yes.

7        Q.    You can have different wheel covers, you

8    can have plain hub caps and spoked hub caps and all

9    of those would be different?

10       A.    Yes, sir.

11       Q.    Those difference are ornamental?

12       A.    Yes.

13       Q.    You looked at the cowl and you said the

14   raised portion you didn't look at that because it

15   was functional?

16       A.    I didn't include that in my analysis

17   because I believe that is functional.

18       Q.    Even if it serves a function it can be

19   designed differently so it looks different?

20       A.    It could be, but I don't believe it is

21   ornamental.

22       Q.    Can't it be looked at so makes one

23   appearance when it is paralleled at you and have a

24   different appearance when it is angled at you?

25       A.    My understanding of design patents --

73

Q.     I am asking if that can show a different appearance depending on how those edges are?

A.     In my analysis I only analyzed what I believed were ornamental features.

Q.     I understand you provided an analysis on what you separated out as ornamental?

A.     Yes.

Q.     Whether it was one kind of a wheel cover or another you looked at that as being functional?

A.     Yes.

Q.     Let's look at the cowl.  Can't you give a different appearance whether the raised sections are parallel or if they are angled?

A.     Yes.

Q.     Would that not be an ornamental appearance?

A.     Not in my opinion.

MR. STERNSTEIN:  I have no further questions.

THE COURT:  Mr. Anders, does the product of Textron conform to the patent in exhibit 1?

A.     Yes, Your Honor, I believe it does.

THE COURT:  You have made an examination of that?

A.     Yes, I have.

74

1          THE COURT:  I was interested in your

2   comment that you thought the handles on the side of

3   the seat were entirely functional; is that your

4   testimony?

5       A.    Yes, they are entirely functional.

6          THE COURT:  They could be oval, they

7   could be lots of shape, but that rakish

8   parallelogram or trapezoidal shape is, in your view,

9   is still functional?

10      A.    Yes, primarily.

11         THE COURT:  Thank you, Mr. Anders.  Do

12   you have something else?

13                    REDIRECT EXAMINATION

14   BY MR. ROBERTSON:

15      Q.    Mr. Anders, if someone was attempting to

16   slide out of one of those seats would an oval or

17   more oval handle perhaps impede someone from trying

18   to get out to perhaps hit their second shot?

19         THE COURT:  Their second shot?

20      A.    It is my opinion that design of those

21   handles is based on ergonomic considerations and

22   ergonomic considerations have to do with the ability

23   to slide in and out.  So, they can really be of any

24   shape.

25      Q.    Have you reviewed any prior art where the

75

 1   handles are of a similar design?

 2       A.    Yes.

 3       Q.    Did that form the basis for any of

 4   opinions that that feature may not be novel?

 5       A.    That was on the basis that it was a done

 6   for ergonomic considerations and I don't consider

 7   that to be a point of novelty.

 8            MR. ROBERTSON:  Thank you. I have no

 9   further question.

10            Your Honor, I have Ron Skenes here who is

11   the manager of marketing and communication and I

12   have some brief questions for Mr. Skenes that I

13   think are relevant to the Court's inquiry here.

14            THE COURT:  All right.  Before we get

15   into him can I ask you a question, Mr. Robertson?  I

16   haven't seen or heard very much about headlights are

17   headlights an option on these  cars.

18            MR. ROBERTSON:  There are a number of

19   options on the cars and headlights can be included

20   as an option on both the E-Z-Go car and the Fairplay

21   car.  Perhaps Mr. Sternstein can shed some light on

22   that.  If not Mr. Bruntz has looked at the

23   headlights with respect to both cars.

24            THE COURT:  There were headlights on the

25   Player car.

76

1              MR. ROBERTSON: I don't want to testify,

2       Your Honor, but my understanding is he has seen

3       pictures in the brochures that appear to be

4       identical to the option offered on the E-Z-Go car.

5              However, Your Honor, I will say that the

6       headlights are not an issue in the patent.  For

7       purpose of today's hearing we did not want to

8       overwhelm the Court.  We thought we would try to

9       streamline our presentation.

10             RONALD PATERSON SKENES, JR.,

11      called as a witness on behalf of the Plaintiff,

12      having been first duly sworn, was examined and

13      testified as follows:

14             THE CLERK: State your full name for the

15      record.

16             THE WITNESS:  Ronald Patterson Skekes

17      Jr.,.

18                     DIRECT EXAMINATION

19      BY MR. ROBERTSON:

20        Q.   Mr. Skenes, tell us your present

21      occupation?

22        A.   I am the manager of marketing and

23      communications for E-Z-Go.

24        Q.   When was E-Z-Go founded?

25        A.   1954.

77

1          Q.    During that entire time was it resident

2     in Augusta, Georgia?

3          A.    That's correct.

4          Q.    How many people are presently employed at

5     the Augusta facility?

6          A.    Approximately 750.

7               MR. STERNSTEIN:   Your Honor, I object to

8     this line of testimony as being irrelevant.

9               THE COURT:   What does this have to do

10    with patent?

11              MR. ROBERTSON:  It goes to the irreparable

12    harm.   That is one of the things I have to

13    demonstrate at a preliminary injunction hearing.   I

14    want to illustrate how the potential loss of sales

15    of the car will effect are market share.

16              THE COURT:   Go ahead.

17         Q.    How many of the 750 employees are

18    dedicated to the production, marketing and sales of

19    the TXT car?

20         A.    Eighty to eighty-five percent.

21         Q.    How long have you have you been employed

22    there?

23         A.    Since September of 1986.

24         Q.    How long has the TXT car been on the

25    market?

78

1        A.    Since 1995.

2        Q.    What percentage of the market share in

3    the United States did E-Z-Go have with the TXT car

4    in 1995?

5        A.    In 1995 it was zero because we just

6    introduced the TXT that year.

7        Q.    What market percentage does it have

8    today?

9        A.    It is in the forties.

10       Q.    Do you sell any other car other than the

11   TXT type car?

12       A.    No.

13       Q.    When you sell that car what are the

14   commercial avenues you sell the car in?

15       A.    Primarily they sold through our branch

16   offices around the country and also through our

17   distributors and to individuals who manager or

18   operate golf courses.

19       Q.    Do you have an understanding whether the

20   ornamental features that are part of the car have

21   any relationship to the dramatic growth of the

22   market for the car?

23       A.    There are the individuals who make

24   decisions based on the model they like better than

25   others.   The ornamental look of the car is certainly

79

1    important to its success.

2        Q.    You have attended golf trade shows?

3        A.    That's correct.

4        Q.    How many have you attended?

5        A.    This will be my twentieth PGA trade show.

6        Q.    What goes on at these trade shows?

7        A.    The PGA merchandise show is the largest

8    golf trade show in the United States.  All of the

9    golf equipment manufacturers, apparel manufactures,

10   the companies who are manufacturing products for

11   golfing industry to show up at them to show their

12   product primarily to individuals who manage or run

13   golf pro shops.

14       Q.    There was some question of Mr. Bruntz or

15   Mr. Anders about who are the consumers for these

16   cars.  Are you familiar with how these cars are

17   sold?

18       A.    They are primarily, typically these days,

19   they are leased to golf courses and used at the golf

20   courses.

21       Q.    When you sell or lease a golf cart to a

22   golf course do they buy them in ones or twos?

23       A.    Typically they will buy them in fleets of

24   seventy-five to one hundred and higher depending on

25   the golf course.

80

1      Q.    When they buy a fleet of seventy-five or
2   one hundred what kind of revenue is involved in that
3   type of sale?
4      A.    I depends on the options that are put on
5   the golf cart, but a couple hundred thousand dollars
6   can be the total financial obligation.
7      Q.    Once the lease runs out what happens to
8   the gulf cars after the lease runs out?
9      A.    Typically a new lease goes into place and
10  the old cars are taken off the course and go into
11  the possession of the golf cart company that gets
12  the new lease.
13     Q.    For example, once you lease one hundred
14  and fifty cars to a golf course and the lease
15  expires does E-Z-Go get those cars back?
16     A.    Yes.
17     Q.    What does E-Z-Go do with the old cars?
18     A.    We sell them through our dealer network
19  throughout the country.
20     Q.    Who will purchase them then?
21     A.    At that point it becomes a retail sale to
22  individuals who want to purchase them through one of
23  our dealers and it becomes more of a retail
24  purchase.
25     Q.    What is your understanding as to the

81

1    ability of E-Z-Go to expand its sales to sell the

2    other golf courses?

3        A.    There are a finite number of golf courses

4    in the United States or the world for that matter.

5    So, there is a very limited customer base for golf

6    cars.  Once a deal is done and a lease is signed,

7    typically for three to five years, that course is

8    off the market for the next three to five years.

9        Q.    Approximately how many golf courses are

10   there in the United States as potential customers

11   for these fleet sales?

12       A.    There are approximately sixteen thousand.

13       Q.    Is that number expanding every year by

14   three or four hundred?

15       A.    The total of new courses opened last you

16   was just about one hundred.

17       Q.    So, you are competing for a finite market

18   out there with your competitors such as Club Car and

19   Yamaha?

20       A.    That's correct.

21       Q.    If someone goes to a trade show and signs

22   a lease with one of these golf courses would you

23   have an opportunity within a year to pitch that

24   business?

25       A.    Typically that's not the case, no.

82

1          Q.    What would be the circumstances under

2     which that might be the case?

3          A.    If there are severe product problems that

4     is normally the only case in which a golf course can

5     get out of a lease.  Under the normal operating

6     conditions if the product is performing then a three

7     year lease is a three year lease.

8          Q.    Do you know whether or not the 762

9     patents will expire in three years?

10         A.    I don't know, sir.

11              MR. ROBERTSON:  That's all I have.

12              MR. STERNSTEIN:  I have no questions,

13    Your Honor.

14              THE COURT:  I don't want to go into

15    privileged material, but the number of these units

16    that are produced every year is that sensitive

17    information?

18         A.    Yes, sir, but I can tell you that we

19    produced a little over 70,000 TXT golf carts in

20    2005.

21              THE COURT:  Do you make various

22    configuration like utility carts or people carriers

23    and things like that?

24         A.    That's correct, but we distinguish those

25    within the company.  Those are in different

83

1    marketing categories.

2              THE COURT:  Okay, thank you.

3              MR. ROBERTSON:  Your Honor, we are

4    attempting to have the cars delivered here.  If you

5    would like to see them I can have them here within

6    the next fifteen minutes.  However, I want to

7    emphasize, Your Honor, as the case law suggest and

8    even in the defendant's brief, in asking for a

9    continuance, they suggest the proper comparison is

10   between the design and the accused vehicle the

11   Fairplay Fleet slash Legacy car.

12             So, the Court will see some minor

13   difference that are not represented in the design

14   patent.  But if the court wants to see them I am not

15   going to stand in the way.

16             THE COURT:  Listen the presentation is

17   yours to make.  That's why I asked Mr. Anders if the

18   TXT version conforms to patent as represented.  You

19   people can look at schematic drawing and see a lot

20   in it, but I can look at an object and get a lot

21   more out of it.  I don't want to do the wrong thing

22   and I want to go by the usual suggested practice.

23             What do you think, Mr. Sternstein, should

24   i look at real thing or should I be left in the

25   vacuum and look at the dimensional drawings?

84

1             MR. STERNSTEIN:  As indicated the test is

2   you look at the drawing.  If you think you will feel

3   more comfortable looking at the device for some

4   aspects I think you should look at it.  But what you

5   are suppose to look at is what is shown in the

6   drawings, but many of the extraneous components are

7   not part of the patent.

8             THE COURT:  All right, we'll take a break

9   why.  Are you telling me they are on their way?

10             MR. ROBERTSON:  Your Honor, we'll make I

11   it happen.

12             THE COURT:  If they are not on the way I

13   am not sure I want to wait on them to get loaded and

14   get down here.

15             MR. ELLINGTON:  Your Honor, they are on

16   their way.

17             (Recess taken.)

18             THE COURT:  Counsel, we will resume.  As

19   you know I went to downstairs and I did not invite

20   you because I wanted to make an independent view of

21   the two golf carts, the so called TXT and the

22   Fairplay model whether that be the Fleet or the

23   Legacy whichever one it was that was out there.

24             Mr. Robertson, what assurances do you

25   want the give me by way of jurisdiction and venue.

85

1    You said that the Fairplay was purchased in

2    Douglasville?

3            MR. ROBERTSON: Yes, Your Honor.  Actually

4    I have the invoice for you.

5            THE COURT:  Is that what Mr. Bruntz told

6    me?

7            MR. ROBERTSON:  Yes, sir. The car you

8    looked at was the car that was purchased on Thursday

9    in Douglasville from West Georgia Golf Carts.

10            THE COURT:  I will take the receipt if

11    you have it.

12            MR. ROBERTSON: We note that personal

13    jurisdiction has not been raised by the defendant.

14            THE COURT:  The court is obligated to

15    find its own jurisdiction.

16            MR. ROBERTSON: Of course, and this Court

17    has exclusive subject matter jurisdiction with

18    respect to patent cases that arise under the federal

19    patent law.  So this is brought under federal

20    question subject matter jurisdiction.  As to

21    personal jurisdiction when you put an item into the

22    stream of commerce that make its way into a foreign

23    state it doesn't have to be to the district where

24    the corporation resides.  That satisfies the

25    standard set forth by the Worldwide Volkswagen case

86

1   and the International Shoe case that they

2   purposefully availed themselves of advantages in a

3   foreign state such that bringing them into court

4   does not offend the traditions of fair play and

5   justice.

6        If I can direct Your Honor, for example,

7   to exhibit 4 in the note book.  We know that

8   Fairplay was already contracted to appear in Atlanta

9   for a trade show where they offering for sale the

10  accused golf cart.  That alone, Your Honor, is

11  purposely directing their activities toward a

12  foreign state.

13       I would also direct you to exhibit 4, the

14  last page on their web site, which has a picture of

15  United States of America and it identifies a

16  Fairplay dealer network of one hundred and

17  seventy-five locations and in the State of the

18  Georgia they have six red dots indicating those are

19  dealer locations.

20       Venue is present wherever the defendant

21  is subject to personal jurisdiction under 1391(c)

22  and 1400(b).  The trade show combine with the offer

23  of sale of the golf cart that was purchased within

24  the state and the fact that they have six dealer

25  locations forever more should end any question about

87

1  whether it is appropriate for them to be before the

2  court here.

3           I appreciate the court wanting to see the

4  cars, but based on the test you need to apply a

5  comparison between the two commercial embodiments,

6  to the ordinary observer are they substantially

7  similar.  Are there difference?  Sure, there are,

8  but they are insignificant differences, but the

9  comparison that is to be made is between the figures

10  of the patent not the two cars.  In fact, I would

11  rely on no less authority than the brief that the

12  defendant has submitted in which they say it is

13  generally proper, however, to compare the appearance

14  of the accused device solely with the patentee's

15  commercial embodiment.

16           So, the proper comparison is between the

17  accused device and the device shown in the patent

18  and we would agree.

19           You mentioned before there is not as much

20  detail provided in the patent as we would see in a

21  commercial embodiment and you are exactly right.

22  The detail is obscured in a design patent because it

23  is suppose to be the overall impression it creates

24  on the ordinary observer. For example, there are not

25  chrome hub caps because that's not part of the

88

1    ornamental design at issue.

2            If I could refer the court back to the

3    testimony today and the declaration of Mr. Anders in

4    which he identified the ornamental aspects of this

5    design patent and there were five as I recall or

6    perhaps six one was the overall ornamental

7    silhouette.  Then he directed them more specifically

8    to the cowl, the dashboard, the seat back and the

9    rear fender.  It is those that stand out

10   predominantly in both the design patent and the

11   Fairplay car.

12           I think the most apparent is the side by

13   side comparison of the figures on page ten of Mr.

14   Anders declaration.  Again the overall similarity is

15   just striking, but let me just focus on ten. Let me

16   just focus on the test that you need to apply that

17   comes from Gorham v White. During the recess I

18   handed it to opposing counsel to your law clerk.  In

19   that case, which is precedent from 134 years ago,

20   you will see in the modern cases it is still

21   applied.  The question is not identically, but

22   whether to the ordinary observer the two designs are

23   substantially the same.  In the eye of the ordinary

24   observer giving such attention as a purchaser

25   usually gives such as to deceive such an observer

89

1    inducing him to purchase one supposing it to be the

2    other.

3            We cite in our brief the Contessa Foods

4    case which was the shrimp plate case that Mr. Anders

5    testified in.  It says that the scope of the claimed

6    design encompasses the visual appearance as a whole

7    and the visual impression it creates, but the court

8    needs to focus on the overall impression which

9    governs rather than individual ornamental features.

10   That's in the Odds On case.

11           Much has been made, Your Honor, of the

12   stabilizer lines or the trim lines around the cowl

13   which is the only difference counsel cross-examined

14   Mr. Anders on.  I think it is instructive to focus

15   on these slight variation and I think it is

16   appropriate for the court to be concerned that those

17   lines are not exactly identical, but the

18   uncontradicted testimony is under the ordinary

19   observer test the overall impression that those

20   lines created is not a substantial difference.

21           Where the court to find they had some

22   ornamental aspect and that aspect dominated I would

23   respectfully suggest, Your Honor, that these minor

24   variation are evidence of the evil intent of the

25   defendant here.  Once they were called on the carpet

90

1    for this infringement they say look at our cowl it

2    is completely different.  Otherwise it is

3    interchangeable with the E-Z-Go car, but we have

4    made this little minor variation.

5            Here is what the Supreme Court said in

6    that context and I think it is quite eloquent. Like

7    anyone who seeks to pirate an invention, like anyone

8    who seeks to copyright a book or a play may be

9    expected to make minor variations to conceal or

10   shelter the piracy.  Daring outright infringement is

11   a dull and a very rear type of infringement.  I

12   would submit, Your Honor, that is exactly what is

13   going on here.  They made that minor variation

14   knowing full well they reverse engineered and E-Z-Go

15   car down to its most minute detail and quite frankly

16   insignificant aspects. They copied everything and

17   then said let's make a minor variation because we

18   know about the 762 patent.

19           As we heard earlier today they knew about

20   the 762 patent because they identified it to the

21   patent office with respect to one of their own

22   designs.

23           If we go to Gorham v White which has been

24   the controlling authority for over one hundred years

25   it states:  The mere difference in lines in a

91

1    drawing or sketch, a greater or smaller number of

2    lines or slight variances in configuration if

3    sufficient to change the effect upon the eyes will

4    not to destroy the substantial identity.  An

5    engraving which has many lines may present to the

6    eye the same picture and to the mind the same idea

7    or conception as another with much fewer lines.  The

8    design, however, would be the same.

9              I would ask the court to look at the

10   design at issue in Gorham v White.  The court said

11   there are significant differences, but they deem

12   them insubstantial when under the standard the court

13   needs to apply which is the ordinary observer test.

14             I submit in virtually every one of the

15   aspects that Mr. Anders, who is far more of an

16   expert than I am states, it is one of the most

17   egregious examples of the copying of an ornamental

18   design in order try to capitalize off the hard work

19   E-Z-Go has built up over the last ten years.

20             I think we have satisfied the standard

21   that there is a reasonable likelihood that we will

22   prevail on the merits.  We have demonstrated an

23   irreparable harm, but that is presumed once a

24   substantial likelihood of success on the merits has

25   been shown because many of the rights that a patent

92

1    gives is it gives the right to exclude others from

2    selling, using or offering for sale your patent

3    design.  The irreparable harm is the balance of the

4    hardship cannot be in favor of someone who knowingly

5    infringes.  I submit, Your Honor, that we have more

6    than satisfied our burden.

7              Now, it has been suggested to the court

8    that the defendant has been able to obtain a patent

9    on some design although it never spelled out what's

10   in that design patent.  The only thing they

11   suggested was they cited to the patent office the

12   762 patent.  The inference that the court is suppose

13   to take away is that somehow that means they can't

14   infringe because the patent office has granted them

15   their own patent and that is not the law.

16          .      First of all we don't know what the

17   patent is directed to.  I could be something

18   completely different for another one of their cars.

19   It has not been suggested that the patent covers the

20   Legacy car.  You will see, Your Honor, in Gorham v

21   White Mr. Gorham obtained the two patents one in

22   1861 and the other in 1867.  Then Mr. White, who was

23   the accused infringer, obtained one in 1868.  The

24   court said it makes no difference that someone is

25   able to obtain a patent later he can still infringe

93

1   a patent.

