# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FAIRPLAY ELECTRIC CARS, LLC, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | C. A. NO. 1:06-cv-00060-JJF |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TEXTRON INNOVATIONS INC., AND | ) | |
| TEXTRON, INC. (INCLUDING ITS E-Z- | ) | |
| GO DIVISION), | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION TO DISMISS, TRANSFER OR STAY SECOND-FILED DECLARATORY JUDGMENT ACTION

OF COUNSEL:

Scott L. Robertson
Christopher C. Campbell
Hunton & Williams LLP
1900 K Street, N.W.
Washington, D.C. 20006-1109
Telephone: (202) 955-1500

THE BAYARD FIRM

Edmond D. Johnson (#2257)
ejohnson@bayardfirm.com
Peter B. Ladig (#3513)
pladig@bayardfirm.com
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, Delaware 19899
(302) 655-5000

Attorneys for Defendant
Textron Innovations Inc.

623874v1

TABLE OF AUTHORITIES ................................................................................. iii

I.    INTRODUCTION ................................................................................. 1

II.   ARGUMENT .................................................................................... 2

      A.    Fairplay's Dismissal Of E-Z-GO As A Defendant Has No Bearing On The Issues
            Presented By This Motion. ......................................................... 2

      B.    Fairplay's Rearguing Of The Issues Already Considered By The Georgia Federal
            District Court Underscores Why This Court Should Not Take Jurisdiction Of This
            Case. ................................................................................ 2

      C.    Fairplay's Grievance Regarding Textron's Letter To Its Dealer Fails To Establish
            Any Basis For Subject Matter Jurisdiction, And Is Already The Subject Of The
            Georgia Action. ..................................................................... 4

            1.    The letter from Textron, Inc. to its dealer did not mention the 2007 ZX car
                  and certainly did not threaten that car with infringement. ................. 4

            2.    The dealer letter was not sent until after Fairplay filed this action ......... 6

            3.    Fairplay's baseless contentions with respect to the dealer letter are already
                  the subject of Fairplay's affirmative defense and counterclaim in the first-
                  filed Georgia action. ................................................... 7

            4.    Fairplay cannot rely upon the Georgia action as the basis for creating a
                  reasonable apprehension of suit with respect to the 2007 ZX model car. ..... 7

      D.    Even If Subject Matter Jursidiction Existed Over This Declaratory Judgment
            Action, The Court Can And Should Exercise Its Discretion To Decline
            Jurisdiction In Light Of The Prior Pending Action Between The Same Parties
            Relating To The Same Patents-In-Suit. ............................................. 9

      E.    This Is A Second-Filed Action, And This Court Should Defer To The First-Filed
            Action. ............................................................................ 10

      F.    In The Alternative, No Compelling Reason Exists Why This Court Should Not
            Transfer Venue Pursuant to 28 U.S.C. § 1404(a). .................................. 10

            1.    Transfer is warranted in order to avoid duplicative litigation that would
                  inconvenience all the parties and witnesses. ............................. 11

            2.    Fairplay's amendment to drop E-Z-GO as a party does not weigh against
                  transfer on grounds of convenience. ..................................... 12

III.  CONCLUSION ................................................................................. 12

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Akzona, Inc. v. E.I. du Pont de Nemours & Co.*, 662 F.Supp. 603 (D. Del. 1987)..........................6

*Bergh v. State of Washington*, 535 F.2d 505 (9th Cir. 1976)...........................................................5

*Brittingham v. Commissioner of Internal Revenue*, 451 F.2d 315 (4th Cir. 1971).........................5

*Dippold-Harmon Enterps., Inc. v. Lowe's Cos., Inc.*, 2001 W.L. 1414868
    (D. Del. Nov. 13, 2001) ...............................................................................................................12

*Exxon Corp. v. U.S. Department of Energy*, 594 F.Supp. 84 (D. Del. 1984) .................................5

*Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318 (Fed. Cir. 1998) .........................8

*Indium Corp. v. Semi-Alloys, Inc.*, 781 F.2d 879 (Fed. Cir. 1985)..................................................6

*International Harvester Co. v. Deere & Co.*, 623 F.2d 1207 (7th Cir. 1980) ...........................8, 10

*Mann Manufacturing Inc. v. Hortex, Inc.*, 439 F.2d 403 (5th Cir. 1971).......................................5

*People with AIDS Health Grp. v. Burroughs Wellcome Co.*, 1992 W.L. 18834
    (D. D.C. Jan. 17,1992) ................................................................................................................10

*Sierra Applied Sci. v. Advanced Energy Industrial*, 363 F.3d 1361 (Fed. Cir. 2004) ...................7

*Sirius Satellite Research, Inc. v. Acacia Research Corp.*, 2006 W.L. 238999
    (S.D.N.Y. Jan. 30, 2006)...............................................................................................................8

*Teva Pharms. USA, Inc. v. Abbott Labs.*, 2004 W.L. 2271827 (N.D. Ill. Oct. 7, 2004).................7

*The Nutrasweet Co. v. Ajinomoto Co., Inc.*, 2006 W.L. 851110
    (D. Del. March 31, 2006)..............................................................................................................6

*Van Dusen v. Barrack*, 376 U.S. 612 (1964) ...............................................................................11

*Vanguard Research, Inc. v. Peat, Inc.*, 304 F.3d 1249 (Fed. Cir. 2002) ........................................8

### FEDERAL STATUTES

28 U.S.C. § 1404...........................................................................................................................10

## I.    INTRODUCTION

Plaintiff Fairplay Electric Cars, LLC's ("Fairplay") opposition brief provides no basis for this Court to exercise subject matter jurisdiction over this second-filed declaratory judgment action.    Fairplay's brief actually underscores the reasons why this Court should refuse jurisdiction.

First, Fairplay spends nearly half of its brief rearguing *the same factual issues already heard and pending* before the Georgia federal district court, the forum of the first-filed action. Fairplay's rearguing of these issues is immaterial to showing a "reasonable apprehension" of suit for this declaratory judgment action, but only serves to highlight why this Court may not and should not exercise jurisdiction.    Another federal district court has already considered these very same issues and has taken jurisdiction of the dispute.

Second, because it is apparent that Fairplay has no reasonable apprehension of suit with respect to its new 2007 ZX model golf car, it has concocted a supposed threat of litigation in the form of a letter to a Textron dealer.    However, this letter does not even discuss the 2007 ZX model car, much less threaten it with infringement.    This "phantom" threat provides no basis for subject matter jurisdiction, but even if it did, Fairplay has already made this letter the subject of a "patent misuse" counterclaim and affirmative defense in the first-filed Georgia action.    *See* Exhibit A (Fairplay Georgia Brief in Opp.) at 2-3, 6 (arguing that letter to dealer provides basis for patent misuse allegations).

Third, the dealer letter that Fairplay relies upon was not sent until *after* the date that Fairplay filed this declaratory judgment action.    Well-settled law requires that Fairplay establish it had a reasonable apprehension of suit at the time it filed its complaint.    It may not rely upon events that occurred after it filed suit in order to establish subject matter jurisdiction retroactively.

623874v1

Fourth, even if this Court were to find it permissible to exercise subject matter jurisdiction over this second-filed action, Fairplay offers no reason why the Court *should* exercise its discretion to do so in competition with the ongoing proceedings in Georgia involving the same parties and the same patents. Neither does Fairplay suggest any reason why this Court would be a more convenient venue, when that would require that two different federal courts adjudicate two actions between the same parties and the same patents-in-suit.

Accordingly, defendant Textron Innovations Inc. ("TII") reiterates its request that the Court dismiss, transfer, and/or stay this second-filed action.

## II.    ARGUMENT

### A.    Fairplay's Dismissal Of E-Z-GO As A Defendant Has No Bearing On The Issues Presented By This Motion.

Apparently recognizing that it had no valid basis for requesting a declaratory judgment against E-Z-GO, a division of Textron, Inc. ("E-Z-GO"), Fairplay filed an amended complaint that omits E-Z-GO as a party. In all other respects, the allegations against the remaining defendant, Textron Innovations Inc. ("TII"), remain the same. Accordingly, as to this motion by TII, the amended complaint has no bearing. Subject matter jurisdiction does not exist over Fairplay's declaratory judgment claim against TII, and TII continues to request dismissal, stay, or transfer, for all the reasons stated in its opening brief.

### B.    Fairplay's Rearguing Of The Issues Already Considered By The Georgia Federal District Court Underscores Why This Court Should Not Take Jurisdiction Of This Case.

Fairplay expends considerable effort in its brief rearguing the merits of all of the same issues already considered by the Georgia federal district court.[1] Among other things, Fairplay

---

[1] Fairplay complains that TII's counsel has been "prone to exaggeration," but it was the Georgia District Court that opined with respect to Fairplay's copying, "[a]t this juncture and at

(continued...)

complains of "[e]rrors seen in the Georgia Court's proceedings and rulings," and it contends that the Georgia Court's findings of copying or infringement by Fairplay were not "appropriate." Fairplay Brf. at 4. Fairplay goes so far as to submit the briefs, the hearing transcript, and factual and expert affidavits and exhibits from the Georgia action, all apparently intended to persuade this Court to sit in review of the decisions of the Georgia federal district court.[2]

Fairplay's arguments serve to demonstrate the impropriety of this second-filed action. It is manifest that this Court does not sit as a court of appeal from the Georgia federal district court. As TII stated with its opening brief, the Georgia federal district court has already found that Fairplay's Fleet and Legacy model cars are knock-offs of TII's patented design. Fairplay's brief stands as stark evidence that it is attempting to manipulate this Court into competition with the Georgia federal district court, where these very same arguments presented by Fairplay have been rejected.

---

this phase of the case, admittedly early on, there is, in my view, a likelihood, a very significant, very substantial likelihood of success on the merits. Perhaps beyond the unusual 'substantial' likelihood of success on the question of infringement of a design patent I see a very substantial probability of success on the merits of the claim of design patent infringement." Trans. at 107. The Court further stated, "I cannot at this juncture imagine how many professional experts it would take me to conclude that the one golf cart which I saw made by Fairplay is not an infringement on the design patent 369,762 which is embodied in the cart which is made and marketed by Textron E-Z-GO ... I see an infringement, a very clear one. One which might have some minor difference in the stiffeners of the front cowling, but as I have said that distinction is, in my view, but a less than differential [sic, deferential] nod toward some pretended originality." Transcript, at 109-10.

[2] Fairplay's portrayal of the Georgia federal district court proceedings, Fairplay Brf. at 3, ranges from misleading to outright false, but TII will not reargue the merits of that proceeding before this Court.

C.    **Fairplay's Grievance Regarding Textron's Letter To Its Dealer Fails To Establish Any Basis For Subject Matter Jurisdiction, And Is Already The Subject Of The Georgia Action.**

Fairplay concedes, as it must, that TII has not made an actual threat or charge of infringement of any kind with respect to the 2007 ZX car.  And Fairplay further concedes that the only product that is the subject of this declaratory judgment action is the 2007 ZX car.

Nonetheless, Fairplay appears to present two arguments:  first, that a Textron, Inc. letter sent to an E-Z-GO dealer ("the dealer letter") made an "implied" charge of infringement with respect to the 2007 ZX cars, and, second, that Fairplay has a reasonable apprehension of suit by virtue of the Georgia litigation regarding the same patents.  Fairplay is wrong on both points.