2          So, Your Honor, suggesting that they got

3   a patent on something we don't even know what it

4   covers is completely irrelevant.

5          Your Honor, with that we would ask that

6   our order be entered precluding the defendant from

7   making, selling, offering for sale or importing into

8   the United States any of the accused cars which

9   include the Legacy and Fleet car.  Thank you very

10  much.

11         THE COURT:  Now, Mr. Sternstein, I ask

12  Mr. Robertson if he wanted to comment on

13  jurisdiction and he did and then he gave me a

14  closing argument.  Would you like to make some

15  closing remarks.  Unless, of course, you have some

16  witnesses to present and I will be glad to hear from

17  them if you do.

18         MR. STERNTEIN:  Your Honor, we have not

19  had the opportunity to obtain any witnesses or the

20  opportunity to retain an expert and have not had the

21  opportunity to look into the jurisdictional issue.

22         As far as the law Mr. Robertson has

23  mentioned the stream of commerce the stream of

24  commerce is not all that is necessary even if you

25  look at the Volkswagen case.  The point is simply we

94

1  don't have the facts at this stage to comment on

2  jurisdiction.

3       As far as overall what has been

4  considered today the first thing I would like to

5  point out is if you look at the design patent the

6  only thing that is at issue in the design patent

7  infringement is the design shown in the patent and

8  that is it.  It is only the aesthetics of what is

9  shown in the patent.

10      It is fundamental patent law that one is

11 free to copy as much as they want of something that

12 is not patented.  If it is not subject to a patent

13 you can copy it. Yet I think that what has been

14 revealed today is all of sort of details that are

15 not patented.  The witnesses themselves have said

16 the bulk of what they have been testifying about was

17 not patented.  I think that's the slight of hand

18 that has been presented in this testimony in this

19 hearing today.  They have presented all sorts of

20 evidence and issue that are not in the patent.

21      If you look at patent that is being

22 asserted.  If you look at the issue of design patent

23 infringement there are two tests that have been

24 looked at.  One is the ordinary observer test and

25 the other is the point of knowledge test.

1           The plaintiffs's expert has testified as

2    to the ordinary observer test. Of course, as we have

3    pointed out we have not had an opportunity to

4    provide an expert and we not have we had the

5    opportunity to prepare the case.

6           What I should point out as to the

7    ordinary observe test in particular is the ordinary

8    observer giving such attention as a purchaser

9    usually gives.  It is not just anybody it is such

10   attention as a purchaser usually gives.  According

11   to the testimony in this hearing today these

12   products are purchased by very sophisticated

13   purchasers who are buying product, as talked about

14   today, involving several hundred thousand dollars

15   and being purchase by a sophisticated buyer.

16           Mr. Anders testified that he did not

17   investigate and he did know the attention given by

18   such an ordinary observer.  I think his testimony

19   was based on the ordinary observer test and he

20   admitted that did not have a basis for his testimony

21   on that.

22           When you look at Gorham versus White a

23   lot of things have been said about that case.  You

24   are talking about a different type of product and a

25   different type of purchaser.  The ordinary observer

96

1    and the attention given by the purchaser here, which

2    is a much more sophisticated purchaser.

3           Of the testimony that was given today one

4    of things that was prominent was that one of the

5    most prominent features was the cowl at the top and

6    that's where there are the difference.  The

7    differences shown in the front. Look at the angular

8    recess portion and there are differences there as

9    well.

10          As far as having a patent that's been

11   allow on our design we have haven't had the

12   opportunity to bring all of the evidence here.  It

13   is relevant that Gorham versus White as indicated is

14   over one hundred years old.  The test has certainly

15   been applied, but it needs to be looked at in more

16   detail.  Fundamentally what happened when the patent

17   office looked at the patent they looked at the prior

18   art.  They looked at the patent of the plaintiff and

19   they looked at the design of the defendant and they

20   said the design of the defendant was novel to what

21   had been patented. That fundamentally does show and

22   is relevant evidence as to a distinction for a

23   design patent.

24          Fundamentally, Your Honor, I do not think

25   the burden has been met to the extent that we have

97

1   not had the opportunity to prepare for this hearing.

2           MR. STEBBINS: Could I make a couple of

3   remarks.

4           THE COURT:  Certainly, I'm always

5   delighted to hear from you, Mr. Stebbins.

6           MR. STEBBINS: As I told Your Honor I

7   don't know much about patent law, but I want to

8   focus on a couple points.  As I have learned from

9   listening today the test of infringement of a design

10  patents is not quite as obvious as it might seem.

11  It is quite obvious that the plaintiffs felt they

12  had to present the expert testimony they presented

13  in order to present an adequate case.

14          I heard the expert say in order to

15  determine whether there has been an infringement he

16  has got to look at the prior art and he said that he

17  looked at the prior art in a conslusary sort of

18  way.  So, we don't know from the testimony given

19  here how much of the four or five features he

20  identified exist in the prior art or not. All we

21  have is his say so.

22          I don't know much about patents, but I do

23  know a little something about cross-examining and

24  preparing to defend against an expert witness.  My

25  client has been ask to prepare to cross-examine

98

1   their expert without the benefit of the normal

2   discovery.  The fact that he may say these features

3   were not present in prior art does not make it so.

4   He was repeatedly ask according to your

5   understanding of the test to be applied do these

6   features meet your test.

7           I don't know this, because I haven't had

8   the opportunity to check, but I imagined that

9   another expert who we might have the opportunity to

10  consult with might have another opinion and might be

11  able to assist us in our cross-examination on this

12  question.  We have not been given what due process

13  would require.

14          It seems to be me it is an unusual case

15  in which the expert testimony of one party was

16  accepted on two days notice without an opportunity

17  to test that expert testimony.

18          The second point I want to make as far as

19  the balance of the harm is concerned I understand

20  that once it is shown that infringement is

21  reasonably likely to be found there is a presumption

22  that there is harm, but we haven't been given the

23  opportunity to show the court anything about the

24  structure of the market and what harm will be caused

25  to our client if they are not allowed to sell these

99

1    cars.  I must say I thought the presentation as to

2    what harm the plaintiff would suffer was rather

3    vague to say the least.

4             The third point I want to make is we have

5    said at the beginning of this -- I want to focus on

6    the order that was the provided by Mr. Ellington.

7    He is asking the court to conclude in the third

8    paragraph that E-Z-Go will be substantially harmed

9    if the defendant Fairplay is permitted to go forward

10   at the Atlanta or Orlando trade shows and offer for

11   sale or market the Legacy Fleet model golf cart.

12            Then they say we have acknowledged that

13   we won't be offering the cart for sale at that

14   time.  Then I think in a remarkable slide he says

15   Fairplay cannot be harmed if it is temporarily

16   enjoined from either offering for sale or marketing

17   the Legacy Fleet model golf cart.  I would agree

18   with that if he added to words at the trade shows.

19   In this order Mr. Ellington has Your Honor finding

20   that because we said we won't we sell this thing at

21   the trade shows therefore we can't be harmed if we

22   are enjoined from selling them anywhere during the

23   pendency of this case.

24            I think that illustrates what has

25   happened here.  This short notice hearing, which we

100

1    frankly did not get an opportunity to prepare for,

2    was obtained from the court on the representation

3    that there was something about these trade shows

4    that is going to cause irreparable harm to the

5    plaintiff.

6         Now, we are willing to agree we won't do

7    anything about this product at the trade shows, but

8    if the court is going to issue a blanket injunction

9    that we can't sell our product on two days notice

10   and no opportunity to present opposing evidence if

11   that is not limited to the supposed emergency

12   situation of the trade shows then I think that is

13   beyond what should be order without Fairplay having

14   an opportunity to respond.

15        Those are my three points, Your Honor.

16        THE COURT:  Thank you, Mr. Stebbins.

17        Counsel, for the defendant Fairplay

18   Electric Cars, LLC has correctly noted that this

19   hearing was scheduled on a virtual emergency basis.

20   The date of filing and the issuance of the Rule Nisi

21   and the setting of this hearing at 1:30 p.m. on the

22   Monday following that filing are all matters of

23   record.

24        In a remarkably short period of time a

25   rather ample understanding of the issues and the

101

1    factors upon which emergency relief might be based

2    has obtained.  I am convinced at this juncture, the

3    golf cart I saw out on East Ford Street, having been

4    purchased in Douglasville, Georgia just last week,

5    that this court does, in fact, have jurisdiction.

6    Venue is proper in this court for a number of

7    reasons not the least of which is that a very, very

8    substantial part of the worldwide golf cart

9    manufacturing market is located within twelve to

10   fourteen miles of this courthouse whether that be

11   south or west of here.

12         Moreover, this Fairplay electric golf

13   cart, which is described as a Fleet Cart, was

14   purchased within the State of Georgia, obviously

15   within the stream of commerce that reaches this

16   state.  A trade show has been scheduled, as I see

17   from the web site which I pulled up during the

18   course of the presentation, within the State of

19   Georgia at its capitol in Atlanta.  It is my view

20   that this Court is sufficiently possessed of In

21   Personam and subject matter jurisdiction and is the

22   proper venue for the filing and resolution of this

23   action.

24         This matter has been presented virtually

25   unilaterally, except for cross-examination and

102

1    argument.  While the matter has been presented, in

2    essence, on an emergency basis it is my intention to

3    enter a temporary restraining order which will

4    remain in effect for at least ten days from the date

5    of its issuance during which time I certainly will

6    allow and encourage the defense to mount whatever

7    presentation it chooses.  And, of course, the Court

8    will afford the same lenity in scheduling as has

9    been made available to the plaintiff corporation.

10        An application to have injunctive relief

11   on a temporary, preliminary, interlocutory or

12   permanent basis all must be grounded on the four

13   typical and frequently observed elements.  That of a

14   substantial likelihood of success on the merits; the

15   court's responsible balancing of any potential harm

16   between the parties; the showing of an irreparable

17   harm to the applying party unless injunctive relief

18   is awarded; and a demonstration that the public

19   interest would be serve more greatly by the issuance

20   of an injunction than by the denial of it.

21        In this case I have, of course, reviewed

22   the drawings that are contained in the design

23   patents which is exhibit 1 in the exhibit list made

24   available to the Court by the plaintiff and which

25   will be the principal exhibits list to which I will

103

1   refer in this recitation of my findings and

2   conclusions.

3            Now, the drawings in exhibit 1 are simple

4   and as I understand the presentation they are

5   intended to be simple.  They are, perhaps, not

6   schematic because they are presented to appear in a

7   third dimensional sort of way or at from an angle

8   prospective.  Frankly, most helpful to me are those

9   in figures 2, 3, 4 and 5 which are presented in more

10  of a silhouette fashion.

11           During the presentation by the plaintiff

12  I made the observation that if those golf carts are

13  still near the City of Augusta they could be brought

14  here and I could see a great deal more from them

15  than I could from the pictures that I have been

16  shown and I still think that's true.  Now,

17  apparently I am correctly admonished by both parties

18  that I should not rely entirely on an object to

19  object comparison in making my objectively

20  reasonable determination about the similarity of the

21  characteristics of these two designs and I don't

22  doubt that.  When I have gentlemen who appear as

23  knowledgable and as well educated as Mr. Sternstein

24  and Mr. Robertson on such specialty matters I will

25  always accede to them.  I will have to say that the

104

1    pictures are good and the pictures are helpful, but

2    there is nothing like an eyes on comparison of real

3    object to see that the one is an obvious knock off

4    of the other.  Here there is no doubt about it.

5        At counsel's insistence I have looked at

6    the two designs in this Gorham against White case.

7    This must be an important case because everybody is

8    referring to it.  This case was decided in 1871 and

9    it is still thought of as good and instructive law.

10    My observation is that if the  "White" designs are

11    an infringement of the "Gorham" designs, they are

12    less egregious in their infringement than the

13    Fairplay is to the Textron E-Z-Go cart.

14        Looking only at the pictures that are

15    presented in the various exhibits, particularly 10

16    through 20, the same result is inescapable.  I am

17    not looking, of course, at the wheels or tires and

18    during the testimony of Mr. Anders I found out why.

19    That is because I should not be looking at

20    functional items as those terms are understood.  I

21    should be looking at, as Mr. Robertson and Mr.

22    Sternstein both observed, the aesthetics of the

23    design, the general and overall appearance.  I began

24    with the proposition, as did Mr. Anders, that the

25    TXT cart is not only in conformity with, but in my

1   view it is also the embodiment of the design patent

2   appearance that is contained in 368,762, of May 14,

3   1996.  A brief review of figures 2, 3, 4 and 5,

4   which are presented in silhouette, will clearly

5   demonstrate that level of similarity if not

6   virtually identically.  Then a review of not only

7   the photographs, which are presented from above, and

8   from an angle and to a degree on silhouette, will

9   lead one to the same conclusion with respect to both

10  designs.

11          Much has been said and I suppose I got it

12  started, by talking about the potential structural

13  feature of the stiffeners or design lines that

14  appear on the front cowling of the golf cart.  While

15  there is a difference between those lines which are,

16  as I believe Mr. Bruntz said, an embossment giving

17  strength to the cowling, they show a difference

18  perhaps without a great deal of distinction.  In my

19  view the difference between the almost parallel

20  lines of the Textron cart and the more triangular

21  lines of the Fairplay cart are but a somewhat less

22  than a defferential nod by the designers of the

23  Fairplay toward some pretence of originality.  If

24  there is difference in the appearance of the two

25  golf carts that is the only difference and it is

1    relatively minor.  The four cup holders, the

2    position of the tee holders, although the tee

3    holders themselves are not included in the design

4    patents, the configuration of the seats; the design

5    features of the seats are all supportive of the

6    conclusions I have drawn.

7             Interestingly, some of these cowlings and

8    body parts are interchangeable.  I will note that I

9    observed that one cannot simply remove the seats

10   from the Fairplay cart and put it on the Textron (at

11   least not without removing and replacing the

12   hardware).  The seats on this Fairplay cart have a

13   different type hinge then those found on the Textron

14   cart. However, the seat configuration, the hand

15   holds on the seat and other design and appearance

16   features of the seats are virtually identical and

17   that goes as well for the seat back.

18             The fact that some of cowling and body

19   parts, the front cowling, and the rear cowling, the

20   fact those are virtually interchangeable, while

21   holes as such are not shown in the design patent, is

22   very interesting.  It is informative and

23   illuminating to note that the fact of their

24   interchangeability is important because one could

25   interchange those parts without significantly or

107

1    substantially altering the appearance of either golf

2    cart.

3              I have no difficulty in applying the

4    standards of substantial similarity as opposed to

5    something that is identical.  That is a

6    conversational phrase and a legal phrase and is one

7    that appears not only in this area of the law, but

8    in others.  I find the design of the Textron golf

9    cart to be not only in conformity with, but the

10   embodiment of the design patent number 369,762 and I

11   find the Fairplay Fleet cart that I observed to be

12   substantially similar to the design depicted in

13   369,762.

14             At this juncture and at this phase of the

15   case, admittedly early on, there is, in my view, a

16   likelihood, a very significant, very substantial

17   likelihood, of success on the merits.  Perhaps

18   beyond the unusual "substantial" likelihood of

19   success on the question of infringement of a design

20   patent I see a very substantial probability of

21   success on the merits of the claim of design patent

22   infringement.

23             The balancing of the harm is an easier

24   question.  Obviously, with the type of market that

25   both of these purveyors of golf carts seek to serve,

1   the intrusion of an infringing item into the market

2   place, considering the features of the market place

3   where golf carts are leased for multiple year terms,

4   could have a very significant and damaging impact on

5   the ability of Textron E-Z-Go to sell is golf carts

6   or to lease them.  It follows, almost automatically,

7   that if this infringement is allowed to persist and

8   to infect the market place, then Textron E-Z-Go will

9   sell or lease fewer cars and, if it sells and prices

10  its carts as it is implied that it will, Fairplay

11  will, sell more carts utilizing the design that has

12  been so successful in E-Z-Go's marketing of its

13  design patent number 369,762.

14          The injunction of the sale or leasing of

15  an infringing design could hardly be said to be

16  against the public interest.  The public interest is

17  served by the enforcement of the patent law.  As the

18  concluding paragraph in Gorham against White

19  announced: "Unless, therefore, the patent is to

20  receive such a construction that the act of Congress

21  will afford no protection to a designer against

22  imitations of his invention, we must hold that the

23  sale by the defendant of spoons and forks bearing

24  the designs patented to White in 1867 and 1868 is an

25  infringement of the complainants rights."

109

1          So, if the patent 369,762 is to receive

2     any construction that affords any protection then

3     the public interest is served by the granting of

4     such an injunction.

5          I must always observe, especially when

6     faced with the appearance of attorneys like Mr.

7     Sterntein and Mr. Stebbins who do put such an

8     appealing presentation before the Court in such a

9     polished way and who contend that given time they

10    could undoubtedly inundate the court with evidence

11    which would compel me to conclude in a contrary

12    direction, that nothing is impossible and everything

13    is possible.  And I certainly want to hear and see a

14    more detailed and a more informative presentation

15    whenever that can be assembled and I look forward to

16    it, but I cannot at this juncture imagine how many

17    professional experts it would take me to conclude

18    that the one golf cart which I saw made by Fairplay

19    is not an infringement on the design patent 369,762

20    which is embodied in the cart which is made and

21    marketed by Textron E-Z-Go.

22         The proof of the appearance of the one as

23    an infringement upon the other in my view, while

24    pictures are important, is best obtained by a visual

25    comparison of the two carts.  I have seen what I

110

1    saw. I see an infringement, a very clear one. One

2    which might have some minor difference in the

3    stiffeners of the front cowling, but as I have said

4    that distinction is, in my view, but a less than

5    differential nod toward some pretended originality.

6         I have spoken for about twenty-five

7    minutes enumerating into the record of this case my

8    findings of facts and to a degree my conclusions of

9    law. Those have been in narrative form and because

10   of the press of time they will remain so. I am not

11   going to try to embellish them. It is probable that

12   given some time in which to draft and redraft them I

13   could express myself in a more artful form, but we

14   are not seeking an artful expression only an

15   expression of the reason or basis for the entry of

16   this Court's injunction. While this statement of my

17   findings and conclusion at this early juncture in

18   this case may be less than artfully stated it is

19   incorporated in the record by this reference and

20   will be referred to in the order that I intend to

21   enter tomorrow morning.

22         Now, I will tell you and you may want to

23   communicate to your client, Mr. Stebbins, that over

24   your objection I will restrain, for the pendency of

25   this restraining order which will bear a date and

111

1    which will extend for ten days thereafter or longer,

2    any sale, marketing or importation of the Legacy or

3    Fleet line of golf carts.  If you find that some are

4    already in transit awaiting whatever casual sales

5    might be in the offing, knowing that they are not

6    going to be featured at the trade shows, we'll deal

7    with that.  They could be placed in some holding

8    area.  I am not suggesting they have to be dumped

9    off the side of a ship somewhere, but they can be

10   put in some sort of customs holding area or

11   something like that.  I will go ahead and enter the

12   order.  I will probably rewrite it and it may be

13   before noon tomorrow.  Any questions, counsel?

14            MR. ROBERTSON: No, Your Honor.

15            MR. STEBBINS: No questions about the

16   order that the court is going to enter, Your Honor.

17   I am informed in these cases as we proceed that it

18   is not unusual for the Court to enter an order for

19   expedited discovery so we can get to a final

20   judgment.  Would it be appropriate to ask about that

21   at this time?

22            THE COURT: Are either one of you asking

23   for a jury trial?

24            MR. ROBERTSON: I would have to the confer

25   with my client, but I would recommend that we waive

112

1   that.

2              THE COURT:  Of course, that won't

3   expedite anything.  Are you from Chicago, Mr.

4   Sternstein?

5              MR. STERNSTEIN:  Yes, Your Honor.

6              THE COURT:  Do you remember Judge

7   Campbell out there?

8              MR. STERNSTEIN:  No, Your Honor.

9              THE COURT:  Well, that may be a little

10  before your time and we'll leave it at that.

11             Why don't you confer with your brother

12  Mr. Ellington, Mr. Stebbins, and anything you want

13  to expedite is fine with me.  You can go as fast as

14  y'all want to.  I am happy to do that and I do think

15  some accommodation ought to given in that regard.

16             You all can be at ease and I will clean

17  up the bench.

18

19                   (Hearing concluded.)