1.    **The letter from Textron, Inc. to its dealer did not mention the 2007 ZX car and certainly did not threaten that car with infringement.**

First, the dealer letter did not even mention the 2007 ZX car, either directly or by implication.[3]  Rather, this letter, which was sent to an E-Z-GO dealer, repeated *verbatim* what the Georgia Court ordered when it preliminarily enjoined Fairplay's Fleet and Legacy model cars.[4]  The letter stated, in pertinent part:

> On January 24, 2006, the United States District Court for the Southern District of Georgia entered an Order enjoining and restraining Fairplay … from making, assembling, importing, marketing, selling, or leasing ***the two-seater versions of Fairplay's Fleet and Legacy Model Golf Cars, or any equivalent car,*** in the United States.  The Order remains in effect until February 6, 2006, at which time E-Z-GO will seek to extend the Order pending the resolution of the lawsuit.

Exhibit B (emphasis added).

---

[3] Fairplay attached the dealer letter as an exhibit to its brief.  TII has reattached the letter as Exhibit B to this filing.

[4] It is beyond argument that the Georgia Court enjoined both the Fleet and Legacy model cars, as well as any equivalent golf car.  While Fairplay contends that the Georgia Court should not have enjoined the Legacy car, Fairplay Brf. at 3, this argument once again shows that Fairplay is simply rearguing to this Court the issues that it lost in Georgia.

The dealer letter nowhere mentioned the 2007 ZX model car. And the dealer letter presented a *verbatim* restatement of what the Georgia Court ordered, and even noted the limited duration of the Order. Fairplay was preliminarily enjoined from "making, assembling, importing, marketing, selling, or leasing the two seater versions of [Fairplay's] Fleet and Legacy Model Golf Cars, or any equivalent golf car." *See* preliminary injunction order, Exhibit C hereto.

Textron's entirely accurate statement to a dealer that the Georgia Court had enjoined sales of the Fleet and Legacy model cars cannot be transformed into a phantom threat against the 2007 ZX cars to justify this Court's subject matter jurisdiction. Fairplay complains that the dealer letter was "vague," because it referred to "these products," "equivalent cars,"[5] and "these Fairplay vehicles," but a review of the letter shows that it was entirely clear and in complete accord with the Order of the Georgia Court. Indeed, the letter specifically quoted the Georgia Court's Order, which enjoined both the Fleet and Legacy model cars, and any equivalent golf

---

[5] The Georgia Court specifically enjoined "equivalent" cars. If Fairplay believes that this language of the injunction is vague and thereby implicates the 2007 ZX cars, then this, too, is an issue that Fairplay may present to the Georgia Court for resolution. Clearly, this Court should not be put in a position of interpreting the scope of another federal district court's injunction order. *Mann Mfg. Inc. v. Hortex, Inc.,* 439 F.2d 403, 408 (5th Cir. 1971) ("When a court is confronted with an action that would involve it in a serious interference with or usurpation of this continuing power, considerations of comity and orderly administration of justice demand that the nonrendering court should decline jurisdiction … and remand the parties for their relief to the rendering court, so long as it is apparent that a remedy is available there.") (citation and footnote omitted); *accord Bergh v. State of Washington,* 535 F.2d 505, 507 (9th Cir. 1976) ("When an injunction sought in one federal proceeding would interfere with another federal proceeding, considerations of comity require more than the usual measure of restraint, and such injunctions should be granted only in the most unusual cases"); *Brittingham v. Commissioner of Internal Revenue,* 451 F.2d 315, 318 (4th Cir. 1971) ("comity dictates that courts of coordinate jurisdiction not review, enjoin or otherwise interfere with one another's jurisdiction"); *Exxon Corp. v. U.S. Dep't of Energy,* 594 F. Supp. 84, 92 (D. Del. 1984) (declining to exercise jurisdiction over a case that would require "[t]wo different courts [to judge] separate parts of the whole interrelated dispute.").

cars. It is a matter of basic grammar that when the letter referred to "these cars" and the like, it clearly referred to the cars identified in the letter. The dealer letter never even mentioned the 2007 ZX car or any other Fairplay products, and Fairplay cannot derive some phantom threat to the 2007 ZX car by distorting the clear language of the letter.

> **2.    The dealer letter was not sent until after Fairplay filed this action. Fairplay cannot rely upon the letter to establish it had a reasonable apprehension at the time it filed suit.**

Fairplay filed this declaratory judgment action on January 30, 2006. Fairplay Brf. at 1. It is well established that Fairplay must show that it had a reasonable apprehension of suit at the time it filed the action. *Indium Corp. v. Semi-Alloys, Inc.,* 781 F.2d 879, 883 (Fed. Cir. 1985) ("reasonable apprehension, like other jurisdictional prerequisites, must exist at the time suit is filed"); *Akzona, Inc. v. E.I. du Pont de Nemours & Co.,* 662 F. Supp. 603, 609-10 (D. Del. 1987) ("an actual case or controversy must exist at all times during the action" and "[a]s in all other litigation, the case or controversy must exist as of the date of the filing of the complaint."). This Court recently reaffirmed this principle in dismissing a similar case. *The Nutrasweet Co. v. Ajinomoto Co., Inc.,* 2006 W.L. 851110, *5 (D. Del. March 31, 2006) (conduct that occurs subsequent to filing of complaint may not be considered and is not relevant).

The dealer letter that Fairplay relies upon was dated January 31, 2006, the day after Fairplay filed suit. And of course, the letter was not even sent to Fairplay, so one can safely assume that Fairplay did not receive it until some time later.[6] Accordingly, Fairplay cannot rely upon the dealer letter at all as providing a basis for subject matter jurisdiction.

---

[6] Fairplay's Exhibit G, the declaration from the dealer Mr. Brock, states that he received the letter "some time after" the January 31 date of the letter.

3.    **Fairplay's baseless contentions with respect to the dealer letter are already the subject of Fairplay's affirmative defense and counterclaim in the first-filed Georgia action.**

Third, Fairplay has asserted a patent misuse counterclaim and affirmative defense based upon this very same dealer letter and the phantom threat against the 2007 ZX model car. *See* Exhibit A (Fairplay Georgia Brief in Opp.) at 2-3, 6 (arguing that letter to dealer provides basis for patent misuse allegations).[7]    Accordingly, this demonstrates all the more why it is entirely inappropriate for Fairplay to ask this Court to adjudicate the same issues it has presented in Georgia, and why Fairplay has no need for this Court to do so.

4.    **Fairplay cannot rely upon the Georgia action as the basis for creating a reasonable apprehension of suit with respect to the 2007 ZX model car.**

Fourth, the fact of the Georgia litigation with respect to the Fleet and Legacy model cars does not establish a reasonable apprehension of suit with respect to the 2007 ZX car.  Fairplay contends that conduct other than a direct accusation of infringement may give rise to a reasonable apprehension of suit, but it ignores the Federal Circuit's rule that a declaratory relief plaintiff must establish a reasonable apprehension of suit with respect to *each* product in suit. *See Sierra Applied Sci. v. Advanced Energy Indus.*, 363 F.3d 1361, 1373-74 (Fed.Cir. 2004) ("the court must carefully calibrate its analysis to each of the products.  To do otherwise would risk issuing an advisory opinion on one product -- or on a method of using that product -- based on an actual controversy involving another product" and further stating that "jurisdiction must be separately considered as to each" of the products of the declaratory judgment plaintiff); *Teva Pharms. USA, Inc. v. Abbott Labs.*, 2004 W.L. 2271827, **4-5 (N.D. Ill. Oct. 7, 2004) (where

---

[7] In the Georgia action, TII and E-Z-GO filed a motion to dismiss the patent misuse counterclaim and affirmative defense for failure to state a claim.  Fairplay opposed that motion, arguing that the dealer letter provides sufficient basis for its patent misuse allegation.

"the only objective facts supporting [the declaratory judgment plaintiff's] apprehension of a patent infringement suit involving its [product] are prior legal proceedings ... involving different products from the one at issue in this action," this was "insufficient to make Teva's apprehension of suit 'reasonable.'"); *see also Int'l Harvester Co. v. Deere & Co.,* 623 F.2d 1207, 1212 (7th Cir. 1980) (rejecting subject matter jurisdiction and stating that the specific product at issue "was in no way involved in the prior suit and thus that suit cannot be viewed as anything more than a general indication that Deere considers litigation a viable alternative once it has determined that a competitor is producing a product which infringes the patent at issue here."). And in order to create a reasonable apprehension of suit with respect to a specific product, "the patentee 'must signal an intention to file suit claiming infringement.'" *Sirius Satellite Research, Inc. v. Acacia Research Corp.,* 2006 W.L. 238999, * 4 (S.D.N.Y. Jan. 30, 2006) (citing *Hunter Douglas, Inc. v. Harmonic Design, Inc.,* 153 F.3d 1318, 1326 (Fed. Cir. 1998)).

TII squarely raised this dispositive rule of law when it filed this motion, and Fairplay failed to respond to it. Fairplay's reliance upon case law in which there was no "direct threat" of infringement fails to justify jurisdiction. For example, in *Vanguard Research,* the patentee made direct statements that the specific technology that was the subject of the declaratory judgment action constituted unlicensed use of the patented technology. *Vanguard Research, Inc. v. Peat, Inc.,* 304 F.3d 1249, 1254-55 (Fed. Cir. 2002).[8] In contrast, here, TII has made no such statements with respect to the 2007 ZX cars.

---

[8] Fairplay's reliance upon *Vanguard* is curious for another reason. Although the Federal Circuit found that subject matter jurisdiction existed, the appellate court admonished that on remand the district court should consider consolidating the case with a related litigation that would likely involve overlapping issues. *Vanguard,* 304 F.3d at 1256.

Finally, in its brief, Fairplay painted a picture of aggressive enforcement on TII's part in order to bolster its argument of having a reasonable apprehension of suit. *See* Fairplay Brf. at 5-8. Yet ironically, when TII moved the Georgia Court for a preliminary injunction against Fairplay, Fairplay urged as one basis for denial of the motion that TII had not been diligent in enforcing its rights, that it had unduly delayed in filing the action, and that it had failed to enforce its patents against several other infringers. *See* Fairplay's Exhibit F at 13-15.

### D. Even If Subject Matter Jurisdiction Existed Over This Declaratory Judgment Action, The Court Can And Should Exercise Its Discretion To Decline Jurisdiction In Light Of The Prior Pending Action Between The Same Parties Relating To The Same Patents-In-Suit.

In light of the law that this Court has discretion to decline subject matter jurisdiction, Fairplay provides no compelling reason why this Court may or should exercise its discretion to hear this lawsuit, particularly when the same parties are already litigating over the same patents in Georgia. Even if one were to accept *arguendo* Fairplay's argument that it must "clear the air" with respect to the 2007 ZX car, Fairplay Brf. at 7, Fairplay does not even venture an explanation why the Georgia Court could not or should not provide that resolution. If Fairplay truly required a declaratory judgment with respect to the 2007 ZX cars, it could have requested resolution within the context of the Georgia Action. Indeed, Fairplay has asserted the dealer letter as the basis for a patent misuse counterclaim and affirmative defense in the Georgia action.

Thus, Fairplay cannot avoid the contradiction at the heart of its lawsuit, *viz.,* even if Fairplay has a "reasonable apprehension" of suit by virtue of the Georgia action, why then shouldn't the Georgia Court be the forum in which to resolve Fairplay's claims, when that Court is already presiding over the same parties and the same patents-in-suit? Fairplay does not venture an explanation, because the obvious answer is that the Georgia Court should resolve

such claims if any exist. *See Int'l Harvester,* 623 F.2d at 1218 ("A declaratory judgment should issue only when it will serve a useful purpose . . . . the pending suit may make resolution of the issues presented by this declaratory judgment suit unnecessary."); *People with AIDS Health Grp. v. Burroughs Wellcome Co.,* 1992 W.L. 18834, *2 (D. D.C. Jan, 17, 1992) ("propriety of declaratory relief must be judged with reference to whether the issue is more properly resolved in another forum.") (citing *Hanes Corp. v. Millard,* 531 F.2d 585, 596 (D.C. Cir. 1976)).