20

21

22

23

24

25

113

1

2

3                          C E R T I F I C A T E

4

5      G E O R G I A:

6      RICHMOND COUNTY:

7                  I hereby certify that the foregoing

8           transcript was taken down, as stated in

9           the caption, and the questions and answers

10          thereto were reduced to typewriting under

11          my direction; that the foregoing pages 1

12          through 112 represent a true, complete, and

13          correct transcript of the evidence given

14          upon said hearing, and I further certify

15          that I am not of kin or counsel to the

16          parties in the case; am not in the regular

17          employ of counsel for any of said parties;

18          nor am I in anywise interested in the result

19          of said case.

20                  This, the 29th day of January, 2006.

21

22

23          RICHARD A. DUERINGER, CCR-A-48.

24          My commission expires on the

25          3rd day of May 2008.

# Exhibit E

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2006 JAN 24 PM 2:50

CLERK
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

TEXTRON INNOVATIONS, INC.,          *
and E-Z GO (a division of           *
TEXTRON, INC.),                     *
                                    *
            Plaintiffs,             *
                                    *
      v.                            *          CV 106-009
                                    *
FAIRPLAY ELECTRIC CARS, LLC,        *
                                    *
            Defendant.              *

O R D E R

Presently before the Court in this captioned matter is
Plaintiffs' motion for a preliminary injunction to enjoin
Defendant from infringing Plaintiffs' United States Design
Patent No. 369,762. (Doc. No. 3.) Upon consideration of the
evidence and the parties' written and oral arguments, the
Court orally expressed findings of fact and conclusions of law
into the record at the conclusion of the hearing held
yesterday on this matter.

Based upon those findings of fact and conclusions of law,
IT IS HEREBY ORDERED that Defendant Fairplay Electric Cars,
LLC,[1] is enjoined and restrained within the United States of

_____

[1] Pursuant to Federal Rule of Civil Procedure 65(d), this
injunction is binding upon Defendant's officers, agents,
servants, employees, and attorneys, and any person in active
concert or participation with them who receive actual notice

America from making, assembling, importing, marketing, selling, or leasing the two-seater versions of Defendant's Fleet and Legacy Model Golf Cars, or any equivalent golf car.

This Order shall remain in effect until February 6, 2006; however, the expiration date of this Order will be extended if Defendant does not file its opposition to this injunction and arrange for another hearing by the close of business on February 6, 2006.

ORDER ENTERED at Augusta, Georgia, this 24th day of January, 2006.

_____
UNITED STATES DISTRICT JUDGE

of this Order, by personal service or otherwise.

2

## Wachowski, Margaret

| | |
|---|---|
| **From:** | Fossier, Patricia |
| **Sent:** | Thursday, February 16, 2006 11:22 AM |
| **To:** | Wachowski, Margaret |
| **Subject:** | FW: Textron Innovations Inc. et al. v. Fairplay Electric Cars, LLC (Our Ref. 065372.0009) |

**Attachments:**    Injunction Order.pdf

| | |
|---|---|
| **From:** | Morella, Timothy |
| **Sent:** | Thursday, February 16, 2006 9:40 AM |
| **To:** | keitha@fairplayelectriccars.com |
| **Cc:** | Sternstein, Allan |
| **Subject:** | Textron Innovations Inc. et al. v. Fairplay Electric Cars, LLC (Our Ref. 065372.0009) |

Keith:

Per your request, please find attached an Adobe version of the Injunction Order in the above-referenced matter.

Regards,
Tim

Injunction
Order.pdf (153 KB)

*Timothy M. Morella*
DYKEMA GOSSETT PLLC
Ten South Wacker Drive
Chicago, Illinois 60606.7509
United States of America
+1 312 876 1700 (Office)
+1 312 627 2302 (Facsimile)
+1 312 627 2592 (Direct)
tmorella@dykema.com
www.dykema.com

1

# Exhibit F

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | | |
|---|---|---|
| TEXTRON INNOVATIONS, INC. and | ) | |
| | ) | |
| E-Z GO (a division of TEXTRON, INC.), | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. CV 106-009 |
| | ) | |
| v. | ) | |
| | ) | |
| FAIRPLAY ELECTRIC CARS, LLC, | ) | |
| | ) | |
| Defendant | ) | |

## DEFENDANT'S OPPOSITION TO
## MOTION FOR PRELIMINARY INJUNCTION

There is no infringement, and no likelihood of success on establishing infringement, of U.S. Design Patent No. 369,762. Plaintiffs' motion for a preliminary injunction is based upon similarities and the alleged copying of features that are *not* part of the design patent asserted in this action, and upon a comparison between Defendant's car and Plaintiffs' car, the latter also containing features *not* present in the asserted patent. As stated by the Supreme Court, features (even if copied) not covered by a patent or copyright are in the public domain "and can be copied in every detail by whoever pleases." Plaintiffs' motion, furthermore, is not based, as it should be, on Defendant's car fully assembled and as it exists in normal use. Numerous components and distinguishing features in Defendant's car, as shown to the Court, had been removed by Plaintiffs or their expert. The significant differences between the design claimed in Plaintiffs' patent and the design of Defendant's Fleet Model car fully assembled and as it is in normal use, preclude infringement and any likelihood of success on the merits.

1

In addition to the lack of likelihood of success on liability, Plaintiffs' Motion for a Preliminary Injunction must fail for lack of irreparable harm, and because the balancing of hardships disfavors an injunction in this case.

The above issues are addressed below. As an initial matter, however, and to gain perspective on the issues presented, the errors in the Court's temporary order and the procedures leading up to it are identified.

I.    **Errors in the Preliminary Injunction Process and Order**

    A.    **There was no need for an evidentiary hearing within 2 business days of service, and such an unnecessarily expedited schedule was prejudicial to Defendant.**

As addressed in Defendant's Motion for a Continuance and at the January 23rd hearing, Plaintiffs' Motion for a Preliminary Injunction was expressly directed to Fairplay's Fleet golf car. The stated need for an expedited evidentiary hearing, furthermore, was "[d]ue to Fairplay's scheduled attendance on January 26-29, 2006, at the PGA Merchandise Show in Orlando, Florida and again on February 9-11, 2006 at the Golf Industry Show in Atlanta, Georgia." That need was non-existent, however, as Fairplay was neither showing nor marketing the Fleet golf car at those shows.

At the time of the evidentiary hearing, Defendant had only two business days after service of the Complaint to prepare for the evidentiary hearing, without receiving any prior notice that a dispute even existed. This is in stark contrast to the three months taken by Plaintiffs, as referenced in Defendant's Motion for Continuance, to prepare their case. In short, at the time of the evidentiary hearing held by the Court, Defendant had not been able adequately to prepare its case, had been unable to obtain any experts, had been unable to obtain any witnesses on its behalf, and had been unable to prepare adequately

2

for cross-examination. The prejudice caused by the alleged, but non-existent, urgency was pointedly shown when Defendant's counsel proposed a briefing and hearing schedule for this Opposition. That is, after Defendant's counsel proposed filing its brief on February 17, 2006 and having the supplemental hearing on February 22, Plaintiffs' protested because they would "need more time to react" for the hearing – and that is after they already knew of the issues, had presented their case in chief, and had picked and prepared their expert and fact witnesses (Sternstein Declaration, February 1, 2006 letter, Exhibit A).

Notwithstanding the lack of any emergency and the lack of time given to Defendant to prepare its case, the Court proceeded with an evidentiary hearing on the date originally noticed and issued an injunction forbidding Defendant from selling or marketing Fleet and Legacy cars. Such actions were clearly unnecessary and prejudicial to Defendant.

    **B.**    **Plaintiffs' motion specifically sought an injunction as to Defendant's Fleet model car and Plaintiffs presented evidence only on Defendant's Fleet model car. No testimony was presented on Defendant's Legacy car and no Legacy car was ever shown to the Court. Nevertheless, without any evidence before it, the Court enjoined the unseen Legacy product.**

Although Plaintiffs' counsel, Mr. Robertson, implied that he learned of Defendant's Legacy product only on the Thursday before the evidentiary hearing (Transcript of Proceedings, p. 14), in fact the Legacy product was identified in Plaintiffs' motion papers and shown and referenced in web-site pages dated in early December 2005 which are attached to Plaintiffs' Brief (Exhibit 7). Plaintiffs' motion expressly sought to enjoin only the Fleet model car. As stated in Plaintiffs' motion:

3

> Fairplay offers several golf car models . . . including the Fleet, Legacy,
> and Legacy LX. . . . E-Z-Go's motion for a preliminary injunction seeks
> to enjoin sale of *Fairplay's Fleet golf car* (hereinafter "Fairplay golf car").

Plaintiffs' Brief, p. 8, emphasis added.

In accordance with Plaintiffs' express statement as to what they were to enjoin, Plaintiffs only put in evidence and obtained testimony at the preliminary injunction hearing on Defendant's Fleet model car. There was no testimony nor other evidence presented on the Legacy car. There were no photographs of the Legacy car identified to the Court. The Court was not shown a Legacy car. Nevertheless, the Order entered by the Court included an injunction against this unseen Legacy product. Such an order is clearly without support and erroneous.

      **C.**     **Plaintiffs presented no testimony under the "ordinary observer" test on the amount of attention a purchaser of golf cars usually gives to his purchase, and no findings could be made**

One of the tests for design patent infringement, as addressed at the preliminary injunction hearing, is the "ordinary observer" test. That test, however, is based upon such an observer "giving such attention as a purchaser usually gives" to the designs at issue. *Gorham Co. v. White*, 81 U.S. (14 Wall.) 511, 528 (1871). That is, differences in the accused design that may not be enough to avoid infringement where the item is relatively inexpensive or an "impulse" item, may be enough to avoid infringement in the case of an expensive item and one to which more attention is paid. See, e.g., *Braun Inc. v. Dynamics Corp. of America*, 975 F.2d 815, 820 (Fed. Cir. 1992).

Mr. Anders, Plaintiffs' expert testifying on the ordinary observer test, first acknowledged that the customers to whom the golf carts at issue are sold are probably owners or operators of golf courses, and more professional persons than the consumer

4

off the street (Transcript of Proceedings, p. 53). He then went on to admit that he had not done any investigation into either the due diligence that purchasers of golf cars usually do or in their perception of the products they purchase. He simply stated that he had not had a chance to do that yet. (Transcript of Proceedings, p. 54). Mr. Anders, by his own admission, was in no position to provide any opinion of what is in the eye of the ordinary observer "giving such attention as a purchaser usually gives." (Transcript of proceedings, p. 54). .

No evidence was presented at the preliminary injunction hearing as to how much attention a purchaser of golf cars usually gives, such that Plaintiffs could not and did not establish a likelihood of meeting the ordinary observer test. Thus, no support could exist for any findings under the ordinary observer test.

**D.    The Court based its findings on comparison between two products which were not received into evidence, which were not authenticated, and which Defendant's counsel was not allowed to see**

The Court's findings are replete with references to an "independent view of the two golf carts" and to the Court's opinion on infringement resulting from that independent viewing (Transcript of Proceedings, pp. 84 -111). Defendant's counsel was not allowed to view the cars (*id*, p. 84). The cars were not authenticated and were not received into evidence. There is no testimony as to the cars, and at the hearing it was never known by Defendant what cars were actually presented by Plaintiffs, how they were presented, what condition they were in, or what was seen by the Court. Obviously, counsel could not address any aspect of the cars actually viewed by the Court.[1]

---

[1] Some time after the hearing, Defendant's counsel was allowed by Plaintiffs to take photographs of the cars purportedly shown, and in the condition as purportedly shown, to the Court. These photographs were taken at the E-Z-Go facility.

5

Findings based on cars not entered into evidence and not even seen by counsel are findings without any support.

**E.    The accused product purportedly shown to the Court was not fully assembled, was not in the condition of its "normal use," and was not in the form upon which a design infringement analysis could be made**

In evaluating design infringement, courts must take into account similarities and differences. *FMC Corp. v. Hennessy Indus., Inc.* 836 F.2d 521 (Fed. Cir. 1987). Furthermore, in the "ordinary observer" analysis, the comparison that is made "must extend to all ornamental features visible during *normal use* of the product, i.e., 'beginning *after* completion of manufacture or *assembly* and ending with the ultimate destruction, loss, or disappearance of the article.'" *Contessa Food Products, Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1380 (Fed. Cir. 2002)(emphasis added). In the present case, the normal use of Defendant's product, after assembly, includes its distinctive canopy, split-windshield and upright framing. The fact that Defendant's product comes with a canopy, as sold, was acknowledged by Plaintiffs' witness, Mr. Bruntz (Transcript of Proceedings, p. 45). Nevertheless, when Defendant's Fleet car was shown to the Court (as evident from the later viewing of the golf cars by Defendant's counsel), the canopy, windshield and upright framing were not there (Stebbins Affidavit, Exhibit B).

A comparison of the design patent at issue with Defendant's accused car *in normal use*, with its distinctive canopy, windshield and framing, is shown in the comparable patent style drawings below. As seen, substantial differences are now quite apparent. These differences, and others, are addressed in more detail in Section II.C., below.

6



FIG. I



FLEET MODEL CAR

**F.    The accused product as depicted in the photographs used by Plaintiffs at the hearing and upon which testimony was based was a further stripped down version of Defendants' product, and not how the product appears in normal use.**

The photographs of the accused Fleet car upon which Plaintiffs' motion and the testimony of their expert, Mr. Anders, are based do not represent Defendant's Fleet car in normal use. The car has been substantially stripped of significant features that establish differences from the design in Plaintiffs' patent. In particular, the car depicted in the photographs within Mr. Anders' report, and in Tab 23, Exhibit 1, used at the preliminary injunction hearing, have at least the following prominent features *removed* from Defendant's car, all of which were assembled, visible and distinguishable in normal use on the product:

1.    a canopy;

2.    a split-windshield;

3.    vertical framing;

4.    styled hub caps;

5.    a sweater basket;

7

6.    a receptacle frame.

These features extend to the ornamental design aspects of Defendant's accused infringing product and distinguish that design from the asserted patent. The hub caps on Defendant's car, for example, distinguish the design of Defendant's car from the design of Plaintiffs' patent which is drafted to show and cover only plain hub caps. In the Court's analysis, on the other hand, it expressly did not consider the hub caps on the cars, apparently based upon Mr. Anders' testimony that he considered the hub caps functional. To the contrary, hub caps, which can be made in numerous different ways, configurations and designs, are primarily ornamental and appropriate for consideration in an infringement analysis. See, e.g., *L.A. Gear, Inc. v. Thom McAn Shoe* Co., 988 F.2d 1117 (Fed. Cir. 1993)("When there are several ways to achieve the function of an article of manufacture, the design of the article is more likely to serve a primarily ornamental purpose."). In cross-examination Mr. Anders finally did admit that the differences in the hub cap arrangement are ornamental (Transcript of Proceedings, p. 72).

The photographs used by Plaintiffs and their expert were alleged to accurately portray Defendant's accused product. To the contrary, they did not show, and actually *removed,* many distinguishing features of the product, and are truly a misrepresentation to the Court.

G.    **Plaintiffs' product shown to the Court and used for comparisons, contained substantial differences from the design shown in the patent drawings.**

As addressed with the Court at the preliminary injunction hearing, the proper comparison in a design patent infringement analysis is to compare an accused device with the design shown in the patent. *Sun Hill Industries, Inc. v. Easter Unlimited, Inc.,* 48

8

F.3d 1193, 1196-1197 (Fed. Cir. 1995)("The test for infringement is not whether the accused product is substantially similar to the patentees' commercial embodiment of the claimed design. . . . The trial court must measure infringement against the claim, not against a commercial embodiment that contains more than the claim"). Nevertheless, significant comparisons were made with Plaintiffs' product, and with features contained in Plaintiffs' product not present in the asserted patent.

In Plaintiffs' motion and during the preliminary injunction hearing, extensive statements and testimony were presented on comparisons between components of Plaintiffs' product and components of Defendant's product as shown in the photographs at Tabs 13-19, Exhibit 1. These components and the features addressed, however, are not part of the design patent at hand. In cross-examination, Plaintiffs' Mr. Bruntz admitted that the features about which he testified at Tabs 13-19, Exhibit 1, were not shown in the '762 patent. These included numerous hole and rivet locations. (Transcript of Proceedings, pp. 38-43).

In addition to the above referenced mounting details, other features shown in the components in these photographs are not part of the '762 patent, yet comparisons were shown. At Tab 17, Exhibit 1, for example, the photographs show shoe guards on the rear fenders, as well as motor covers. Neither of these features is in Plaintiffs' patent. Similarly, at Tab 18 there is shown a comparison between Plaintiffs' and Defendant's brush guards. But even the brush guard appearing on Plaintiffs' car is not of the design shown in Plaintiffs' own patent – the brush guard in Plaintiffs' product is much more rounded than the one in the '762 patent.

9

The E-Z-Go car purportedly shown to the Court (based upon the photographs taken of this car, attached at Exhibit B), similarly differs from the design shown in the '762 patent drawings. Some of the more prominent features found on the car shown to the court, but not covered by Plaintiffs' patent, include a sweater basket, styled hub-caps, rear shoe guards, and a larger golf bag lining. These features, not found in the patent, should not be considered in this infringement action, and such features can be freely copied by anyone  *See, e.g., Compco Corp. v. Day-Bright Lighting, Inc.*, 376 U.S. 234, 84 S. Ct. 779 (1964).

## H.    There was no support for the Court's findings on infringement

The testimony of the first witness provided by Plaintiffs, Mr. Bruntz, was about hole and rivet locations. As stated by Plaintiffs' expert, Mr. Anders, "[a]ll of his [Mr. Bruntz's] testimony was dealing with functional aspects." (Transcript of Proceedings, p. 60). Function aspects, however, are not covered by a design patent and should not be considered in a design patent analysis. *See, e.g., OddsOn Products, Inc. v. Just Toys, Inc. 122 F.3d 1396 (Fed. Cir. 1997)*. Mr. Bruntz also acknowledged that the features he testified about were not shown in the design patent being asserted (Transcript of Proceedings, pp. 38-43). For this reason, too, these features are not relevant to design patent infringement, which is directed only to what is shown in the patent drawings. *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed. Cir. 1995). And, although the Court seemed to place weight on what was perceived as a direct copy of these functional aspects of the product, where such are not covered by the patent they are in the public domain and can be freely copied by all. *See, e.g., Compco Corp., supra,* at 237-38 (where a fixture was not covered by a design or mechanical patent, "[u]nder the federal

10

patent laws it is, therefore, in the public domain and can be copied in every detail by whoever pleases.")

The second witness, Mr. Anders, was not qualified to testify on the ordinary observer test. As stated above, there was no evidence presented on the attention purchasers of golf cars usually give to their purchases, and Mr. Anders admitted that he was not aware and did not perform any investigation on the amount of attention given by purchasers of golf cars to their purchases. This element, fundamental to the ordinary observer test, was totally lacking from Plaintiffs' case.

The Court made no findings under the "point of novelty" test for infringement. That test, as well as the ordinary observer test, must also be met for a finding of infringement or likelihood of success for infringement. *Bernhardt, LLC v. Collezione Europa USA, Inc.*, 386 F.3d 1371 (Fed. Cir. 2004). Without any such findings, no likelihood of success on liability could exist.

Finally, there was never any evidence presented on the accused product as it appears in normal use.

Without these fundamental elements of Plaintiffs' case, there is no support for its claim of infringement, for its claim of likelihood of success on the merits, or for the Court's findings.

### I.    There was no irreparable harm shown to support a preliminary injunction.

As Plaintiffs acknowledged, evidence found to rebut the presumption of irreparable harm in patent cases includes where "movants unduly delayed in bringing suit, thereby negating the idea of irreparability" (Plaintiffs' Brief, p. 32). In the present case, and as stated at the evidentiary hearing, Defendant has been selling the accused

11

infringing products for almost a year (the date of introduction has now been confirmed as January 2005 when Defendant began marketing its electric cars and March 2005 when its first sales occurred (Andrews Declaration, ¶3, Exhibit C). Additionally, although Plaintiffs' brief claims "it was not until late October 2005 that E-Z-Go became suspicious of Fairplay's possible infringing activity" and that E-Z-Go then obtained a Fairplay golf car (Plaintiffs' Brief, p. 32), in fact E-Z-Go had purchased a Fairplay car at the "end of September or the first of October" 2005 (Transcript of Proceedings, p. 24), over three and one-half months before they alleged the need for an expedited hearing and a preliminary injunction. Such delay supports the lack of irreparable harm.

Plaintiffs also rely, in support of their allegation of irreparable harm, on Defendant's showing of the alleged infringing Fleet car at two trade shows. As stated at the hearing, however, Defendant was not showing or marketing the accused infringing cars at the shows. This alleged "irreparable harm" was non-existent.