**E.     This Is A Second-Filed Action, And This Court Should Defer To The First-Filed Action.**

In an attempt to avoid clearly-settled law compelling deference to a first-filed action, Fairplay contends that this is neither a "mirror-image" case nor a "second-filed" action. Fairplay is wrong. The same parties and the same patents-in-suit are involved in both cases. While Fairplay has dropped E-Z-GO as a party to this case in order to make the actions appear different, TII and Fairplay both remain as parties in both cases.

In the Georgia action, Fairplay has alleged that the same patents-in-suit are invalid, and it has relied upon the same dealer letter (upon which it bases its "reasonable apprehension" for this action) as the basis for a counterclaim and affirmative defense of patent misuse in the Georgia action. If the Georgia Court permits that counterclaim and defense to go forward, resolution of those issues in Georgia will likely overlap with those involved in this action.

There is simply no reason why the resources of two separate federal courts should be occupied with these parties and their respective issues.

**F.     In The Alternative, No Compelling Reason Exists Why This Court Should Not Transfer Venue Pursuant to 28 U.S.C. § 1404(a).**

With respect to the venue transfer analysis, Fairplay simply criticizes TII for ostensibly failing to identify the witnesses, documents, and the like, for which litigation in this forum would be inconvenient. But Fairplay ignores TII's primary argument, *viz.,* the Georgia Court is already

623874v1

-10-

hearing an action between the same parties and the same patents-in-suit. It would require duplicative litigation to have this Court entertain Fairplay's declaratory judgment action, to the inconvenience of all the parties and witnesses, regardless of where they are located.

Fairplay does not even bother to defend its forum choice, nor does it argue that either it or this dispute has any substantial connection with this forum. It appears to rely entirely on TII being incorporated here, and the fact that it has dropped Georgia-based E-Z-GO as a party. Fairplay does not deny that it has chosen this forum in a classic instance of forum-shopping, essentially, in order to avoid further scrutiny from the Georgia Court.

### 1.     Transfer is warranted in order to avoid duplicative litigation that would inconvenience all the parties and witnesses.

The purpose of Section 1404(a) is "to prevent 'waste of time, energy, and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense.'" *Van Dusen v. Barrack,* 376 U.S. 612, 616 (1964). Thus, as this Court has found in other "second-filed" cases, the existence of a previously-filed and related action pending in Georgia weighs heavily in favor of transfer on convenience grounds. *See* TII Opening Brf. at 20-21.

As to the case law cited by TII showing that transfer is appropriate in order to consolidate related actions between the same parties, Fairplay has no response. There is no reason why the parties should adjudicate most of their claims in Georgia, but litigate some overlapping issues pertaining to one model of Fairplay's products in this Court.

623874v1

2.    **Fairplay's amendment to drop E-Z-GO as a party does not weigh against transfer on grounds of convenience.**

In a last-minute ploy to avoid transfer, Fairplay filed an amended complaint that dropped E-Z-GO as a party, leaving TII as the only named defendant.[9]  Fairplay's tactic backfires, however, because under this Court's case law the convenience of third party witnesses weighs considerably more heavily than that of party witnesses.  *Dippold-Harmon Enterps., Inc. v. Lowe's Cos., Inc.,* 2001 W.L. 1414868, *6 (D. Del. Nov. 13, 2001).  Therefore, Fairplay's tactic of rendering E-Z-GO a third party rather than a party defendant actually strengthens the reasons for transferring this case to Georgia, where E-Z-GO's golf car business employees and records are maintained.[10]  Clearly, their convenience lies in having this action tried before the Georgia court.  *Id.* ("[r]equiring that [third-party witnesses] come to Delaware to litigate this action separately cannot be considered convenient and in the interest of justice").  Fairplay does not allege that any third-party witnesses are present in this forum.

## III.    CONCLUSION

For the reasons stated herein, TII respectfully requests that this Court dismiss this action for lack of subject matter jurisdiction or, in the alternative, transfer or stay this second-filed action in favor of the ongoing federal district court action in Georgia regarding the same parties and the same patents-in-suit.

---

[9]  As noted in TII's opening brief, E-Z-GO's primary golf car operations are located in Augusta, Georgia, where the related action between the parties is pending.

[10]  Fairplay cannot reasonably contend that E-Z-GO's witnesses will not be relevant to this action.  Fairplay itself filed with this Court the testimony from E-Z-GO witnesses from the Georgia action, *see* Fairplay Brf., Exhibit D (hearing transcript with testimony of Kent Bruntz and Ronald Skenes, Jr.), as well as the briefs, and many of the exhibits and affidavits from the Georgia action.

Dated: April 25, 2006                          Respectfully submitted,

                                        TEXTRON INNOVATIONS INC.


                                        By: _____
                                                Edmond D. Johnson (#2257)
                                                Peter B. Ladig (#3513)
                                                THE BAYARD FIRM
                                                222 Delaware Avenue
                                                Suite 900
                                                Post Office Box 25130
                                                Wilmington, DE 19801



                                                OF COUNSEL:

                                                Scott L. Robertson
                                                Christopher C. Campbell
                                                Hunton & Williams LLP
                                                1900 K Street, N.W.
                                                Washington, DC 20006
                                                (T) (202) 955-1500
                                                (F) (202) 778-2201

                                                Attorneys for Defendant
                                                Textron Innovations Inc.

EXHIBIT A

ORIGINAL

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA

2006 MAR 31  PM 3: 15

CLERK _C Reynolds_
SO. DIST. OF GA.

TEXTRON INNOVATIONS INC. and
E-Z-GO (A Division of TEXTRON INC.),

                Plaintiffs,

        v.

FAIRPLAY ELECTRIC CARS, LLC,

                Defendant.

Civil Action No.  CV 106-009

Judge Dudley H. Bowen, Jr.

---

### DEFENDANT FAIRPLAY ELECTRIC CARS, LLC'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE AFFIRMATIVE DEFENSE AND COUNTERCLAIM OF PATENT MISUSE

        Plaintiffs seek to avoid the consequences of their acts of patent misuse and to dismiss defendant's affirmative defense and counterclaim surrounding such misuse based upon an alleged lack of factual specificity in defendant's pleadings. The Federal Rules, however, allow for notice pleadings. Fact pleadings are not required, and added specificity is not required for pleadings on patent misuse. Accordingly, defendant's pleadings are believed sufficient, and plaintiffs' motion to strike should be denied. Should the Court believe that more detailed pleadings are required, however, defendant shall, with leave of this Court, add such additional details as clearly exist and are referenced below.

### I.    Background.

        On January 17, 2006, Plaintiffs filed the present action alleging, *inter alia*, that Fairplay infringed U.S. Design Patent No. 369,762 ("the '762 Patent"). On the same day, Plaintiffs also

filed a Motion For Preliminary Injunction seeking to enjoin the importation and sales of

Fairplay's Fleet Model car as an infringement of the '762 Patent. After an initial hearing, in

which only Plaintiffs' case was presented and no witnesses appeared on behalf of Fairplay, this

Court issued a temporary ruling and injunction against Fairplay's "making, assembling,

importing, marketing, selling, or leasing the two-seater versions of Defendant's Fleet and Legacy

Model Golf Cars, or any equivalent golf car." *See* January 24, 2006 Order. That injunction was

for a limited duration, pending time for Fairplay to be able to present its case. Plaintiffs have

acknowledged, furthermore, that Defendant's newly introduced 2007 ZX Model cars are not part

of the present action; are not, accordingly, part of the Court's preliminary ruling; and that they

have not alleged defendant's new 2007 ZX Model cars infringe their patents. *See, e.g.,* Textron's

Motion to Dismiss, Transfer or Stay the declaratory judgment action filed in Delaware in which

plaintiffs herein state "E-Z-GO has not made any charge of infringement [of, *inter alia*, the '762

patent] with respect to this new '2007 ZX' model of golf car," p. 2, Exhibit A.

  Soon after the Court's temporary order, Plaintiffs' counsel wrote threatening letters to

Fairplay's customers who are also E-Z-GO dealers. Those letters flaunted the Court's order,

claiming that the Court found preliminarily that the sale and offer for sale of Fairplay vehicles

infringes E-Z-GO's legal and intellectual property protections; that if these Fairplay vehicles are

sold by E-Z-GO dealers, the dealer's actions may constitute breach of the dealer's contract (an

exemplary copy of which is attached in Exhibit B[1]) and will permit E-Z-GO to terminate the

dealer's agreement and seek compensation for damages; and that Plaintiffs wanted to ensure that

the dealer does not "inadvertently participate in the Court-restricted sale or offer for sale of

*Faiplay vehicles*" (exemplary letter at Exhibit B, emphasis added[2]). Contrary to Plaintiffs'

---

[1] As Exhibit 1 to the Declaration of Wayne Brock.
[2] As Exhibit 2 to the Declaration of Wayne Brock.

2

threatening letters, the issue before this Court was on a preliminary injunction and, thus, the

*likelihood of success* on infringement, and no final or binding finding on infringement of

anyone's patent was made.  There are also no legal and intellectual property protections *of E-Z-*

*GO* that were before the Court or could constitute an infringement, as all of the patents are

owned by Textron.  And, more importantly, no sales by E-Z-GO dealers, even of Fairplay cars,

would be part of the Court-restricted sales or offers for sale *by Fairplay*, as the E-Z-GO dealers

are not agents of Fairplay and are not subject to the Court's injunction order.  Plaintiffs' letter

also implies, through vague and intimidating language and the timing thereof when Fairplay's

new cars were introduced, that Fairplay's 2007 ZX cars are or may be an infringement of

Plaintiffs' patents and/or are covered by the Court's existing order.  Such is also not the case.  In

short, through misleading and threatening letters, all based upon alleged enforcement of

Textron's patent beyond its proper scope, Plaintiffs sought to intimidate Fairplay's customers

and prevent those customers from selling Fairplay's vehicles.

The intimidating acts of Plaintiffs are acts whereby Plaintiffs have attempted to use the

rights in the '762 Patent to obtain or to coerce an unfair commercial advantage between Plaintiffs

and Fairplay, by extending the economic effect of that patent beyond its proper scope.  This, at

least in part, forms the basis for Fairplay's affirmative defense and counterclaim for patent

misuse, and is what is alleged in Fairplay's Responsive Pleadings and Counterclaim.  *See, e.g.,*

Responsive Pleading and Counterclaims of Defendant Fairplay Electric Cars, LLC, ¶24, Exhibit

C).

II.    **Legal Standards.**

    A.    **Motion To Strike.**

3

In considering a motion to strike, or dismiss, pursuant to Rule 12 of the Federal Rules of

Civil Procedure, "the court must accept as true all material allegations of the [non-movant], and

it must construe" the pleadings in favor of the non-movant.[3] *Bayer AG v. Housey*

*Pharmaceuticals, Inc.*, 169 F.Supp.2d 328, 330 (D. Del. 2001), *citing Trump Hotels & Casino*

*Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F.3d 478, 483 (3rd Cir. 1998). A pleading "should be

dismissed only if, after accepting as true all of the facts alleged [therein], and drawing all

reasonable inferences in the [non-movant's] favor, no relief could be granted under any set of

facts consistent with the allegations [thereof]." *Id.*; *see also BlueCross BlueShield of South*

*Carolina v. Carillo*, 372 F.Supp.2d 628, 633 (N.D. Ga. 2005). Claims may be dismissed

pursuant to a Rule 12 motion only if the non-movant cannot demonstrate *any* set of facts that

would entitle him to relief. *Id.*; *see also Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (emphasis

added).