## II.   A Preliminary Injunction is Not Warranted.

The Federal Circuit has "cautioned . . . that a preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted." *Intel Corp. v. ULSI System Technology, Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993), reh'g denied, in banc suggestion declined (August 26, 1993). A preliminary injunction is inappropriate here.

As stated in Plaintiffs' Brief, to be entitled to a preliminary injunction, Plaintiffs must prove: (1) a reasonable likelihood of success on the merits; (2) irreparable harm if an injunction is not granted; (3) a balance of hardships tipping in its favor; and (4) the injunction's favorable impact on the public interest. (Plaintiffs' Brief, p.11, citing *Reebok Int'l Ltd. v. J. Backer, Inc.*, 32 F.3d 1552, 1555 (Fed. Cir. 1994)). Here, there is

12

no likelihood of success on the merits, there is no irreparable harm if an injunction is not granted, and the balance of hardships greatly tips in favor of Defendant.

### A.    There is No Irreparable Harm

As referenced above (*supra*, p. 11), Defendant's golf cars have been on the market for a year, since January 2005. Plaintiffs' delay in seeking a preliminary injunction demonstrates the lack of irreparable harm. Similarly, and contrary to Plaintiffs' assertions, other similarly designed cars are also on the market and have been on the market for years, which Plaintiffs have never sought to enjoin. The Star Series Golf Cars by JH Global Services, Inc., for example, have been on the market for years, as shown in a July/August 2004 advertisement reproduced below (the full advertisement is attached in Exhibit D). As can be seen, this car even contains the parallel raised portion on its hood or cowl as shown in Plaintiffs' patent and addressed at the initial preliminary injunction hearing; it has many other features in Plaintiffs' patent and not on Defendant's car; and it does not have many of the distinguishing features on Defendant's car (such as shoe guards over the rear wheel wells).

13



Also on the market and similarly designed is the Tiger golf car shown in the September/October 2005 issue of Golf Car Advisor (Exhibit E), and the Ruff & Tuff 2005 R/T Golf car, appearing in the September/October 2005 issues of Gold Car Advisor (Exhibit E) and Golf Car News (Exhibit F). The latter is also advertised starting at a sales price of $3095, in contrast to Plaintiffs' claims they will be irreparably harmed by Fairplay's advertising of its car for the low amount of $3495 (Plaintiffs' Brief, p. 33).

14





All of these similarly designed cars on the market demonstrate the lack of irreparable harm caused by Defendant's later entry into this field.

15

CHICAGO\2180885.1
ID\AJST

Of even more significance in showing the lack of irreparable harm, however, is that Defendant's sales are insignificant compared to the sales of Plaintiffs. As the testimony presented by Plaintiffs has shown, E-Z-Go produced over 70,000 TXT golf cars in 2005, and has over a 40% share in the golf car market (Transcript of Proceedings, pp. 82, 78). Defendant's total sales in 2005 of the Fleet model car, for which the preliminary injunction was sought, were only 131 cars – less than two-tenths of one percent of Plaintiffs' car production. (Andrews Declaration, ¶5, Exhibit C). With such disparity, no such harm to Plaintiffs' sales or market share can exist as Plaintiffs have claimed.

Plaintiffs have further recognized – and indeed have implicitly admitted – the lack of impact that Defendant's sales can make. In their recent proffer of security for costs and damages that could be incurred in the event Defendant is wrongfully enjoined, Plaintiffs stated that "$100,000 should be more than adequate." (Plaintiffs' Rule 65 Proffer of Security for Preliminary Injunction or Restraining Order). At $3,495 per car, $100,000 represents the sale of less than 30 cars. Defendant's size and sales simply cannot cause "irreparable harm" to Plaintiffs warranting a preliminary injunction. *See, e.g., Travelers Express Company, Inc. v. Transaction Tracking Technologies*, 305 F. Supp.2d 1090, 1095 (D.Minn. 2003)("In determining whether such harm [loss of market share or loss of customers] is irreparable, courts consider the *actual value* of such losses." (emphasis added)) (*Lopes v. International Rubber Distributors*, 309 F.Supp.2d 972, 980 (N.D.Ohio, 2004)("Mr. Lopes argues that he will suffer irreparable harm without a preliminary injunction because he stands to lose a considerable amount of business from IRD's sale of the accused devices. Moreover, he suggests that IRD's sale of 'an inferior

16

knock-off product' will imperil his goodwill and business reputation. Mr. Lopes allegations of irreparable harm are conjectural at best. The record contains no evidence regarding Mr. Lopes' lost sales, if any, and IRD has actually only sold $5000 of its product to date. Even if Mr. Lopes proved lost sales from IRD's activities, he could be fully compensated by monetary damages. [citation omitted]. Mr. Lopes' suggestion that, absent a preliminary injunction, his reputation and business goodwill will be harmed is similarly speculative. One could certainly argue that IRD's sale of an 'inferior product' . . . would actually serve to solidify his hold on the market.")

**B.    The Balance of Hardships Hangs Over Defendant.**

Another factor necessary to consider for the grant of a preliminary injunction is the balance of hardships. Textron is obviously a large conglomerate. Its E-Z-GO Division manufactured over 70,000 of its TXT golf cars last year and has 750 employees at the Augusta facility. (Transcript of Proceedings, pp. 77, 82). Defendant, Fairplay, on the other hand, is a small privately held company, has only 11 employees, and last year and through the injunction sold only 131 of the Fleet model cars to which Plaintiffs' preliminary injunction motion was directed (Andrews Declaration, ¶5, Exhibit C). The *only* products being sold by Fairplay at the time of the preliminary injunction hearing by Fairplay (prior to introduction of its new ZX car), were its Fleet, Legacy and Legacy LX model cars and accessories (Andrews Declaration, ¶3, Exhibit C). Any injunction on the Fleet and Legacy cars, as the original order covers, would thus be over most of Fairplay's products. Such a disparity in size, relative economic effect on the parties, and the potential to destroy an alleged infringer without its full day in court, warrants denial of any preliminary relief. *See, e.g., Illinois Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 670

17

(Fed. Cir. 1990) ("a court must remain free to deny a preliminary injunction, whatever be the showing of likelihood of success, when equity in the light of all the factors so requires").

### C.    There is No Likelihood of Success on Infringement

As specified in Plaintiffs' Brief, two distinct tests must be satisfied in order to find design patent infringement: (a) the "ordinary observer" test, and (b) the "point of novelty" test. (Plaintiffs' Brief, p. 13, citing to *Contessa Food Prods., Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1376 (Fed. Cir. 2002)). Neither test has been nor can be met in this case, and no likelihood of success on the merits can exist.

#### i.    Substantial Differences Exist to Preclude a Likelihood of Success Under the Ordinary Observer Test

Substantial differences exist between the design shown and claimed in Plaintiffs' patent and Defendant's Fleet model car, such that from the point of view of an ordinary observer, giving such attention as a purchaser usually gives to this purchase, the two designs are not substantially the same, and a purchaser would not be deceived into purchasing one supposing it to be the other.

As an initial matter, one has to consider who is the ordinary observer, and how much attention  a purchaser usually gives in purchasing the product (*see, supra*, p.4). Here, Plaintiffs' expert, Mr. Anders, testified that the purchasers in this case are probably the owners or operators of golf courses, more professional persons than the consumer off the street (Transcript of Proceedings, p. 53). The product is a relatively expensive item, so that  even where the purchaser is an ordinary retail consumer, he  usually gives considerable attention to and studies the aesthetics of the product.  This is not an "impulse" purchase. Many treat its purchase as  similar to the purchase of an automobile.

18

(Thibault Declaration, Exhibit G). In short, even minor distinctions make a significant difference.

The scope of the design patent must also be evaluated. In that regard, and contrary to Plaintiffs' assertion throughout their brief, the scope of a design patent is *not* broad. Plaintiffs cite to the case of *In re Mann*, 861 F.2d 1581 (Fed. Cir. 1988), for example, for the proposition that the protection of a design patent "generally" covers what is shown in the drawings (Plaintiffs' Brief, p. 12). This statement is simply inaccurate. As correctly stated by the Federal Circuit in *In re Mann*, "[d]esign patents have almost *no scope*. The claim at bar, as in all design cases, is *limited to what is shown in the application drawings*." *In re Mann*, *supra* at 1582 (emphasis added). See also, *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed. Cir. 1995).

When the ordinary purchaser is comparing the asserted patent, which has almost no scope and is limited to what is shown in the drawings, with the accused product, with such attention as a purchaser usually gives, the accused product is to be viewed as the product exists in *normal use* (*see, supra*, p.6). In the present case, Defendant's Fleet Model car as it is displayed, sold, and seen in normal use, includes a canopy, split-windshield, upright supports, hub caps, and a sweater basket. (Anders Declaration, ¶5, Exhibit C). None of these features are shown in Plaintiffs' patent drawings and none were in the photographs taken and used by Plaintiffs' expert, Mr. Anders. It is with these features, however, that Defendant's product must be viewed in a design patent infringement analysis. *Contessa Food Products, supra.*

Finally, in making the ordinary observer comparison, the similarities and *differences* between the patented design and the accused infringing product must be

19

evaluated. *FMC Corp. v. Hennessy Indus., Inc.* 836 F.2d 521 (Fed. Cir. 1987). Especially in its normal use, significant features are added to Defendant's car. These additions make significant differences in its appearance, precluding a finding of infringement in the present case. See, e.g., *Horwitt v. Longines Wittnauer Watch Co., Inc.* 388 F.Supp. 1257, 1263 (S.D.N.Y. 1975)("whereas plaintiff's design is graced with the utmost simplicity, defendants' watches are highly ornate and elaborate, especially those encrusted with jewels. This added feature serves to underline the differences between plaintiff's design on the one hand the defendants' watches on the other hand, and precludes a finding of infringement").

In comparing what is limited to the patent claim, e.g., the patent drawings, to Defendant's actual product as sold and in use, the following differences, as also addressed by Defendant's expert, Jordan Rotheiser (Exhibit H), are noted:

Looking first at the perspective views of the cars in labeled patent-type drawings shown below, with Plaintiffs' patented design on the left, and Defendant's Fleet car on the right, and a photograph of the Fleet car below:



FIG. I



FLEET MODEL CAR

20



1.    Defendant's car has a canopy, 1, and windshield, 2, which are distinctive and nowhere in Plaintiffs' patented design;

2.    Defendant's car has a distinctive triangular center portion, 3, on its cowl instead of a rectangular center portion, A, as in Plaintiffs' patent;

3.    Defendant's car has an oval name-plate, 4, centered between the horizontal style line and the lower edge on the cowl, whereas Plaintiffs' patent shows a

21

deeply recessed and large rectangular section, B, for its logo, positioned immediately below and abutting the horizontal style line;

4.    Defendant's car has fender flairs, 5, above the front wheels, whereas Plaintiffs' patented design has fender flairs, J, only in the rear and none in front;

5.    Defendant's car has styled and distinctive hub-caps, 6, compared to Plaintiffs' patent with plain hub-caps, C;

6.    Defendant's car has a broad and long aluminum foot step, 7, extending from the front wheel well to the rear wheel well, whereas the patented design is of a small foot step, D, of very limited length.

7.    Defendant's car has a charging receptacle and surrounding square frame, 8, beneath the seat whereas Plaintiff's design has none.

8.    Defendant's car has prominent black and slotted rear shoe guards, 9, whereas Plaintiffs' patented design has none.

9.    Defendant's seat back has very rounded edges, 12, as opposed to the square, seam-lines, E, on Plaintiffs' patented design.

Looking at the side view, the following differences are also noted:

22



FLEET MODEL CAR



10.    The differences in the hub-caps, 6 and C, are prominent in viewing the cars from the side; as are the distinctions in the logo recess on Plaintiffs' patent, B, and the lack of such a recess on Defendant's car; the differences in the foot steps, 7 and D;

23

and the more rounded seat sections, 12, in Defendant's car than in Plaintiffs' patent, all as mentioned above;

11.    Plaintiffs' patent shows a direction control, F, whereas Defendant's car has no such similar control knob;

12.    Plaintiffs' rear back support, H, is angled with an angled supporting brace, G, whereas Defendant's car has a simple square and vertical arrangement with its seat support 11;

13.    Defendant's shoe guards, 9, are prominently shown from the side whereas Plaintiffs have none, as well as Defendant's car having a front fender flair, 5, and a canopy, 1, as also addressed above;

14.    Defendant's car also has a sweater basket, 10, whereas none is shown in Plaintiffs' patent.

Looking at the rear of the cars, further distinctions are seen.



FIG. 5

FLEET MODEL CAR

24



15.    Prominently shown from the back are Defendant's shoe guards, 9; sweater basket, 11; and, of course, the canopy, 1, all of which are lacking in Plaintiffs' patent.

16.    Also prominently seen from the back is the difference between Plaintiffs' relatively small golf bag lining, I, positioned solely along the forward wall of the golf bag retaining section, whereas Defendant's liner, 13, extends around to the sides.

The front view of the cars, with distinctions already mentioned, is shown below:

25



FIG. 4



FLEET MODEL CAR



26

Finally, further demonstrating the distinctiveness of Defendant's cars with a canopy in place, as its cars are displayed and seen in normal use, the United States Patent and Trademark Office ("PTO") granted Defendant a design patent on its own design. See US Patent No. D514,981, Exhibit I. The PTO furthermore granted Defendant's design patent, and considered Defendant's car design distinctive and patentable, over Plaintiffs' '762 patent (the latter was cited and reviewed by the PTO Examiner as shown by its reference on the front page of Defendant's issued patent). The distinctiveness and nonobviousness of the design of cars of Defendant with their canopy in place, evidenced by the grant of a United States patent thereon, is relevant to and supports the recognition of noninfringement. *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1570 (Fed. Cir. 1996) ("The nonobviousness of the accused device, evidenced by the grant of a United States patent, is relevant to the issue of whether the charge [between an asserted and an accused design] is substantial."); *Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112, 1128 (Fed. Cir. 1996)(Nies, J., Additional Views)("[T]he fact of a second patent . . . may be relevant to the issue of whether the changes are substantial."); *National Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1192 (Fed. Cir. 1996)("The fact of separate patentability is relevant, and is entitled to due weight.").

### ii. Substantial Differences Exist to Preclude a Likelihood of Success Under the "Points of Novelty" Test

In addition to meeting the "ordinary observer" test, a finding of design patent infringement requires the Plaintiffs to meet the "point of novelty" test. The latter "requires proof that the accused design appropriates the novelty which distinguished the patented design from the prior art." *Bernhardt, LLC v. Collezione Europa USA, Inc.*, 386 F.3d 1371 (Fed. Cir. 2004). *See, also, Goodyear Tire & Rubber Company v. Hercules*

27

*Tire & Rubber Company*, 162 F.3d 1113, 1121 (Fed. Cir. 1998) ("Since several significant points of novelty of the '080 design do not appear in the accused design, the district court did not clearly err in finding that the 'points of novelty' test was not met.").

Here, as identified by Defendant's expert, Jordan Rotheiser (Exhibit H), numerous points of novelty of the '762 patent do not appear in the Fairplay Fleet design.

1.    Plaintiffs' expert witness, Mr. Anders, claimed that the cowl depicted in the '762 patent is a point of novelty. However, the cowl in the '762 patent contains novel and ornamental cowl lines that are parallel, a feature not found on Defendant's car.

2.    A further point of novelty in the '762 patent is the recessed, rectangular logo or name plate section located at the top of the lower portion of the cowl. No such recessed, rectangular section located at the top of the lower cowl portion is found on Defendant's car. Defendant's logo is oval, not as recessed, and is centered, as opposed to at the distinctive location shown in the '762 patent, in the lower portion of the cowl.

3.    Plaintiffs' expert witness, Mr. Anders, claimed that the ornamental seat back depicted in the '762 patent is a point of novelty. The ornamental seat back depicted in Figures 1, 2 and 3 of the '762 patent has a hard front edge with a very small radius. This is also not found in Defendant's car, where the seat back is softly rounded.

4.    Plaintiffs' expert witness, Mr. Anders, claimed that the rear fender depicted in the '762 patent (Figures 1, 2 and 3) is a point of novelty. However, none of the figures of that patent shows the black shoe guard that is a prominent feature of Defendant's rear fender design.

5.    Plaintiffs' expert witness, Mr. Anders, claimed that the ornamental dashboard depicted in the '762 patent is a point of novelty. However, hardly any of the

28

dashboard is illustrated in the figures of the '762 patent (Figures 2 and 3). Furthermore, the shift mechanism present on Defendant's car is nowhere to be seen in the figures of the '762 patent.

There are other points of novelty in addition to those identified by Mr. Anders, and none of them is present in Defendant's car.

6.     The foot guard is a point of novelty in the '762 patent which shows a foot guard only in the space between the cowl and front of the seat. Defendant's car employs a foot guard that extends from the front cowl to the rear wheel, unlike the footguard shown on the '762 patent.

7.     Another point of novelty in addition to those identified by Mr. Anders is the forward/reverse control, shown on the front of the seat between the driver and the passenger. The Fairplay car is completely smooth in that area and does not have depict a forward/reverse control lever on the front of the seat between the driver and the passenger.

8.     A further point of novelty is the golf bag liner of the '762 patent, which extends only partially across the area between the fenders. The black golf bag liner of Defendant's car extends across the space between the rear fenders and up the sides of the rear fenders and differs significantly from that shown in the '762 patent.

These differences, and the lack of inclusion in Defendant's car of many significant points of novelty in the '762 design, preclude meeting the "points of novelty" test, the finding of infringement, or the finding of any likelihood of success on the merits.

29

**IV.    Conclusion**

For the reasons stated above, Plaintiffs' have not met their burden of proving

entitlement to a preliminary injunction in this case. Plaintiffs' motion should be denied.

Charles C. Stebbins, III
Ga. Bar No. 677350
Attorney for Defendant

OF COUNSEL:
WARLICK, TRITT, STEBBINS & HALL, LLP
Post Office Box 1495
Augusta, Georgia 30903-1495
(706) 722-7543

Allan J. Sternstein, Esquire
Illinois Bar No.: 2728966
(Admitted Pro Hac Vice)
Attorney for Defendant

OF COUNSEL:
DYKEMA GOSSETT PLLC
10 S. Wacker Drive
Chicago, Illinois 60606
(312) 627-2143

Craig N. Hentschel, Esquire
California Bar No: 66178
(Admitted Pro Hac Vice)
Attorney for Defendant

OF COUNSEL:
DYKEMA GOSSETT PLLC
333 South Grand Avenue
Suite 2100
Los Angeles, California 90071
(213) 457-1850

30

CHICAGO\2180885.1
ID\AJST

CERTIFICATE OF SERVICE

This is to certify that I have caused a copy of the within and foregoing

Defendant's Motion for Extension of Time and Preliminary Opposition to be served upon

counsel for Plaintiffs by U.S. Mail addressed to:

> James B. Ellington, Esq.
> Hull, Towill, Norman, Barrett & Salley
> Post Office Box 1564
> Augusta, Georgia 30903-1564

This the 22 day of February, 2006.

Charles C. Stebbins, III
Attorney for Defendant

CHICAGO\2181077 1
ID\AJST

CHICAGO\2180885.1
ID\AJST

# Exhibit G

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FAIRPLAY ELECTRIC CARS, LLC,                     )
                                                  )
                    Plaintiff,                    )
                                                  )
        v.                                        )       C.A. No. 06-60-JJF
                                                  )
TEXTRON INNOVATIONS, INC. and                     )
TEXTRON, INC. (including its E-Z-GO              )
Division),                                        )
                                                  )
                    Defendants.                   )

## DECLARATION OF WAYNE BROCK

I, Wayne Brock, hereby declare as follows:

1.      I am the President and Owner of South-Central Products, Inc.,
d/b/a GFL - Golf Products Co., 10401 Maumelle Blvd., North Little Rock, AR, and have
been the president and owner of South-Central Products, Inc. since 1990.

2.      South-Central Products, Inc. has been a distributor for E-Z-GO, a
Division of Textron Inc., since 1997. A copy of the current Distribution Agreement
between E-Z-GO and South Central Products, Inc., dated January 1, 2005, is attached
to this Declaration as Exhibit 1.