The notice pleading requirements set forth by the Federal Rules are liberal in nature, and,

consequently, specific fact pleading is not required by the Federal District Court System. Rule 8

requires only "a short and plain statement of the claim showing that the pleader is entitled to

relief." Fed.R.Civ.P. 8(a)(2). In *Conley v. Gibson*, the Supreme Court stated in effect that the

Rule meant what it said:

> The Federal Rules of Civil Procedure do not require a claimant to
> set out in detail the facts upon which he bases his claim. To the
> contrary, all the Rules require is "a short and plain statement of the
> claim" that will give the defendant fair notice of what the
> plaintiff's claim is and the grounds upon which it rests.

*Conley*, 355 U.S. at 47 (footnote omitted).

---

[3] For purposes of the instant Motion, Fairplay has alleged Patent Misuse as part of its Affirmative Defenses (its
Ninth Affirmative Defense) and Counterclaims (its Fourth Counterclaim). Fairplay is thus the Counterclaimant
in this Action with regard to the issue of Patent Misuse, and all inferences drawn in favor of a non-movant are
applicable to Fairplay in this role.

4

The cases cited by Plaintiffs for the proposition that more specificity is required are to no avail. In particular, in *Takeda Chemical Industris, Ltd. v. Alphapharm Pty., Ltd.*, 2004 WL 1872707 (S.D. N.Y. August 19, 2004) (cited by Plaintiffs at Pages 4-5 of its Memorandum), the allegation was simply that Plaintiffs' patents were unenforceable "as a result of unclean hands and/or patent misuse." *Takeda*, 2004 WL at *1. This allegation is significantly less than the allegations made by Fairplay. *Raines v. Switch Manufacturing*, 1997 WL 578547 (N.D. Cal. July 28, 1997) (cited by Plaintiffs at Page 5 of its Memorandum), on the other hand, is directed to an action allegedly brought in bad faith, which, as addressed in Section IIII, below, is similarly not the case here.

Rule 9(b) imposes a detail requirement in two specific instances: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). Claims of Patent Misuse are not an exception in Rule 9 and, consequently, Patent Misuse claimants have not, in practice, been required to provide more than the required "short and plain statement of the claim." *See Rosenthal Collins Group, LLC v. Trading Technologies Int'l, Inc.*, 2005 WL 3357947, at *7 (N.D. Ill. December 26, 2005).[4]

### B.    Patent Misuse.

"The defense of patent misuse arises from the equitable doctrine of unclean hands, and relates generally to the use of patent rights to obtain or to coerce an unfair economic advantage. Patent misuse relates primarily to a patentee's actions that affect competition in unpatented goods or that otherwise extend the economic effect beyond the scope of the patent grant." Plaintiffs' Brief In Support Of Motion To Strike Affirmative Defense And Counterclaims Of Patent Misuse ("Plaintiffs' Memorandum"), Page 3, *citing C.R. Bard, Inc. v. M3 Sys., Inc.*, 157

F.3d 1340, 1372 (Fed.Cir. 1998).  In other words, Patent Misuse has "the effect of extending the patentee's statutory rights and does so with an anti-competitive effect." *Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 869 (Fed.Cir. 1997).

In the present situation, facts establishing patent misuse clearly exist.  As shown above, based upon the '762 Patent, Plaintiffs have alleged the existence and rulings of patent protection beyond the actual scope of the '762 Patent, and have sought to intimidate Fairplay's customers into not selling past and present products of Fairplay.  Such acts support a claim for patent misuse.  *See, e.g., Rosenthal Collins*, 2005 WL 3357947, at *8.

### III.    Under Standards of Notice Pleading, Fairplay's Ninth Affirmative Defense And Fourth Counterclaim Are Sufficiently Plead

Viewing the allegations in the light most favorable to Fairplay, it is clear that Fairplay's allegations are within the notice pleading requirements of the Federal Rules.

In its Ninth Affirmative Defense, Fairplay alleges that "Plaintiffs are guilty of patent misuse in that their claims and assertions result in a broader scope of the '762 Patent than was granted."  As specific fact pleading is not required, this allegation, which encompasses the above referenced facts, provides the requisite fair notice of what Fairplay's Affirmative Defense is and the grounds upon which it rests.

Likewise, in its Fourth Counterclaim, Fairplay alleges that "Plaintiffs have attempted to use the rights in the '762 Patent to obtain or to coerce an unfair commercial advantage between Plaintiffs and Fairplay, by extending the economic effect of the '762 Patent beyond the scope thereof."  This allegation, also encompassing the above referenced facts, provides the requisite fair notice of what Fairplay's Counterclaim is and the grounds upon which it rests.

---

[4] This case is attached to this Response as Exhibit D.

In both their Affirmative Defense and their Counterclaim, Fairplay presents "direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory," the act of which fulfills Fairplay's requirement under the Federal Rules. *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984).

## IIII.  Fairplay Is Not Claiming That Plaintiffs' Patent Misuse Is A Result Of Plaintiffs' Lawsuit.

Plaintiffs' contention – that it is E-Z-GO's present enforcement action that prompted Fairplay's Affirmative Defense and Counterclaim of Patent Misuse – is simply a strawman argument, conceived by Plaintiffs only to be knocked down.  Fairplay is not claiming misuse as a result of Plaintiffs' lawsuit.

## V.  Alternatively, If This Court Decides Additional Pleadings Are Warranted, Fairplay Seeks Leave To Submit Amended Pleadings.

Fairplay believes that its Ninth Affirmative Defense and Fourth Counterclaim both provide sufficient notice under the notice pleading standards of the Federal Rules.  However, should this Court decide in the contrary, Fairplay shall, with leave of Court, add such additional details as clearly exist, and hereby requests this Court for such leave to amend.  Fairplay will be able to provide its amended pleadings, if necessary, within ten days of the Court's ruling on the motion.

Rule 15(a) of the Federal Rules of Civil Procedure allows a party to amend a pleading by leave of court, and further notes that "leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a).  Concerning this last aspect of Rule 15(a), courts have held that "justice does so require unless the [movant] is guilty of undue delay or bad faith or unless permission to amend would unduly prejudice the opposing party." *Bausch & Lomb, Inc. v. Allergan, Inc.*, 136

F.Supp.2d 166, 169 (W.D. N.Y. 2001), *quoting S.S. Silberblatt, Inc. v. East Harlem Pilot Block*, 608 F.2d 28, 42 (2nd Cir. 1979). "The purpose of Rule 15(a) is to encourage disposition of litigation on the merits, rather than on procedural technicalities." *Id.*, *citing Sanders v. Thrall Car Mfg. Co.*, 582 F.Supp. 945, 952 (S.D. N.Y. 1983), aff'd, 730 F.2d 910 (2nd Cir. 1984).

Because Fairplay is requesting this Motion for leave to file amended pleadings at this time, when this Action is still in its early stages and prior to the commencement of discovery, it cannot be said that Fairplay is guilty of undue delay or bad faith, or that Plaintiffs' will be unduly prejudiced by Fairplay's Motion.

### VI.    Conclusion.

For at least the above-stated reasons, Fairplay respectfully requests this Court deny Plaintiffs' Motion To Strike Affirmative Defense And Counterclaims Of Patent Misuse or, alternatively, provide leave for Fairplay to amend its pleadings.

Date:  March 31, 2006

Respectfully submitted,

By: _____

Charles C. Stebbins, III
Georgia Bar No. 677350
706-722-7543

Of Counsel:

WARLICK, TRITT, STEBBINS & HALL, LLP
Post Office Box 1495
Augusta, Georgia  30903.1495

Allan J. Sternstein
Illinois Bar No. 2728966
(Admitted *Pro Hac Vice*)
312-627-2143

Of Counsel:

DYKEMA GOSSETT PLLC
10 South Wacker Drive
Chicago, Illinois  60606

Craig N. Hentschel
California Bar No. 66178
(Admitted *Pro Hac Vice*)
(213) 457-1818

Of Counsel:

DYKEMA GOSSETT PLLC
333 South Grand Avenue
Los Angeles, California  90071

Attorneys for Defendant,
    FAIRPLAY ELECTRIC CARS, LLC

9

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

TEXTRON INNOVATIONS, INC. and )
E-Z GO (a division of TEXTRON, INC.), )
                                      )
    Plaintiffs,                      )    CIVIL ACTION NO. CV 106-009
                                      )
v.                                    )
                                      )
FAIRPLAY ELECTRIC CARS, LLC,          )
                                      )
    Defendant.                       )

### DECLARATION OF WAYNE BROCK

I, Wayne Brock, hereby declare as follows:

1.    I am the President and Owner of South-Central Products, Inc., d/b/a GFL - Golf Products Co., 10401 Maumelle Blvd., North Little Rock, AR, and have been the president and owner of South-Central Products, Inc. since 1990.

2.    South-Central Products, Inc. has been a distributor for E-Z-GO, a Division of Textron Inc., since 1997. A copy of the current Distribution Agreement between E-Z-GO and South Central Products, Inc., dated January 1, 2005, is attached to this Declaration as Exhibit 1.

3.    Shortly after its date, I received the January 31, 2006 dated letter purportedly from John A. Rupp, Assistant General Counsel, Textron Inc., attached to this Declaration as Exhibit 2.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 3/20 , 2006    _Wayne Brock_

# Exhibit 1

Expires December 31, 2006

# E-Z-GO Division of Textron Inc.
## Distribution Agreement

THIS Distribution AGREEMENT, dated this 1<u>st</u> day of <u>January</u> 2005 by and between the E-Z-GO Division of Textron Inc., a Delaware corporation (the "Company"), acting through it's <u>Southwest</u> Branch located in <u>Dallas, TX</u> and <u>South Central Products, Inc. dba GFL - Golf Products #62912</u>, a <u>Dealer</u> (Type of Business) (the "Dealer"), whose principal place of business is located at <u>10401 Maumelle Blvd., North Little Rock, AR, 72190-4606.</u>

WITNESSETH:

WHEREAS, the Company manufactures and markets equipment, parts and accessories for the golf and turf industries under the trademarks "E-Z-GO" and "Cushman", such products being advertised and marketed nationally; and

WHEREAS, Dealer desires to purchase products manufactured by the Company and to resell or lease them to users and consumers;

In consideration of the premises and the mutual covenants and agreements hereinafter set forth, the parties hereby agree as follows:

## 1. APPOINTMENT OF DEALER

Subject to the terms of this Agreement, the Company hereby appoints Dealer as its non-exclusive Dealer primarily responsible for selling those products manufactured by the Company and listed on Exhibit A hereto (collectively, together with parts and accessories therefore and other products mutually agreed upon by written amendment, "Company Products") and for leasing Company Products in the geographic area set forth on Exhibit A hereto (the "Territory"). This Agreement covers stocking, display, sales and leases of Company Products only at or from the Dealer's location specified in this Agreement. Any other business location shall be subject to the written approval of the Company and shall be covered by a separate agreement or a written amendment hereto. Dealer accepts the appointment and agrees to act as a Company Dealer subject to the terms and conditions of this Agreement. Dealer recognizes and agrees that this Agreement is non-exclusive, and that nothing herein shall preclude the Company from selling or leasing Company Products directly to customers in the Territory or from appointing other Dealers of Company Products in the Territory. Dealer will not, directly or indirectly, solicit sales of Company Products nor establish a place of business outside the Territory.