3.      Shortly after its date, I received the January 31, 2006 dated letter
purportedly from John A. Rupp, Assistant General Counsel, Textron Inc., attached to
this Declaration as Exhibit 2.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on __3/20__, 2006        _____

CHICAGO\2186789.1
ID\AJST

# Exhibit 1

Expires December 31, 2006

# E-Z-GO Division of Textron Inc.
## Distribution Agreement

THIS Distribution AGREEMENT, dated this 1st day of January 2005 by and between the E-Z-GO Division of Textron Inc., a Delaware corporation (the "Company"), acting through it's Southwest Branch located in Dallas, TX and South Central Products, Inc. dba GFL - Golf Products #62912 , a Dealer (Type of Business) (the "Dealer"), whose principal place of business is located at 10401 Maumelle Blvd., North Little Rock, AR 72190-4606.

WITNESSETH:

WHEREAS, the Company manufactures and markets equipment, parts and accessories for the golf and turf industries under the trademarks "E-Z-GO" and "Cushman", such products being advertised and marketed nationally; and

WHEREAS, Dealer desires to purchase products manufactured by the Company and to resell or lease them to users and consumers;

In consideration of the premises and the mutual covenants and agreements hereinafter set forth, the parties hereby agree as follows:

## 1. APPOINTMENT OF DEALER

Subject to the terms of this Agreement, the Company hereby appoints Dealer as its non-exclusive Dealer primarily responsible for selling those products manufactured by the Company and listed on Exhibit A hereto (collectively, together with parts and accessories therefore and other products mutually agreed upon by written amendment, "Company Products") and for leasing Company Products in the geographic area set forth on Exhibit A hereto (the "Territory"). This Agreement covers stocking, display, sales and leases of Company Products only at or from the Dealer's location specified in this Agreement. Any other business location shall be subject to the written approval of the Company and shall be covered by a separate agreement or a written amendment hereto. Dealer accepts the appointment and agrees to act as a Company Dealer subject to the terms and conditions of this Agreement. Dealer recognizes and agrees that this Agreement is non-exclusive, and that nothing herein shall preclude the Company from selling or leasing Company Products directly to customers in the Territory or from appointing other Dealers of Company Products in the Territory. Dealer will not, directly or indirectly, solicit sales of Company Products nor establish a place of business outside the Territory.

## 2. PURCHASE OF COMPANY PRODUCTS BY DEALER

(a) The Company shall sell Company Products to Dealer, and Dealer shall purchase Company Products from the Company, subject to availability and the terms of this Agreement. The Company may, in its sole discretion, accept, reject or allocate Company Products to any order sent to it by Dealer and the Company shall not be liable to the Dealer or to any of its customers or to any other person for any refusal or failure to accept or fill any order.

(b) The Company shall, at all times, have the right to discontinue, change the specifications and design of , alter or substitute materials in Company Products without notice and without incurring any obligation or liability to Dealer.

(c) All sales of Company Products to Dealer are final, and Dealer shall accept all Company Products which Dealer has ordered. Company Products ordered by it, whether such orders are given to the Company by telegram, telephone, fax, letter, purchase order, oral order or other communication and no cancellation of such order. whether made before or after shipment, and no returns shall be made without the express prior written authorization of the Company. All sales of Company Products made by the Company to a Dealer shall be in accordance with Company's terms and conditions of sale as in effect on the date of sale. Company's terms and conditions shall not be altered or modified by the provisions of any purchase order or other instrument furnished by Dealer even though shipment is made by the Company against such purchase order or other instrument. Without regard to freight being prepaid or collect, insurance against risk of loss while in transit, or method of payment, title to and risk of loss of Company Products shall pass to the Dealer upon delivery by the Company to a carrier for shipment to the Dealer unless other terms are specifically agreed upon in

advance in writing; provided, however, that in the event that Company Products are delivered to Dealer's premises by the Company's employees, title and risk of loss remain with the Company until delivery at the destination point. Notwithstanding passage of title, the Company shall have all security and other rights permitted by law, including, without limitation, the right of rescission, stoppage in transit and resale, and the Company reserves the right to possession of each Company Product, notwithstanding delivery to the carrier, until payment in full of the purchase price therefor.

(d) All delivery dates which may be agreed on by the parties shall be tentative, and although the Company shall endeavor to make delivery in accordance with such dates, it shall not be in breach of this Agreement or any other duty to Dealer if it fails to meet such delivery dates, whether due to any event of force majeure or otherwise.

## 3. PRICE AND PAYMENT

(a) Company Products shall be purchased by Dealer at the Dealer prices and discounts established by the Company and in effect on the date of the Company's shipment of such Company Products, regardless of when the order for such Company Products was submitted or accepted. The Company may change its prices and discounts for Company Products at any time upon written notice to Dealer effective as of the date of such notice. Such changes shall apply to all Company Products shipped after the effective date of such changes regardless of when ordered. All prices are F.O.B. the Company's plant. The Company reserves the right to sell or lease Company Products to any customer it chooses. Dealer acknowledges such right of the Company and recognizes that sales or leases by the Company may be at prices lower than those paid by Dealer.

(b) The full price of all Company Products shall be due and payable in cash upon delivery of the Company Products, unless the Company has agreed in writing to extend credit to Dealer, in which event the price of all Company Products delivered pursuant to such extension of credit shall be due and payable as provided in such separate writing. The Company may at any time, and for any reason whatever, revoke its extension of credit or alter the terms and conditions thereof with respect to any sale without prior notice to Dealer prior to shipment. The Company also reserves the right to set-off against any credit memos or payments for leased products to be issued for the benefit of Dealer, any amounts owing from Dealer to Company or TFC (if Dealer finances the purchase of products form Company with financing from TFC) which are thirty-one (31) days or more past due. If Dealer breaches this Agreement, any other agreement with the Company or any agreement entered into by Dealer relating to the financing of Company Products, the Company may revoke its extension of credit or alter the terms and conditions thereof for any Company Products not paid for in full, regardless of whether such Products have been delivered. Any failure to make any payment when and as due shall be a material breach of this Agreement.

## 4. REPORTING OF PACKING SHORTAGES AND DEFECTS

Dealer shall promptly and thoroughly inspect all shipments of Company Products immediately after arrival. Dealer shall notify the Company in writing within ten days after the arrival of any Company Products of any packing shortages with respect thereto and shall submit all packing slips and inspection reports along with said written notice. The Company reserves the right to refuse to adjust any packing shortages in the event the foregoing procedure has not been followed. Dealer shall within ten days after arrival notify the Company in writing of any other failure of Company Products to

conform to this Agreement which is reasonably discoverable upon arrival, and shall notify the Company in writing of any other failures to conform within ten days after the earlier of the date of actual discovery thereof, or the date of which they should have been discovered in the exercise of reasonable diligence. All failures of Company Products to conform to this Agreement not reported to the Company as required by this section will be deemed forever waived.

## 5.  DUTIES OF THE DEALER

Dealer shall use its best efforts to promote and solicit the sale and lease of Company Products in the Territory. Without limiting the generality of the foregoing, Dealer shall:

(a)  Purchase from the Company, and resell or lease to customers located in the Territory, during the term of this Agreement such number of Company Products (hereinafter, the "marketing objective" which shall be set forth on Exhibit A hereto) as the Company and Dealer shall agree upon, or in the absence of such agreement, as shall be reasonably designated by the Company based upon the Company's national average market penetration, such information as is available to the Company concerning Dealer's previous sales and lease levels, if applicable, in the Territory, and the growth rate of the market, if applicable, in the Territory and in the nation and other marketing factors deemed appropriate by the Company. If a Dealer sells Company Products outside of the assigned territory, the selling Dealer will be charged, via special invoice payable within 30 days, 10% of the selling Dealer's purchase price of the Company Product or Products involved in order to provide adequate compensation to Dealer and other Dealers of Company Products for performing service and warranty obligations in the servicing territory. The Dealer in whose territory the sale was made (servicing Dealer) will receive a credit against future purchases equal to 10% of the selling Dealer's purchase price on Product(s) sold in the Servicing Dealer's territory. In order for these provisions to apply, the servicing Dealer must notify Textron within 180 days of the sale into the territory. The notice will include (i) name and location of the customer (ii) the model of the Product(s); and (iii) the serial number of the Products. Any such notice is subject to verification by Textron in its sole discretion. Dealer expressly acknowledges that the foregoing provisions represent an appropriate and fair allocation of the cost and benefits of both selling and servicing Products. Dealer acknowledges that the provisions of 5(a) do not in any way limit or restrict Textron's remedies for breach of this Agreement by Dealer. Only Company Products purchased by Dealer from the Company and resold or leased by Dealer within the Territory shall be credited against Dealer's marketing objectives as set forth herein.

(b)  Purchase and maintain at all times an adequate stock of repair parts and accessories either manufactured or approved by the Company in order to provide reasonable and prompt service and repairs to Company Products.

(c)  Comply with the Company's Warranty Policy and Procedure, as described in Section 6 of this Agreement, and in connection with such compliance select, hire and train an adequate number of service technicians to enable the Dealer to perform all warranty repair, service and/or replacement work under such Company Warranty Policy and Procedure, all at its own expense. If Dealer is unable or unwilling to perform warranty repairs to Company Products which Dealer sold or leased, the Company reserves the right to charge Dealer for the cost of repairs in accordance with the Company warranty labor schedule. In conformance with established Company Warranty policy and procedure, Dealer is required to use only OEM parts and products manufactured by the Company for Warranty repairs to Company Products. In addition, Dealer shall perform other service program obligations (as established by the Company from time to time) and send, at its own expense, service technicians to schools conducted by the Company from time to time.

(d)  In order that the Company may provide proper warranty coverage for all Company Products sold or leased by Dealer, Dealer shall be required to provide to the Company, within thirty (30) working days from the date of delivery of Company Products the (i) name and location of the customer; (ii) the model of the product(s); and (iii) the serial number of the product(s).

(e)  Participate in advertising programs adopted by the Company for the Territory and bear its designated pro rata share of the cost thereof, as shall be specified in advance from time to time by the Company. Dealer is specifically required to provide a Yellow Pages listing or approved logo insert identifying the Dealer as an authorized E-Z-GO Dealer in those directories corresponding to the Dealer's assigned sales territory.

(f)  Cause appropriate personnel from Dealer to attend all Dealer meetings and conventions to which they are invited by the Company.

(g)  Maintain a place of business and sales staff in an area in the Territory suitable for handling all sales, service and sales promotional activities.

(h)  Promptly follow up on all direct or referred inquiries from prospective customers.

(i)  Fully comply with all applicable federal, state and local laws, regulations, rules, orders and ordinances relating to Dealer's business.

(j)  Obtain and maintain insurance underwritten by an insurance company with an A.M. Best rating of A- and licensed to do business in all States where the Dealer has operations and/or conducts business and in such amounts as is customarily maintained by prudent businessmen in the trade of distributing goods comparable to the Company Products, including but not limited to premises liability, public liability, fire and extended coverage, automobile and worker's compensation coverage and shall provide the Company annually (by January 31st of each year) with a certificate of insurance issued by the relevant carrier(s) as to the types and amounts of such insurance which the Dealer then has in effect, along with such other information relating thereto as the Company may reasonably request.

(k)  The Company assumes no liability to the Dealer or any third parties with respect to the performance characteristics of Company Products which have been altered, modified, or re-manufactured by the Dealer, for any claimed failures or deficiencies in the performance in the Company Products resulting, directly or indirectly, from such alterations, modifications or re-manufacturing by the Dealer. Its agents and/or distributors, or any entity related to or doing business on the part of the Dealer (hereinafter referred to collectively as "the Dealer"). The Dealer agrees to hold harmless, defend and indemnify the Company, its officers, shareholders, employees and agents (hereinafter referred to collectively as "the Company") against all third party claims, liabilities, demands, judgments or causes of action, whether at law or in equity, and all costs and expenses related thereto (including, but not limited to, reasonable attorneys' fees and costs), from claims and lawsuits arising from or in relation to the Dealer's: (a) alterations, modifications or re-manufacturing of the Company Products; (b) warranties (express or implied) or warranty service; (c) infringement, directly or indirectly, of the Company's patents, copyrights, design protections or other intellectual property rights – or of the same such rights of any third party; and (d) unauthorized use of the Company's trademarks, copyrights, service marks of other licensed marks – or of the same such rights of any third party. The Dealer further agrees to hold harmless, defend and indemnify the Company, and in no event will the Company ever be liable, for indirect, special or consequential damages incurred by the Dealer. Except as otherwise stated following, the Company agrees to: (a) provide prompt written notice to the Dealer of any such claim or lawsuit; and (b) permit the Dealer a right and option to undertake and conduct the defense of any such wholly indemnified claim or lawsuit brought against the Company; provided, however, that no settlement of any such claim or lawsuit may be entered into by the Dealer without the prior express written consent of the Company.

(l)  The Dealer shall acquire and maintain at its sole cost and expense throughout the Term and any renewal of this Distribution Agreement, and for a period of five (5) years following the termination or expiration of the Distribution Agreement, a policy of Comprehensive General Liability Insurance, to include specific insurance protection for products liability, advertisements, intellectual property and contractual liability, underwritten by an insurance company with an A.M. Best rating of at least A- and licensed to do business in all States where the Dealer has operations and/or conducts business. This insurance coverage shall provide protection of not less than two million dollars ($2,000,000) in a combined single limit for personal injury and property damage on a per occurrence basis, and $5,000,000 in the aggregate, with a deductible in such amount as is customarily maintained by prudent businessmen in the trade of distributing goods comparable to the Company Products. The Dealer shall, upon reasonable request, furnish to the Company copies of all insurance policies evidencing this insurance protection. The insurance policies shall: (a) provide an endorsement to the policy naming the Company as an additional insured party; (b) contain an endorsement requiring that, at minimum, thirty (30) days written notice be given to the Company prior to cancellation or expiration of the policy; and (c) otherwise provide adequate protection to the Company, for and against any and all claims, demands, causes of action or damages, including attorneys' fees, arising from the Dealer's sale, distribution, warranties (express or implied) and warranty service, uses and advertisement of the Company Products, regardless of when such claims may have been made or when the

2

underlying injuries occurred or were manifested. The Dealer's insurance coverage shall not contain exclusion clauses (i.e., barring cross-claims, cross-suits) which would preclude the Company, as an additional insured, from instituting causes of action against other insureds, or otherwise limit the Company's protections as an additional insured. In the event the Dealer's insurer issues notice of cancellation for the failure to pay insurance premium and the Dealer has not obtained replacement insurance coverage prior to the effective date of such cancellation, the Dealer's insurance policy must offer the Company the independent right but not obligation to: (a) pay the outstanding insurance premium to retain insurance coverage for the benefit of the Company, to the extent and in the amounts specified herein, and charge the expense incurred to the Dealer. If the Dealer fails to provide appropriate insurance coverage, the Company may in its sole discretion terminate this Distribution Agreement upon notice, but without a right to cure.

(m) Prior to the effective date of this Distribution Agreement, certificates issued by the Dealer's insurer(s) shall be provided to the Company, evidencing insurance protection to the extent, and in the amounts, specified herein. These certificates shall detail, at minimum, the amount of insurance, the endorsement evidencing the Company as an the additional insured, the policy number, the date of expiration, and an endorsement that the Company shall receive thirty (30) days written notice prior to termination, reduction or material modification of the coverage. The certificates shall bear an inked or stamped signature. Facsimile or photocopied certificates will not be acceptable. Certificates also shall be timely furnished to the Company upon all renewals of the Dealer's insurance. In the event the Dealer has not provided the required certificate(s) of insurance, the Company shall have the independent right but not the obligation to: (a) remit payment for the insurance coverage for the benefit of the Company, to the extent and in the amounts specified herein, and charge the expense incurred to the Dealer; or (b) terminate this Distribution Agreement upon notice, but without a right to cure.

(n) Purchase from the Company, or from its designated finance company, those Company Products which were located in the Territory in transactions originated by the Dealer or in which the Dealer participated, such repurchase to be on terms and conditions acceptable to the Company.

(o) Promptly advise the Company of all problems and claims involving Company Products of which Dealer becomes aware, and fully assist the Company in any investigations or responses which the Company may undertake, direct or request.

(p) Dealer acknowledges the Company's right to sell or lease products to national accounts in the territory. Dealer agrees to support such sales or leases as requested from time to time by the Company. The Company agrees to compensate Dealer for such support in an amount determined by and under the sole discretion of the Company.

(q) Dealer shall, at its own expense, purchase parts, sales and e-commerce software programs recommended by the Company for the express purposes of good communication with the Company.

(r) Dealer agrees to subscribe, at its own expense, to an e-mail provider for the purposes of communicating with the Company.

(s) As an authorized dealer of Company Products, Dealer agrees that it will set up, adjust and inspect all equipment before delivery. Dealer shall deliver the equipment face-to-face to the owner. Dealer shall personally and face-to-face hand the owner the Owner's Manual including safety instructions and warranty and personally direct the owner to:

  a)   The proper operation procedures and instructions as explained in the Owner's Manual;
  b)   The importance of safety precautions, safety equipment and preventative maintenance as explained in the Owner's Manual;
  c)   The warning decals on the equipment; and
  d)   The warranty terms and conditions.

## 6.   WARRANTY

The Company warranty shall be as set forth in the current Company Warranty Policy and Procedure, as furnished to Dealer from time to time by the Company. THE COMPANY MAKES NO REPRESENTATION OR WARRANTY OF ANY OTHER KIND, EXPRESS OR IMPLIED, WITH RESPECT TO THE COMPANY PRODUCTS, WHETHER AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR ANY OTHER MATTER. THE REMEDIES SET FORTH IN SUCH WARRANTY SHALL BE THE ONLY REMEDIES AVAILABLE TO ANY PERSON. Neither Dealer nor any other person shall have authority to bind

the Company to any other representation or warranty. Dealer shall indemnify the Company for all losses, damages, liabilities or expenses (including but not limited to reasonable attorneys' fees and litigation costs) to which the Company may be put as a result of any claim under said warranty by reason of any defect caused by any act or omission of Dealer, its employees or agents, or as a result of any claim based upon a different warranty given or purported to be given by Dealer, its employees or agents. Dealer agrees to comply with all its obligations set forth in the Company Warranty Policy and Procedure and section 5(o) of this agreement.

## 7.   TRADEMARKS AND TRADENAMES

(a) The Company hereby authorizes Dealer to use the trade names and trademarks listed on Exhibit A hereto (the "Trademarks"), in the manner described in the following sentence in connection with, and only in connection with, the promotion, advertising, merchandising, selling, distribution and servicing of Company Products pursuant to this Agreement. Dealer may use the designation "Authorized E-Z-GO Dealer" following or preceding its own name, and may use the Trademarks in any lawful way in advertising or promotional materials it may prepare for the sole purposes of identifying Dealer and identifying the Company Products being offered for sale. Dealer shall not use any Trademark as part of its company or business name and, if applicable, shall immediately amend such name to exclude such Trademark. Dealer shall supply the Company with advance copies or samples of all sales literature or other advertising, merchandising, or promotional materials proposed to be distributed with respect to Company Products. Such sales literature and materials shall not be distributed without the prior approval of the Company, which approval shall not be unreasonably withheld.

(b) Dealer hereby acknowledges the sole and exclusive right and title of the Company in and to the Trademarks and the exclusive right of the Company to use the same, and agrees that it shall not at any time, whether during or after the term of this Agreement, directly or indirectly, question, oppose, dispute or attack the same or the exclusive ownership thereof by the Company, or become a party, directly or indirectly, to any proceeding disputing the validity or tending to impair the value thereof or the exclusive title of the Company thereto. Dealer explicitly agrees that it shall not use, file or register any trademark or trade name which consists of or includes the word "E-Z-GO" or "Cushman", or any word or words similar thereto and that it shall not file, register or use any of the Trademarks in any manner without the prior written consent of the Company.

(c) Dealer shall not, whether during or after the term of this Agreement, sell or offer to sell any Company Product without the "E-Z-GO" or "Cushman" trademark(s) affixed and clearly visible.

(d) Upon termination of this Agreement for any reason, the authorization hereby granted to Dealer shall automatically terminate, and Dealer shall discontinue immediately any and all use of the Trademarks. In connection therewith, the Dealer will promptly cause all listings in telephone, building, city or other directories and all stationery, advertisements, bill heads and other written material bearing said Trademarks to be destroyed, and thereafter will not use as a mark or trade name or otherwise any of the Trademarks or any other word or words similar thereto or susceptible of being confused therewith, or represent in any manner that it is in any way connected or associated with the Company. Dealer will forthwith, upon request, do all acts and execute all documents as the Company may deem necessary or desirable to accomplish the foregoing and to relinquish and assign to the Company any and all rights and interests it may have acquired in said Trademarks by the terms of or as a result of this Agreement. Recognizing the importance of the Trademarks to the Company and the irreparable damage to the Company as a result of use thereof in contravention of this Agreement, Dealer hereby consents to any equitable relief sought by the Company to enforce the provisions of this paragraph.