## 2. PURCHASE OF COMPANY PRODUCTS BY DEALER

(a) The Company shall sell Company Products to Dealer, and Dealer shall purchase Company Products from the Company, subject to availability and the terms of this Agreement. The Company may, in its sole discretion, accept, reject or allocate Company Products to any order sent to it by Dealer and the Company shall not be liable to the Dealer or to any of its customers or to any other person for any refusal or failure to accept or fill any order.

(b) The Company shall, at all times, have the right to discontinue, change the specifications and design of, alter or substitute materials in Company Products without notice and without incurring any obligation or liability to Dealer.

(c) All sales of Company Products to Dealer are final, and Dealer shall accept all Company Products ordered by it, whether such orders are given to the Company by telegram, telephone, fax, letter, purchase order, oral order or other communication and no cancellation of such order, whether made before or after shipment, and no returns shall be made without the express prior written authorization of the Company. All sales of Company Products made by the Company to a Dealer shall be in accordance with Company's terms and conditions of sale as in effect on the date of sale. Company's terms and conditions shall not be altered or modified by the provisions of any purchase order or other instrument furnished by Dealer even though shipment is made by the Company against such purchase order or other instrument. Without regard to freight being prepaid or collect, insurance against risk of loss while in transit, or method of payment, title to and risk of loss of Company Products shall pass to the Dealer upon delivery by the Company to a carrier for shipment to the Dealer unless other terms are specifically agreed upon in

advance in writing; provided, however, that in the event that Company Products are delivered to Dealer's premises by the Company's employees, title and risk of loss remain with the Company until delivery at the destination point. Notwithstanding passage of title, the Company shall have all security and other rights permitted by law, including, without limitation, the right of rescission, stoppage in transit and resale, and the Company reserves the right to possession of each Company Product, notwithstanding delivery to the carrier, until payment in full of the purchase price therefor.

(d) All delivery dates which may be agreed on by the parties shall be tentative, and although the Company shall endeavor to make delivery in accordance with such dates, it shall not be in breach of this Agreement or any other duty to Dealer if it fails to meet such delivery dates, whether due to any event of force majeure or otherwise.

## 3. PRICE AND PAYMENT

(a) Company Products shall be purchased by Dealer at the Dealer prices and discounts established by the Company and in effect on the date of the Company's shipment of such Company Products, regardless of when the order for such Company Products was submitted or accepted. The Company may change its prices and discounts for Company Products at any time upon written notice to Dealer effective as of the date of such notice. Such changes shall apply to all Company Products shipped after the effective date of such changes regardless of when ordered. All prices are F.O.B. the Company's plant. The Company reserves the right to sell or lease Company Products to any customer it chooses. Dealer acknowledges such right of the Company and recognizes that sales or leases by the Company may be at prices lower than those paid by Dealer.

(b) The full price of all Company Products shall be due and payable in cash upon delivery of the Company Products, unless the Company has agreed in writing to extend credit to Dealer, in which event the price of all Company Products delivered pursuant to such extension of credit shall be due and payable as provided in such separate writing. The Company may at any time, and for any reason whatever, revoke its extension of credit or alter the terms and conditions thereof with respect to any sale without prior notice to Dealer prior to shipment. The Company also reserves the right to set-off against any credit memos or payments for leased products to be issued for the benefit of Dealer, any amounts owing from Dealer to Company or TFC (if Dealer finances the purchases of products from Company with financing from TFC) which are thirty-one (31) days or more past due. If Dealer breaches this Agreement, any other agreement with the Company or any agreement entered into by Dealer relating to the financing of Company Products, the Company may revoke its extension of credit or alter the terms and conditions thereof for any Company Products not paid for in full, regardless of whether such Products have been delivered. Any failure to make any payment when and as due shall be a material breach of this Agreement.

## 4. REPORTING OF PACKING SHORTAGES AND DEFECTS

Dealer shall promptly and thoroughly inspect all shipments of Company Products immediately after arrival. Dealer shall notify the Company in writing within ten days after the arrival of any Company Products of any packing shortages with respect thereto and shall submit all packing slips and inspection reports along with said written notice. The Company reserves the right to refuse to adjust any packing shortages in the event the foregoing procedure has not been followed. Dealer shall within ten days after arrival notify the Company in writing of any other failure of Company Products to

conform to this Agreement which is reasonably discoverable upon arrival, and shall notify the Company in writing of any other failure to conform within ten days after the earlier of the date of actual discovery thereof, or the date of which they should have been discovered in the exercise of reasonable diligence. All failures of Company Products to conform to this Agreement not reported to the Company as required by this section will be deemed forever waived.

**5.  DUTIES OF THE DEALER**

Dealer shall use its best efforts to promote and solicit the sale and lease of Company Products in the Territory. Without limiting the generality of the foregoing, Dealer shall:

(a)  Purchase from the Company, and resell or lease to customers located in the Territory, during the term of this Agreement such number of Company Products (hereinafter, the "marketing objective" which shall be set forth on Exhibit A hereto) as the Company shall agree upon, or in the absence of such agreement, as shall be reasonably designated by the Company based upon the Company's national average market penetration, such information as is available to the Company concerning Dealer's previous sales and lease levels, if applicable, in the Territory, and the growth rate of the market, if applicable, in the Territory and in the nation and other marketing factors deemed appropriate by the Company.  If a Dealer sells Company Products outside of the assigned territory, the selling Dealer will be charged, via special invoice payable within 30 days, 10% of the selling Dealer's purchase price of the Products or Products involved in order to provide adequate compensation to Dealer and other Dealers of Company Products for performing service and warranty obligations in the servicing territory. The Dealer in whose territory the sale was made (servicing Dealer) will receive a credit against future purchases equal to 10% of the selling Dealer's purchase price on Product(s) sold in the Servicing Dealer's territory. In order for these provisions to apply, the servicing Dealer must notify Textron within 180 days of the sale into the territory. The notice will include (i) name and location of the customer; (ii) the model of the Product(s); and (iii) the serial number of the Products. Any such notice is subject to verification by Textron in its sole discretion. Dealer expressly acknowledges that the foregoing provisions represent an appropriate and fair allocation of the cost and benefits of both selling and servicing Products. Dealer acknowledges that the provisions of 5(a) do not in any way limit or restrict Textron's remedies for breach of this Agreement by Dealer. Only Company Products purchased by Dealer from the Company and resold or leased by Dealer within the Territory shall be credited against Dealer's marketing objectives as set forth herein.

(b)  Purchase and maintain at all times an adequate stock of repair parts and accessories either manufactured or approved by the Company in order to provide reasonable and prompt service and repairs to Company Products.

(c)  Comply with the Company's Warranty Policy and Procedure, as described in Section 6 of this Agreement, and in connection with such compliance select, hire and train an adequate number of service technicians to enable the Dealer to perform all warranty repair, service and/or replacement work under such Company Warranty Policy and Procedure, all at its own expense.  If Dealer is unable or unwilling to perform warranty repairs to Company Products which Dealer sold or leased, the Company reserves the right to charge Dealer for the cost of repairs in accordance with the Company warranty labor schedule. In conformance with established Company Warranty policy and procedure, Dealer is required to use only OEM parts and products manufactured by the Company for Warranty repairs to Company Products. In addition, Dealer shall perform other service program obligations (as established by the Company from time to time) and send, at its own expense, service technicians to schools conducted by the Company from time to time.

(d)  In order that the Company may provide proper warranty coverage for all Company Products sold or leased by Dealer, Dealer shall be required to provide to the Company, within thirty (30) working days from the date of delivery of Company Products the (i) name and location of the customer; (ii) the model of the product(s); and (iii) the serial number of the product(s).

(e)  Participate in advertising programs adopted by the Company for the Territory and bear its designated pro rata share of the cost thereof, as shall be specified in advance from time to time by the Company.  Dealer is specifically required to provide a Yellow Pages listing or approved logo insert identifying the Dealer as an authorized E-Z-GO Dealer in those directories corresponding to the Dealer's assigned sales territory.

(f)  Cause appropriate personnel from Dealer to attend all Dealer meetings and conventions to which they are invited by the Company.

(g)  Maintain a place of business and sales staff in an area in the Territory suitable for handling all sales, service and sales promotional activities.

(h)  Promptly follow up on all direct or referred inquiries from prospective customers.

(i)  Fully comply with all applicable federal, state and local laws, regulations, rules, orders and ordinances relating to Dealer's business.

(j)  Obtain and maintain insurance underwritten by an insurance company with an A.M. Best rating of A- and licensed to do business in all States where the Dealer has operations and/or conducts business and in such amounts as is customarily maintained by prudent businessmen in the trade of distributing goods comparable to the Company Products, including but not limited to premises liability, public liability, fire and extended coverage, automobile and worker's compensation coverage and shall provide the Company annually (by January 31st of each year) with a certificate of insurance issued by the relevant carrier(s) as to the types and amounts of such insurance which the Dealer then has in effect, along with such other information relating thereto as the Company may reasonably request.

(k)  The Company assumes no liability to the Dealer or any third parties with respect to the performance characteristics of Company Products which have been altered, modified, or re-manufactured by the Dealer, for any claimed failures or deficiencies in the performance in the Company Products resulting, directly or indirectly, from such alterations, modifications or re-manufacturing by the Dealer, its agents and/or distributors, or any entity related to or doing business on the part of the Dealer (hereinafter referred to collectively as "the Dealer"). The Dealer agrees to hold harmless, defend and indemnify the Company, its officers, shareholders, employees and agents (hereinafter referred to collectively as "the Company") against all third party claims, liabilities, demands, judgments or causes of action, whether at law or in equity, and all costs and expenses related thereto (including, but not limited to, reasonable attorneys' fees and costs), from claims and lawsuits arising from or in relation to the Dealer's: (a) alterations, modifications or re-manufacturing of the Company Products; (b) warranties (express or implied) or warranty service; (c) infringement, directly or indirectly, of the Company's patents, copyrights, design protections or other intellectual property rights – or of the same such rights of any third party; and (d) unauthorized use of the Company's trademarks, copyrights, service marks or other licensed marks – or of the same such rights of any third party. The Dealer further agrees to hold harmless, defend and indemnify the Company, and in no event will the Company ever be liable, for indirect, special or consequential damages incurred by the Dealer. Except as otherwise stated following, the Company agrees to: (a) provide prompt written notice to the Dealer of any such claim or lawsuit; and (b) permit the Dealer a right and option to undertake and conduct the defense of any such wholly indemnified claim or lawsuit brought against the Company, provided, however, that no settlement of any such claim or lawsuit may be entered into by the Dealer without the prior express written consent of the Company.