## 8.   CERTAIN REPORTS

(a) Upon request, but not more often than once per quarter, Dealer will furnish to Company a detailed inventory of Company Products on hand and complete information with respect to sales and leases of Company Products (including names of customers and lessees).

(b) The Company and Dealer recognize that the Company has a special interest in the financial stability of Dealer. Within 60 days after the end of each fiscal year, the Dealer shall furnish to the Company a balance sheet as at the end of such fiscal year and statements of income and surplus of such fiscal year prepared in accordance with generally accepted accounting principles applied on a consistent basis and certified by a firm of certified

3

public accountants. If the Company in good faith deems itself insecure as to its receipt of the purchase price for Company Products when and as due, it may require Dealer to furnish such unaudited financial statements and other financial information as it may reasonably request, all to be certified as complete and accurate by Dealer's chief financial officer.

(c) Dealer shall furnish to the Company monthly sales and marketing reports (including forecasts) in the form specified by the Company. Dealer shall furnish to the Company, upon request, such additional written reports as the Company in good faith believes will be of assistance to it in evaluating the market in the Territory or Dealer's performance under this Agreement. These reports shall be in the form specified by the Company.

(d) Dealer shall give the Company written notice at least fourteen days prior to (i) any sale or other transfer, not in the ordinary course of Dealer's business, or resulting into any agreement to do the same, of any substantial portion of its assets used in connection with its distribution of Company Products, or (ii) the sale or other transfer of control by the holder or holders of any controlling equity interest in Dealer over the right to vote such equity interest, or entering into any agreement to do the same. Such notice shall also identify the proposed purchaser(s) and shall be accompanied by a copy of the proposed agreement (if any) or, if there is none in writing, a complete description of the terms and conditions of the proposed transaction. Any sale or other transfer of such assets or equity interest, or any agreement to do so, which is entered into without the Company's prior written consent shall constitute a material breach of this Agreement. Further, Dealer shall promptly notify the Company of any changes in Dealer's executive, marketing or service management and the reasons for such change.

### 9.  DUTIES OF THE COMPANY

Except as otherwise expressly provided herein, the duties of the Company shall be limited to the following:

(a) The Company shall make, available to Dealer parts catalogs, service manuals, current servicing information and such service training as the Company reasonably deems necessary to qualify Dealer or its employees for the servicing of Company Products through Dealer's own service department. The time, place and frequency of service training will be determined by the Company.

(b) The Company shall conduct annual sales reviews, individually and in groups, and at its election, may provide display and promotional facilities at national trade shows and other trade exhibits as the Company deems necessary.

### 10.  INDEPENDENT CONTRACTOR

Dealer shall be deemed for all purposes to be an independent contractor, and shall not be deemed to be an agent, employee, partner, joint venture or franchisee of the Company. Accordingly, Dealer shall have the sole right to control the manner in which it performs its duties under this Agreement, subject to no control by the Company except as otherwise expressly provided in this Agreement, and shall not be entitled to any assistance from the Company with respect to the performance of such duties except as otherwise expressly provided in this Agreement. Dealer shall be solely responsible for all of its costs and expenses in any way relating to this Agreement and for the profitability of its business. Dealer shall have no authority to act on behalf of the Company or to bind or obligate the Company in any way in dealing with any customer or other person or entity, and Dealer shall not claim or imply that it has any such authority. Dealer shall indemnify and hold the Company harmless from and against all claims, damages, losses, liabilities, costs and expenses (including but not limited to reasonable attorneys' fees and legal expenses) which may arise relating to any action or conduct, or failure to act, by Dealer or its agents which was not authorized in writing by an authorized officer of the Company.

### 11.  CONFIDENTIAL INFORMATION

The Dealer acknowledges that the Company has communicated, disclosed and confided and will communicate, disclose and confide to the Dealer valuable know-how and technical information with respect to Company Products and the servicing thereof, as well as promotion and advertising know-how and sales and merchandising information, (including names of existing or prospective customers), which Dealer agrees is of substantial value to the Company's business. The Dealer undertakes and agrees to maintain

such know-how and information confidentially, to not disclose it to any other party during or after the term of this Agreement, and to cause its employees, officers, directors, agents and shareholders or partners to comply with the foregoing restrictions.

### 12.  TERM AND TERMINATION

(a) This Agreement, unless sooner terminated as provided herein, shall remain in effect for a period of two (2) years from the date hereof. Neither party has the right, express or implied, to renew or continue this Agreement. The parties may continue the relationship of manufacturer and independent Dealer only by mutual execution of a new agreement or a letter agreement adopting some or all of the terms and conditions set forth herein. Dealer and the Company each acknowledge by signing this Agreement that neither has any obligation or duty to give notice to the other party of the non-renewal of this Agreement. In the event that the Company continues to accept orders for Company Products from the Dealer after the termination of this Agreement, such acceptance of orders shall neither constitutes a renewal of this Agreement nor shall it prevent the Company, at its option, from refusing to accept subsequent orders from the Dealer or from changing a price different from its normal Dealer price.

(b) If any of the following events occur the Company may, at its option, upon ten days' written notice immediately terminate this Agreement, except that no notice shall be required as to Section 12(b)(i), Section 12(b)(iii) or Section 19:

  (i) The Dealer shall become insolvent or Dealer or its accountants shall indicate that a substantial doubt exists as to the ability of Dealer to continue as a going concern, or, Dealer shall file or have filed against it a petition in bankruptcy or for an arrangement or a reorganization, or shall be adjudicated a bankrupt, or shall make a general assignment for the benefit of creditors, or if a receiver or trustee shall be appointed for its property, or if a petition for dissolution or for an assignment or the reorganization of its affairs is filed by or against it or if it admits in writing its inability to pay its debts as they become due or becomes insolvent if otherwise evidenced; or

  (ii) There shall be any material adverse change in the financial position of the Dealer which the Company in good faith believes will impair its prospect of receiving timely and full payment for Company Products from the Dealer or

  (iii) In recognition of the fact that this Agreement has been entered into based on a careful examination of the personal skills, reputation and ability of Dealer's current management, ownership and control, there shall be any change in Dealer's management, ownership or control to which Company has not, in its sole discretion, consented or the Dealer shall cease to do business; or

  (iv) The Dealer shall breach or be in default under any provision of this Agreement; or

  (v) The Dealer shall fail to pay any affiliate of the Company any amount due under or pursuant to any other agreement within five days after such amount becomes due and payable; or

  (vi) If based upon Dealer performance, the Company determines that Dealer is not likely to be able to achieve the annual objectives as set forth in Exhibit A.

(c) In the event of any material breach by the Company of any of the provisions of this Agreement in its part to be kept and performed, where the same does not arise from causes beyond the Company's control, the Dealer may at its option terminate this Agreement upon giving ten days' prior written notice to the Company.

(d) Either party may terminate this Agreement without cause upon 90 days' prior written notice to the other.

(e) Termination or expiration of this Agreement shall in no way alter the right of the Company to receive payment of all amounts due to it under this Agreement or otherwise, and to have recourse to any remedy permitted by this Agreement or applicable law.

(f) Upon termination or expiration of this Agreement for any reason whatsoever, (i) all rights and privileges granted Dealer hereunder shall forthwith cease and terminate, and (ii) the Company shall have the option, at its sole discretion, exercisable by notifying Dealer within thirty (30) days after such expiration or the effective date of such termination or receipt of notice of termination, whichever is later, to repurchase Dealer's inventory of then-current-model new, unused and undamaged Company Products (other than parts) at Dealer's cost less freight to the Company's facility, and to repurchase then-current (as determined by Company) parts at Dealer's cost less freight

and fifteen percent restocking charge. Company will evaluate demonstrator Company Products and offer to repurchase them at a price determined by Company. Dealer shall carefully pack and box, at its own expense, such parts to be resupplied by the Company or returned to the Company pursuant to this paragraph as the Company may direct. Company Products repurchased shall be delivered to the Company F.O.B. the Company's facilities at Augusta, Georgia, or such other location designated in writing by the Company. Dealer shall furnish to the Company, in form and substance satisfactory to the Company, a bill of sale of all Company Products reacquired by the Company pursuant to this paragraph, together with evidence satisfactory to the Company that Dealer has complied with all applicable bulk sales laws and that such Company Products are free and clear of all claims, liens and encumbrances except those in favor of the Company. If the Company does not repurchase all of the Company Products covered by Dealer upon any such termination or expiration, then Dealer may sell or lease the balance of any such Company Products on hand in any manner it deems appropriate.

(g) Within 30 days after termination or expiration of this Agreement, Dealer shall assign and transfer to the Company such unfilled orders and contracts, together with any advance payments thereon, for the purchase of Company Products from Dealer as the Company may elect to accept. On orders so assigned and accepted, the Company shall reimburse Dealer for its out-of-pocket expenses in procuring such orders to the extent such expenses do not exceed 10% of Dealer's cost for the Company Products covered by such order. The Company may, at its sole discretion, cancel any order from the Dealer which provides for delivery of Company Products after the expiration or the effective date of termination of this Agreement.

**13. NO LIABILITY FOR EXPIRATION OR TERMINATION**
Neither the Company nor Dealer shall by reason of the expiration or termination of this Agreement in accordance with its terms be liable to the other for compensation, reimbursement or damages of any kind relating to such expiration or termination, whether on account of expenditures, investments, leases or commitments in connection with the business or good will of the Company or Dealer, or otherwise. Nothing in this section shall excuse the payment by Company or Dealer of any charges incurred prior to the date of expiration or termination.

**14. FORCE MAJEURE**
The Company shall not be liable to any person for failure to perform any of its obligations under this Agreement when the failure is caused in whole or in part by the occurrence of any contingency beyond the control of the Company, including but not limited to war (whether an actual declaration thereof is made or not) or hostility; sabotage, insurrection, riot or other act of civil disobedience, crime, tort or other unlawful act; act of a public enemy; failure or delay in transportation; act of any government or any agency, subdivision or branch thereof; judicial action; strike or other labor dispute; accident, fire, explosion, flood, storm or other act of God; shortage of labor, fuel, materials or machinery, or technical failure; or delay or failure to perform by any supplier. In the event of a shortage of Company Products which makes it impossible or impracticable for the Company to fill all orders from all of its customers in the quantities and within the time period originally agreed upon, the Company will allocate its available Company Products in any manner it deems reasonable.

**15. NOTICES**
All notices and other communications required or permitted under this Agreement shall be in writing (including a writing delivered by facsimile transmission) and shall be deemed to have been duly given (a) when delivered, if sent by registered, certified or first class mail, (b) when received, if delivered personally or by facsimile, or (c) on the next following business day, if sent by overnight mail or overnight courier, in each case to the recipient at the address designated above (or such other address as shall be specified by like notice) or by facsimile to the Company at (706) 796-4340 and to the Dealer at ( ) _____.

**16. AGREEMENT NON-EXCLUSIVE**
The Dealership created by this Agreement is non-exclusive and the Company reserves full rights to sell at wholesale, retail or otherwise within the Territory, without obligation to Dealer, and the Company assumes no responsibility for sales by others within the Territory.

**17. EXCLUSIVE FORUM FOR CERTAIN LITIGATION AND CONSENT TO JURISDICTION; CHOICE OF LAW**
The parties agree that no action or proceeding may be maintained by Dealer against the Company except either in Georgia State Superior Court for the County of Richmond, or in the United States District Court for the Southern District of Georgia, Augusta Division, and Dealer hereby irrevocably waives any right it may have to commence any action or proceeding against the Company in any other court. Dealer hereby submits to the personal jurisdiction of the aforementioned courts with respect to any claims relating to or arising out of this Agreement or any actions or failures to act related thereto, and irrevocably waives any rights or defenses it may have to the commencement or continuation of an action against it in the aforementioned courts based on lack of personal jurisdiction or improper or inconvenient venue. Dealer hereby further agrees that service of process may be made upon it by certified mail or personal service at the address provided for in Section 15. This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia, exclusive of its conflicts of law provisions.

**18. AWARD OF ATTORNEY'S FEES TO THE COMPANY**
In any action or proceeding commenced by or against the Company relating to or arising out of this Agreement, whether such action or proceeding be founded upon contract, tort, statute, regulation or otherwise, the Company shall be entitled to recover from Dealer its costs and expenses (including but not limited to reasonable attorneys' fees) of prosecuting and/or defending any such action or proceeding in which the Company has substantially prevailed. For purposes of this Agreement, the Company shall be considered to have "substantially prevailed" in such action or proceeding if it is not recovery therein exceeds that of the Dealer in the same action or proceeding, or, in an action or proceeding in which the Company is the defendant and has asserted no counterclaim against the Dealer, if the Dealer recovers no damages (which for purposes of this section shall not be considered to include costs or attorneys' fees or other litigation expenses, even if the same are awarded by statute or other rule of law) from the Company and fails to obtain any equitable relief against the Company.

**19. COMPLIANCE WITH FOREIGN CORRUPT PRACTICES ACT; THIRD PARTY PAYMENTS**
(a) Dealer represents and agrees that it is familiar with the provisions of the U.S. Foreign Corrupt Practices Act and agrees that (i) it will not violate or cause the Company to violate such Act in connection with the sale or distribution of the Company Products and related items, products and/or services, (ii) notwithstanding any other provision of this Agreement to the contrary, the Company may terminate this Agreement forthwith upon learning that Dealer has violated or caused the Company to violate the Foreign Corrupt Practices Act in connection with the sale and/or distribution of Company Products and/or services, and (iii) in the event of termination for such cause, the Company may retain from, or charge to, Dealer an amount equal to the amount to be earned by Dealer in respect of the transaction or matter in which Dealer violated or caused the Company to violate the Foreign Corrupt Practices Act.

(b) Dealer represents that it has not and agrees that it will not in connection with the transactions contemplated by this Agreement, or in connection with any other business transactions involving the Company, make any payment or transfer anything of value, directly or indirectly, (i) to any governmental official or employee (including employees of government corporations), or to any political party or candidate, (ii) to any officer, director, employee or representative of any actual or potential customer of Textron Inc., or any of its affiliates, or (iv) to any other person or entity if such payment or transfer would violate the laws of the country in which made or the laws of the United States. It is the intent of the parties that no payments or transfers of value shall be made which have the purpose or effect of public or commercial bribery, acceptance of or acquiescence in extortion, kickbacks or other unlawful or improper means of obtaining business. This section shall not, however, prohibit normal and customary business entertainment or the giving of business mementos of nominal value.

(c) Dealer acknowledge that it has read the Textron Business Conduct Guidelines dated March 1997 or the latest revision (the "Guidelines", supplied with this contract and additionally located at www.c.cgo.com resources/links) and is familiar with the same. In connection therewith, Dealer agrees to perform under this Agreement within the intent that underlies

the Guidelines generally and to comply specifically with the Guidelines relating to "Relationships With Other Parties" as they apply to Dealer.

## 20. NO FRANCHISE CREATED

Dealer acknowledges that this Agreement does not create nor constitute a franchise. Dealer has not paid to, nor been charged by, the Company any consideration which would constitute a franchise fee, including any payment for the right to sell Company Products or for use of trade names and trademarks as described in Section 7. Notwithstanding anything herein to the contrary, Dealer hereby waives, to the extent permitted by law, the application of any law governing or controlling a "franchise". In the event any such waiver is deemed ineffective, then the only such franchise law which shall be considered for application shall be the applicable law of the State of Georgia.

## 21. MISCELLANEOUS

(a) Dealer shall not assign, transfer or sell all or any part of its rights or obligations under this Agreement without the prior written consent of the Company. Any attempt to do so without such prior written consent shall be wholly void and without effect. This Agreement shall be binding upon and insure to the benefit of the successors and assigns of the Company and the permitted successors and assigns of Dealer.

(b) The prices and terms and conditions of sale regarding Dealer's resale of Company Products to its own customers shall be exclusively under the control of Dealer, and the Company shall have no right to control, nor shall it attempt to control, such prices or terms and conditions of resale.

(c) In the event any part of this Agreement is held by the final order of any court, tribunal or administrative agency having jurisdiction over this Agreement or the subject matter hereof to be invalid, contrary to the law or public policy, or otherwise unenforceable, such part or parts shall be severed here from and shall not affect any other part or parts of this Agreement.

(d) The Company shall not be liable to Dealer for special, incidental, consequential, punitive or other extraordinary damages of any description in connection with any breach of this Agreement.

(e) This Agreement shall supersede and make inoperative as of this date any oral or written sales agency, Dealership or similar agreement heretofore entered into between the parties hereto with respect to the Company Products. Except for any other agreement granting a security interest to the Company, this Agreement contains the entire agreement between the parties as to the subject matter hereof, and no modifications or waiver of any of the provisions hereof, nor any representation, promise or addition hereto, or waiver of any breach hereof, shall be binding upon either party unless made in writing and signed by the party to be charged thereby. No waiver of any particular breach shall be deemed to apply to any other breach, whether prior or subsequent to the waiver. Notwithstanding anything to the contrary, any amendment executed on or after the date hereof in writing and signed by both parties shall be deemed to be part of this Agreement.

6

# EXHIBIT A AND AMENDMENT

EXHIBIT A

1. The following products manufactured by the Company are covered by this Agreement:

### 2005 MARKETING
### OBJECTIVE

| | |
|---|---|
| Fleet   Electric ( *O* )  Gas ( *O* ) | |
| Turf   *1* | |
| Commercial   *1* | |
| Individual   *18* | |
| Trail (ST)   *11* | |
| Parts   *30,000* | |
| Used   *200* | |

2. The Dealer's "Territory" as referenced in Section 1 is:

See attached exhibit

3. The "Trademarks" referenced in Section 7 are: E-Z-GO Textron, E-Z-GO, Medalist™, TXT™, PowerWise™, QuietDrive™, DuraShield™, E-Z-GO Shuttle™, Refresher™, Workhorse™, ST-350™, ST-480™.

AMENDMENT

Sections 5(j)-(m) Indemnification and Insurance

**Objectives for the 2006 Marketing Year (January 1-December 31, 2006) will be sent to dealers for approval prior to January 1, 2006.**

IN WITNESS WHEREOF, the Company and Dealer have caused this Agreement to be duly executed as of the day and year first above written.

In the Presence of:

_____    By

Witness for E-Z-GO Division of Textron Inc.

E-Z-GO Division of Textron Inc.

_____

For the President

 South Central Products, Inc. dba GFL - Golf Products

Dealership Name

_____    By

Witness for Dealer

_____

Dealer Signature and Title

# Exhibit 2

# TEXTRON

Textron Inc.
40 Westminster Street
Providence, RI 02903
John A. Rupp
Assistant General Counsel

Tel: (401) 421-2800
www.textron.com

Direct (401) 457-3674
Fax: (401) 457-3696
Email: jrupp@textron.com

January 31, 2006

**VIA OVERNIGHT DELIVERY**

Mr. Wayne Brock
Golf for Less
10401 Maumelle Boulevard
North Little Rock, AR  72113

Dear Mr. Brock:

I am an Assistant General Counsel with Textron Inc., writing on behalf of the E-Z-GO Division of Textron.

You are an authorized Dealer for E-Z-GO golf cars and other products, in accordance with a current and ongoing contractual agreement with E-Z-GO. E-Z-GO has been advised that your Dealership is offering for sale golf cars and related vehicles from the Fairplay product lines, sold under the Fairplay and/or Player brand names.

E-Z-GO recently brought suit against the distributor of these products, Fairplay Electric Cars LLC, stating that Fairplay has copied protected aspects of E-Z-GO's vehicles, including the Company's patented designs.

On January 24, 2006, the United States District Court for the Southern District of Georgia entered an Order enjoining and restraining Fairplay Electric Cars, LLC from making, assembling, importing, marketing, selling, or leasing the two-seater versions of Fairplay's Fleet and Legacy Model Golf Cars, or any equivalent car, in the United States. The Order remains in effect until February 6, 2006, at which time E-Z-GO will seek to extend the Order pending the resolution of the lawsuit. A copy of the Order can be obtained by contacting me at the address and telephone number noted.