(l)  The Dealer shall acquire and maintain at its sole cost and expense throughout the Term and any renewal of this Distribution Agreement, and for a period of five (5) years following the termination or expiration of the Distribution Agreement, a policy of Comprehensive General Liability Insurance, to include specific insurance protection for products liability, advertisements, intellectual property and contractual liability, underwritten by an insurance company with an A.M. Best rating of at least A- and licensed to do business in all States where the Dealer has operations and/or conducts business. This insurance coverage shall provide protection of not less than two million dollars ($2,000,000) in a combined single limit for personal injury and property damage on a per occurrence basis, and $5,000,000 in the aggregate, with a deductible in such amount as is customarily maintained by prudent businessmen in the trade of distributing goods comparable to the Company Products. The Dealer shall, upon reasonable request, furnish to the Company copies of all insurance policies evidencing this insurance protection. The insurance policies shall: (a) provide an endorsement to the policy naming the Company as an additional insured party; (b) contain an endorsement requiring that, at minimum, thirty (30) days written notice be given to the Company prior to cancellation or expiration of the policy; and (c) otherwise provide adequate protection for the Company, for and against any and all claims, demands, causes of action or damages, including attorneys' fees, arising from the Dealer's sale, distribution, warranties (express or implied) and warranty service, uses and advertisement of the Company Products, regardless of when such claims may have been made or when the

2

underlying injuries occurred or were manifested. The Dealer's insurance coverage shall not contain exclusion clauses (i.e., barring cross-claims, cross-suits) which would preclude the Company, as an additional insured, from instituting causes of action against other insureds, or otherwise limit the Company's protections as an additional insured. In the event the Dealer's insurer issues notice of cancellation for the failure to pay insurance premium and the Dealer has not obtained replacement insurance coverage prior to the effective date of such cancellation, the Dealer's insurance policy must offer the Company the independent right but not obligation to: (a) pay the outstanding insurance premium to retain insurance coverage for the benefit of the Company, to the extent and in the amounts specified herein, and charge the expense incurred to the Dealer. If the Dealer fails to provide appropriate insurance coverage, the Company may in its sole discretion terminate this Distribution Agreement upon notice, but without a right to cure.

(m) Prior to the effective date of this Distribution Agreement, certificates issued by the Dealer's insurer(s) shall be provided to the Company, evidencing insurance protection to the extent, and in the amounts, specified herein. These certificates shall detail, at minimum, the amount of insurance, the endorsement evidencing the Company as an the additional insured, the policy number, the date of expiration, and an endorsement that the Company shall receive thirty (30) days written notice prior to termination, reduction or material modification of the coverage. The certificates shall bear an inked or stamped signature. Facsimile or photocopied certificates will not be acceptable. Certificates also shall be timely furnished to the Company upon all renewals of the Dealer's insurance. In the event the Dealer has not provided the required certificate(s) of insurance, the Company shall have the independent right but not the obligation to: (a) remit payment for the insurance coverage for the benefit of the Company, to the extent and in the amounts specified herein, and charge the expense incurred to the Dealer; or (b) terminate this Distribution Agreement upon notice, but without a right to cure.

(n) Purchase from the Company, or from its designated finance company, those Company Products which were leased in the Territory in transactions originated by the Dealer or in which the Dealer participated, such repurchase to be on terms and conditions acceptable to the Company.

(o) Promptly advise the Company of all problems and claims involving Company Products of which Dealer becomes aware, and fully assist the Company in any investigations or responses which the Company may undertake, direct or request.

(p) Dealer acknowledges the Company's right to sell or lease products to national accounts in the territory. Dealer agrees to support such sales or leases as requested from time to time by the Company. The Company agrees to compensate Dealer for such support in an amount determined by and under the sole discretion of the Company.

(q) Dealer shall, at its own expense, purchase parts, sales and e-commerce software programs recommended by the Company for the express purposes of good communication with the Company.

(r) Dealer agrees to subscribe, at its own expense, to an e-mail provider for the purposes of communicating with the Company.

(s) As an authorized dealer of Company Products, Dealer agrees that it will set up, adjust and inspect all equipment before delivery. Dealer shall deliver the equipment face-to-face to the owner. Dealer shall personally and face-to-face hand the owner the Owner's Manual including safety instructions and warranty and personally direct the owner to:

   a) The proper operation procedures and instructions as explained in the Owner's Manual;

   b) The importance of safety precautions, safety equipment and preventative maintenance as explained in the Owner's Manual;

   c) The warning decals on the equipment; and

   d) The warranty terms and conditions.

## 6.  WARRANTY

The Company warranty shall be as set forth in the current Company Warranty Policy and Procedure, as furnished to Dealer from time to time by the Company. THE COMPANY MAKES NO REPRESENTATION OR WARRANTY OF ANY OTHER KIND, EXPRESS OR IMPLIED, WITH RESPECT TO THE COMPANY PRODUCTS, WHETHER AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR ANY OTHER MATTER. THE REMEDIES SET FORTH IN SUCH WARRANTY SHALL BE THE ONLY REMEDIES AVAILABLE TO ANY PERSON. Neither Dealer nor any other person shall have authority to bind the Company to any other representation or warranty. Dealer shall indemnify the Company for all losses, damages, liabilities or expenses (including but not limited to reasonable attorneys' fees and litigation costs) to which the Company may be put as a result of any claim under said warranty by reason of any defect caused by any act or omission of Dealer, its employees or agents, or as a result of any claim based upon a different warranty given or purported to be given by Dealer, its employees or agents. Dealer agrees to comply with all its obligations set forth in the Company Warranty Policy and Procedure and section 5(e) of this agreement

## 7.  TRADEMARKS AND TRADENAMES

(a) The Company hereby authorizes Dealer to use the trade names and trademarks listed on Exhibit A hereto (the "Trademarks"), in the manner described in the following sentence in connection with, and only in connection with, the promotion, advertising, merchandising, selling, distribution and servicing of Company Products pursuant to this Agreement. Dealer may use the designation "Authorized E-Z-GO Dealer" following or preceding its own name, and may use the Trademarks in any lawful way in advertising or promotional materials it may prepare for the sole purpose of identifying Dealer and identifying the Company Products being offered for sale. Dealer shall not use any Trademark as part of its company or business name and, if applicable, shall immediately amend such name to exclude such Trademark. Dealer shall supply the Company with advance copies or samples of all sales literature or other advertising, merchandising or promotional materials proposed to be distributed with respect to Company Products. Such sales literature and materials shall not be distributed without the prior approval of the Company, which approval shall not be unreasonably withheld. (b) Dealer hereby acknowledges the sole and exclusive right and title of the Company in and to the Trademarks and the exclusive right of the Company to use the same, and agrees that it shall not at any time, whether during or after the term of this Agreement, directly or indirectly, question, oppose, dispute or attack the same or the exclusive ownership thereof by the Company, or become a party, directly or indirectly, to any proceeding disputing the validity or tending to impair the value thereof or the exclusive title of the Company thereto. Dealer explicitly agrees that it shall not use, file or register any trademark or trade name which consists of or includes the word "E-Z-GO" or "Cushman", or any word or words similar thereto and that it shall not file, register or use any of the Trademarks in any manner without the prior written consent of the Company.

(c) Dealer shall not, whether during or after the term of this Agreement, sell or offer to sell any Company Product without the "E-Z-GO" or "Cushman" trademark(s) affixed and clearly visible.

(d) Upon termination of this Agreement for any reason, the authorization hereby granted to Dealer shall automatically terminate, and Dealer shall discontinue immediately any and all use of the Trademarks. In connection therewith, the Dealer will promptly cause all listings in telephone, building, city or other directories and all stationery, advertisements, bill heads and other written material bearing said Trademarks to be destroyed, and thereafter will not use as a mark or trade name or otherwise any of the Trademarks or any other word or words similar thereto or susceptible of being confused therewith, or represent in any manner that it is in any way connected or associated with the Company. Dealer will forthwith, upon request, do all acts and execute all documents as the Company may deem necessary or desirable to accomplish the foregoing and to relinquish and assign to the Company any and all rights and interests it may have acquired in said Trademarks by the terms of or as a result of this Agreement. Recognizing the importance of the Trademarks to the Company and the irreparable damage to the Company as a result of use thereof in contravention of this Agreement, Dealer hereby consents to any equitable relief sought by the Company to enforce the provisions of this paragraph.

## 8.  CERTAIN REPORTS

(a) Upon request, but not more often than once per quarter, Dealer will furnish to Company a detailed inventory of Company Products on hand and complete information with respect to sales and leases of Company Products (including names of customers and lessees).

(b) The Company and Dealer recognize that the Company has a special interest in the financial stability of Dealer. Within 60 days after the end of each fiscal year, the Dealer shall furnish to the Company a balance sheet as of the end of such fiscal year and statements of income and surplus of such fiscal year prepared in accordance with generally accepted accounting principles applied on a consistent basis and certified by a firm or certified

public accountants. If the Company in good faith deems itself insecure as to its receipt of the purchase price for Company Products when and as due, it may require Dealer to furnish such unaudited financial statements and other financial information as it may reasonably request, all to be certified as complete and accurate by Dealer's chief financial officer.

(c) Dealer shall furnish to the Company monthly sales and marketing reports (including forecasts) in the form specified by the Company. Dealer shall furnish to the Company, upon request, such additional written reports as the Company in good faith believes will be of assistance to it in evaluating the market in the Territory or Dealer's performance under this Agreement. These reports shall be in the form specified by the Company.

(d) Dealer shall give the Company written notice at least fourteen days prior to (i) any sale or other transfer, not in the ordinary course of Dealer's business, or entering into any agreement to do the same, of any substantial portion of its assets used in connection with its distribution of Company Products, or (ii) the sale or other transfer of control by the holder or holders of any controlling equity interest in Dealer over the right to vote such equity interest, or entering into any agreement to do the same. Such notice shall identify the proposed purchaser(s) and shall be accompanied by a copy of the proposed agreement (if any) or, if there is none in writing, a complete description of the terms and conditions of the proposed transaction. Any sale or other transfer of such assets or equity interest, or any agreement to do so, which is entered into without the Company's prior written consent shall constitute a material breach of this Agreement. Further, Dealer shall promptly notify the Company of any changes in Dealer's executive, marketing or service management and the reasons for such change.

## 9. DUTIES OF THE COMPANY

Except as otherwise expressly provided herein, the duties of the Company shall be limited to the following:

(a) The Company shall make available to Dealer parts catalogs, service manuals, current servicing information and such service training as the Company reasonably deems necessary to qualify Dealer to its employees for the servicing of Company Products through Dealer's own service department. The time, place and frequency of service training will be determined by the Company.

(b) The Company shall conduct annual sales reviews, individually and in groups, and at its election, may provide display and promotional facilities at national trade shows and other trade exhibits as the Company deems necessary.

## 10. INDEPENDENT CONTRACTOR

Dealer shall be deemed for all purposes to be an independent contractor, and shall not be deemed to be an agent, employee, partner, joint venture or franchisee of the Company. Accordingly, Dealer shall have the sole right to control the manner in which it performs its duties under this Agreement, subject to no control by the Company except as otherwise expressly provided in this Agreement, and shall not be entitled to any assistance from the Company with respect to the performance of such duties except as otherwise expressly provided in this Agreement. Dealer shall be solely responsible for all of its costs and expenses in any way relating to this Agreement and for the profitability of its business. Dealer shall have no authority to act on behalf of the Company or to bind or obligate the Company in any way in dealing with any customer or other person or entity, and Dealer shall not claim or imply that it has any such authority. Dealer shall indemnify and hold the Company harmless from and against all claims, damages, losses, liabilities, costs and expenses (including but not limited to reasonable attorneys' fees and legal expenses) which may arise relating to any action or conduct, or failure to act, by Dealer or its agents which was not authorized in writing by an authorized officer of the Company.