The Court found preliminarily that the sale and offer for sale of these Fairplay vehicles infringes E-Z-GO's legal and intellectual property protections. If, therefore, these vehicles are sold by E-Z-GO Dealers, the Dealer's actions may constitute a breach of the Dealer's contractual agreement with the Company. This will permit E-Z-GO to invoke the Company's remedial rights in the Dealer Contract, which can include termination and compensation for damages.

I am writing to you as an authorized E-Z-GO Dealer, to bring this situation to your attention so that your Dealership remains in compliance with its contractual obligations to E-Z-GO, and to ensure that you do not inadvertently participate in the Court-restricted sale or offer for sale of Fairplay vehicles.

If you have any questions on this Court Order and/or your sale of Fairplay products, please do not hesitate to contact me directly (401/457-3674), or Kevin Holleran (706/771-4672), Mike Parkhurst (706/772-5980) or Bill Robson (706/792-5846) at E-Z-GO.

E-Z-GO greatly appreciates your cooperation in this regard. Thank you.

Very truly yours,

John A. Rupp
Assistant General Counsel
Textron Inc.

cc:    Kevin Holleran - E-Z-GO Division of Textron Inc.
       Michael Parkhurst – E-Z-GO Division of Textron Inc.
       William Robson – E-Z-GO Division of Textron Inc.

# Exhibit H

US00D369762S

# United States Patent [19]

## Molzon et al.

| [11] | Patent Number: | Des. 369,762 |
| --- | --- | --- |
| [45] | Date of Patent: | **May 14, 1996 |

[54] **GOLF CAR**

[75] Inventors: **William R. Molzon**, Clarkston, Mich.; **James M. Criscuolo**, Martinez, Ga.

[73] Assignee: **Textron Inc.**, Providence, R.I.

[**] Term: **14 Years**

[21] Appl. No.: **29,859**

[22] Filed: **Oct. 18, 1994**

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 17,534, Jan. 14, 1994, which is a continuation-in-part of Ser. No. 886,444, May 20, 1992, Pat. No. Des. 345,717, and Ser. No. 886,445, May 20, 1992, Pat. No. Des. 345,718.

[52] U.S. Cl. ............................................. **D12/16**
[58] Field of Search ............... D12/16; 280/DIG. 5; 296/186

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| D. 255,558 | 6/1980 | Elman | D12/16 |
| D. 320,580 | 10/1991 | Kim | D12/16 |
| D. 326,831 | 6/1992 | Lenius et al. | D12/16 |
| D. 345,717 | 4/1994 | Molzon et al. | D12/16 |
| D. 345,718 | 4/1994 | Molzon et al. | D12/16 |
| 4,037,614 | 7/1977 | Hines et al. | 135/5 A |
| 4,098,536 | 7/1978 | Mills | 296/78.1 |
| 4,334,692 | 6/1982 | Lynch | 280/79.1 A |
| 4,533,013 | 8/1985 | Hightower | 180/210 |
| 4,650,238 | 3/1987 | Healey | 296/37.7 |
| 4,772,064 | 9/1988 | Moore | 296/102 |
| 4,773,695 | 9/1988 | Jones et al. | 296/77.1 |
| 5,094,500 | 3/1992 | Maypole et al. | 296/102 |

#### OTHER PUBLICATIONS

1990 E–Z–GO Textron Product Catalog, pp. 1, 6, 9, 14, 22, 23, 24.

*Primary Examiner*—Melody N. Brown
*Attorney, Agent, or Firm*—Perman & Green

[57] **CLAIM**

The ornamental design for a golf car, as shown and described.

### DESCRIPTION

FIG. 1 is a perspective view of a golf car showing our new design;
FIG. 2 is a top plan view thereof;
FIG. 3 is a side elevational view thereof, the opposite side being a mirror image;
FIG. 4 is a front elevational view thereof; and,
FIG. 5 is a rear elevational view thereof.

**1 Claim, 4 Drawing Sheets**



**U.S. Patent**    May 14, 1996    Sheet 1 of 4    **Des. 369,762**



FIG. 1

**U.S. Patent**     May 14, 1996     Sheet 2 of 4     **Des. 369,762**



FIG. 2



FIG. 3

**U.S. Patent**          May 14, 1996          Sheet 4 of 4          **Des. 369,762**



FIG. 4



FIG. 5

# Exhibit I











# Exhibit J

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | |
|---|---|
| TEXTRON INNOVATIONS, INC. and | ) |
| | ) |
| E-Z GO (a division of TEXTRON, INC.), | ) |
| | ) |
| Plaintiffs, | )    CIVIL ACTION NO. CV 106-009 |
| | ) |
| v. | ) |
| | ) |
| FAIRPLAY ELECTRIC CARS, LLC, | ) |
| | ) |
| Defendant | ) |

## DECLARATION OF JORDAN ROTHEISER

I, JORDAN ROTHEISER, hereby declare and state, to the best of my knowledge, understanding and belief, as follows:

1.    I have been retained as an expert in this case by Defendant Fairplay Electric Cars, LLC to opine on whether the accused Fairplay Fleet golf car ("Fairplay car") comes within the scope of the claims of U.S. Design Patent 369,762.

2.    I am a consultant and expert in the fields of product design and engineering, and have my own consulting firm, Rotheiser Design, Inc. I have a B.F.A. in Industrial Design and a B.S. degree in Industrial Engineering. I have worked in the design field since 1960 and have worked for Fisher Body, Abbott Laboratories and Raymond Loewy (Paris). I am a professional member of the Industrial Design Society of America. I served on the Board of Directors of the Chicago Chapter for several years. I wrote the Industrial Design sections for the *American Educators Encyclopedia* and for the *Handbook of Plastics Material and Technology*, John Wiley & Sons, NY (1990), a leading handbook for plastics designers and engineers. I have practiced industrial design since 1960. I have been a member of the Society of Plastics Engineers (SPE) since 1960 and have held various positions as a Councilor, and Chairman of the Product Design and Development Division and various programs of the organization over the years. I was elected a Fellow of the SPE in 2000. I have received several awards from the SPE for professional development and was elected a member of the Plastics Pioneers Association in 2001. I have authored numerous articles in my field, and also presented numerous seminars and papers, written a book, and have been a contributor to several handbooks in the plastic product

1

design field. I have been teaching design since 1981 and have taught 101 seminars to date. I am also the inventor of eight U.S. Patents, two of which are design patents. A copy of my resume is attached as Exhibit "A". The compensation for my services in this case is set at $300 per hour, of which I receive $200 per hour.

3.    I have been an expert witness in several litigation cases involving product design, Design Patents and Utility Patents. These cases involved patent validity, patent infringement and product liability.

4.    Within the past four years, I have testified as an expert either at trial or by deposition in connection with the following matters:  Client company is underlined.

| | |
|---|---|
| Case: | Seiko Epson v. Dynamic Print, et al |
| Matter: | Patent Infringement |
| Project: | Wrote declaration and was deposed |
| Date: | 2003 - 2005 |

| | |
|---|---|
| Case: | Parfums de Coeur, Ltd. v. LePapillon, Ltd. |
| Matter: | Product Liability |
| Project: | Wrote expert witness report and was deposed. |
| Date: | 2003 – 2005 |

| | |
|---|---|
| Case: | Mark A. Freeman and Timothy K. Stringer v. Gerber Products Company |
| Matter: | Patent infringement |
| Project: | Wrote expert witness report and was deposed. |
| Date: | 2003 - present |

| | |
|---|---|
| Case: | ADC Telecommunications, Inc. v. Panduit Corp. |
| Matter: | Patent infringement |
| Project: | Wrote declaration, expert witness report and was deposed. |
| Date: | 2001-2003 |

| | |
|---|---|
| Case: | Don De Cristo Concrete v. American Allsafe Company, Inc., Flex-O-Lite, Inc. and Jackson Products, Inc. dba Services & Materials Company |
| Matter: | Patent infringement |
| Project: | Wrote expert witness report and was deposed. |
| Date: | 2000-2002 |

| | |
|---|---|
| Case: | Plastics Research Corp., Inc. v. Brite-Millwork, Inc., Avon Plastics, Inc., Weyerhauser USA, Inc. |
| Matter: | Patent infringement |
| Project: | Wrote expert witness report and was deposed. |
| Date: | 2001-2002 |

5.    Following is a list of the publications I have authored within the past ten years:

Books:

Joining of Plastics, *Handbook for Designers and Engineers*, Hanser Gardner, Oct., 1999

Joining of Plastics, *Handbook for Designers and Engineers 2nd Edition*, Hanser Gardner, June, 2004

Plastics chapter, *Handbook of Materials for Product Design,* McGraw-Hill, 2001

Plastics Product Design chapter, Modern Plastics Handbook, McGraw-Hill, March 1999

Magazines

"Laser Welding of Plastics, *Plastics Decorating Magazine,* July/August 2002

"Automation and Volume Decorating", *Plastics Decorating Magazine,* April/May 2002

"K2001 Technology Review", *Plastics Decorating Magazine*, January/February 2002

"Laser Marking of Plastics, *Plastics Decorating Magazine*, November/December, 2001

"Decorating Hollow Parts," *Plastics Decorating Magazine*, June/July, 2001

"Are Metallized Plastics Returning," *Plastics Decorating Magazine*, April/May, 2001

"In-Mold Decorating of Plastic Parts," *Society of Plastic Engineers ANTEC paper*, May, 2001

"Designing For Decorating And Assembly - Warpage," *Plastics Decorating Magazine*, March, 2001

"Heat Staking and Insertion," *Plastic Decorating Magazine*, Nov., 2000

"In-Mold Decorating," *Plastic Decorating Magazine*, Aug., 2000

"Design for Rotational Molding," *Society of Plastics Engineers ANTEC paper*, May,

6.    I expect to testify both generally and specifically regarding the golf car design in U.S. Patent No. Des. 369,762. I may also serve as a rebuttal witness in response to positions taken by the Textron Innovations and E-Z-Go (a division of Textron, Inc.) Plaintiffs. A copy of the '762 patent is attached as Exhibit H.

**Summary of Work Done**

7.    In preparation for this declaration, I have examined patents D369,762, D373,099, D345,717 and D345,718. I have also reviewed photographs of the Fairplay car, the Transcript of Proceedings, 23 January 2006 including Exhibit 1 (which included the Declaration of Robert John Anders) and the prior art cited in the patent and by Mr. Anders. Furthermore, I have had discussions with people in the field pertaining to the ordinary observer and the attention usually given by purchasers of the golf cars involved in this action.

3

**Understanding of the Law**

        8.    I have reviewed the Declaration of Robert John Anders and his understanding of the law of infringement for design patents. My understanding of the law is generally the same as explained by Mr. Anders with some additions. In particular, I am informed and understand that it is a basic principal of patent law that the determination of whether a patent claim is infringed requires a two-step analysis: first the claim must be construed, and then the properly construed claim is compared to the design of the accused product. The claim of a design patent is limited to what is shown in the drawings. Furthermore, a design patent only protects the ornamental features of the design that is shown. Accordingly, where a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent. And, where there are several ways to achieve the function of a product, the design of the product is more likely to serve a primarily ornamental purpose.

        I am informed and understand that determining design patent infringement includes two distinct tests, both of which must be satisfied in order to find infringement: (a) the "ordinary observer" test, and (b) the "points of novelty" test. The two tests are separate. As for the "ordinary observer" test, I am informed and understand that the test is if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other.

        I am further informed and understand that it is the appearance of the design as a whole which is controlling in determining design patent infringement. In making the comparison between the patented design and the accused infringing product, furthermore, one must take into account similarities and differences. The comparison that is made must extend to all ornamental features visible during normal use of the product, i.e., beginning after completion of manufacture or assembly and ending with the ultimate destruction, loss or disappearance of the article.

        I am also informed and understand that under the "points of novelty" test, the accused design must contain substantially the same points of novelty that distinguished the patented design from the prior art.

4

**The Ordinary Observer and Designer of Ordinary Skill in the Art**

9.    It is my understanding that an "ordinary observer" for the purpose of patent infringement analysis would be the ordinary person who would purchase the product. In this case, E-Z-GO's product is initially sold or leased to golf courses and the "ordinary observer" would be the professional in charge of purchasing golf cars for the golf course. I have also considered ordinary retail consumers to the extent they would be considered "ordinary observers" of these electric cars. Based on conversations with those in the field, these purchasers closely examine the product before purchase considering their cost of several thousands of dollars apiece.

10.    It is my opinion that a "designer of ordinary skill in the art " would have a degree in industrial design and at least three years of practical experience. including that of ergonomics.

**Ordinary Observer Test**

11.    Overall Ornamental Silhouette.  The overall silhouette of the Fairplay car consists of a golf car including a vertical structure composed of a canopy, windshield and their supports as shown in Exhibits B, C, D, E and F. The figures in the '762 patent depict a golf car with no such vertical structure. Therefore, it is my opinion that, for this reason alone, an ordinary observer would not mistake a Fairplay car for the one shown in the '762 patent.

12.    Overall Ornamental Appearance.  The overall appearance of the Fairplay car consists of a golf car with a vertical structure composed of a canopy, split windshield and their supports as shown in as shown in Exhibits B, C, D, E and F. The figures in the '762 patent depict a golf car with no such vertical structure. Therefore, it is my opinion that, for this reason alone, an ordinary observer would not mistake a Fairplay car for the one shown in the '762 patent.

13.    Cowl Lines.  The cowl lines of the Fairplay car are significantly angled toward each other as shown in Exhibits B and C , whereas those in the '762 patent (Figures 1 and 2) are clearly parallel to each other. While these cowl lines have a function of stiffening the cowl panel, they can be arranged in different ornamental configurations and numbers, and still provide the stiffening function. While the cowl lines have a functional attribute, their position and number are ornamental. The angled cowl lines are a designer's device intended to lead the observer's eye to the badge indentation.

14.    Badge Recess.  The shape of the badge recess is clearly ornamental.

5

Manufacturers, such as Chevrolet for example, work hard to maintain the shape of their product's badge as it establishes the product's identity for the prospective buyer, or the ordinary observer. The Fairplay product employs an oval shaped badge recess as shown in Exhibits B and C, whereas the badge recess depicted in Figures 1, 2 and 4 of the '762 Patent is larger, rectangular, and has a deeper indentation.

The location of the Fairplay badge recess also differs from that of the '762 patent. The Fairplay badge recess is located in the center of the lower segment of the cowl whereas the badge recess in the '762 patent is carved in from the upper edge of the lower segment of the cowl.

15.    Fender Flairs. The fender flair is an ornamental feature used to enhance the appearance of a vehicle wherein the edge of the wheel cutout is flaired outward . The front wheel cutouts of the Fairplay car feature fender flairs, as shown in Exhibits B, C and F, that are not shown on any of the '762 patent figures.

16.    Hubcaps. The Fairplay car displays distinctive spoked hubcaps, as shown in Exhibits C and F, whereas Figures 1 and 3 of the '762 patent depict flat hubcaps such as those found on vintage automobiles. Hub cap design variations are often use by vehicle manufacturers to differentiate vehicle models.

17.    Foot Guard. The Fairplay car employs a foot guard that extends from the front cowl to the rear wheel as shown in Exhibits C and F. Figures 1, 2 and 3 of the '762 patent show a foot guard only in the space between the cowl and front of the seat.

18.    Charging Receptacle. The Fairplay car has a large square, black charging receptacle on the front edge of the driver's seat as shown in Exhibits C and F. As illustrated in Figure 1, the front seat of the car in the '762 patent contains no such shape.

19.    Forward/Reverse Control. Figures 2 and 3 of the '762 patent depict a forward/reverse control lever on the front of the seat between the driver and the passenger. The seat front of the Fairway car is completely smooth in that area as shown in Exhibit F.

20.    Shoe Guards. The Fairplay car has large black shoe guards on the rear fenders as shown in Exhibits B, C, D, E and F. As shown in Figure 2, the '762 patent does not show any shoe guards.

21.    Seat Back. The seat back illustrated in Figures 1, 2 and 3 of the '762 patent  has a hard front edge with a very small radius as shown in Exhibits B, C, D and F. The seat back of the Fairway car is softly rounded.

6

22.    Sweater Basket. The Fairplay car has a sweater basket mounted behind the seats as shown in Exhibits D, E and F. There is no sweater basket shown in Figures 2, 3 and 5 of the '762 Patent.

23.    Golf Bag Support. The golf bag support of the Fairplay car is attached to the canopy support as shown in Exhibits D and F. The car depicted in the '762 patent has no canopy and the golf bag support contains an angled bar as shown in Figure 3 of the '762 patent.

24.    Golf Bag Holder. The golf bag is held to the golf bag support on the Fairplay car by means of a strap as shown in Exhibits D, E and F. The device for holding the golf bag to the golf bag support on the car depicted in Figures 1, 2, 3 and 5 of the '762 patent is a metal bar.

25.    Golf Bag Liner. The black golf bag liner of the Fairplay car extends across the space between the rear fenders and up the sides of the rear fenders as shown in Exhibits D and E. The golf bag liner illustrated in Figures 2 and 5 of the '762 patent extends only partially across the area between the fenders and does not extend up the sides of the fenders at all.

26.    Motor Cover. The Fairplay car contains a large black motor cover as shown in Exhibits D and E. No such motor cover is represented in any of the '762 figures.

27.    Turf Guard. The turf guard depicted in Figures 1 and 4 of the '762 patent differs from that on the Fairplay cart (Exhibit G) because it has sharp corners and a much larger lower section. In fact, the lower section in Figure 1 of the '762 patent appears to be a separate part altogether.

28.    While some of these distinctions taken alone may not be sufficient to cause a difference, taken collectively the ordinary observer, giving such attention as a purchaser usually gives, the two designs are not substantially the same, and the ordinary observer would surely conclude that the Fairplay car is not the vehicle depicted in the '762 patent.

**Points of Novelty**

29.    E-Z-GO's expert witness, Mr. Anders, claims that the cowl depicted in the '762 patent is a point of novelty. However, the cowl in the '762 patent contains novel and ornamental cowl lines that are parallel whereas the cowl lines on the Fairplay car converge on an angle as shown in Exhibits B and C.

30.    A further point of novelty in the '762 patent's cowl is the badge recesses. The '762 patent's badge recess is rectangular, more deeply recessed, considerably larger and located at the top of the lower section of the cowl (Figures 1, 2 and 4). Fairplay's badge recess is smaller, oval in shape, shallowly recessed and located in the center of the cowl as shown in Exhibits B

7

and C.

31.     E-Z-GO's expert witness, Mr. Anders, claims that the ornamental seat back depicted in the '762 patent is a point of novelty. The ornamental seat back depicted in Figures 1, 2 and 3 of the '762 patent has a hard front edge with a very small radius. In contrast, the seat back of the Fairway car is softly rounded as shown in Exhibits B, C, D and F.

32.     E-Z-GO's expert witness, Mr. Anders, claims that the rear fender depicted in the '762 patent (Figures 1, 2 and 3) is a point of novelty. However, none of the figures of that patent show the black shoe guard that is a prominent feature of Fairplay's rear fender design as shown in Exhibits B, C, D, E and F.

33.     E-Z-GO's expert witness, Mr. Anders, claims that the ornamental dashboard depicted in the '762 patent is a point of novelty. However, hardly any of the dashboard is illustrated in the figures of the '762 patent (Figures 2 and 3). Furthermore, the shift mechanism present on the Fairplay car as shown in Exhibit D is nowhere to be seen in the figures of the '762 patent.

34.     There are other points of novelty in addition to those identified by Mr. Anders. The foot guard is a point of novelty in the '762 patent which shows a foot guard only in the space between the cowl and front of the seat as shown in Figures 1, 2 and 3. The Fairplay car employs a foot guard that extends from the front cowl to the rear wheel as shown in Exhibits C and F which is unlike the footguard shown on the '762 patent.

35.     Another point of novelty in addition to those identified by Mr. Anders is the forward/reverse control. Figures 2 and 3 of the '762 patent depict a forward/reverse control lever on the front of the seat between the driver and the passenger. The Fairplay car is completely smooth in that area as shown in Exhibit F and does not depict a forward/reverse control lever on the front of the seat between the driver and the passenger.

36.     A further point of novelty in addition to those identified by Mr. Anders is the golf bag liner. The golf bag liner illustrated in Figures 2 and 5 of the '762 patent extends only partially across the area between the fenders and does not extend up the sides of the fenders at all. The black golf bag liner of the Fairplay car extends across the space between the rear fenders and up the sides of the rear fenders as shown in Exhibits D and E and differs from that shown in the '762 patent.