## 11. CONFIDENTIAL INFORMATION

The Dealer acknowledges that the Company has communicated, disclosed and confided and will communicate, disclose and confide to the Dealer valuable know-how and technical information with respect to Company Products and the servicing thereof, as well as promotion and advertising know-how and sales and merchandising information, (including names of existing or prospective customers), which Dealer agrees is of substantial value to the Company's business. The Dealer undertakes and agrees to maintain

such know-how and information confidentially, to not disclose it to any other party during or after the term of this Agreement, and to cause its employees, officers, directors, agents and shareholders or partners to comply with the foregoing restrictions.

## 12. TERM AND TERMINATION

(a) This Agreement, unless sooner terminated as provided herein, shall remain in effect for a period of two (2) years from the date hereof. Neither party has the right, express or implied, to renew or continue this Agreement. The parties may continue the relationship of manufacturer and independent Dealer only by mutual execution of a new agreement or a letter agreement adopting some or all of the terms and conditions set forth herein. Dealer and the Company each acknowledge by signing this Agreement that neither has any obligation or duty to give notice to the other party of the non-renewal of this Agreement. In the event that the Company continues to accept orders for Company Products from the Dealer after the termination of this Agreement, such acceptance of orders shall neither constitute a renewal of this Agreement nor shall it prevent the Company, at its option, from refusing to accept subsequent orders from the Dealer or from changing a price different from its normal Dealer price.

(b) If any of the following events occur the Company may, at its option, upon ten days' written notice immediately terminate this Agreement, except that no notice shall be required as to Section 12(b)(i), Section 12(b)(iii) or Section 19:

(i) The Dealer shall become insolvent or Dealer or its accountants shall indicate that a substantial doubt exists as to the ability of Dealer to continue as a going concern, or, Dealer shall file or have filed against it a petition in bankruptcy or for an arrangement or a reorganization, or shall be adjudicated a bankrupt, or shall make a general assignment for the benefit of creditors, or if a receiver or trustee shall be appointed for its property, or if a petition for dissolution or for an assignment or the reorganization of its affairs is filed by or against it or if it admits in writing its inability to pay its debts as they become due or becomes insolvent if otherwise evidenced; or

(ii) There shall be any material adverse change in the financial position of the Dealer which the Company in good faith believes will impair its prospect of receiving timely and full payment for Company Products from the Dealer; or

(iii) In recognition of the fact that this Agreement has been entered into based on a careful examination of the personal skills, reputation and ability of Dealer's current management, ownership and control, there shall be any change in Dealer's management, ownership or control to which Company has not, in its sole discretion, consented or the Dealer shall cease to do business; or

(iv) The Dealer shall breach or be in default under any provision of this Agreement or

(v) The Dealer shall fail to pay any affiliate of the Company any amount due under or pursuant to any other agreement within five days after such amount becomes due and payable; or

(vi) If based upon Dealer performance, the Company determines that Dealer is not likely to be able to achieve the annual objectives as set forth in Exhibit A.

(c) In the event of any material breach by the Company of any of the provisions of this Agreement on its part to be kept and performed, where the same does not arise from causes beyond the Company's control, the Dealer may at its option terminate this Agreement upon giving ten days' prior written notice to the Company.

(d) Either party may terminate this Agreement without cause upon 90 days' prior written notice to the other.

(e) Termination or expiration of this Agreement shall in no way alter the right of the Company to receive payment of all amounts due to it under this Agreement or otherwise, and to have recourse to any remedy permitted by this Agreement or applicable law.

(f) Upon termination or expiration of this Agreement for any reason whatsoever, (i) all rights and privileges granted Dealer hereunder shall forthwith cease and terminate, and (ii) the Company shall have the option, at its sole discretion, exercisable by notifying Dealer within thirty (30) days after such expiration or the effective date of such termination, whichever is later, to repurchase Dealer's inventory of then-current-model new, unused and undamaged Company Products (other than parts) at Dealer's cost less freight to the Company of any of then-current parts (as determined by Company) parts at Dealer's cost less freight

and fifteen percent restocking charge. Company will evaluate demonstrator Company Products and offer to repurchase them at a price determined by Company. Dealer shall carefully pack and box, at its own expense, such parts to be reacquired by the Company or returned to the Company pursuant to this paragraph as the Company may direct. Company Products repurchased shall be delivered to the Company F.O.B. the Company's facilities at Augusta, Georgia, or such other location designated in writing by the Company. Dealer shall furnish to the Company, in form and substance satisfactory to the Company, a bill of sale of all Company Products reacquired by the Company pursuant to this paragraph, together with evidence satisfactory to the Company that Dealer has complied with all applicable bulk sales laws and that such Company Products are free and clear of all claims, liens and encumbrances except those in favor of the Company. If the Company does not repurchase all of the Company Products owned by Dealer upon any such termination or expiration, then Dealer may sell or lease the balance of any such Company Products on hand in any manner it deems appropriate.

(g) Within 90 days after termination or expiration of this Agreement, Dealer shall assign and transfer to the Company such unfilled orders and contracts, together with any advance payments thereon, for the purchase of Company Products from Dealer as the Company may elect to accept. On orders so assigned and accepted, the Company shall reimburse Dealer for its out-of-pocket expenses in procuring such orders to the extent such expenses do not exceed 10% of Dealer's cost for the Company Products covered by such order. The Company may, at its sole discretion, cancel any Dealer orders for Dealer which provide for delivery of Company Products after the expiration or the effective date of termination of this Agreement.

### 13. NO LIABILITY FOR EXPIRATION OR TERMINATION

Neither the Company nor Dealer shall by reason of the expiration or termination of this Agreement in accordance with its terms be liable to the other for compensation, reimbursement or damages of any kind relating to such expiration or termination, whether on account of expenditures, investments, losses or commitments in connection with the business or good will of the Company or Dealer, or otherwise. Nothing in this section shall excuse the payment by Company or Dealer of any charges incurred prior to the date of expiration or termination.

### 14. FORCE MAJEURE

The Company shall not be liable to any person for failure to perform any of its obligations under this Agreement when the failure is caused in whole or in part by the occurrence of any contingency beyond the control of the Company, including but not limited to war (whether an actual declaration thereof is made or not) or hostility; sabotage, insurrection, riot or other act of civil disobedience, crime, tort or other unlawful act; act of a public enemy; failure or delay in transportation; act of any government or any agency, subdivision or branch thereof; judicial action; strike or other labor dispute; accident, fire, explosion, flood, storm or other act of God; shortage of labor, fuel, materials or machinery, or technical failure; or delay or failure to perform by any supplier. In the event of a shortage of Company Products which makes it impossible or impracticable for the Company to fill all orders from all of its customers in the quantities and within the time period originally agreed upon, the Company will allocate its available Company Products in any manner it deems reasonable.

### 15. NOTICES

All notices and other communications required or permitted under this Agreement shall be in writing (including a writing delivered by facsimile transmission) and shall be deemed to have been duly given (a) when delivered, if sent by registered, certified or first class mail, (b) when received, if delivered personally or by facsimile, or (c) on the next following business day, if sent by overnight mail or overnight courier, in each case to the recipient at the address designated above (or such other address as shall be specified by like notice) or by facsimile to the Company at (706) 796-4540 and to the Dealer at ( ) _____.

### 16. AGREEMENT NON-EXCLUSIVE

The Dealership created by this Agreement is non-exclusive and the Company reserves full rights to sell at wholesale, retail or otherwise within the Territory, without obligation to Dealer, and the Company assumes no responsibility for sales by others within the Territory.

### 17. EXCLUSIVE FORUM FOR CERTAIN LITIGATION AND CONSENT TO JURISDICTION; CHOICE OF LAW

The parties agree that no action or proceeding may be maintained by Dealer against the Company except either in Georgia State Superior Court for the County of Richmond, or in the United States District Court for the Southern District of Georgia, Augusta Division, and Dealer hereby irrevocably waives any right it may have to commence any action or proceeding against the Company in any other court. Dealer hereby submits to the personal jurisdiction of the aforementioned courts with respect to any claims relating to or arising out of this Agreement or any actions or failures to act related thereto, and irrevocably waives any rights or defenses it may have to the commencement or continuation of an action against it in the aforementioned courts based on lack of personal jurisdiction or improper or inconvenient venue. Dealer hereby further agrees that service of process may be made upon it by certified mail or personal service at the address provided for in Section 15. This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia, exclusive of its conflict of law provisions.

### 18. AWARD OF ATTORNEY'S FEES TO THE COMPANY

In any action or proceeding commenced by or against the Company relating to or arising out of this Agreement, whether such action or proceeding be founded upon contract, tort, statute, regulation or otherwise, the Company shall be entitled to recover from Dealer its costs and expenses (including but not limited to reasonable attorneys' fees) of prosecuting and/or defending any such action or proceeding in which the Company has substantially prevailed. For purposes of this Agreement, the Company shall be considered to have "substantially prevailed" in such action or proceeding if in net recovery therein exceeds that of the Dealer in the same action or proceeding, or, in an action or proceeding in which the Company is the defendant and has asserted no counterclaim against the Dealer, if the Dealer recovers no damages (which for purposes of this section shall not be considered to include costs or attorney' fees or other litigation expenses, even if the same are awarded by statute or other rule of law) from the Company and fails to obtain any equitable relief against the Company.

### 19. COMPLIANCE WITH FOREIGN CORRUPT PRACTICES ACT; THIRD PARTY PAYMENTS

(a) Dealer represents and agrees that it is familiar with the provisions of the U.S. Foreign Corrupt Practices Act and agrees that (i) it will not violate or cause the Company to violate such Act in connection with the sale or distribution of the Company Products and related items, products and/or services, (ii) notwithstanding any other provision of this Agreement to the contrary, the Company may terminate this Agreement forthwith upon learning that Dealer has violated or caused the Company to violate the Foreign Corrupt Practices Act in connection with the sale and/or distribution of Company Products and/or services, and (iii) in the event of termination for such cause, the Company may retain from, or charge to, Dealer an amount equal to the amount to be earned by Dealer in respect of the transaction or matter in which Dealer violated or caused the Company to violate the Foreign Corrupt Practices Act.

(b) Dealer represents that it has not and agrees that it will not in connection with the transactions contemplated by this Agreement, or in connection with any other business transactions involving the Company, make any payment or transfer anything of value, directly or indirectly, (i) to any governmental official or employee (including employees of government corporations), or to any political party or candidate, (ii) to any officer, director, employee or representative of any actual or potential customer of the Company, (iii) to any officer, director or employee of Textron Inc., or any of its affiliates, or (iv) to any other person or entity if such payment or transfer would violate the laws of the country in which made or the laws of the United States. It is the intent of the parties that no payments or transfers of value shall be made which have the purpose or effect of public or commercial bribery, acceptance of or acquiescence in extortion, kickbacks or other unlawful or improper means of obtaining business. This section shall not, however, prohibit normal and customary business entertainment or the giving of business mementos of nominal value.

(c) Dealer acknowledges that it has read the Textron Business Conduct Guidelines dated March 1997 or the latest revision (the "Guidelines", supplied with this contract and additionally located at www.xxxx.com resources/links) and is familiar with the same. In connection therewith, Dealer agrees to perform under this Agreement within the intent that underlies

the Guidelines generally and to comply specifically with the Guidelines relating to "Relationships With Other Parties" as they apply to Dealer.

## 20. NO FRANCHISE CREATED

Dealer acknowledges that this Agreement does not create nor constitute a franchise. Dealer has not paid to, nor been charged by, the Company any consideration which would constitute a franchise fee, including any payment for the right to sell Company Products or for use of trade names and trademarks as described in Section 7. Notwithstanding anything herein to the contrary, Dealer hereby waives, to the extent permitted by law, the application of any law governing or controlling a "franchise". In the event any such waiver is deemed ineffective, then the only such franchise law which shall be considered for application shall be the applicable law of the State of Georgia.