37.     Considering the numerous points of novelty that differentiate the '762 patent from the prior and which are not present in the Fairplay car, I must conclude that the Fairplay car does

8

not infringe the '762 patent.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 21, 2006      *Jordan Rotheiser*

Jordan Rotheiser

# EXHIBIT A to EXHIBIT H

(FAIRPLAY'S Georgia Memorandum)

## JORDAN I. ROTHEISER

## PROFESSIONAL EXPERIENCE

**1964 to Present**    **Rotheiser Design Inc.**
**3075 University Ave.**
**Highland Park, IL 60035**
**847-433-4288**
**rotheiser@sbcglobal.net**

Rotheiser Design Incorporated provides industrial design and engineering services for plastic products. These services include the creation of product concepts, appearance, function, ergonomics, and engineering. Rotheiser Design Inc. executes projects from concept through production or any portion thereof. Included are the completion of troubled projects started by others and consultation on product failures in the field. Other work includes the creation of books, seminars and periodicals on design.

Projects include:

- Developed first low pressure molding compound outdoor refrigeration unit housings.

- Developed first successful plastic outdoor refrigeration unit housings.

- Designed first plastic housing street sweeper.

- Miniaturized telephone headset connectors using plastics.

- Miniaturized electronic intravenous drop detector using plastics.

- Developed first thin-wall injection molded disposable cocktail glass.

- Designed first injection mold using "lost wax" process.

- Developed first plastic lawn and garden wheels.

- Developed first plastic caster using recycled polypropylene.

- Developed first disposable humidifiers and atomizers for inhalation therapy

**Jordan I. Rotheiser**
**Resume**                                                                                    Page 2.

- Designed first plastic underwater camera housing.

- Designed first mold using prototype DME collapsing core.

- Designed first commercial living hinge package (excluding closures)

- Developed miniaturized plastics hearing aid housing.

- Developed first polypropylene electrical bobbin.

- Designed first plastic fire extinguisher gauge

**1963 to 1964**          **Compagnie de l'Esthetique Industrielle (Raymond Loewy, Paris)**

**1960 to 1963**          **Abbott Laboratories**

- Designed first plastic microdrip intravenous system.

- Developed first plastics assembly system using induction heating.

- Developed first thermoplastic intravenous system.

**1959 to 1960**          **General Motors Corp.**
                          **Fisher Body Division Styling**

**EDUCATION**

BS, Industrial Engineering, University of Illinois, 1960
BA, Industrial Design, University of Illinois, 1960

**LITIGATION SUPPORT EXPERIENCE**

Client company is underlined.

| | |
|---|---|
| Case: | Inter Partes Reexamination of Patent for Radio Shack Corporation |
| Matter: | Patent Validity |
| Project: | Wrote Affidavit |
| Date: | 2004 |

Jordan I. Rotheiser
Resume                                                                                    Page 3.

Case:        <u>RTC Industries, Inc.</u> v. William Merit & Associates
Matter:      Patent Infringement
Project:     Wrote declaration
Date:        2004

Case:        Seiko Epson v. <u>Dynamic Print, et al</u>
Matter:      Patent Infringement
Project:     Wrote declaration and was deposed
Date:        2003 - 2005

Case:        <u>Parfums de Coeur, Ltd.</u> v. LePapillon, Ltd.
Matter:      Product Liability
Project:     Wrote expert witness report and was deposed
Date:        2003 – 2004

Case:        Mark A. Freeman and Timothy K. Stringer v. <u>Gerber Products Company</u>
Matter:      Patent infringement
Project:     Wrote expert witness report and was deposed
Date:        2003 to present

Case:        ADC Telecommunications, Inc. v. <u>Panduit Corp.</u>
Matter:      Patent infringement
Project:     Wrote declaration, expert witness report and has been deposed.
Date:        2001-2003

Case:        Don De Cristo Concrete v. <u>American Allsafe Company, Inc., Flex-O-Lite,
             Inc. and Jackson Products, Inc. dba Services & Materials Company</u>
Matter:      Patent infringement
Project:     Wrote expert witness report and has been deposed.
Date:        2000-2002

Case:        Plastics Research Corp., Inc. v. <u>Brite-Millwork, Inc., Avon Plastics, Inc.,
             Weyerhauser USA, Inc.</u>
Matter:      Patent infringement
Project:     Wrote expert witness report and has been deposed.
Date:        2001-2002

Jordan I. Rotheiser
Resume                                                                                 Page 4.

## PUBLICATIONS

### Books

Joining of Plastics, *Handbook for Designers and Engineers*, Hanser Gardner, Oct., 1999

Joining of Plastics, *Handbook for Designers and Engineers 2nd Edition*, Hanser Gardner, June, 2004

Plastics Product Design chapter, *Modern Plastics Handbook*, McGraw-Hill, March 1999

Plastics chapter, *Handbook of Materials for Product Design*, McGraw-Hill, 2001

Industrial Design chapter, *Handbook of Plastics Material and Technology*, John Wiley & Sons, NY, 1990

Industrial Design article, *American Educator Encyclopedia*, The United Educators, Inc., 1963

### Magazines

"The Process of Vibration Welding, *Plastics Decorating Magazine,* July/August 2005

"Laser Welding of Plastics, *Plastics Decorating Magazine,* July/August 2002

"Automation and Volume Decorating", *Plastics Decorating Magazine,* April/May 2002

"K2001 Technology Review", *Plastics Decorating Magazine,* January/February 2002

"Laser Marking of Plastics, *Plastics Decorating Magazine*, November/December, 2001

"Decorating Hollow Parts," *Plastics Decorating Magazine,* June/July, 2001

Are Metallized Plastics Returning," *Plastics Decorating Magazine*, April/May, 2001

"In-Mold Decorating of Plastic Parts," *Society of Plastic Engineers ANTEC paper*, May, 2001

"Designing For Decorating And Assembly - Warpage," *Plastics Decorating Magazine*, March, 2001

"Heat Staking and Insertion," *Plastic Decorating Magazine*, Nov., 2000

"In-Mold Decorating," *Plastic Decorating Magazine*, Aug., 2000

Jordan I. Rotheiser
Resume

"Design for Rotational Molding," *Society of Plastics Engineers ANTEC paper*, May, 2000

"The Bigger Picture," *Plastics Engineering Magazine*, January, 1997

"Hot Stamping Reaches New Level of Quality," *Plastics Design Forum*, Nov./Dec., 1990

"Appearance Factors in Hot Stamping," *Design for Decorating RETEC*, Oct., 1990

"Czar of the World," *Plastics Design Forum*, May/June, 1989

"Tomorrow's Design Challenges Roundtable," *Plastics Design Forum*, Jan./Feb., 1987

## EDUCATIONAL SEMINARS CREATED AND PRESENTED

Assembly of Plastics Update - University of Wisconsin - Milwaukee - 6 seminars between 6/91 and 12/94

Assembly Seminar - SPE - 5/92, 5/94, 6/94, SPE Chicago Section - 3/94, 4/95 and 9/97

Basic Principles of Assembly and Use of Fasteners - University of Wisconsin - Milwaukee - 1994

Cost Effective Assembly of Plastic Parts - SPE - 9/95, 5/96, 6/97, SPE Chicago Section - 1990, SPE Wichita Section - 2/97

Cost Effective Decorating of Plastics Parts - SPE - 5/92, 5/94, 6/94, 9/95, 6/97, SPE Chicago Section - 1990, SPE Wichita Section - 2/97, Plastics Fair Seminars - 11/93, The Plastics Seminars - 10/95

Cost Effective Part Design for Injection Molded Products - SPE - 3/96

Decorating and Finishing Plastic Products - The Plastics Seminars and SPE Chicago Section - 2/93

Design of Injection Molded Parts - The Plastics Seminars - 4/92, University of Wisconsin - Milwaukee - 12/95, SPE Chicago Section - 3/96

Designing to Sell - Presented at Designing Plastic Products Symposium, Rockford, IL - 6/81

Designing for Outdoor Applications - University of Wisconsin - Milwaukee - 3/94

Environmentally Conscious Plastic Product Design - Ohio University - 3/94, 4/94, 5/94

Flexible Plastic Containers - University of Wisconsin - Milwaukee - 9/94

Fundamentals of Decorating Plastics - Society of Manufacturing Engineers - 5/97

Fundamentals of Design for Injection Molded Products - Modern Plastics Seminars - 17 seminars between 10/81 and 6/86

Joining and Fastening Plastic Parts - The Plastics Seminars - 11/96 and 4/98

Labeling and Decorating of Plastics - University of Wisconsin - Milwaukee - 9/94

Plastics Finishing and Decorating Update - University of Wisconsin - Milwaukee - 6 seminars between 6/91 and 12/94

Plastic Packaging, Labeling and Decorating - University of Wisconsin - Milwaukee - 1994

Plastic Packaging Materials - University of Wisconsin - Milwaukee - 9/94

Plastic Part Design - The Finishing Touches - SPE - 18 seminars between 5/82 and 6/91

Rigid Plastic Containers and Closures - University of Wisconsin - Milwaukee - 9/94

Snap Fits, Press Fits and Joining of Plastics - University of Wisconsin - Madison - 11/00, 12/01. 12/02

Snap Fits, Press Fits and Welding of Plastics - SPE Kansas City Section - 3/00, SPE Chicago Section - 4/99 and 4/00, National Plastics Exposition - 6/00, American Plastics Council - 1/01, Plastics USA - 10/01, San Francisco 5/02, Philadelphia, 3/03, National Plastics Exposition - 6/03, Plastics USA – 10/04, Boston 5/05

## PATENTS

| Patent Number | Year Issued | Title |
|---|---|---|
| 6,905.274 | 2005 | Liquid Applicator |
| 5,935,281 | 1999 | Filter Apparatus |
| 4,541,541 | 1985 | Tamper-Resistant Closure for Dispenser |

Jordan I. Rotheiser
Resume
Page 7.

| | | |
|---|---|---|
| 4,170,384 | 1979 | Molded Wheel having a Decorative Side Wall |
| D249679 | 1978 | Molded Wheel |
| D249678 | 1978 | Molded Wheel |
| 3,664,466 | 1972 | Wheel Wedge |
| 3,635,232 | 1972 | Rope Retaining Stake |

**PROFESSIONAL AFFILIATIONS & AWARDS**

Society of Plastics Engineers - Offices Held:

Member of SPE since 1960 - Elected Fellow of the Society - May, 2000

House Committee - Chicago Section - 1 year
Professional Activities Committee Chairman -Chicago Section - 1 year
Board of Directors - Chicago Section - 3 years
Membership Chairman - Chicago Section - 3 years
Created SPE Educational Traveling Display
SPE International Membership Chairman - 1 year
Charter Member - Plastics Product Design and Development Division
Board of Directors - Plastics Product Design and Development Division - 12
    years
Annual Technical Conference Program Chairman, Plastics Product Design and
    Development Division - 5 years
Annual Technical Conference Program Chairman, Decorating and Assembly
    Division - 1 year
SPE International Councilor - Plastics Product Design and Development Division
    - 3 years
SPE International Councilor - Decorating and Assembly Division - 6 years
Chairman-Elect - Plastics Product Design and Development Division - 1 year
Chairman - Plastics Product Design and Development Division - 1 year
Chairman - Plastics Product Design and Development Division Plastics
    Certification Committee
Past Chairman - Plastics Product Design and Development Division - 1 year
Plastics Product Design and Development Division Forum - Conference
    Chairman - 4 years
Charter Member - SPE Rotational Molding Division

Industrial Designers Society of America:
Professional Member
Member of Chicago Chapter Board of Directors - 5 years

**Awards**

Elected Honored Service Member of the Society of Plastics Engineers, Inc.- May 2002

Elected to membership in the Plastics Pioneers Association - October 2001

Elected Fellow of the Society of Plastics Engineers, Inc. - May 2000

Society of Plastics Engineers Plastics Product Design and Development Division
Recognition and Appreciation of contributions to the Division through serving on the
board of directors from 1987-1994 and serving as Chairman from 1995-1996. Received
1996

Pride Award for Divisional Excellence - Society of Plastics Engineers Product Design
and Development Division. Received 1996

Chairman's Cup for Contributions Toward Creating Society of Plastics Engineers
Plastics Product Design and Development Division. Received 1995

# EXHIBIT B to EXHIBIT H

(FAIRPLAY'S Georgia Memorandum)



# EXHIBIT C to EXHIBIT H

(FAIRPLAY'S Georgia Memorandum)



# EXHIBIT D to EXHIBIT H

(FAIRPLAY'S Georgia Memorandum)



# EXHIBIT E to EXHIBIT H

(FAIRPLAY'S Georgia Memorandum)



# EXHIBIT F to EXHIBIT H

(FAIRPLAY'S Georgia Memorandum)



# EXHIBIT G to EXHIBIT H

(FAIRPLAY'S Georgia Memorandum)



# EXHIBIT H to EXHIBIT H

(FAIRPLAY'S Georgia Memorandum)

US00D514981S

(12) **United States Design Patent**
Andrews et al.

(10) Patent No.: **US D514,981 S**
(45) Date of Patent: ⁎⁎ Feb. 14, 2006

(54) **GOLF CAR**

(75) Inventors: Keith R. Andrews, Grand Junction, CO (US); Kevin Fitzgerald, Long Beach, CA (US); Larry F. Johnsen, Grand Junction, CO (US); Jim Wilson, Grand Junction, CO (US)

(73) Assignee: Fairplay Electric Cars, LLC, Grand Junction, CO (US)

(**) Term: 14 Years

(21) Appl. No.: 29/226,521

(22) Filed: Mar. 30, 2005

(51) LOC (8) Cl. ........................................ 12-02
(52) U.S. Cl. ........................................ D12/16
(58) Field of Classification Search ............... D12/1, D12/16, 14, 82, 83, 85, 107; 280/DIG. 5; 224/274; 180/233, 908, 6.5, 89.1; 296/186
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| D236,098 S | * | 7/1975 | Bedel | D12/16 |
| D245,592 S | * | 8/1977 | Davidson | D12/16 |
| D326,831 S | * | 6/1992 | Lambs et al. | D12/16 |
| D345,717 S | | 4/1994 | Molzon et al. | D12/16 |
| D345,718 S | | 4/1994 | Molzon et al. | D12/16 |
| D369,762 S | | 5/1996 | Molzon et al. | D12/16 |
| D373,099 S | * | 8/1996 | Molzon et al. | D12/16 |
| D395,023 S | * | 6/1998 | Hikida | D12/16 |
| D432,460 S | * | 10/2000 | Hoag | D12/16 |
| D498,704 S | * | 11/2004 | Boxner et al. | D12/16 |

* cited by examiner

*Primary Examiner*—Stacia Codmus
(74) *Attorney, Agent, or Firm*—Dykema Gossett PLLC

(57) **CLAIM**

The ornamental design for a golf car, as shown and described.

**DESCRIPTION**

FIG. 1 is a perspective view of a golf car showing our new design.
FIG. 2 is a side elevation view thereof, the opposite side being a mirror image;
FIG. 3 is a front elevation view thereof;
FIG. 4 is a rear elevation view thereof;
FIG. 5 is a top plan view thereof; and,
FIG. 6 is a top plan view thereof with the roof and its associated mounting assembly removed.

**1 Claim, 6 Drawing Sheets**





*FIG. 1*

**U.S. Patent**    Feb. 14, 2006    Sheet 2 of 6    US D514,981 S



FIG. 2

**U.S. Patent**    Feb. 14, 2006    Sheet 3 of 6    US D514,981 S



## FIG. 3

**U.S. Patent**    Feb. 14, 2006    Sheet 4 of 6    US D514,981 S



## FIG. 4



*FIG. 5*



*FIG. 6*

# EXHIBIT I to EXHIBIT H

(FAIRPLAY'S Georgia Memorandum)

US00D369762S

# United States Patent [19]

## Molzon et al.

[11] Patent Number: Des. 369,762

[45] Date of Patent: **May 14, 1996

[54] **GOLF CAR**

[75] Inventors: William R. Molzon, Clarkston, Mich.; James M. Criscuolo, Martinez, Ga.

[73] Assignee: Textron Inc., Providence, R.I.

[**] Term: **14 Years**

[21] Appl. No.: 29,859

[22] Filed: **Oct. 18, 1994**

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 17,534, Jan. 14, 1994, which is a continuation-in-part of Ser. No. 886,444, May 20, 1992, Pat. No. Des. 345,717, and Ser. No. 886,445, May 20, 1992, Pat. No. Des. 345,718.

[52] U.S. Cl. ................................................. D12/16

[58] Field of Search ................ D12/16; 280/DIG. 5; 296/186

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 255,558 | 6/1980 | Brown | D12/16 |
| D. 320,580 | 10/1991 | Kim | D12/16 |
| D. 326,831 | 6/1992 | Lanius et al. | D12/16 |
| D. 345,717 | 4/1994 | Molzon et al. | D12/16 |
| D. 345,718 | 4/1994 | Molzon et al. | D12/16 |
| 4,037,614 | 7/1977 | Hines et al. | 135/5 A |
| 4,098,536 | 7/1978 | Mills | 296/78.1 |
| 4,334,692 | 6/1982 | Lynch | 280/79.1 A |
| 4,533,013 | 8/1985 | Hightower | 180/210 |
| 4,650,238 | 3/1987 | Healey | 296/37.7 |
| 4,772,064 | 9/1988 | Moore | 296/102 |
| 4,773,695 | 9/1988 | Jones et al. | 296/77.1 |
| 5,094,500 | 3/1992 | Maypole et al. | 296/102 |

#### OTHER PUBLICATIONS

1990 E-Z-GO Textron Product Catalog, pp. 1, 6, 9, 14, 22, 23, 24.

*Primary Examiner*—Melody N. Brown
*Attorney, Agent, or Firm*—Perman & Green

[57] **CLAIM**

The ornamental design for a golf car, as shown and described.

### DESCRIPTION

FIG. 1 is a perspective view of a golf car showing our new design;

FIG. 2 is a top plan view thereof;

FIG. 3 is a side elevational view thereof, the opposite side being a mirror image;

FIG. 4 is a front elevational view thereof; and,

FIG. 5 is a rear elevational view thereof.

**1 Claim, 4 Drawing Sheets**



**U.S. Patent**     May 14, 1996     Sheet 1 of 4     **Des. 369,762**



FIG. 1

U.S. Patent    May 14, 1996    Sheet 2 of 4    Des. 369,762



FIG. 2



FIG. 3





FIG. 4



FIG. 5

## Lenz, Mark

| | |
|---|---|
| **From:** | John Corrigan [jcc@johncorrigan com] |
| **Sent:** | Wednesday, April 12, 2006 4:48 PM |
| **To:** | Lenz, Mark |
| **Cc:** | Corrigan, John |
| **Subject:** | SB 3086/Eminent Domain Update |
| **Attachments:** | SB 3086 ham 001.pdf; SB 3086 ham 002.pdf |

Mark:

Attached are the two amendments that passed the House Judiciary Committee today. The bill is now on Second Reading and will likely come up for a vote in the House next week leaving the Senate enough time to concur in the amendment. Sen. Garrett has been included in these discussions and the House Sponsor reported that she is okay with these changes so it is highly likely she will push this amendment once it goes back to the Senate. Although both the IML and the City of Chicago slipped these amendments as "opponents" both testified today that the changes are "livable." Therefore, I do not anticipate these groups actively opposing the legislation in its current form. The City also represented that the Mayor would be sending a letter to all the Aldermen saying that this legislation is "okay."

The amendments contain numerous changes beyond making it more difficult to establish a TIF zone. These, include the following: a modified attorneys' fees provision, adoption of the federal standard for payment of relocation costs, and limited (but different) grandfather clauses for "Blight" TIFs and "Conservation" TIFs. The effective date of the legislation is January 1, 2007.

Many municipalities will need to know what they will need to do (a) in order to preserve their rights in existing TIF zones and (b) what new measures they must take to get "grandfathered" in (1) before passage of the legislation and (2) after passage but before the effective date.

As a result, I see a potential for us to pick up some business but we will need to do an analysis of this bill to get people to think about creating TIFs. Do you know any TIF consultants we can work with? We should probably get a group together to target some municipalities.

John

P.S. Here's a link to the bill: http://www.ilga.gov/legislation/billstatus.asp?
DocNum=3086&GAID=8&GA=94&DocTypeID=SB&LegID=24217&SessionID=50


John C. Corrigan
Dykema Gossett PLLC
10 South Wacker Drive
Suite 2300
Chicago, Illinois 60606
Direct: 312-627-2187
Fax: 312-627-2302
Email: jcorrigan@dykema.com

# Exhibit K