## 21. MISCELLANEOUS

(a) Dealer shall not assign, transfer or sell all or any part of its rights or obligations under this Agreement without the prior written consent of the Company. Any attempt to do so without such prior written consent shall be wholly void and without effect. This Agreement shall be binding upon and insure to the benefit of the successors and assigns of the Company and the permitted successors and assigns of Dealer.

(b) The prices and terms and conditions of sale regarding Dealer's resale of Company Products to its own customers shall be exclusively under the control of Dealer, and the Company shall have no right to control, nor shall it attempt to control, such prices or terms and conditions of resale.

(c) In the event any part of this Agreement is held by the final order of any court, tribunal or administrative agency having jurisdiction over this Agreement or the subject matter hereof to be invalid, contrary to the law or public policy, or otherwise unenforceable, such part or parts shall be severed here from and shall not affect any other part or parts of this Agreement.

(d) The Company shall not be liable to Dealer for special, incidental, consequential, punitive or other extraordinary damages of any description in connection with any breach of this Agreement.

(e) This Agreement shall supersede and make inoperative as of this date any oral or written sales agency, Dealership or similar agreement heretofore entered into between the parties hereto with respect to the Company Products. Except for any other agreement granting a security interest to the Company, this Agreement contains the entire agreement between the parties as to the subject matter hereof, and no modifications or waiver of any of the provisions hereof, nor any representation, promise or addition hereto, or waiver of any breach hereof, shall be binding upon either party unless made in writing and signed by the party to be charged thereby. No waiver of any particular breach shall be deemed to apply to any other breach, whether prior or subsequent to the waiver. Notwithstanding anything to the contrary, any amendment executed on or after the date hereof in writing and signed by both parties shall be deemed to be part of this Agreement.

6

# EXHIBIT A AND AMENDMENT

EXHIBIT A

1. The following products manufactured by the Company are covered by this Agreement:

## 2005 MARKETING OBJECTIVE

| | | |
|---|---|---|
| Fleet   Electric ( *0* )   Gas ( *0* ) | | |
| Turf   *1* | | |
| Commercial   *1* | | |
| Individual   *18* | | |
| Trail (ST)   *11* | | |
| Parts   *30,000* | | |
| Used   *200* | | |

2. The Dealer's "Territory" as referenced in Section 1 is:
   See attached exhibit

3. The "Trademarks" referenced in Section 7 are: E-Z-GO Textron, E-Z-GO, Medalist™, TXT™, PowerWise™, QuietDrive™, DuraShield™, E-Z-GO Shuttle™, Refresher™, Workhorse™, ST-350™, ST-480™.

AMENDMENT

Sections 5(j)-(m) Indemnification and Insurance

Objectives for the 2006 Marketing Year (January 1-December 31, 2006) will be sent to dealers for approval prior to January 1, 2006.

IN WITNESS WHEREOF, the Company and Dealer have caused this Agreement to be duly executed as of the day and year first above written.

In the Presence of:

By _____

Witness for E-Z-GO Division of Textron Inc.

By _____

Witness for Dealer

E-Z-GO Division of Textron Inc.

_____

For the President
 South Central Products, Inc. dba GFL - Golf Products
Dealership Name

_____

Dealer Signature and Title

# Exhibit 2

**TEXTRON**

Textron Inc.
40 Westminster Street
Providence, RI 02903
John A. Rapp
Assistant General Counsel

Tel: (401) 421-2800
www.textron.com

Direct: (401) 457-3674
Fax: (401) 457-3696
Email: jrapp@textron.com

January 31, 2006

**VIA OVERNIGHT DELIVERY**

Mr. Wayne Brock
Golf for Less
10401 Maumelle Boulevard
North Little Rock, AR 72113

Dear Mr. Brock:

I am an Assistant General Counsel with Textron Inc., writing on behalf of the E-Z-GO Division of Textron.

You are an authorized Dealer for E-Z-GO golf cars and other products, in accordance with a current and ongoing contractual agreement with E-Z-GO. E-Z-GO has been advised that your Dealership is offering for sale golf cars and related vehicles from the Fairplay product lines, sold under the Fairplay and/or Player brand names.

E-Z-GO recently brought suit against the distributor of these products, Fairplay Electric Cars LLC, stating that Fairplay has copied protected aspects of E-Z-GO's vehicles, including the Company's patented designs.

On January 24, 2006, the United States District Court for the Southern District of Georgia entered an Order enjoining and restraining Fairplay Electric Cars, LLC from making, assembling, importing, marketing, selling, or leasing the two-seater versions of Fairplay's Fleet and Legacy Model Golf Cars, or any equivalent car, in the United States. The Order remains in effect until February 6, 2006, at which time E-Z-GO will seek to extend the Order pending the resolution of the lawsuit. A copy of the Order can be obtained by contacting me at the address and telephone number noted.

The Court found preliminarily that the sale and offer for sale of these Fairplay vehicles infringes E-Z-GO's legal and intellectual property protections. If, therefore, these vehicles are sold by E-Z-GO Dealers, the Dealer's actions may constitute a breach of the Dealer's contractual agreement with the Company. This will permit E-Z-GO to invoke the Company's remedial rights in the Dealer Contract, which can include termination and compensation for damages.

I am writing to you as an authorized E-Z-GO Dealer, to bring this situation to your attention so that your Dealership remains in compliance with its contractual obligations to E-Z-GO, and to ensure that you do not inadvertently participate in the Court-restricted sale or offer for sale of Fairplay vehicles.

If you have any questions on this Court Order and/or your sale of Fairplay products, please do not hesitate to contact me directly (401/457-3674), or Kevin Holleran (706/771-4672), Mike Parkhurst (706/772-5980) or Bill Robson (706/792-5846) at E-Z-GO.

E-Z-GO greatly appreciates your cooperation in this regard. Thank you.

Very truly yours,

John A. Rupp
Assistant General Counsel
Textron Inc.

cc: Kevin Holleran - E-Z-GO Division of Textron Inc.
Michael Parkhurst – E-Z-GO Division of Textron Inc.
William Robson – E-Z-GO Division of Textron Inc.

EXHIBIT B

## TEXTRON

Textron Inc.
40 Westminster Street
Providence, RI 02903
John A. Rupp
Assistant General Counsel

Tel: (401) 421-2800
www.textron.com

Direct: (401) 457-3674
Fax: (401) 457-3696
Email: jrupp@textron.com

January 31, 2006

VIA OVERNIGHT DELIVERY

Mr. Wayne Brook
Golf for Less
10401 Maumelle Boulevard
North Little Rock, AR 72113

Dear Mr. Brook:

I am an Assistant General Counsel with Textron Inc., writing on behalf of the E-Z-GO Division of Textron.

You are an authorized Dealer for E-Z-GO golf cars and other products, in accordance with a current and ongoing contractual agreement with E-Z-GO. E-Z-GO has been advised that your Dealership is offering for sale golf cars and related vehicles from the Fairplay product lines, sold under the Fairplay and/or Player brand names.

E-Z-GO recently brought suit against the distributor of these products, Fairplay Electric Cars LLC, stating that Fairplay has copied protected aspects of E-Z-GO's vehicles, including the Company's patented designs.

On January 24, 2006, the United States District Court for the Southern District of Georgia entered an Order enjoining and restraining Fairplay Electric Cars, LLC from making, assembling, importing, marketing, selling, or leasing the two-seater versions of Fairplay's Fleet and Legacy Model Golf Cars, or any equivalent car, in the United States. The Order remains in effect until February 6, 2006, at which time E-Z-GO will seek to extend the Order pending the resolution of the lawsuit. A copy of the Order can be obtained by contacting me at the address and telephone number noted.

The Court found preliminarily that the sale and offer for sale of these Fairplay vehicles infringes E-Z-GO's legal and intellectual property protections. If, therefore, these vehicles are sold by E-Z-GO Dealers, the Dealer's actions may constitute a breach of the Dealer's contractual agreement with the Company. This will permit E-Z-GO to invoke the Company's remedial rights in the Dealer Contract, which can include termination and compensation for damages.

I am writing to you as an authorized E-Z-GO Dealer, to bring this situation to your attention so that your Dealership remains in compliance with its contractual obligations to E-Z-GO, and to ensure that you do not inadvertently participate in the Court-restricted sale or offer for sale of Fairplay vehicles.

If you have any questions on this Court Order and/or your sale of Fairplay products, please do not hesitate to contact me directly (401/457-3674), or Kevin Holleran (706/771-4672), Mike Parkhurst (706/772-5980) or Bill Robson (706/792-5846) at E-Z-GO.

E-Z-GO greatly appreciates your cooperation in this regard. Thank you.

Very truly yours,

John A. Rupp
Assistant General Counsel
Textron Inc.

cc:    Kevin Holleran - E-Z-GO Division of Textron Inc.
       Michael Parkhurst – E-Z-GO Division of Textron Inc.
       William Robson – E-Z-GO Division of Textron Inc.

EXHIBIT C

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

2006 JAN 24 PM 2:50

CLERK 174
SO. DIST. OF GA.

TEXTRON INNOVATIONS, INC.,          *
and E-Z GO (a division of          *
TEXTRON, INC.),                    *
                                   *
        Plaintiffs,                *
                                   *
    v.                             *          CV 106-009
                                   *
FAIRPLAY ELECTRIC CARS, LLC,       *
                                   *
        Defendant.                 *

O R D E R

        Presently before the Court in this captioned matter is
Plaintiffs' motion for a preliminary injunction to enjoin
Defendant from infringing Plaintiffs' United States Design
Patent No. 369,762. (Doc. No. 3.) Upon consideration of the
evidence and the parties' written and oral arguments, the
Court orally expressed findings of fact and conclusions of law
into the record at the conclusion of the hearing held
yesterday on this matter.

        Based upon those findings of fact and conclusions of law,
IT IS HEREBY ORDERED that Defendant Fairplay Electric Cars,
LLC,[1] is enjoined and restrained within the United States of

_____
    [1] Pursuant to Federal Rule of Civil Procedure 65(d), this
injunction is binding upon Defendant's officers, agents,
servants, employees, and attorneys, and any person in active
concert or participation with them who receive actual notice

Jan-24-06   08:46pm   From-USDC Aug   7069484400   T-301   P 002/003   F-573

America from making, assembling, importing, marketing, selling, or leasing the two-seater versions of Defendant's Fleet and Legacy Model Golf Cars, or any equivalent golf car.

This Order shall remain in effect until February 6, 2006, however, the expiration date of this Order will be extended if Defendant does not file its opposition to this injunction and arrange for another hearing by the close of business, on February 6, 2006.

ORDER ENTERED at Augusta, Georgia, this 24th day of January, 2006.

_(signature)_

UNITED STATES DISTRICT JUDGE

of this Order, by personal service or otherwise.

2

**CERTIFICATE OF SERVICE**

The undersigned counsel certifies that, on April 25, 2006, he electronically filed the

foregoing REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION TO

DISMISS, TRANSFER OR STAY SECOND-FILED DECLARATORY JUDGMENT ACTION

with the Clerk of the Court using CM/ECF, which will send automatic notification of the filing

to the following:

> Richard L. Horwitz
> David E. Moore
> Potter Anderson & Corroon LLP
> Hercules Plaza, 6th Floor
> 1313 N. Market Street
> Wilmington, Delaware 19899-0951

Edmond D. Johnson (#2257)

623874v1